-cr-00043-SPF   Document 36-13 Filed in USDC ND/OK on 04/13/09   Pa

# HARVARD

# LAW REVIEW.

VOL. XII.                JANUARY 25, 1899.                NO. 6

## THE STATUS OF OUR NEW TERRITORIES.[1]

WHAT extent of territory do the United States of America comprise? In order to answer this question intelligently, it is necessary to ascertain the meaning of the term "United States."

First. — It is the collective name of the States which are united together by and under the Constitution of the United States; and, prior to the adoption of that Constitution, and subsequently to the Declaration of Independence, it was the collective name of the thirteen States which made that Declaration, and which, from the time of the adoption of the Articles of Confederation to that of the adoption of the Constitution, were united together by and under the former. This, moreover, is the original, natural, and literal meaning of the term. Between the time of the first meeting of the Continental Congress, and that of the Declaration of Independence, the term "United Colonies" came into general use,[2] and, upon in-

---

[1] The following article was already planned, and in part written, when the writer first learned of Mr. Randolph's intention to furnish an article on the same general subject for the January number of this Review. While, therefore, the writer desires to acknowledge the material assistance which he has derived from Mr. Randolph's article, he entirely disclaims any intention to answer it, or to criticise it.

[2] It first occurs in the Journal of the Continental Congress, under date of June 7, 1775, vol. I. (ed. of 1777), p. 114 ["Resolved, that Thursday, the 20th of July next, be observed throughout the twelve United Colonies, as a day of humiliation, fasting, and prayer"]; and, from that time to the date of the Declaration of Independence, its use is very frequent. It occurs three times in the commission issued to Washington as commander-in-chief (p. 122), six times in the articles of war (pp. 133, 137, 138, 139, 140), and twice in the Declaration of the United Colonies of North America, under date of July 6, 1775, setting forth the causes and necessity of their taking up arms

dependence being declared, as the thirteen colonies became the thirteen States, the term was of course changed to "United States." In the Declaration of Independence both terms are used.[1] When the Articles of Confederation were framed, "United States of America" was declared to be the name and style of the confederation created by those articles.[2] This, however, had no other effect than to confirm the existing practice, and to increase the use of the term in the sense which it had already acquired; and accordingly, during the whole period of the Confederation, "United States" meant the same as "the thirteen United States," and the primary reason for using either term was to save the necessity of enumerating the thirteen States by name.

Indeed, the Articles of Confederation were merely an agreement between the thirteen States in their corporate capacity, or, more correctly, an agreement by each of the thirteen States with all the others. There were, therefore, thirteen parties to the confederation, and no more, and the people of the different States as individuals had directly no relations with it. Accordingly, it was the States in their corporate capacity that voted in the Continental Congress, and not the individual members of the Congress; and hence the voting power of a State did not at all depend upon the number of its delegates in Congress, and in fact each State was left to determine for itself, within certain limits, how many delegates it would send.[3] Hence also each State had the same voting power.[4] Even the style of the Continental Congress was "The United States in

---

(pp. 143, 145). Sometimes the number of United Colonies was specified, and sometimes it was not. The colony of Georgia did not unite with the other twelve, and so was not represented by delegates in Congress, until the thirteenth of September, 1775 (p. 197). Prior to that date, therefore, the term used was either the United Colonies, or the twelve United Colonies, while after that date it was either the United Colonies, or the thirteen United Colonies.

While this term was making its way to the front, it had a competitor (which was even earlier in the field), in the term "Continent" or "Continental," which was also much used during the war of the Revolution. Perhaps an attentive study of the Journal of Congress would show that "Continent" or "Continental" was not precisely synonymous with United Colonies or United States, but it certainly was very nearly so.

[1] "United Colonies" is used once, namely, in the concluding paragraph, and "United States" is used twice, namely, in the title and in the concluding paragraph.

[2] Art. 1.

[3] By the fifth article of Confederation, no State was to be represented by less than two delegates, nor by more than seven.

[4] Namely, each State had one vote.   (Fifth Article of Confederation.)

Congress assembled," — not (as the present style would suggest) "The Delegates of the United States in Congress assembled"; and if the style had been "The Thirteen United States in Congress assembled," the meaning would have been precisely the same.

Evidence to the same effect, as to the sense in which the term "United States" was used prior to the time of the adoption of the Constitution, is furnished by the treaties made during the period of the Confederation. Thus, the Treaty of Alliance made with France, February 6, 1778, begins:[1] "The Most Christian King and the United States of North America, namely, New Hampshire," etc. (enumerating the thirteen States). So the Treaty of Amity and Commerce, made with France the same day, begins:[2] "The Most Christian King and the thirteen United States of North America, New Hampshire," etc. So the Treaty of Amity and Commerce made with Holland, October 8, 1782, begins:[3] "Their High Mightinesses, the States-General of the United Netherlands, and the United States of America, namely, New Hampshire," etc. So the Treaty of Amity and Commerce made with Sweden, April 3, 1783, begins:[4] "The King of Sweden and the thirteen United States of North America, namely, New Hampshire," etc. Lastly, the Definitive Treaty of Peace with England, September 3, 1783, by which our independence was established, after a recital, proceeds thus:[5] "Art. 1. His Britannic Majesty acknowledges the said United States, namely, New Hampshire, &c., to be free, sovereign, and independent States; that he treats with them as such; and relinquishes all claims to the government, propriety, and territorial rights."

With the adoption of the Constitution there came a great change; for the Constitution was not an agreement, but a law, — a law, too, superior to all other laws, coming as it did from the ultimate source of all laws, namely, the people, and being expressly declared by them to be the supreme law of the land.[6] At the same time, however, it neither destroyed nor consolidated the States, nor even affected their integrity; and, though it was established by the people of the United States; yet it was not established by them as one people, nor was its establishment a single act; but, on the contrary, its establishment in each State was the act of

---

[1] 8 U. S. Stats. 6.      [2] Page 12.

[3] Page 32.      [4] Page 60.

[5] Page 80.      [6] Art. 6, sect. 2.

the people of that State; and if the people of any State had finally refused to ratify and adopt it, the consequence would have been that that State would have ceased to be one of the United States. Indeed, the Constitution and the Articles of Confederation differ from each other, in respect to the source of their authority, in one particular only, namely, that, while the former proceeded from the people of each State, the latter proceeded from the Legislature of each State. In respect to their effect and operation also, the two instruments differ from each other in one particular only, namely, that, while the Articles of Confederation merely imposed an obligation upon each State, in its corporate and sovereign capacity, in favor of the twelve other States, the Constitution binds as a law, not each *State*, but all persons and property in each State. These differences, moreover, fundamental and important as they undoubtedly are, do not, nor does either of them, at all affect either the meaning or the use of the term "United States"; and, therefore, the conclusion is that the meaning which that term had the day after Independence was declared, it still retains, and that this is its natural and literal meaning.

Regarded, then, as simply the collective name of all the States, do the United States comprise territory? Directly, they certainly do not; indirectly, they do comprise the territory of the forty-five States, and no more. That they comprise this territory only indirectly, appears from the fact that such territory will always be identical with the territory of all the States in the aggregate, — will increase as that increases, and diminish as that diminishes.

Secondly. — Since the adoption of the Constitution, the term "United States" has been the name of a sovereign, and that sovereign occupies a position analogous to that of the personal sovereigns of most European countries. Indeed, the analogy between them is closer, at least in one respect, than at first sight appears; for a natural person who is also a sovereign has two personalities, one natural, the other artificial and legal, and it is the latter that is sovereign. It is as true, therefore, of England (for example) as it is of this country, that her sovereign is an artificial and legal person (*i. e.*, a body politic and corporate), and, therefore, never dies. The difference between the two sovereigns is, that, while the former consists of a single person, the latter consists of many persons, each of whom is a member of the body politic. In short, while the former is a corporation sole, the latter is a corporation aggregate.

Who, then, are those persons of whom the United States as a body politic consists, and who constitute its members? Clearly they must be either the States in their corporate capacity, *i. e.*, artificial and legal persons, or the citizens of all the States in the aggregate; and it is not difficult to see that they are the former. Indeed, the latter do not form a political unit for any purpose. The citizens of each State form the body politic of that State, and the States form the body politic of the United States. The latter, therefore, consisted at first of the original thirteen States, just as the Confederation did; but, as often as a new State was admitted, a new member was received into the body politic, — which, therefore, now consists of forty-five members. It will be seen, therefore, that, while the United States, in its second sense, signifies the body politic created by the Constitution, in its first sense it signifies the members of that body politic in the aggregate. A consequence is that, while in its first sense the term "United States" is always plural, in its second sense it is in strictness always singular.

The State of New York furnishes a good illustration of the two senses in which the term "United States" is used under the Constitution; for the style of that State, as a body politic, is "The People of the State of New York," and the members of that body politic are the citizens of the State. The term "people," therefore, in that State, means, first, all the citizens of the State in the aggregate (*i. e.*, the members of the body politic), and, secondly, the body politic itself; and while in the former sense it is plural, in the latter sense it is singular.

The term "United States" is used in its second sense whenever it is used for the purpose of expressing legal or political relations between the United States and the particular States, or between the former and foreign sovereigns or states, or legal relations between the former and private persons, while it is used in its first and original sense whenever it is desired to designate the particular States collectively, either as such or as members of the body politic of the United States. It is also used in that sense whenever it is used to designate the territory of all the States in the aggregate.

As a substitute for the term "United States," when used in its second sense, the term "Union" is often employed. The original difference between "United States" and "Union" was that, while the former was concrete, the latter was abstract; and hence it is

*HARVARD LAW REVIEW.*

that the latter cannot be substituted for the former when used in its original sense.[1]

When used in its second sense, it is plain that the term "United States" has no reference to extent of territory, either directly or indirectly. Regarded as a body politic, the United States may and does own territory, and may be and is a sovereign over territory, but to speak of its constituting or comprising territory would be no less absurd than to predicate the same thing of a personal sovereign, though the absurdity would be less obvious.

Thirdly. — Since the treaty with England of September 3, 1783, the term "United States" has often been used to designate all territory over which the sovereignty of the United States extended. The occasion for so using the term could not of course arise until the United States acquired the sovereignty over territory outside the limits of any State, and they first acquired such territory by the treaty just referred to. For, although, as has been said, that treaty was made with each of the thirteen States, yet, in fixing the boundaries, the thirteen States were treated as constituting one country, England not being interested in the question how that country should be divided among the several States. Moreover, the boundaries established by the treaty embraced a considerable amount of territory in the Northwest to which no State had any separate claim, and which, therefore, belonged to the United States; and the territory thus acquired was enlarged from time to time by cessions from different States, until at length it embraced the entire region within the limits of the treaty, and west of Pennsylvania, Virginia, North Carolina, and Georgia, as the western boundaries of those States were afterwards established, with the exception of the territory now constituting the State of Kentucky. Then followed in succession the acquisitions from France, Spain, Texas, and Mexico. Out of all the territory thus acquired, twenty-eight great States have been from time to time carved; and yet there has never been a time, since the date of the treaty before referred to, when the United States had not a considerable amount of territory outside the limits of any State.

---

[1] The term "Union" is used three times in the Constitution, namely, in Art. 1, sect. 8, subsect. 15 [Congress shall have power "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions"]; in Art. 2, sect. 3 [the President "shall from time to time give to the Congress information of the state of the Union," &c.]; and in Art. 4, sect. 3, subsect. 1 ["new States may be admitted by the Congress into this Union"].

It is plain, therefore, that for one hundred and fifteen years there has been more or less need of some word or term by which to designate as well the Territories of the United States as the States themselves; and such word or term ought, moreover, to have been one signifying directly not territory, but sovereignty, sovereignty being the only thing that can be predicated alike of States and Territories. The same need was long since felt by England as well as by other European countries, and the word "empire" was adopted to satisfy it; and perhaps we should have adopted the same word, if we had felt the need of a new word or term more strongly. Two peculiarities have, however, hitherto characterized the territory held by the United States outside the limits of any State: first, such territory has been virtually a wilderness; secondly, it has been looked upon merely as material out of which new States were to be carved just as soon as there was sufficient population to warrant the taking of such a step; and hence the need of a single term which would embrace territories as well as States has not been greatly felt. At all events, no such new term has been adopted; and hence "United States" is the only term we have had to designate collectively either the States alone, or the States and Territories; and accordingly, while it has always been used for the former of these two purposes, it has also frequently been used for the latter.

It is very important, however, to understand that the use of the term "United States" to designate all territory over which the United States is sovereign, is, like the similar use of the word "empire" in England and other European countries, purely conventional; and that it has, therefore, no legal or constitutional significance. Indeed, this use of the term has no connection whatever with the Constitution of the United States, and the occasion for it would have been precisely the same if the Articles of Confederation had remained in force to the present day, assuming that, in other respects, our history had been what it has been.

The conclusion, therefore, is that, while the term "United States" has three meanings, only the first and second of these are known to the Constitution; and that is equivalent to saying that the Constitution of the United States as such does not extend beyond the limits of the States which are united by and under it, — a proposition the truth of which will, it is believed, be placed beyond doubt by an examination of the instances in which the term "United States" is used in the Constitution.

*HARVARD LAW REVIEW.*

Its use first occurs in the preamble,[1] in which it is used twice. The first time it is plainly used in its original sense, *i. e.*, as the collective name of the States which should adopt it. If the words had been "We, the people of the thirteen[2] United States respectively," the sense in which "United States" was used would have been precisely the same. Nor is there any doubt that it is used in the same sense at the end of the preamble. Of course there is a very strong presumption that when a constitution is made by a sovereign people, it is made exclusively for the country inhabited by that people, and exclusively for that people regarded as a body politic, and so having perpetual succession; and the same thing is true, *mutatis mutandis*, of a constitution made by the people of several sovereign States united together for that purpose. The preamble, however, does not leave it to presumption to determine for what regions of country and what people the Constitution of the United States was made; for it expressly declares that its purposes and objects are, first, to form a more perfect union (*i. e.*, among the thirteen States, or as many of them as shall adopt it). Then follow four other objects which, though in terms indefinite as to their territorial scope, are by clear implication limited to the same States;[3] and lastly its purpose and object are

---

[1] "We the People of the United States, in order to form a more perfect Union, establish justice, insure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of Liberty to ourselves and our posterity, do ordain and establish this Constitution for the United States of America."

[2] To have stated the number of States in the preamble would, however, have been inconvenient, because it was uncertain, when the Constitution was framed, how many States would adopt it. It was provided by Art. 7 that, as soon as it was adopted by nine States, it should become binding upon the States adopting it, nine being within a fraction of three-fourths of the whole, and the assent of nine States having been required by the Articles of Confederation for the doing of all acts of prime importance. (See Art. 9, last paragraph but one, and Arts. 10 and 11.) In fact, only eleven States participated in the first election of Washington as President, and only that number was represented in Congress during the first session of the first Congress.

[3] Moreover, the usage of the times furnishes positive proof that the terms "common defence" and "general welfare" were used in the preamble with exclusive reference to the thirteen States; for the words "common" and "general" were familiarly used to distinguish what concerned the United States from what concerned the several States as such, and that too at a time when "United States" could not possibly mean anything else than the thirteen United States. Thus, the 3d Article of Confederation provides as follows: "The said States hereby severally enter into a firm league of friendship with each other, for their 'common' defence, the security of their liberties, and their mutual and 'general' welfare." So also the 5th Article contains the following: "For the more convenient management of the 'general' interest of the United States, delegates shall be annually appointed . . . to meet in Congress." So also in

declared to be to secure the blessings of liberty to the people by whom it is ordained and established, and their successors; for, though the word used is "posterity," it is clearly not used with literal accuracy, but in the sense of "successors." According to the preamble, therefore, the Constitution is limited to the thirteen States which were united under the Articles of Confederation; and it is by virtue of Art. 4, sect. 3, subsect. 1,[1] and in spite of the preamble, that new States have been admitted upon an equal footing with the original thirteen.

In the phrases, "Congress of the United States,"[2] "Senate of the United States,"[3] "President of the United States," or "Vice President of the United States,"[4] "office under the United States,"[5] "officers of the United States,"[6] "on the credit of the United States,"[7] "securities and current coins of the United States,"[8] "service of the United States,"[9] "government of the United States,"[10] "granted by the United States,"[11] "Treasury of the United States,"[12] "Constitution of the United States,"[13] "army and navy of the United States,"[14] "offences against the United States,"[15] "judicial power of the United States,"[16] "laws of the United States,"[17] "controversies to which the United States shall be a party,"[18] "treason against the United States,"[19] "territory or other property belonging to the

the 7th Article are the words: "When land forces are raised by any State for the 'common' defence," etc. So in the 8th Article are the words: "All charges of war, and all other expenses that shall be incurred for the 'common' defence or 'general' welfare, and allowed by the United States in Congress assembled, shall be defrayed out of a 'common' treasury." Lastly, the 9th Article contains the following: "The United States in Congress assembled shall have authority to appoint such other committees and civil officers as may be necessary for managing the 'general' affairs of the United States under their direction."

[1] See *supra*, page 370, note 1.     [2] Art. 1, sect. 1; Art. 1, sect. 2, subsect. 3.

[3] Art. 1, sect. 3, subsect. 1.

[4] Art. 1, sect. 3, subsects. 4, 5, and 6; Art. 2, sect. 1, subsects. 1 and 8; 12th Amendment; 14th Amendment, sect. 2; Art. 1, sect. 7, subsects. 2 and 3.

[5] Art. 1, sect. 3, subsect. 7; Art. 1, sect. 9, subsect. 8; Art. 2, sect. 1, subsect. 2; Art. 6, subsect. 3; 14th Amendment, sect. 3; Art. 1, sect. 6, subsect. 2.

[6] Art. 2, sect. 2, subsect. 2, sect. 3, sect. 4; Art. 6, subsect. 3; 14th Amendment, sect. 3.

[7] Art. 1, sect. 8, subsect. 2.     [8] Art. 1, sect. 8, subsect. 6.

[9] Art. 1, sect. 8, subsect. 16; Art. 2, sect. 2, subsect. 1.

[10] Art. 1, sect. 8, subsects. 17 and 18; Art. 2, sect. 1, subsect. 3; 12th Amendment.

[11] Art. 1, sect. 9, subsect. 8.

[12] Art. 1, sect. 10, subsect. 2; Art. 1, sect. 6, subsect. 1.

[13] Art. 2, sect. 1, subsect. 8; 14th Amendment, sect. 3.

[14] Art. 2, sect. 2, subsect. 1.     [15] Art. 2, sect. 2, subsect. 1.

[16] Art. 3, sect. 1; 11th Amendment.

[17] Art. 3, sect. 2, subsect. 1; Art. 6, subsect. 2.

[18] Art. 3, sect. 2, subsect. 1.     [19] Art. 3, sect. 3, subsect. 1.

United States," [1] "claims of the United States," [2] "the United States shall guarantee," [3] "shall be valid against the United States," [4] "under the authority of the United States," [5] "court of the United States," [6] "delegated to the United States," [7] "public debt of the United States," [8] "insurrection or rebellion against the United States," [9] "shall not be denied or abridged by the United States," [10] "neither the United States nor any State shall assume or pay," [11] the term "United States" is used in its second sense.[12] It seems also to be used in the same sense in the phrase, "citizen of the United States;" [13] for it is only as a unit, a body politic, and a sovereign, that the United States can have citizens, — not as the collective name of forty-five States. In the phrase, "common

---

[1] Art. 4, sect. 3, subsect. 2.                    [2] Art. 4, sect. 3, subsect. 2.
[3] Art. 3, sect. 4.                               [4] Art. 6, subsect. 1.
[5] Art. 6, subsect. 2.                            [6] 7th Amendment.
[7] 10th Amendment.                               [8] 14th Amendment, sect. 4.
[9] 14th Amendment, sect. 4.                       [10] 15th Amendment.
[11] 14th Amendment, sect. 4.

[12] As the second sense in which the term "United States" is used in the Constitution had no existence prior to the time of the adoption of the Constitution, it follows that, whenever the Articles of Confederation use the term in such phrases as any of those enumerated above or in similar phrases, they use it (as they do in all cases) in its original sense. Instances will be found in Art. 4 ["no imposition, duties, or restriction shall be laid by any State on the property of the United States or either of them"], Art. 5 ["nor shall any delegate hold any office under the United States," etc.], Art. 6 ["nor shall any person holding any office of profit or trust under the United States or any of them accept of any present," etc.], Art. 9 ["no State shall be deprived of territory for the benefit of the United States;" "nor ascertain the sums and expenditures necessary for the defence and welfare of the United States or any of them;" "in the service of the United States;" "Congress of the United States;" "on the credit of the United States;" "at the expense of the United States"], Art. 11 ["Canada acceding to this confederation, and joining in the measures of the United States, shall be admitted into, and entitled to all the advantages of, this Union"], Art. 12 ["shall be deemed and considered as a charge against the United States, for payment and satisfaction whereof the said United States and the public faith are hereby solemnly pledged"], and Art. 13 ["Congress of the United States"].

In most cases, however, in which the term "United States," in its second sense, or the term "Congress" or "Congress of the United States," would be used in the Constitution, the phrase "United States in Congress assembled" is used in the Articles of Confederation. That phrase occurs in those articles a great number of times, and, whenever it occurs, "United States" is used in its original sense. This is clearly brought out by the following words in Art. 5: "Each State shall maintain its own delegates in any meeting of the States;" also by the following words in Art. 10: "the voice of nine States in the Congress of the United States assembled;" and also by the following words in Art. 12: "before the assembling of the United States [not the delegates of the United States] in pursuance of the present confederation."

[13] Art. 1, sect. 2, subsect. 2; Art. 1, sect. 3, subsect. 3; Art. 2, sect. 1, subsect. 5; 14th Amendment, sects. 1 and 2; 15th Amendment, sect. 1.

cr-00043-SPF Document 36-13 Filed in USDC ND/OK on 04/13/09 Pa

defence and general welfare of the United States,"[1] it seems to be used in its first or original sense, especially as "common defence" and "general welfare" are taken from the preamble.[2] Certainly there is no pretence for saying it is used in its third sense. In the phrase, "throughout the United States,"[3] there is believed to be no doubt that it is used in its original sense,[4] though it may be claimed that it is used in its third sense.[5] That it is used in its original sense in one instance is certain;[6] and when the same phrase is used in different parts of the Constitution, a strong presumption arises that it is always used in the same sense.

In the phrase, "resident within the United States,"[7] there can be no doubt that "United States" is used in its original sense, the meaning being the same as if the words had been, "resident in one or more of the United States."

The phrase, "one of the United States," affords a good instance of the use of "United States" in its original sense.[8]

In the phrase, "shall not receive any other emolument from the United States or any of them,"[9] it is certain that "United States" is used in its second sense, though it is also certain that the draughtsman supposed he was using it in its original sense.[10]

---

[1] Art. 1, sect. 8, subsect. 1.

[2] See *supra*, page 372, and notes 1 and 3.

[3] Art. 1, sect. 8, subsects. 1 and 4; Art. 2, sect. 1, subsect. 3.

[4] It has been seen (*supra*, p. 365, n. 2) that the first time the term "United Colonies" occurs in the Journal of Congress, it is in the phrase, "throughout the twelve United Colonies." The phrase, "throughout the United States" is also used in two instances in the 9th Article of Confederation ["the United States in Congress assembled shall have the sole and exclusive right and power of fixing the standard of weights and measures throughout the United States . . . establishing or regulating Post Offices *from one State to another* throughout all the United States"], in neither of which can it possibly have any other meaning than throughout the thirteen United States. Can any reason then be given for supposing that the authors of the Constitution attached a wholly different meaning to the same phrase, namely, "throughout all the territory within the sovereignty of the United States"? It is believed that there cannot; and yet the question depends entirely upon intention. For the reader should bear in mind the fact that, while the term "United States" may have its second meaning in the Constitution, though it was previously used in the same phrase with its original meaning (and that, too, without any change of intention), it cannot, in the Constitution or elsewhere, have its third meaning, in a phrase in which it had previously had its first meaning, without a corresponding change of intention.

[5] See *infra*, page 381.

[6] Art. 2, sect. 1, subsect. 4 ["The Congress may determine the time of choosing the electors, and the day on which they shall give their votes; which day shall be the same throughout the United States"].

[7] Art. 2, sect. 1, subsect. 5.

[8] Art. 2, sect. 1, subsect. 7.

[9] 11th Amendment.

[10] At page 374, note 12, will be found an extract from the 4th Article of Confedera-

In the phrase, "all persons born or naturalized in the United States,"[1] it seems clear that "United States" is used in its original sense; for, first, it is either used in that sense or in its third sense, and, as the latter is not a constitutional or legal sense, there is a presumption that the term is not used in that sense in an amendment of the Constitution; secondly, it is declared that the same persons shall be citizens of the State in which they reside, and this shows that the authors of the amendment contemplated only States, for, if they had contemplated Territories as well, they certainly would have said "citizens of the State or Territory in which they reside"; thirdly, the whole of the 14th Amendment had reference exclusively to the then late war, and was designed to secure its results, — in particular to secure to persons of African descent certain political rights, and to take from the States respectively in which they might reside the power to deprive them of those rights. Moreover, the amendment consists mainly of prohibitions, and these are all (with a single exception which need not be mentioned) aimed exclusively against the States. It was no part of the object of the amendment to restrain the power of Congress (which its authors did not distrust), and hence there was no practical reason for extending its operation to Territories, in which all the power resided in Congress. What is the true meaning of "United States" in the phrase under consideration is certainly a question of great moment, for on its answer depends the question whether all persons hereafter born in any of our recently acquired islands will be by birth citizens of the United States.

The foregoing comprise all the instances but one in which the term "United States" is used either in the original Constitution,

---

tion, in which occurs the phrase, "the United States or either of them," and also an extract from the 6th Article, in which occurs the phrase, "the United States or any of them;" and, while these phrases are perfectly correct where they stand, yet a transfer to the Constitution of the passages containing them would have made the same phrases incorrect, as such transfer would have changed the meaning of "United States." On the other hand, a transfer to the Constitution of an extract in the same note from Art. 9, containing the same phrase, would, it seems, have caused no change in the meaning of "United States," and hence the phrase in question would have been correct, notwithstanding such transfer.

[1] 14th Amendment, sect. 1: ["All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."]

or in any of its amendments. The other instance is found in the 13th Amendment,[1] — in which "United States" is plainly used in its original sense, if the words which follow it are to have any meaning; and yet, if the authors of that amendment had understood that the term "United States," when used in the Constitution to express extent of territory, had its third meaning, they would have omitted the words, "or any place subject to their jurisdiction."

If a broader view be taken of the Constitution and its amendments, it will be found that the only portions of it which indicate the slightest intention to extend their operation beyond the limits of the States, are the clause authorizing the admission of new States,[2] the clause providing for the government of territories,[3] and the 13th Amendment.

The Constitution of the United States, like other constitutions, is mainly occupied with the creation and organization of the three great departments of government, — the legislative, the executive, and the judicial. Accordingly, the first three articles, comprising about six-sevenths of the whole, are entirely occupied with these three departments respectively. The last three sections of Art. 1 (namely, the 8th, 9th, and 10th Sections) are, however, peculiar to the Constitution of the United States as a federal constitution, and will, therefore, be excluded from view for the present. Of the remainder of Art. 1, and of the whole of Arts. 2 and 3, it may be affirmed that not one word in either has any reference or any application to any territory outside the limits of the States. As to Arts. 1 and 2, the correctness of this view has never been questioned, and, as to Art. 3, its correctness is established by the uniform practice of the legislative department[4] of the govern-

---

[1] ["Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction."]

[2] See *supra*, page 370, note 1.

[3] Art. 4, sect. 3, subsect. 2.

[4] For example, the entire judicial power in the Territories has always been vested by Congress in one set of courts, regardless of the dual system which exists in all the States by virtue of Art. 3 of the Constitution. Moreover, these courts have always been termed Territorial courts (not United States courts), and have always been so regarded; the statutes by which they have been created and governed are wholly separate and distinct from those creating and governing the courts of the United States within the States; their judges have generally held office only for a term of four years, whereas all judges appointed under Art. 3 of the Constitution hold office during good behavior; and originally there was no appeal from any Territorial court to the Supreme Court.

ment, and by a uniform course of decisions in the judicial department.[1]

A distinction must, however, be made between those articles of the Constitution by which the several departments of the government were respectively created and organized, and those departments themselves; for the reasoning which is applicable to the former is not necessarily applicable to the latter, nor is the same reasoning necessarily applicable to all of the latter. It does not follow, because a department of the government is created and organized by the Constitution with reference solely to a given territory, that, therefore, the power of that department and its sphere of action are limited to that territory. It may or may not be true, and it may be true of one department, and not true of another department. In fact, it is true of the judicial department, but it is not true of either the legislative or the executive department. How is it, then, that one of these three departments can differ so materially from the other two, when no such difference is indicated by the Constitution, which created and organized them all? It is because the difference depends, not upon the Constitution, but upon the nature of the departments themselves. The legislative and executive departments are sovereign in their nature, and, therefore, their power and sphere of action are co-extensive with the sovereignty of the United States, of which sovereignty they constitute the vital part, — of which, in fact, they constitute all that has been delegated. It is by them alone that the sovereignty of the United States can, without changing or overthrowing the present Constitution, either speak or act, *i. e.*, either declare its will, or execute that will when declared. The judicial department, on the other hand, is not the depositary of any portion of the sovereign power; its function is simply to judge; it cannot even enforce its own judgments; without the support of both the legislative and executive departments it could have no existence, other than theoretical, since the latter alone can appoint judges, and the former alone can provide them with salaries. It is true that the judicial department sometimes disregards what the legislative department has declared to be the sovereign will; but that is not because of the nature of the judicial office, — it is rather in spite

---

[1] Seré *v.* Pitot, 6 Cr. 332; Am. Ins. Co. *v.* Canter, 1 Pet. 511; Benner *v.* Porter, 9 How. 235; Clinton *v.* Englebrecht, 13 Wall. 434; Reynolds *v.* U. S., 98 U. S. 145; The City of Panama, 101 U. S. 453; McAllister *v.* U. S., 141 U. S. 174.

of it; it is not because it is the function of the judicial depart-
ment to sit in judgment upon the action of the legislative depart-
ment, but because the judicial department has held that it cannot
do otherwise than disregard an act of the legislative department
which is in violation of the Constitution, without itself incurring
the guilt of violating the Constitution, and also (it may be added)
because the legislative department and the people have acquiesced
in that view.

While, therefore, the power of the legislative and executive de-
partments is co-extensive with the sovereignty, the judicial depart-
ment can exercise only such jurisdiction as has been delegated to
it; and hence its jurisdiction would still be limited to the original
thirteen States, had not the Constitution provided for the admission
of new States.

There is, therefore, no room for any question as to where either
the legislative, the executive, or the judicial power in our new ter-
ritories resides; for the legislative power clearly resides in the
Congress of the United States, and the executive power in the
President of the United States; and the power of establishing
the judicial department also resides in Congress, though Congress
cannot itself exercise the power belonging to that department. In
the legislative and executive departments, therefore, is vested all
the sovereign power in our new territories that has been delegated
by the people; and the real question is in what character, and sub-
ject to what limitations, if any, do they hold this power. Does Con-
gress (for example) hold the legislative power there as it does in the
States, *i. e.*, subject to all the limitations and restrictions imposed
by the Constitution; or does it hold that power in the new terri-
tories without any other limitation than that imposed by the
13th Amendment, namely, that it shall not establish slavery in
any of them; or does the truth lie somewhere between these two
extremes? And this brings us to the question whether the limita-
tions and restrictions imposed upon Congress by the Constitution
are operative outside the States. These limitations and restrictions
are found chiefly in the 8th and 9th sections of Art. 1, and in the
first ten Amendments.

The 8th Section of Art. 1 owes its existence entirely to the fact
that the Constitution of the United States, while it is a true consti-
tution, and creates a true sovereign, is yet a federal constitution.
By it the people of each State vested a portion of the sovereignty

of that State in the new sovereign created by the Constitution, *i. e.,* they made a partition of the sovereignty of the State between the State and the United States, and the 8th section of Art. 1 contains that partition. The mode of making it was by granting to the new sovereign those branches of sovereignty which are enumerated in the respective subsections of Section 8. That section, therefore, so far as regards its main object and scope, can have no application to any territory beyond the limits of the several States, for no partition was to be made of the sovereignty over any such territory. A strong presumption, therefore, arises that no part of the section was intended to extend beyond the limits of the States, as it cannot be supposed that any incidental objects were intended to have a more extensive operation than the main object.

What were the incidental objects of the section? One was to provide security that the United States, in exercising those branches of sovereignty which had been granted to it, should treat all the States alike; for, if no such security were provided, a majority of States might at any time combine to oppress a minority. Accordingly, subsection 1 having granted to Congress the power "to lay and collect taxes, duties, imposts, and excises," it is added "but all duties, imposts, and excises shall be uniform throughout the United States." So, also, subsection 4 grants to Congress the power to establish an "uniform" rule of naturalization, and "uniform" laws on the subject of bankruptcies "throughout the United States." Reasons have already been given for believing that the term "United States," in both these subsections, is used in its original sense; and we now find another argument, in favor of the same view, in the scope and object of Section 8. As it would be absurd to hold that the grant of power in these subsections had any reference to territories as distinguished from States, since Congress has full legislative powers in the territories without any grant from the States, so it would be absurd to hold that the limitation of the power has a more extensive operation than the power itself. Moreover, if all other arguments fail, it is at least true that those subsections contain nothing whatever to overthrow the presumption in favor of their being limited in their operation to the States.

There is a *dictum* by Chief Justice Marshall, in Loughborough *v.* Blake,[1] which is opposed to the view insisted upon in this article.

---

[1] 5 Wheat. 317.

It is, however, only a *dictum*, as the learned Chief Justice himself admits. The circumstances of the case were these. Jan. 9, 1815, Congress passed an Act[1] laying an annual direct tax of $6,000,000 upon the United States, which sum it proceeded to apportion among the eighteen then existing States. Feb. 27, 1815, Congress passed another Act,[2] which in effect extended the first Act to the District of Columbia. The plaintiff having refused to pay his share of the tax imposed upon the District by the second Act, claiming that the Act was unconstitutional, his property was seized, and he brought trespass against the officer making the seizure. The plaintiff's claim admitted of a very short answer, namely, that by Art. 1 of the Constitution, Section 8, subsection 17, Congress had all the power within the District that it had in any State *plus* the power of the legislature of that State, and, therefore, had an unqualified power of taxation. Still, the Chief Justice thought it desirable (for what reason is not very apparent) to show that Congress also had the power to impose the tax under the same grants of power by which it was authorized to pass the first Act. Accordingly, he said, first, the power given to Congress to lay and collect taxes was in terms without limitation as to place; secondly, the power to lay and collect taxes had the same extent as to place as the power to lay and collect duties, imposts, and excises; thirdly, the latter power was required to be exercised uniformly throughout the United States, and it could not be so exercised unless it extended throughout the United States; and this brought him to the question, what was meant by "United States" in the phrase, "throughout the United States." "Does this term," said he,[3] "designate the whole or any particular portion of the American Empire? Certainly this question can admit of but one answer. It is the name given to our great republic, which is composed of States and Territories. The District of Columbia, or the territory west of the Missouri, is not less within the United States than Maryland or Pennsylvania." If this *dictum* be taken as simply giving one of the meanings of the term "United States," and without reference to the Constitution, its correctness cannot be questioned; but it seems not to have occurred to its learned author that, while the meaning which he attributed to the term was one of its meanings, it had other meanings also;

---

[1] C. 21, 3 Stats. 164.     [2] C. 60, 3 Stats. 216.
[3] 5 Wheat. 319.

that it had been used in another sense in the first [1] of the two Acts of Congress which gave rise to the litigation in question, and that his argument, therefore, required him to show that the meaning which he attributed to the term, rather than one of the others, was its true meaning in the clause of the Constitution upon which he was commenting.

Perhaps it will not be thought unreasonable to place against the *dictum* in question the *dictum* of Webster in another case,[2] also decided by Chief Justice Marshall. It is true that he was arguing for a client; but then it was not his habit, even as counsel, to state propositions of law which he did not believe to be true, and the truth of which he was not prepared to maintain. He said:[3] "What is Florida? It is no part of the United States. How can it be? How is it represented? Do the laws of the United States reach Florida? Not unless by particular provisions. The Territory and all within it are to be governed by the acquiring power, except where there are reservations by the treaty. . . . Florida was to be governed by Congress as she thought proper. What has Congress done? She might have done anything, — she might have refused a trial by jury, and refused a legislature. . . . Does the law establishing the court at Key West come within the restrictions of the Constitution of the United States? If the Constitution does not extend over this territory, the law cannot be inconsistent with the national Constitution." It may be added that the decision was in Webster's favor, that not a word was said by the Chief Justice in disapproval of the passage just quoted, that Loughborough *v.* Blake was not cited either by counsel or judge, that it has seldom been cited by any member of the court by which it was decided, and that the *dictum* under consideration has, it is believed, never been so cited.

One other observation may be made upon Loughborough *v.* Blake, namely, that the District of Columbia differs materially from a Territory, that the former is within the limits of a State, was once a part of a State, and, therefore, the Constitution once

---

[1] Which enacts (sect. 1) "that a direct tax of $6,000,000 be and is hereby annually laid upon the United States, and the same shall be and is hereby apportioned to the States respectively in manner following: To the State of New Hampshire $193,586.74," etc. (enumerating the eighteen then existing States). Plainly, therefore, "United States" is here used in its original sense.

[2] Am. Ins. Co. *v.* Canter, 1 Pet. 511.          [3] 1 Pet. 538.

extended over it; and it may not be easy to show that it has ever ceased to extend over it.

The object of the 9th Section of Art. 1 is to prohibit Congress from doing certain things which it would otherwise have had the power to do under the several grants in the 8th section.  Its object was, therefore, the same as that of the limitations contained in Section 8, and hence it would be as irrational to give Section 9 a more extensive operation, in respect to territory, than Section 8 has as it would be to give to the limitations upon the power of Congress imposed by Section 8 upon the grants contained in that section a more extensive operation than the grants themselves have.

An examination of the different subsections of Section 9 (other than subsection 1, which, having ceased to be operative, may be passed over) will lead to the same conclusion.  Thus, subsection 2 provides that the writ of *Habeas Corpus* shall not be suspended, except under special circumstances; subsection 3, that no bill of attainder or *ex post facto* law shall be passed; subsection 4, that all "capitation or other direct" taxes which shall be laid shall be apportioned among the States according to the respective numbers of their inhabitants, *i. e.*, shall neither be laid upon property without reference to State lines, nor apportioned among the States according to their property;[1] subsection 5, that no tax or duty shall be laid on articles exported *from any State;* subsection 6, that no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another, and that no vessel bound to or from one State shall be obliged to enter, clear, or pay duties in another; subsection 7, that no money shall be drawn from the Treasury but in consequence of appropriations made by law, and a regular statement and account of the receipts and expenditures of all public money shall be published from time to time; and subsection 8, that no title of nobility shall be granted by the United States, and that no person holding any office of trust or profit under them shall accept of any present, emolument, office, or title from any King, Prince, or foreign State.

Of these seven subsections, no one discloses any intention to make it operative over a greater extent of territory than any of the others, and it must, therefore, be assumed that the intention was,

---

[1] By Article 8 of the Confederation, the amount of money required by Congress to be raised, from time to time, was to be apportioned among the States according to the aggregate value of the land in the States respectively, exclusive of crown lands.

in that respect, the same as to all; and hence it follows that they must all receive the same construction, in respect to the extent of territory over which they shall be operative, at least so far as their construction in that respect depends upon intention. Moreover, subsections 5 and 6 show conclusively upon their face that they are to be operative only within the States, and subsection 4 shows the same intention with sufficient clearness. Subsection 4 has also the same *raison d'être* as the limitations in subsections 1 and 4 of Section 8, *i. e.,* it was designed to secure a minority of wealthy States against the risk of having the whole burden of government thrown upon them by the less wealthy majority; and, therefore, it is absurd to suppose that it was intended to be operative in territories, — which were never to have any voice in Congress, and as to which, therefore, no such precaution was necessary.

Subsection 8 of Section 9 is more doubtful as to the territorial extent of its operation than any other part of the Constitution, — not because of any intention that can be justly attributed to its authors, but because of the language in which it happens to be couched. Thus, it provides in effect, that no title of nobility shall ever be granted by the United States as a sovereign, and that no person holding office under the sovereignty of the United States shall accept any present, etc. Fortunately, however, this subsection is of little importance, and any doubt that may exist as to its true construction, as it arises from accident, can have no influence upon the construction of other parts of the Constitution.

In respect to the first ten Amendments of the Constitution, it seems scarcely necessary to say more than to refer briefly to the circumstances under which they were adopted. They were proposed by the first Congress and at its first session, and were a concession to the party which had opposed the adoption of the Constitution, and which had thus far prevented its ratification by two of the States, namely, Rhode Island and North Carolina. Some of the States also which had ratified it, had done so only because they had been induced to believe that it would be amended at the earliest opportunity.

In respect to the nature and objects of the amendments adopted, it may be said that they are in the nature of a bill of rights, *i. e.,* they were designed still further to limit and restrict the powers of the new government under the grants contained in the first three articles of the Constitution, and especially those contained in the

8th section of Art. 1. It would be very surprising, therefore, if they should disclose any intention to extend their operation beyond the limits of the States; and in fact they do not disclose any such intention. If any doubt exists as to the extent of territory over which any of them are operative, it is only as to the 1st Amendment,[1] and it arises, not from any doubt as to the intention of its authors, but from the same cause as in subsection 8 of Section 9 of Art. 1. As to the remaining first ten Amendments, the utmost that can be said against the view now urged is that the language in which they are couched is so broad and general as to make them susceptible of an indefinite extension in respect to territory; but that is far from being sufficient to overcome the presumption which exists in favor of their being limited to the States. Moreover, it is as true of the first ten Amendments as it is of the 9th Section of Art. 1, that the intention of their authors was the same as to all of them, so far as regards the extent of territory over which they were to be operative; and yet it is certain that some of them are limited in their operation to the States. Thus, the 6th Amendment provides that all criminal trials shall be by a jury of the "State and district" in which the crime shall have been committed;[2] and by "district" is here meant either an entire State or a subdivision of a State. So the 7th Amendment perpetuates the right to trial by jury in common-law actions, and declares that no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law. It is assumed, therefore, that the common law of England will be the law of the land in every place where this amendment will be operative. Moreover, the operation of the amendment is expressly limited to courts of the United States, *i. e.,* courts exercising some portion of the judicial power conferred upon the United States by Art. 3 of the Constitution; and it is only within the States, as has been seen,[3] that such power can be exercised, or such courts can exist. Lastly, the 10th Amendment provides that the powers not delegated to the United States by the Constitution (*i. e.,* in its first three articles), nor prohibited by it to the States (*i. e.,* in Section 10

---

[1] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

[2] U. S. *v.* Dawson, 15 How. 467.          [3] See *supra,* page 378.

of Art. 1), are reserved to the States respectively or to the people (*i. e.*, the people of the respective States); and there could not well be a stronger proof that the sole object of the first ten amendments was to limit the power of the United States in and over the several States. Nor should the fact be lost sight of that these ten amendments as a whole are so peculiarly and so exclusively English that an immediate and compulsory application of them to ancient and thickly settled Spanish colonies would furnish as striking a proof of our unfitness to govern dependencies, or to deal with alien races, as our bitterest enemies could desire.

It may be added that Art. 3, Section 2, subsection 3, is of the same nature as the first ten Amendments; and yet that subsection is limited, like the 7th Amendment, to the courts of the United States, and so to the several States, and that, too, not only for reasons applicable to the whole of Art. 3, but because it is expressly provided that all trials for crimes shall be held in the State where the crime was committed; and though it is added that, when not committed in any State, the trial shall be at such place as Congress by law directs, yet a crime not committed in a State can come within that subsection only when it is committed on the high seas, or in some place which is without an organized government, and so without the means of administering justice.[1]

It must be admitted that the provisions, both of the original Constitution and of the amendments, securing the right of trial by jury, have several times been subjects of discussion in the Supreme Court, and that opinions have been expressed by members of that court that these provisions extend to Territories. But, in the recent case of the American Publishing Co. *v.* Fisher,[2] the question was treated as still an open one; and though, in the still more recent case of Thompson *v.* Utah,[3] the court professedly decided that the provisions in question extended to the former territory of Utah, yet it seems clear that the question was not involved in the decision. The only question directly involved was whether the clause in the constitution of Utah, providing that persons accused of felonies not capital should be tried by a jury of eight persons, was *ex post facto* as to a felony committed while

---

[1] See U. S. *v.* Jones, 137 U. S. 202; Cook *v.* U. S., 138 U. S. 157, 181. It seems clear also that the Constitution intended that Congress, in directing the place of trial of a crime not committed in any State, should select a place within the limits of some State, as otherwise the trial could not be in a United States court.

[2] 166 U. S. 464.           [3] 170 U. S. 343.

Utah was a territory, and, therefore, inoperative; and that question was decided in the affirmative, and for the reason that the law of the Territory, as it was when the crime was committed, required any person accused of such a crime to be tried by a jury of twelve persons.   But, if such was the law of the Territory, it seems to have been immaterial how it was established, — whether by the Constitution of the United States, or by Act of Congress, or by Act of the territorial legislature; and, in fact, such was the law of the Territory by virtue of an Act of the territorial legislature,[1] and therefore it was not necessary for the accused to invoke the aid of the Constitution of the United States.[2]

It may aid us in determining the status ot our new territories to inquire what their status would be, if the United States, instead of being a confederation of States, were a single State, organized substantially as our several States are, or if it were a monarchy, either absolute or constitutional.

The mere acquisition by one country (A, for example) of the sovereignty over another country (B, for example) produces no other legal effect upon the latter than to give it a new sovereign, and consequently to substitute the legislature and the chief executive of A for those of B; but A and B will still be in strictness foreign to each other, each having its own government, laws, and institutions; and though the legislature and chief executive of each will be the same, yet they will act in an entirely different capacity when acting for B from that in which they act when acting for A.[3]   If any greater change than this is wrought, it will be because A has done something more to B than to acquire the sovereignty over her.   She may do with B whatever she pleases, assuming the sovereignty which she has acquired over her to be absolute.   She may (for example) incorporate B so completely with A that B's own government, institutions, and laws will cease to

---

[1] See 170 U. S. 345.  Moreover, by the Act of Sept. 9, 1850, c. 51, s. 17 (9 Stats. 435, 458), for organizing the Territory of Utah, it was enacted as follows: "The Constitution and laws of the United States are hereby extended over and declared to be in force in said Territory of Utah, so far as the same, or any provision thereof, may be applicable." And though it was not within the power of Congress to extend the Constitution over territory to which it did not extend by its own force, yet Congress could give it the effect of a statute in such territory, and that was the effect of this provision.

[2] In Am. Ins. Co. *v.* Canter, 1 Pet. 511, 538, Webster, *arguendo,* said Congress had the power to refuse trial by jury to the Territory of Florida.  See *supra,* page 382.

[3] Hence, no statute made by the legislature of A as such will affect B, unless it expressly declare that it shall extend to B.  See *supra,* page 382.

exist, and even she herself will cease to exist as a separate country; or A may keep the two countries entirely separate and distinct, and yet reduce the inhabitants of B to a condition of servitude. But if B be incorporated with A, or the inhabitants of B be reduced to a condition of servitude, it will not be because of the acquisition by A of the sovereignty over B, but because of the action taken by A consequent upon the acquisition of such sovereignty. If, indeed, A have a written constitution, by which her government was created and organized, and under which it acts, and the powers of such government are subject to limitations imposed by the constitution, and such limitations are made by the constitution to apply to all future acquisitions of territory, and so are applicable to B, of course it will follow that the government of A will be subject to the same limitations when acting for B as when acting for A; and A can get rid of these limitations, in respect either to herself or B, only by changing or overthrowing her constitution.

Does, then, the fact that the United States is a confederation of States make any difference? It is conceived that it makes no difference whatever as to the foregoing principles; but it does suggest two observations which affect their application: first, that, as all the limitations imposed upon the United States by the Constitution have reference primarily to the States, and owe their existence primarily to the fact that the sovereignty over the territory of each State is divided between the State and the United States, there is a strong presumption that such limitations have no application to territory which is subject to no State sovereignty, and in which the United States can exercise all the power which can be exercised within a State either by the State or by the United States; secondly, that there is but one known mode of incorporating newly acquired territory into the United States, namely, by admitting it as a State.

Much confusion of ideas has been caused as to the effect of the acquisition of new territory by the United States, by the constant use of the word "annexation," — a word which has no constitutional or legal meaning. It first came into general use in connection with the agitation for and against the acquisition of Texas. Whether its use was by design or accident may not be certain. The acquisition of Texas was peculiar in this, namely, that it was the first instance (as it is still the only instance) of the acquisition of foreign territory by admitting it as a State. For this reason, the

cr-00043-SPF   Document 36-13 Filed in USDC ND/OK on 04/13/09   Pa

word "admission" may have been thought objectionable, that word
having become associated with the practice of admitting as States
territory already within the sovereignty of the United States.   The
acquisition of Texas was peculiar also in another respect, namely,
that it was the acquisition of an independent State with her own
consent.   In this respect, the case of Hawaii is similar to that of
Texas; and this may account for the fact that Hawaii was acquired
by the process (so called) of annexation.[1]   But, however this may
be, the mode in which Hawaii was acquired, does not at all affect
her *status* when acquired, nor make it different from that of the
Spanish islands which have been acquired by conquest and by
treaty with Spain.

What has been the practice of Congress in respect to those
branches of legislation which the Constitution[2] requires to be uni-
form throughout the United States, and does such practice indicate
that Congress has held itself bound by the Constitution to make
such legislation uniform throughout all territory within the sover-
eignty of the United States?   First, the undoubted fact that there
has been hitherto no want of uniformity in the taxes, duties, im-
posts, and excises laid and collected by Congress, nor in the rules
of naturalization, or the laws on the subject of bankruptcies, estab-
lished by Congress, proves nothing; for there has not hitherto been
the slightest reason why legislation upon each of these subjects
should not be uniform throughout all the territory over which it
extended; nor have there been even two opinions upon the ques-
tion.   Secondly, the earliest legislation respecting duties upon
imports and tonnage[3] was limited in its operation to the States.
This, however, may not have involved any constitutional question,
as it did not follow that there was to be "free trade" between the
territories and foreign countries, but rather that foreign goods
could not enter the territories at all, for want of any ports of entry.[4]

---

[1] Another point of similarity between Texas and Hawaii is, that both were acquired
by joint resolution.   The resolution of March 1, 1845, by which Texas was acquired (5
Stats. 797) is entitled, "Joint Resolution for annexing Texas to the United States;"
but neither the verb "annex," nor the noun "annexation," occurs in the resolution itself.
The resolution of July 7, 1898, by which Hawaii was acquired, is entitled, "Joint Reso-
lution to provide for annexing the Hawaiian Islands to the United States;" and the
resolution itself declares "that the said Hawaiian Islands and their dependencies be,
and they are hereby annexed as a part of the territory of the United States, and are
subject to the sovereign dominion thereof."

[2] Art. 1, sec. 8, subsects. 1 and 4.

[3] Acts of July 31, 1789, ch. 5 (1 Stats. 29), and Aug. 4, 1790, ch. 57 (1 Stats. 145).

[4] There was, however, early legislation imposing excise duties, and this was also

*HARVARD LAW REVIEW.*

The earliest legislation respecting naturalization [1] and bankruptcy [2] was also limited in its operation to the States; and it seems that this was in violation of the Constitution, if "United States," as used in Art. 1, Section 8, subsection 4, includes the territories; for a consequence was that no person residing in a territory could be naturalized, and that neither any debtor residing in a territory, nor the creditors of any such debtor, could have the benefit of the bankrupt law.  Thirdly, all naturalization acts except the first, and all bankrupt acts except the first, have been extended to the territories, but it by no means follows that Congress regarded itself as bound by the Constitution so to extend them.  So also the Act of March 2, 1799,[3] to regulate the collection of duties on imports and tonnage, was extended to the then existing territories, *i. e.*, the latter were divided into collection districts; and this is true also of all similar acts which have since been passed, and of all territories which have since been acquired; and, if Congress had not taken this course, it must have either prohibited the importation of foreign goods into territories, or it must have admitted all foreign goods free of duty, or it must have established for the territories a revenue system of their own.  Moreover, there were many reasons in favor of the course adopted, and none in favor of either of the other three:  First, all the different parcels of territory acquired by the United States from time to time (with the unimportant exception of Alaska) were contiguous either to existing States or to territory previously acquired; secondly, none of them differed more widely from the States in soil and climate than the States differed from each other; thirdly, they were all virtually without inhabitants and were expected to be peopled by immigrants from the States, from the British Islands, and from Western Europe; fourthly, they were all expected, at an early day, to be formed into States, and as such to be admitted into the Union; fifthly, none of them produced (to any extent) dutiable articles which, if admitted into the United States free of duty, would either deprive the government . of revenue, or compete with home products, or produce both of these effects; sixthly, they all bordered upon navi-

---

limited to the States.  See Act of March 3, 1791, ch. 81 (1 Stats. 199).  It seems, therefore, that such legislation was in violation of Art. 1 of the Constitution, Sec. 8, subsect. 1, if "United States," as used in that subsection, includes territories, as no excise duties were imposed upon the latter.

[1] Act of March 26, 1790, ch. 29, 1 Stats. 103.

[2] Act of April 4, 1800, ch. 19, 2 Stats. 19.           [3] 1 Stats. 627.

gable waters through which the products of all foreign countries could easily be imported into them, and, if admitted free of duty, could be smuggled thence into the States.[1]

With the acquisition of Hawaii and the Spanish islands, however, all these conditions are radically changed. None of these islands have been acquired with a view to their being admitted as States, and it is to be sincerely hoped that they never will be so admitted, *i. e.*, that they will never be permitted to share in the government of this country, and especially to be represented in the United States Senate. Their agricultural capabilities are very great, their products enter almost wholly into commerce, and all or nearly all of them are dutiable under our tariff. Some of them consist of articles from which the government raises a great amount of revenue, and most of them, if admitted free of duty, will compete ruinously with home products of the same kind. Lastly, none of these islands are manufacturing countries, nor are likely to become such, and none of them import articles which compete with their home products, and, therefore, duties should be levied on articles imported into them only for purposes of revenue.

The strongest possible reasons, therefore, exist for abandoning totally, in respect to our new territories, the practice which has hitherto prevailed of extending to territories the revenue system of the United States, and for giving to each of them a revenue system of its own.[2] This is required as well in justice to them as in justice to this country; for, while the admission of sugar and tobacco, for example, from those islands into this country free of duty, would ruin the producers of those articles in this country, and would make it necessary for the government to resort to new and oppressive modes of raising revenue, the extension to those islands of our tariff on imports would compel their people to buy

---

[1] On the 14th of August, 1848, the then military governor of California wrote to the War Department as follows: "If all customs were withdrawn, and the ports thrown open free to the world, San Francisco would be made the depot of all the foreign goods in the North Pacific, to the injury of our revenue and the interests of our own merchants." See Cross *v.* Harrison, 16 How. 164, 183.

[2] Congress seems to have taken it for granted that the revenue system of the United States was to be extended to the Hawaiian Islands; for the resolution by which those islands were acquired declares that "until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands, the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged."

imported articles, not as their interests, but as our interests, dictate.

If we are to undertake the government of dependent countries, with any hope of gaining credit for ourselves, we must enter upon the task with a single eye to promoting the interests of the people governed, and we must content ourselves with such material advantages as may accrue to us incidentally from a faithful discharge of our duty. Does the Constitution of the United States prevent our attempting such a rôle? If it does, one will be driven to the conclusion that the authors of that instrument were either less successful in saying what they meant, or else were less sagacious and far-sighted, than they have had the reputation of being.

*C. C. Langdell.*

---

## N O T E.

THE numerous editions of the Constitution of the United States vary somewhat in their mode of dividing the different sections into paragraphs, and in numbering the paragraphs. For example, in Art. 1, Section 9, some editions print in one paragraph the matter which, in the preceding article, is treated as constituting subsections 5 and 6; and this, of course, changes the numbering of the remaining paragraphs. So in Art. 2, Section 1, some editions do not number the third paragraph, it having been superseded by the 12th Amendment. Some editions also print and number the form of oath at the end of the section as a separate paragraph. In the preceding article the third paragraph is regarded as numbered, and the form of oath is not regarded as a separate paragraph; and hence the section is referred to as containing eight subsections.