IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA

        Plaintiff,

                        Case No. 09-CR-043-SPF

v.

LINDSEY KENT SPRINGER,
OSCAR AMOS STILLEY

        Defendants.

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FRANK'S
HEARING AND MOTION TO SUPPRESS EVIDENCE

Lindsey Kent Springer ("Springer") files this memorandum of law in support of his Motion for a Frank's Hearing and Motion to Suppress certain evidence obtained in violation of Springer's Fourth and Fifth Amendment.

1. **FACTS NOT IN DISPUTE**

Springer first was being investigated by a Grand Jury in 1995. See declaration of Lindsey K. Springer.   On September 3, 1996, the Internal Revenue Service ("IRS") sent Springer a Notice of Deficiency addressed to 5147 S. Harvard, # 116, Tulsa, Oklahoma, 74135, using the Bureau of Labor Statistics for years 1990 through 1995. See Exhibit 1   Springer was being investigated by Neal Kirkpatrick out of the Northern District as of September 25, 1996.  See Exhibit 2 (Historical # 1180) Springer received evidence in July, 2005, in case 05-466,(W.D. Oklahoma) under Rule 26, he was  being investigated in 1997, 1998 and 1999, by the Criminal Investigation of the

1

IRS. See Exhibit 3,(Individual Master File code "914")    On April 28, 1999, the IRS, under the Restructuring and Reform Act of 1998 mandates of Congress, purportedly mailed to Springer a Notice of Tax Lien and Right to Collection Due Process Hearing, but instead of using Springer's Last Known Address of 5147 S. Harvard, # 116, as they knew to do, the IRS used a then unknown address of 5943 E. 13th St. See Exhibit 4 (Ambhuel Declaration in 08-278)

On July 3, 2001, an ongoing criminal investigation of Lindsey Springer and Bondage Breaker's Ministries was active. See Exhibit 5 (Meadors # 141) On March 6, 2003, an active criminal "referral" was ongoing against Springer. See Exhibit 6 (Meadors # 18) On October 14, 2003, Criminal Investigation is actively involved in hot pursuit of Springer for non filing. See Exhibit 7 (Meadors # 21) Donna Meadors was officially a "revenue agent" during this time period but secretively, she had applied for the position of Criminal Investigator ("CI").   See Exhibit 15, Deposition of Meadors, pg.  7-8   Meadors was turned down for CI the first time.  Exhibit 15, Deposition at pg. 8

The Pattersons were tried beginning in November 17, 2003, with the return of guilty on all counts by the Jury on December 16, 2003.  See Exhibit 8, Memo of Tim Arsenault dated May 6, 2004 (MOI 125).    Donna Meadors testified at the trial of Eddy and Judy Patterson as a Revenue Agent.  See Declaration of Springer at 1. Tim Arsenault and Donald Shoemake were the main investigators in bringing the Pattersons to Trial.  See Exhibit 9 (PA 857)(March 1, 2000 Memorandum Interview of

Eddy Patterson).    On January 26, 2004, Special Agent Donna Meadors, in disguise as a "Revenue Agent" sent Springer a letter involving a 6700 investigation she was pursuing.   See Exhibit 10 (Meadors 1.26.04)

Springer was notified by Donna Meadors in this letter she had "reviewed certain materials with respect to your tax shelter promotion."   Id.   Springer was assured by Meadors he was not under any criminal investigation and that Meadors was simply investigating a tape the IRS found on the internet dated in 1995.  See Declaration of Lindsey K. Springer at 2.   Meadors also informed Springer she was working with no other person and the information Springer shared with her was not being reviewed by any other person. Springer's declaration at 2   Meadors wrote on Springer's file that when Springer found out this was not true Springer was "not happy" about it.  Exhibit 11 (Case History File, pg. 9)

On May 12, 2004,  Springer was being further investigated by Special Agent Tim Arsenault and Stan Swagerty of the IRS and FBI.   See Exhibit 12 (MOI # 211) Special Agent Arsenault was the Case Agent assigned in the Patterson Trial and worked directly with Agent Donna Meadors.  Springer's Declaration at 1   Doug Horn and Melody Nelson were a part of that investigation.  See Exhibit 8 (MOI # 125)

Ms. Meadors sent Springer a letter stating he was not found to have committed any acts prohibited by section 6700 on December 2, 2004.  See Exhibit 13.   On March 2, 2005, a Revenue Officer Fred Rice, sent a Notice of Levy and Right to Collection Due Process Hearing purportedly to Springer but at 5943 E. 13th

3

St. and not the last known address of 5147 S. Harvard, # 116, Tulsa, Oklahoma 74135 that appears on the Notice of Deficiencies in 1996 (Exhibits 1) and that likewise appeared on Donna Meadors letters dated January 26, 2004 and December 2, 2004. (Exhibit 10 and 13) Rice instead scotch taped a business card to Springer's front door. Exhibit 14   Springer commences 05-466 on April 25, 2005, based in part on Rice's conduct with Springer. See Declaration of Springer at 2. This case was known as 05-466 (W.D.Ok.)

On April 26, 2005, the next day, Brian Shern Declares he was assigned to do a criminal investigation of Springer. Exhibit 19 (declaration of Shern in 06-156)  On August 15, 2005, the IRS decides to issue two Notice of Determinations to Springer using the correct address. See Exhibit 16   One notice gave Springer the option of going to the District Court and the other to the Tax Court within 30 days. Springer opted to the United States District Court and on September 15, 2005, Springer commenced 05-1075 in the Western District of Oklahoma. See Declaration of Springer at 2.

On September 15, 2005, Melody Nelson obtained a purported search warrant to search the private home location of Springer for certain evidence of willful failure to file and tax evasion crimes. See Exhibit 18  Declaration of Melody Nelson in 06-156.   Allegedly accompanying this purported request of Nelson was a document entitled declaration.  Exhibit 18, at 2-3 ("I presented the search warrant and the supporting **declaration of IRS Special Agent Brian M. Shern**") Brian Shern also filed

a Declaration in 06-156.  See Exhibit 19   On May 22, 2009, and again, on May 29, 2009, Springer confirmed no "declaration" was ever made in obtaining the search warrant and that only an unverified document styled "Affidavit in Support of Application for Search Warrant" was on file in the Clerk's Office.  See Springer's declaration at 3

Special Agent Brian Shern purportedly states that he is an accountant since 2000 and has performed "financial statement audits" for PricewaterhouseCoopers, LLC before his current job.  Exhibit at 20   Shern graduated from training to be a "Special Agent" in February, 2005.  He states he is being instructed and supervised by Special Agent Donald Shoemake.  He testifies that the "investigation" of Eddy Patterson was "expanded to include Lindsey Springer."  Exhibit 20 at 3.  Shern states his "investigation pertains to allegations that Lindsey Springer received income for providing legal and tax advice to numerous clients, and that he knowingly and willfully did not report this income in order to evade the taxes associated with it."  Exhibit 20 at 3.  Shern also "suggests" that "Springer's conduct may constitute violations of Title 26, U.S.C. § 7212(a).  Exhibit 20 at 3.   He also states that the "information" he was presenting in this "affidavit" "was received by the affiant from personal observation and experience, from other law enforcement officers, and other individuals named herein."

Shern stated that "In March 2000, Patterson met with Stilley and Lindsey Springer (Springer) to discuss the issue of him being under criminal investigation for

tax violations.  At the meeting Patterson decided to hire Springer and Stilley to represent him with respect to his criminal investigation.  Springer told Patterson he was not an attorney."  Exhibit 20 at 4.

Patterson stated Springer "initially told him that he needed $ 45,000 to work on the case.  Patterson said he paid Springer this $ 45,000 over the next several months.  Springer asked Patterson to write 'donation' on the memo line of the checks that were written to him."  "Patterson said that any payments to Springer represented fees for services related to handling his criminal case."  "It is not known if BBM functions as a ministry."  "Patterson identified three $ 10,000 checks written to Springer dated 8/25/00, 9/25/00 and 11/9/00..."  "These records were obtained pursuant to a grand jury subpoena issued during the investigation of Patterson."  Patterson said these "were part of the $ 45,000 paid to Springer, and that he thought there were another check written to Springer earlier than August 2000 that investigators did have at the interview."  Exhibit 20, at 5

On or around the "Spring of 2003, Patterson endorsed a $ 112,500 check payable to him for the sale of ECC Energy Stock over to Stilley for legal fees. Patterson said he gave Stilley permission to pay Springer $ 15,000 for services rendered by Springer for Patterson's criminal case."  Exhibit 20 at 5

Shern stated that he had examined the IOLTA account of Oscar Stilley and confirmed the $ 112,500 was deposited in Stilley's account and that a check for $14,539 was "paid to Springer from the IOLTA."  Exhibit 20 pg. 6.   Shern also stated

he reviewed emails between Springer and Patterson and Stilley in July and August 2003 and that these "discussions" included "legal strategy and explanation of court procedures." Exhibit 20 at 6.

In November, 2003, "Patterson said that he gave Stilley permission" to pay Springer $ 90,000 of money Patterson received from an insurance settlement with "officer's and directors" insurance. Stilley paid Springer $ 90,000 of this money for Springer's expertise and services rendered for Patterson's criminal case." Exhibit 20 at 6.

Section 7 of Shern's unverified statements identify Shern heavily relied upon the purported 6700 investigation of Special Agent Donna Meadors. Shern states that he "reviewed records from a civil IRS investigation of Springer which was conducted to determine if Springer was involved in the promotion of anti tax plans or abusive trusts for the period of January 1, 2000 to December 31, 2003. Exhibit 20 at 7.

Shern also states that "based upon the information contained in this affidavit, I have probable cause to believe and do believe that within the premises described in Attachment A, Location to be Searched, ... are **now located records evidencing Federal Violations of Title 26, U.S.C. Section 7201 and 7203.**" Exhibit 20 at 24    Shern's declaration in 06-156, attached as Exhibit 19, contains the Magistrate's "Search Warrant" and is accompanied by "Exhibit A & B."

**2.    LEGAL AUTHORITY IN FAVOR OF FRANK'S HEARING**

A search warrant must be voided and the fruits of the search suppressed where a court (1) finds that the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) concludes, after excising such false statements and considering such material omissions, that the corrected affidavit does not support a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56,98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Kennedy*,131 F.3d 1371, 1376 (10th Cir. 1997). U.S. v. Garcia -Zambrano, 530 F.3d 1249, 1254 (10th Cir. 2008) "Affidavits for search warrants must be tested in a common sense and realistic manner, and warrants issued thereon should not be interpreted hypertechnically." *United States v. Berry*, 423 F.2d 142, 144 (10th Cir. 1970).   Garcia at 1256

Although it is true that a search warrant affidavit may contain hearsay evidence, *see United States v. Mathis*, 357 F.3d 1200, 1204 (10th Cir. 2004), the government is held accountable "for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit," *Kennedy*, 131 F.3d at 1376. *See also Franks*, 438 U.S. at 163 n. 6, 98 S.Ct. 2674 (['T]he Court [in *Rugendorf v. United States*, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964)] took as its premise that police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity.").

It is a violation of the Fourth Amendment for an affiant to knowingly and intentionally, or with reckless disregard for the truth, make a false statement in an affidavit." <u>United States v.</u> <u>Basham,</u> 268 F.3d 1199, 1204 (10th Cir. 2001) (citing Franks, 438 U.S. at 171-72). Where a false statement is made in an affidavit for a search warrant, the search warrant must be voided only if the affidavit's remaining content is insufficient to establish probable cause. Franks, 438 U.S. at 171-72.

In determining whether probable cause supports a search warrant, we review the sufficiency of the underlying affidavit by looking at the totality of the circumstances and ensuring "the magistrate had a substantial basis for concluding that probable cause existed." United States v. Tisdale, 248 F.3d 964, 970 (10th Cir. 2001) (internal citations and quotations omitted). **Probable cause to issue a search warrant exists only when the supporting affidavit sets forth facts that lead a prudent person to believe a fair probability exists that contraband or evidence of a crime will be found in a particular place**. <u>See</u> <u>United States v.</u> <u>Wicks,</u> 995 F.2d 964, 972-73 (10th Cir. 1993).

*Franks,* however, applies only to intentional or reckless omissions from the affidavit. *See Avery,* U.S. v. Avery, 295 F.3d 1158, 1166 (10th Cir. 2002) "Under *Franks,* a hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy,* 131

F.3d 1371, 1376 (10th Cir. 1997) (citing *Franks,* 438 U.S. at 155-56, 98 S.Ct. 2674). "The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods." *United States v. McKissick,* 204 F.3d 1282, 1297 (10th Cir. 2000). If, after considering the evidence presented at a *Franks* hearing, the district court concludes by a preponderance of the evidence that the affidavit contains "intentional or reckless false statements," Kennedy, 131 F.3d at 1376, or "material omissions," McKissick, 204 F.3d at 1297, "then the district court must suppress the evidence   obtained pursuant to the warrant." *Id.* If, however, the district court concludes that the omitted information would not have altered the magistrate judge's decision to authorize the search, then the fruits of the challenged search need not be suppressed. *Id.* at 1297-98; Kennedy, 131 F.3d at 1376.

Rather, courts reviewing the alleged omission of information bearing on an informant's credibility ask whether, assuming the magistrate judge had been apprised of the omitted information, the judge still "would have found probable cause to issue the search warrant." *Kennedy,* 131 F.3d at 1377; McKissick, 204 F.3d at 1297 (same). In asking this question, it is important to keep in mind that "[a] magistrate judge's task in determining whether probable cause exists to support a search warrant `is simply to make a practical, common-sense decision whether, given **all the facts and circumstances set forth in the affidavit before him**, including the `veracity' and `basis of knowledge' of persons supplying hearsay information,

there is a fair probability that contraband or evidence of a crime will be found in a particular place."' *Kennedy,* 131 F.3d at 1378 (quoting Gates, 462 U.S. at 238, 103 S.Ct. 2317).

"The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." Franks, 438 U.S. at 171, 98 S.Ct. at 2684. It is not enough to show that the informant lied to an unsuspecting affiant, or that an affiant's negligence or innocent mistake resulted in false statements in the affidavit. *United* States v. Orr, 864 F.2d 1505, 1508 (10th Cir. 1988); *United States v. Bloomgren,* 814 F.2d 580, 584 (10th Cir. 1987). Thus to qualify for a *Franks* hearing, **Owens must make a substantial showing that Harper and Nestor knew of, or recklessly disregarded the truth**. Bloomgren, 814 F.2d at 584 (citing *United States v.* Schauble, 647 F.2d 113, 117 (10th Cir. 1981)).

The perception underlying these decisions — that the connection between police misconduct and evidence of crime may be sufficiently attenuated to permit the use of that evidence at trial — is a product of considerations relating to the exclusionary rule and the constitutional principles it is designed to protect. *Dunaway* v. *New York*, 442 U.S. 200, 217-218 (1979);

Deference to the magistrate, however, is not boundless. It is clear, first, that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. Franks v. Delaware, 438 U.S. 154 (1978).   Second, the

11

courts must also insist that the magistrate purport to "perform his `neutral and detached' function and not serve merely as a rubber stamp for the police." Aguilar v. Texas, supra, at 111. See Illinois v. Gates, supra, at 239. A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search. Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-327 (1979). United States v. Leon, 468 U.S. 897, 914-915 (1984)

3.     **LEGAL AUTHORITY IN FAVOR OF SUPPRESSION**

    **A.  Fourth and Fifth Amendment**.

The Fourth Amendment requires not only that warrants be supported by probable cause, but that they "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). *See also Marron v. United States*, 275 U.S. 192, 196 (1927) ("The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.").

In *Gouled v United States,* 255 U.S. 298, 306, 41 S.Ct. at p. 264, the Supreme

Court said:

> "In practice the result is the same to one accused of crime, whether he be obliged to supply evidence against himself or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers. In either case he is the unwilling source of the evidence, and the Fifth Amendment forbids that he shall be compelled to be a witness against himself in a criminal case."

The Supreme Court has reiterated this principle in subsequent cases, see

Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925) and United States

v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 523 (1932), and the same proposition

appears implicit in the Court's rationale in both Warden v. Hayden,

387 U.S. 294, 87 S.Ct. 1642 (1967) and Schmerber v. California, 384 U.S. 757, 86 S.Ct.

1826 (1966).

Any jury will know the books and records belong to Springer and the

entries he has made therein speak against him as clearly as his own voice. "This

seems particularly true in a prosecution for violation of the income tax laws."  Hill v.

Philpott, 445 F.2d 144, 146 (7th Cir. 1971)

In United States v. Dickerson, 413 F.2d 1111 (7 Cir. 1969), the 7th Circuit held

that the *Miranda* warnings must be given to a taxpayer under criminal investigation

by the Internal Revenue Service at the inception of the first contact with the

taxpayer after his case has been transferred to the Intelligence Division of the

Internal Revenue Service for possible criminal prosecution. See also,

United States v. Lackey, 413 F.2d 655 (7 Cir. 1969); United States v. Habig, 413 F.2d

1108 (7 Cir. 1969). We would vitiate the effects of those decisions if we ruled today

that the government could avoid all Fifth Amendment considerations by

merely obtaining a search warrant.  Hill v. Philpott, 445 F.2d 144, 147 (7th Cir. 1971)

  In deciding this case as we do, we are not unmindful of the very difficult

task that confronts the Internal Revenue Service in meeting its responsibility to

enforce the income tax laws. There is no evidence, however, that the availability

of the privilege against self-incrimination has unduly interfered with prosecutions

which result from investigations wherein taxpayers' books and records have been

sought by a summons. We believe the same experience will prove true in future

cases involving searches and seizures.[fn6] Of course, the Fifth Amendment makes

the business of criminal prosecutions more difficult, but

this is its clear intent.  Hill at 150

  Furthermore records are not producible  under the "required

records doctrine" enunciated in Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92

L.Ed. 1787 (1948). It seems apparent however, that records maintained by an

individual taxpayer exceed the constitutional limits of the required records doctrine.

See Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709,

19 L.Ed.2d 906 (1968).

  In Warden v. Hayden (1967), 387 U.S. 294, 303, 87 S.Ct. 1642, the Supreme

Court found it unnecessary to "consider whether there are items of evidential value

14

whose very nature precludes them from being the object of a reasonable search and seizure." In order to suppress the evidence in this case, it would be necessary to decide both that such class does exist, and that the business and professional records seized from appellant are within it.

Probable cause must support the warrant authorizing the Government's search of Defendant's residence. See U.S. Const. amend.IV. (stating "no warrants shall issue, but upon probable cause"). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972). Our analysis of the lawfulness of this search begins with a summary of the evidence presented in the Government's probable-cause affidavit. U.S. v. Biglow, 08-3155 (10th Cir. 4-20-2009

In *Groh v. Ramirez,* 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004), the Supreme Court recently affirmed that every warrant must meet the requirements of the Warrant Clause, and be based upon probable cause, supported by oath or affirmation. *Id.* at 1289-90; *see also Albrecht v. United States,* 273 U.S. 1, 4-6, 47 S.Ct. 250, 71 L.Ed. 505 (1927) (holding an arrest warrant invalid because it was issued based upon affidavits which had been sworn to before an official "not authorized to administer oaths in federal criminal proceedings"). Thus, where a warrant is issued unsupported by oath or affirmation, it is invalid under the Fourth Amendment. *See United States v. Rabe,* 848 F.2d 994, 997 (9th Cir. 1988) (explaining that Warrant Clause "requires the government to establish by sworn evidence presented to a

magistrate that probable cause exists to believe that an offense has been committed").

To use an IRS administrative summons, the government must show that the IRS has not made a referral of the taxpayer's case to the Justice Department for criminal prosecution. United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). The government then must show that the IRS is proceeding in good faith by demonstrating: (1) that the investigation will be conducted pursuant to a legitimate purpose; (2) that the inquiry will be relevant to that purpose; (3) that the information sought is not already in the possession of the IRS; and (4) that the summons was issued in compliance with the administrative steps required by the Internal Revenue Code. United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); United States v. Balanced Financial Management, Inc., 769 F.2d 1440 (10th Cir. 1985).

Institutional good faith on the part of the Internal Revenue Service is essential to insure honest pursuit of the goals of 26 U.S.C. § 7602 in the issuance of the summons. LaSalle, 437 U.S. at 313, 98 S.Ct. at 2365. In LaSalle, the IRS agent began his investigation of the taxpayer with information he received from the FBI, the local United States Attorney, and other federal agencies. To aid in this investigation, he issued two administrative summons which were subsequently made the subject of an enforcement hearing in the district court. The district court refused enforcement of the summons upon a finding that they were issued "solely for the purpose of

unearthing evidence of criminal conduct" by the taxpayer. LaSalle, 437 U.S. at 304, 98 S.Ct. at 2361. That order was affirmed by the Seventh Circuit with the admonition that the use of an administrative summons "solely for criminal purposes is a quintessential example of **bad faith**." United States v. LaSalle National Bank, 554 F.2d 302, 309 (7th Cir. 1977), rev'd, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978).

In reversing, the Supreme Court concluded that the coincidence between a taxpayer's civil and criminal liability was such that the two could not be untwined prior to referral by the IRS to the Department of Justice for prosecution. Thus, until referral occurs, the pendency of a criminal investigation against the taxpayer does not inhibit the authority of the IRS to conduct investigations pursuant to § 7609. Anaya v. U.S., U.S., 815 F.2d 1373 (10th Cir. 1987)

**4.     THE PURPORTED "AFFIDAVIT" IS NOT SWORN OR AFFIRMED**

At all times Springer had the right to privacy in his home and was protected from unreasonable searches and seizures.  On April 22, 2009, this Court denied Springer access to any transcribed meeting on September 15, 2005 between Melody Noble Nelson and Magistrate McCarthy, finding that no such evidence of such meeting existed.

This Court did direct Springer to be given the "Affidavit" to which after Springer got through 33,000 documents, and no "Affidavit" was therein any discovery, Springer contacted the Clerk's Office and obtained a true and complete copy of the document entitled "Affidavit in Support of Application for

Search Warrant."  See exhibit 20 and Declaration of Lindsey K. Springer

Exhibit 20 begins "I, Brian M. Shern, being on oath first duly sworn, depose and say:" Exhibit 20, at 1.  On page 24, Brian Shern signed his name claiming "Based on the information contained in this affidavit, I have probable cause to believe and do believe that with the premises described in Attachment A, Location to be Searched, incorporated herein by reference to the Search Warrant, are no w located records evidencing Federal Violations of Title 26, U.S.C. Sections 7201 and 7203, including all records described in Attachment B, items to be Seized, incorporated herein by reference to the Search Warrant for property of Lindsey Springer."

Below his name is the phrase "Subscribed and Sworn to before me this ____ day of _____, _____.   Hand written in the blanks is "15th" "Sept" and "2005."  There is no identification of who "me" is and me's power to administer oaths.  Presuming without saying that the handwriting is Magistrate McCarthys, coupled with the known fact there is no meeting between Shern, Nelson and McCarthy of record, the record appears to show that the purported "affidavit" was never properly verified and sworn to by someone authorized to administer oaths.   There is also some confusion between whether what was presented with the "application" was an "affidavit" or a "declaration."

Ms. Nelson refers to the document as a "declaration" and says she prepared and presented to Magistrate McCarthy both the Search Warrant dated September

18

15, 2005, and the "declaration" of Brian Shern.  See Exhibit 18, pg. 2-3    Shern

contradicts Nelson   in his declaration in 06-156 and says he "presented an

application and affidavit for Search Warrant" to Magistrate McCarthy who

purportedly later that day "signed" what Shern presented earlier.  See 19, pg. 2

How the document entitled "Affidavit" was presented to Magistrate

McCarthy is crucial as to whether the Search Warrant contained any probable

cause, supported by oath or affirmation.  *Groh*  at 1289-90

Exhibit C tendered to Springer by the Clerk's Office on May 22, 2009, as

affirmed on May 29, 2009, does not contain any evidence it was sworn to before

anyone authorized to administer oaths.  Furthermore, with the absence of any

hearing before Magistrate McCarthy, there is no evidence Shern was orally sworn

on the record and then reading his 24 page document into the record.

Everything that was obtained by way of the "Search Warrant" is invalid under

the Fourth Amendment because the Search Warrant was never supported by oath

or affirmation with that oath being administered by someone authorized to

administer oaths and therefor no probable cause established by Shern's unsworn

statements existed whatsoever.   This deletes all 24 pages of Shern's unsworn

statements from being considered an affidavit finding probable cause.

5.    **AFFIDAVIT CONTAINS INFORMATION OBTAINED IN VIOLATION OF THE FOURTH
AND FIFTH AMENDMENT BY DONNA MEADORS AGAINST SPRINGER.**

At all times Springer had the right to privacy in his home and was protected

from unreasonable searches and seizures. There is no question that the record

19

presented herein substantially shows that Springer was in ongoing criminal investigation mode by the United States from 1995 to the present.   Special Agent Meadors was using civil IRS summons to hide a criminal investigation she was just one of several people pursuing.   See Exhibit 2,3,5,6,7 and 12.   When Springer received Meadors January 24, 2004 letter and subsequent summons, Springer asked Meadors whether he was under criminal investigation as far as her knowledge was concerned and Meadors answered absolutely NO! Springer asked her whether she was working with anyone else who was criminally investigating Springer and to which Meadors said there was no one she knew.   Springer asked if she was working with Horn and Nelson to which she said absolutely not and in fact Meadors told Springer she was assigned to Springer before she was aware of the Patterson Indictment.        See Declaration of Springer at 2

All the information Meadors obtained from Springer directly and indirectly, as a result of her 6700 investigation should be suppressed and held in violation of the Fourth and Fifth Amendment.   The information Springer provided was illegally seized from Springer by violating the Supreme Court's decision in United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) which held that use of the civil summons under section 7602 to do a civil investigation unlawful when referral has been made. See also United v. Jones, 703 F.2d 473 (10th Cir. 1983)

Exhibit # 6 demonstrates a "referral" from a RA in Oklahoma relating to Mr. Springer's current and continued non filer status." This statement contained in the

20

Meador file is dated March 6, 2003. Exhibit # 21 shows "CI" as of 7.01.03. Exhibit 7 shows CI in "further review." Exhibit 8 shows two United States Department of Justice Attorneys, Horn and Nelson, CI Tim Arsenault and FBI Special Agent Stan Swagerty were trading purported information with Eddy Patterson for a reduced sentence. Brian Shern in his unsworn statement dated September 15, 2005, stated his "information" was obtained from "other law enforcement officers." See Exhibit 20 at 3. Shern states that while Eddy Patterson was under "investigation" that "investigation" was "expanded to include Lindsey Springer. Exhibit 20, at 3. Shern states Patterson was found guilty on December 16, 2003. Id. The Pattersons were indicted on April 16, 2003. This would make Springer part of the "expanded" investigation prior to April 16, 2003.

Because Special Agent Donna Meadors falsely obtained information from Springer on the disguise of a 6700 investigation, where in fact she was actively participating in a decade long criminal investigation of Springer for "non filing," she was also pending becoming a Criminal Investigator (CI), and where there was an active "referral" with clear evidence of a criminal investigation of Springer, unbeknownst to Springer, Meador's use of the civil summons procedure was knowingly in violation of the Supreme Court's holding in United States v. LaSalle National Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) of which she clearly knew. Springer had a right not to answer Meador's questions involving her summons conduct under 6700 and was clearly denied that right with the utmost

21

intention by Meadors and others.  Springer also had a right to remain with his information and not disclose it to Meadors and had he known the true intentions of Meadors Springer would have moved to quash Meadors Summons.

All the evidence obtained by Meadors regarding her 6700 investigation should be suppressed and any subsequent usage of that information regarding fruit of the poisoned tree should also be suppressed. This deletes pages 7, paragraph 7 through 12, paragraph 15  of Shern's unsworn statements from being considered an affidavit finding probable cause.

**6.     BRIAN SHERN'S RELIANCE UPON MEADORS "INVESTIGATION" WAS IMPROPER IN VIOLATION OF SPRINGER'S FOURTH AND FIFTH AMENDMENT RIGHTS AND SUCH VIOLATIONS WERE NOT DONE IN GOOD FAITH.**

At all times Springer had the right to privacy in his home and was protected from unreasonable searches and seizures.  Brian Shern stated that he relied upon "6700" investigation as he reviewed records Meadors obtained by way of Springer in violation of Springer's Fourth and Fifth Amendment Rights.  See Exhibit # 20, pg. 7, paragraph 7.  In paragraphs 8 through 15 of Shern's unsworn statement, he gathers information from the name Phillip Roberts,   James Lake, Michael Burt, Cynthia Hawkins, Erika Dertien, Salvatore Pizzino, Patrick Turner, Patrick Bogan, Orvil Duane Hassebrock and each of the "Ten" IRS-CI Special Agents from "different areas of the Country."  See Exhibit 20, pg 8-12.  What is missing from Shern's statement is any mention of speaking with any one of the named persons other than the Agents.  There is nothing about speaking with any CI Agents across the

Country that would lead anyone to believe there was probable cause to search the home Springer lives in to find "evidence" of violations of section 7201 and 7203.

This Court should suppress the evidence obtained by way of the Search Warrant obtained by way of Shern, relying in any way upon the unconstitutional conduct by Special Agent Meadors and find otherwise there was no probable cause established by Shern's unsworn statements.

Shern made statements relying upon others who came before him in the investigation of Springer and thus the only hope to save Shern in paragraph 7 through 12 is good faith.

Shern had no good faith and that can easily be seen from the record of this case. Shern's Good Faith is affixed to the faith of Horn, Nelson, Arsenault, Meadors, Shoemake and Beckner.   Horn knew he was investigating Springer during the "investigation of Eddy Patterson." Exhibit 20, at 3. This investigation was well before Pattersons were even indicted.  Shern would have known about the Meadors conduct as he relied heavily upon it.  Meadors conduct was in 2002 through 2004. Shern clearly spoke with Meadors as his unsworn statement suggests.  Meadors also says in Exhibit 11, pg. 9, that she is sharing photographs with CI.  Just because Shern comes on board on April 26, 2005, the say after 05-466 was filed in Oklahoma City, does not mean he had good faith because all those exercises in bad faith happened before his tenure.

This deletes pages 7, paragraph 7 through 12, paragraph 15  of Shern's

unsworn statements from being considered an affidavit finding probable cause.

## 7.   SHERN'S UNSWORN AFFIDAVIT CONTAINS KNOWN FALSE STATEMENTS REGARDING EDDY PATTERSON AND PROBABLE CAUSE.

At all times Springer had the right to privacy in his home and was protected from unreasonable searches and seizures.   Brian Shern, Donna Meadors, Melody Nelson, Douglas Horn, Tim Arsenault, Donald Shoemake and Kathy Beckner, each relied upon the May 6, 2004 interrogation of Eddy Patterson in Shern's unsworn statements dated sometime around September 15, 2005.

Shern states that the investigation of Eddy Patterson "expanded" to include Lindsey Springer but he never says who was conducting that investigation.  Shern stated he began as CI on April 26, 2005.  Surely the Patterson investigation ended when the Patterson's were indicted in 2003.  If not, surely it ended when Patterson exchanged purported testimony for securing a benefit for himself in May of 2004. If not, then most definitely, when he was "sentenced" September 13, 2004.

In this regard, Nelson informed the District Court on August 30, 2004, she and Patterson had reached an agreement that Patterson would cooperate fully with the investigation of the "criminal conduct of Oscar Stilley, Jerold Brringer and Lindsey Springer."  See Exhibit 22, pg. 2 (Joint Agreement)

Springer has sought and has not received any Memorandum of Interview of Judy Patterson dated May 3, 2004 and presumes that means there is not one.  See Declaration of Springer at 3.  See also Exhibit  23, pg. 2 (Rule 35(b) Motion).  Ms.

24

Nelson stated under Rule 11 that Ms. Patterson appeared on May 3, 2004, with her attorney William Widel.  Exhibit 23, pg. 1.  Mr. Knorr, in a Motion to be appointed Counsel for Eddy Patterson, stated under Rule 11 that after the Patterson "conviction" he was retained by Mr. Patterson and his wife.  See Exhibit 24, pg. 1 Jerold Barringer stated in a declaration filed in 03-cr-55 on October 8, 2004, that Widell told him he had not spoke to Ms. Patterson since around March 23, 2004, and that on or about September 1, 2004, he was contacted by Steve Knorr to receive a fax from Douglas Horn and that Ms. Patterson was getting a reduction in her sentence under Rule 35(b) for giving substantial assistance.  See Exhibit 25, pg. 2.  Barringer declared that at all times including May 3, 2004 and through September 1, 2004, he was Ms. Patterson's attorney and had briefed her entire appeal to the 10th Circuit.  Id.

On page 3 of Exhibit 20, Shern states Patterson was represented by Stilley during his trial and "sentencing."  Nelson declared in Exhibit 18 that she drafted the Search Warrant and Attachments.  Exhibit 18, pg. 2-3.  Nelson knew Stilley did not represent Mr. Patterson for his sentencing.  So did Arsenault and Horn.  See Exhibit 8. In fact, Arsenault writes that what Horn and Nelson were doing was obtaining a "Rule 11 proffer."  Id.

Shern and Arsenault state Patterson told them after a meeting in early March, 2000, Springer and Stilley would represent Patterson regarding his "tax problems." Shern and Arsenault claim Patterson told them Springer sought at that Saturday

meeting $ 45,000 which Patterson paid Springer over the next several months.   See Exhibit 8, at 2.   Shern and Arsenault claim patterson told them Springer directed Patterson to write on his $ 10,000 checks "donation" on the "memo" line.   Patterson said it was "understood" any "payments to Springer were fees for his services for handling his criminal case."  Id.   Patterson stated he would not have made any "donation" to Springer because that is not what Paterson made donations to."  Id. Patterson believes there was another check "earlier than August written to Springer that investigators did not have at the interview." Id.  Patterson identified three $ 10,000 checks written to Springer dated 8.25.00, 9.25.00 and 11.9.000.  Id.

All of this above is false and Shern knew it at the time he made his unsworn statement on or about September 15, 2005.  Shern says Patterson "hired" Springer in March, 2000, but Springer does not receive any money until August 25, 2000 some 6 months later.   Accompanying the first $ 10,000 check to Springer dated August 25, 2000, Patterson sends a letter that says:

> Please find enclosed our donation check hopefully as an encouragement to you to continue your fight against the anti constitutional issues endorsed, encouraged and policed by our government. If we had more Christians standing up for God's laws and for the rights of the American people, this would once again be a country of the people, by the people and for the people, endowed and blessed by its Creator. Thank you for being willing to suffer persecution to do that which is right In closing please don't forget to call Eric Lynch to discuss the issues he is working on.
> Sincerely in Christ, Eddy Patterson

See Exhibit 26.

Yet, Shern states "Patterson decided to hire Springer and Stilley to represent him with respect to his criminal tax investigation.  Exhibit 20, pg. 4.  Patterson "said any payments to Springer represented fees for services."  Id.  Exhibit 26 clearly demonstrates what Shern stated Patterson told him was knowingly false.  Shern further wrote "Patterson would not have made charitable donations to Springer because he did not believe that Springer had any kind of religious ministry." Exhibit 20, at 5.  Yet, Exhibit 26 uses the term "Christians" "God" "Creator" and "Christ." Shern knowingly left this out of his unsworn statement because he knew if opposed his agenda to get Springer for the team.  To believe Shern the Magistrate would have to believe Springer was hired in March, 2000, but not paid, yet the one calling all the shots.  To believe this is absurd on its face.  Patterson and Shern know that Patterson and Springer met in January after Springer directed Patterson to dismiss his civil complaint against Jay Bryce which was done on December 14, 1999.  See Exhibit 27; See also Springer Declaration at 1.

Then there is the $ 45,000.  Shern would have this Court believe that his service theory takes the $ 30,000 give Springer in August, September and November, 2000, and adds to this the theory of $ 15,000 Patterson asserted Stilley to give to Springer in the "Spring" of 2003 from the proceeds of the $ 112,500. Shern even referenced this as for "services rendered."  Shern stated that he reviewed the IOLTA account of Stilley. Exhibit 20, at 6.  If this was so, he would have known the $112,500 was in late July and not "Spring."

27

First, Shern knew the $ 112,500 was in July, 2003, and not in the "Spring" when Patterson was "indicted."  Shern lied here to make it look like Springer charged $ 15,000 to Patterson when he was indicted.   In other areas Shern makes it look like the $ 15,000 theory in July of 2003 was the finally payment of the $ 45,000 Shern says Patterson claimed he paid Springer.  Shern also knew Patterson got $ 30,000 and Springer did not get $ 15,000 from the $ 112,500.   These were all false statements intending to lead someone into believe Shern's theory.    The truth is Patterson actually had no money when he was indicted and was in the process of asking Barringer for the $ 5,000 retainer he had given Mr. Barringer in 2000 to be returned to him because it looked to Patterson like it was not ever going to be needed.  See Exhibit 8, pg. 2 for amount of check.  This entire line of statements were entirely false and Shern, Horn and Nelson, knew it at the time Shern made the unsworn statement.

Next is the $ 90,000 paid to Springer for "services rendered."  Shern states "Stilley paid Springer $ 90,000 of this money" and this money he meant the "insurance settlement" Patterson received with an offer to buy his contract.  Shern accepts this happened in November 2003.  Exhibit 20, at 6.

What Shern leaves out is Patterson was to go to trial in September of 2003. His attorneys Stilley and Barringer had worked from April when he and his wife got indicted, until the end of July, 2003, without any expectation of being paid anything.  In fact, Barringer and Stilley were planning on going to trial without any

realistic hope of ever being paid because Eddy and Judy Patterson had no way of paying for anything.  There was no way either Barringer or Stilley would have known in November, 2003, that the insurance company getting tire of paying Hall Estel hundreds of thousands of dollars a month, would seek to pay Patterson for his insurance contract.  There first offer was $ 100,000 of which all would have gone to Hall Estel for their current fees Patterson owed.   Of the $540,000 settlement, See Exhibit 8, pg. 3, only $ 375,000 made its way to Oscar Stilley. $ 165,000 was paid to Hall Estel.  Of this Shern knows Patterson received over $ 112,500, for himself.  Exhibit 8, pg 3.  Yet, Shern states the $ 90,000 was for "Springer's expertise and services rendered." Exhibit 20, at 6.  Springer was owed no money from Patterson ever and Shern knew this at the time he wrote his unsworn statement.

The remaining $ 15,000 was for services "rendered" by Springer for Patterson's criminal defense?   Patterson did not "believe that Springer had any kind of 'religious ministry." Id. As stated above, and as the exhibits show, these statements are unsupported by any evidence and Shern, Horn and Nelson, knew this at the time Shern made his unsworn statement on or about September 15, 2005.

In September 2003, Patterson settled with his insurance company for $ 540,000k.  Exhibit 8, at 3.  Out of the $ 400,000 "Stilley gave Springer $ 90,000." Id. "Stilley said the money was for Springer's expertise and that he need to be paid for his services."  Shern makes this statement as if Stilley said it when Stilley never said any such thing.  This is a false statement by Shern.  Stilley advised Patterson Pay

Springer.  Id.  Patterson did not give this permission until after he met with Springer.

Springer said it was "less than what he normally charges" and that it was based

upon the ability to pay.  In order to believe Shern on this (and Patterson if he

actually said it) this Court would need to conclude many facts clearly not present.

First, Shern says this took place in November, 2003, which is right before Trial.

Second, Springer would have had some ongoing claim or bill Patterson's owed him

which there is not any such evidence on the planet earth.  Third, how would

Springer have known the insurance company was going to make an offer to buy

out Patterson's contract that was paying Hall Estel Firm hundreds of thousands a

month? Of for that matter, that any such settlement could be reached.  Springer

had no control over any of that but to accept Shern's unsworn statements, this

Court would need to believe Springer knew this offer was coming in 2000 or 2003,

Patterson was always indebted to Springer , and that after everyone was "paid"

there would be some for Springer to be "paid."

The evidence does not support Shern's statement of events and Shern, with

the slightest bit of investigation would have known that his statements were false.

Shern and Arsenault write that Patterson told them "money was important to Hall

Estill as the insurance check had not arrived at the time when he was deciding who

to represent him."  Exhibit 8, pg. 4.  Patterson was indicted in April of 2003 and the

insurance company did not even begin to offer to buy out Patterson's policy until

September, 2003, and the deal was not accepted until early November, 2003.

Shern and Arsenault act like Patterson knew in April he was going to get some buy out of his policy at some near future date.  That is simply far fetched and ridiculous. They had to continue with this false statement of material fact because otherwise they would have to accept the truth that Springer was never owed any money by Patterson and in fact up until the $ 112,500 out of no where, Stilley and Barringer had no money to defend the Pattersons and continued to defend regardless.

Patterson understood that $ 60,000 was to be returned to Patterson if the "civil case did not go forward."  Id.  Springer had previously told him the $ 15,000 payment "was all he needed."  This was done in the "later" part of 2003.  Id As stated above and the substantial evidence shows that the $ 60,000 "return" theory is simply ridiculous.  Arsenault even suggests that the $ 60,000 was to be turned over to Judy Patterson when she got out of prison.  Exhibit 8, at 4.  There is no evidence of Springer being paid for any services rendered whatsoever and Shern knew it from the first time he looked into the facts of this part of his statement.  Shern knew about Exhibit 26 and failed to mention it in his unsworn statement.  If Springer was to give back $ 60,000 then how was Springer "paid" $90,000" for "expertise and services rendered for the Pattersons."  Exhibit 20, at 6  The theory Shern advances is simply absurd and unbelievable.[1]

---

[1]Shern is known for some unbelievable claims.  In 06-156, Shern has advanced arguments like Special Agent Training does not include learning how to count individual notes of currency, Agents only Count bundles when they are to locate currency, $ 19,000 is really $ 17,000, and he did not know he could be held personally liable for either the theft or cover up of the theft of money

None of these unsworn statements are reliable and Shern and Arsenault should have known that at the time Shern sought his search warrant.   Shern certainly should have known they were false at the time he made out his unsworn statement dated on or about September 15, 2005.

There were so many false statements in Exhibit 8 and Shern's unsworn statement that anyone would have known no probable cause existed to believe Patterson or Shern.  Patterson had recently been convicted of making false claims and false statements to the SEC and continued to deny any wrong doing.  See Exhibit 28 (Trial Brief of Nelson); See Exhibit 22 (Joint Agreement),

**8.    THERE IS NOT ONE SHRED OF PROBABLE CAUSE TO BELIEVE ANY OF THE "EVIDENCE" SOUGHT BY SHERN IN HIS UNSWORN AFFIDAVIT WOULD BE LOCATED IN THE HOME SPRINGER LIVES IN.**

At all times Springer had the right to privacy in his home and was protected from unreasonable searches and seizures. Shern states he spoke to IRS Special Agents, including Special Agent Donna Meadors, and read memos before he sought the Search Warrant in this case.   Not a single person ever identified the place where Springer lives as a place containing any of the "evidence" sought by Shern on page 24 of his unsworn statement.  There is not a single statement that Springer runs a business out of his house.  No statement Springer provides any services out of his house. The only statements unsworn are that cars in the front yard

---

belonging to Springer,  just to name a few.

32

are registered to Springer and they are lien free.  Sure sounds like a affirmative act of tax evasion doesn't it?  Thats it. Out of all the "items" to be seized only 2, 3 and 4, were even remotely understandable and those there was no probable cause to believe any of it existed in the home Springer lives in.  What was the currency listed as "evidence" of a crime?  Nelson stated it could be taken as evidence of "cash dealing."  She even thought she could keep as forfeited property for a while.  Everything in Attachment B to the Search Warrant is derived from page 24 of Shern's unsworn statement.

Based upon the "information contained in this" unsworn statement, Shern stated he had probable cause to believe and did believe that within Springer's home he would find "records evidencing Federal Violations of Title 26, U.S.C. § 7201 and 7203, including all "records" described in Attachment B.

Here, the "records" listed in Attachment B are now the basis for the unsworn statement purported as an Affidavit in Attachment C.  Yet Attachment B has no support from anything in Attachment C.   Without Attachment C, there is no probable cause and no warrant.  Without a warrant there is only a intentional violation of Springer's Fourth and Fifth Amendment Rights.

Shern's "knowledge" is nothing but a generalization of anything at any time and anywhere.  There is nothing from page 19 to 24 that specifically states how Shern believes there is probable cause that he will find these "evidences" listed in Exhibit B in Springer's home.  Nothing else in the unsworn statement would lead

33

anyone to believe any evidence sought in Attachment B would be supported by probable cause derived from Attachment C.   Nor would anyone conclude after reading Attachment C that what is listed in Attachment B is anything other than a fishing expedition into the Fourth Amendment protected private home of Springer.

9.    **SPRINGER'S HOME WAS PROTECTED BY THE FOURTH AMENDMENT FROM UNREASONABLE SEARCH AND SEIZURES.**

At all times Springer had the right to privacy in his home and was protected from unreasonable searches and seizures.   Many brave men and women gave their life so that each person involved in this case could peacefully advance their own rights and issues today in 2009.   The right to be secure in one's home is one of those rights.   Imagine giving your life so others can be safe from Government intrusion into a mans private home.   Men and Women did not give their life so Special Agents of the IRS could invade a mans home because of speculative heresay and false manufactured unsworn statements.   Nor did they give their life so Government Attorneys with something to hide can attempt shifting their deceit upon someone else instead of examining their own prejudices.

Congress had no power to give to a United States Magistrate to authorize an invasion of Springer's Home based upon the unsworn statement of Shern or the fact nothing in Attachment B is derived from Attachment C.

It was unreasonble for the United States to invade Springer's private home seeking things Springer wrote or possessed that he held in private in his home to use

against him.

This Court should find that with no sworn affidavit, no probable cause, no mention of anything from Attachment B in Attachment C, that U.S. Magistrates are not authorized to direct anyone to storm the home of Springer located in the State of Oklahoma, County of Creek, Congressionally or Constitutionally, and that coupled with the false and manufactured statements of Shern and Patterson, coupled with the false pretenses in which Special Agent Meadors obtained the information Shern relied upon to unsware out his unsworn statement in Attachment C, there can be only one conclusion.

The purported search warrant in this case violated Springer's Fourth Amendment Rights and sought to violate Springer's Fifth Amendment Rights with the information it sought.

**10.   CONCLUSION**

Lindsey K. Springer respectfully request this Court find that (1) Springer has demonstrated substantial and convincing evidence that a Frank's Hearing should be held on July 2, 2009, and further that (2)  Attachment C is not sworn before anyone, (3) contains information gathered in violation of Springer's Fourth and Fifth Amendment Rights by Special Agent Meadors, (4) that Brian Shern's reliance upon Special Agent Meadors was improper and in bad faith, (5) that Shern's unsworn statement contains known false statements otherwise, (6)  that nothing in Shern's unsworn statement would lead anyone to believe what is listed in Exhibit B would

be found in Springer's home, (7) that at all times Springer's home should have been protected under the Fourth Amendment from the United States seeking evidence to use against Springer in violation of the Fifth Amendment, from his private protected  home, (8) that the Magistrate lacked authority to issue any Search Warrants located territorially in the State of Oklahoma, and (9) that having removed all the unlawful conduct contained in the unsworn statement of Shern, there is simply no doubt no probable cause existed to believe any evidence of any violation of section 7201 or 7203 existed in the private home locate of Springer subject to protection under the Fourth Amendment and presented to anyone.

Respectfully Submitted
/s/ Lindsey K. Springer
Lindsey K. Springer
5147 S. Harvard, # 116
Tulsa, Oklahoma 74135
918-748-5539/955-8225(cell)

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Lindsey Kent Springer's

Memorandum of Law in Support of his Motion to Suppress and for a Frank's Hearing

accompanied with attached exhibits, was ecf'd on June  1, 2009, to:


Kenneth P. Snoke,
Charles O'Reilly,
Oscar Stilley


<u>/s/ Lindsey K. Springer</u>
Signature