Internal Revenue Service
Criminal Investigation

# Memorandum of Interview

| | | | |
|---|---|---|---|
| **In Re:** | Eddy Patterson | **Location:** | United States Attorney's Office |
| **Investigation #:** | 730030040 | | |
| **Date:** | May 6, 2004 | | |
| **Time:** | Approx. 2:20 P.M. | | |
| **Participant(s):** | Eddy Patterson, Witness | | |
| | Tim Arsenault, Special Agent IRS-CI | | |
| | Stan Swagerty, Special Agent FBI | | |
| | Steve Knorr, Attorney for Patterson | | |
| | Doug Horn, Assistant United States Attorney | | |
| | Melody Nelson, Assistant United States Attorney | | |

On the above date and time, SA Swagerty and I transported Eddy Patterson from David L. Moss correctional facility to the United States Attorney's Office. This Rule 11 proffer was set up at the request of Eddy Patterson who wanted to provide information to us about his criminal trial attorneys' and legal advisers. Patterson agreed to waive attorney client privileges relating to all his criminal trial attorney's including Oscar Stilley, Jerry Barringer, Frank Hagedorn, William Widell and William Patterson. Patterson was informed by Doug Horn that he could stop the questioning at any time and that we would leave the room, so he could have private conversations with his attorney Steve Knorr. In response to our questions Patterson provided the following information:

1. Patterson first contacted Lindsey Springer by phone shortly after SA Arsenault informed Patterson that he was under criminal investigation for tax violations. (SA Arsenault contacted Patterson on March 1, 2000.) Springer was referred to Patterson by Richard Clark. Patterson was also told by a fellow Gideon named Richard Hackler (phonetic spelling) that Springer conducts weekly meetings at an unknown location every Tuesday night in Broken Arrow with individuals that have a common denominator of tax problems or issues with the U.S. government. Patterson never attended these meeting but knows they are taped as Springer gave him tapes of meetings during which they discussed Patterson's tax problems.

2. After contacting Springer they met shortly after on a Saturday at NESCO. Present at the meeting was Patterson, Springer, Springer's unknown girlfriend and Oscar Stilley. Patterson is sure the meeting was on a Saturday because he did not want to meet during working hours with employees present. During the meeting it was decided that they would represent Patterson regarding his tax problems. Springer told Patterson that he was not an attorney but had been doing research for the last 10 years in this area. Stilley was the attorney and was familiar with this type of law. In the beginning Stilley

would bill Patterson on an hourly basis and Patterson would pay Stilley monthly. Springer told Patterson that he had a bus he needed to refurbish and use to travel to other tax cases. Springer wanted $45,000 from Patterson which Patterson paid to Springer over the next several weeks/months. Springer told Patterson that "is what he needed to do the case". Springer asked Patterson to write "donation" on the memo portion of the checks and told Patterson this money went through his ministry. Springer said that he did not charge fees but took money for his ministry. Patterson understood that any payments to Springer were fees for his services for handling his criminal case and managing the attorneys Oscar Stilley and Jerry Barringer. Springer said he knew more than the attorneys about this area of law and would direct them how to handle the case. Patterson would not have made donations to Springer because that is not what Patterson made donations to.

3. Patterson did not believe that Springer had any kind of religious ministry.

4. Patterson identified a $5,000 check payable to Jerry Barringer dated 3/17/00 and a $5,000 check payable to Oscar Stilley dated 3/17/00 written from his account #4008822 at Citizens Bank of Tulsa, now known as Gold Bank. Patterson believes he mailed these checks to Barringer and Stilley at Springer's request. They were for a retainer. Patterson believes he used the retainer money refunded from Tony Graham to pay Barringer and Stilley.

5. Patterson identified a check payable to Feldman, Frandon, Woodard & Farris dated 3/14/00 in the amount of $10,000 written from his account #4008822 at Citizens Bank of Tulsa. This check was a retainer for Tony Graham to represent him. After he decided not to use Graham, approximately $9,600 of the money was returned to Patterson. The difference was the amount charged by Graham for working on the case.

6. Patterson identified three $10,000 checks written to Springer dated 8/25/00, 9/25/00 and 11/9/00 drawn from his account #4008822 at Citizens Bank of Tulsa. Patterson believes these were part of the $45,000 paid to Springer. Patterson believes there was another check earlier than August written to Springer that investigators did not have at the interview. Springer did not instruct Patterson to make the checks $10,000 or less.

7. During approximately the spring of 2003, Patterson sold ECC Energy stock. [handwritten: July not Spring] Ed Foraker is the President of ECC Energy. Patterson endorsed an ECC Energy check in the amount of approximately $112,500 over to Oscar Stilley for criminal legal fees. Patterson believes Stilley deposited this into a trust account. Patterson is unsure how the check got to Stilley. He might have given it to Springer to deliver to Stilley. Springer told Patterson that it was important that the check go straight to Stilley. Springer warned that the IRS may attach to it if the check was deposited into Patterson's bank account. Once Stilley received the $112,500, Stilley gave Springer $45,000. Stilley had Patterson agree to this before the money was given to Springer. Springer then gave Patterson $30,000 of the $45,000. Patterson used the $30,000 to pay legal fees to Hall Estill. Hall Estill was representing Patterson for his civil liabilities. Patterson sometimes wrote credit card checks to Hall Estill and may have used the $30,000 to repay the credit card debt. The remaining $15,000 that Springer received was for services provided by Springer for Patterson's criminal defense.

8. Patterson never received monthly billings from Springer, just Stilley. The billings from Stilley may show payments made to Springer. Patterson agreed to turn these billings over to us. He may have some of the billings and communications with Stilley or Springer on his computer. He agreed to turn the computer over to us as well. Patterson may have saved some of the e-mails onto his computer hard drive. Patterson used AOL as his internet provider. The computer may currently be in storage at 106th and Memorial. His daughter Debra (918) 451-6430 or Tim Patterson would have access to it. With the approval of Patterson, Steve Knorr agreed to locate the computer, any billings and bank records documenting payments to Stilley, Springer or Barringer and turn them over to us. Knorr instructed Patterson to let Tim Patterson know that Knorr would pick up the evidence.

9. During approximately September 2003 Patterson settled with his insurance company for approximately $540,000 for legal fees. Patterson had officers and directors liability insurance. Patterson could not recall the name of the insurance company. Springer advised Patterson to take the settlement as it would provide enough money to fund his criminal defense. The insurance company made a check payable to Patterson and Hall Estill. Hall Estill was due $140,000. The remaining approximate $400,000 was paid over to Oscar Stilley by Hall Estill. Patterson believes the funds could have been wired to Stilley. Hall Estill represented Patterson for the class action law suit brought by NESCO shareholders and the SEC civil investigation. Patterson had to personally pay Hall Estill for a lawsuit brought by Dal Bagley against Patterson. The insurance company would not pay for this as Bagley was a director.

10. Out of the $400,000, Stilley gave Springer $90,000. Stilley said the money was for Springer's expertise and that he needed to be paid for his services. Stilley advised that Patterson pay Springer. Stilley received permission from Patterson before giving Springer the money. Patterson did not give this permission until after he met with Springer. Springer came to Patterson's house and told Patterson it was less than what he normally charges but that he charges "on ability to pay." Patterson understood that $60,000 was supposed to be for civil representation and Springer would return it if the civil case did not go forward. The civil case did not go forward but Springer never returned the money. Patterson felt the $90,000 paid to Springer was too high. Springer previously told him that the last payment of $15,000 was all he needed. Springer told Patterson that the case was more work than originally thought and since the insurance money was there Springer was entitled to it. After Patterson approved the money being paid to Springer, he believes it was done in the next few days. This would have been the later part of 2003.

11. After Stilley received the $400,000 insurance funds he gave Patterson back approximately $112,500 which represented the money from the stock sale. The $112,5000 was deposited by Patterson into Tulsa Sales and Rental's account at Oklahoma National Bank. Some of this money was used to pay off Patterson's credit card debt that had accrued legal fees to Hall Estill.

12. Out of the $400,000 & $112,500 payments, Stilley was left with approximately $270,000 for himself after the payments to Springer.

13. Patterson is unsure how much money Barringer received. The billings from Stilley may show this.

14. After Patterson was found guilty by jury, Patterson paid an additional $20,000 to Stilley. $10,000 was supposed to be for the transcript and $10,000 for sentencing phase representation. Patterson paid the $20,000 with funds from Tulsa Sales and Rental. The check was paid to Stilley's trust account. This took place in 2003 or 2004. Patterson asked why the $400,000 of insurance money did not cover this and was told there was none left. Patterson then asked Stilley about the $60,000 that was paid to Springer for civil representation. Springer told Stilley that he didn't owe it. The transcript turned out to cost around $6,600 and Stilley was going to return a little bit of the money but Judy Patterson continued to use Barringer for her sentencing phase. The remaining money was then paid to Barringer.

15. Patterson stated there was no understanding that Springer was to hold the $60,000 until Judy Patterson was released from prison and then the money would be given back to her. There was no intent in hiding money from the IRS.

16. After Patterson was found guilty he was taken to David L. Moss. A week or so later Stilley and Springer came to David L. Moss to visit with Patterson. 5 minutes into the meeting the guards made Stilley and Springer leave. Patterson later learned, after Stilley returned alone, that there was a problem with Springer's credentials and Springer was not found on the bar card. Springer was not allowed to visit Patterson anymore. Patterson was stripped searched when Stilley and Springer were made to leave the room.

17. Patterson decided to have Springer, Stilley and Barringer represent him for the entire criminal case as Springer told him they would do a better job and Springer had done a lot of research and knew more than Hall Estill. Barringer or Stilley never told Patterson they were experts in SEC related law. Hall Estill wanted to separate the SEC criminal case from the tax case. Hall Estill told Patterson they did not defend tax cases and he could get whoever he wanted to represent him on that. Patterson felt that Hall Estill was too expensive and felt they were not committed to the case. Patterson also felt that money was important to Hall Estill as the insurance check had not arrived at the time when he was deciding who to represent him. Patterson also felt that Frank Hagedorn's, Hall Estill criminal attorney, heart was not in the case. Patterson agreed with Doug Horn that it is an honest evaluation to assume that Hall Estill did not think Patterson's tax defense carried any weight. Hagedorn did not tell Patterson he disagreed with his beliefs but that he did not want to handle the tax case and it should be separated.

18. Stilley and Springer both told Patterson that they did not pay Federal income taxes. Stilley told Patterson that his wife filed married filing separate. Patterson is unsure if Barringer filed Federal tax returns or not.

19. Both Eddy and Judy Patterson were given assurances by Springer and Stilley that no one would go to jail. They said Judy was an innocent spouse. No plea agreements were ever communicated to Patterson by Stilley, Barringer or any other criminal attorney.

Frank Hagedorn wanted to discuss a plea and consider talking about it to prosecutors but no agreements or specifics were presented to Patterson. Patterson told Stilley that he would plead guilty to keep Judy out of the criminal case. John Bugg, Patterson's pastor at Woodland Acres Baptist Church, talked to Patterson about how the criminal process usually proceeds. Bugg suggested that a plea agreement is usually offered. Bugg was a former attorney for Connors and Winters. Patterson waived any attorney client or clergy privilege between him and Bugg and told us we were welcome to talk to Bugg about this.

20. In all, Patterson believes Springer receive at least $150,000. Patterson believes Springer lives in Sand Springs, OK or the Cleveland, OK area. Springer also dated a pro from the Clary Field Country Club (phonetic spelling).

21. At the conclusion of the interview we thanked Patterson for his time and SA Swagerty and I returned him to the David L. Moss correctional facility. At the jail SA Arsenault let Patterson use his cell phone to contact Tim Patterson. Eddy Patterson told Tim Patterson to get the computer, attorney billings and bank records together for Steve Knorr to pick up.

I certify that the above information clearly reflects the events that took place on the above date and time.

*Tim Arsenault*
Tim Arsenault
Special Agent

I prepared this memorandum on May 7, 2004, after refreshing my memory from notes made during the interview with Eddy Patterson.

*Tim Arsenault*
Tim Arsenault
Special Agent