IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03-CR-55-C |
| | ) | |
| EDDY PATTERSON and | ) | |
| JUDITH PATTERSON, | ) | |
| | ) | |
| Defendants. | ) | |

FILED
AUG 29 2003
Phil Lombardi, Clerk
U.S. DISTRICT COURT

## TRIAL BRIEF

### FACTUAL SUMMARY

Defendants Eddy and Judith Patterson are a married couple who have at all times relevant to the indictments lived in Tulsa County, Oklahoma. Defendant Judith Patterson worked for Moore's Funeral Home during the time period of the indictment.

Defendant Eddy Patterson was one of the founders of National Environmental Service Company (NESCO) and its CEO during the years 1994 to 2001. NESCO was a public-traded company, with its principal place of business in Tulsa, Oklahoma.

Tax : Counts 1-12

The Defendants filed federal income tax returns every year until 1997. In 1997, the Defendants, as a married couple, filed amendments (Form 1040X) to their 1993 and 1995 federal income tax returns. The amendments sought to obtain refunds of the federal income taxes they had previously paid in the amount of $48,000.00. Both Defendants signed the 1993 and 1995 Form 1040X and both forms were sent to the Internal Revenue Service (IRS) in 1997. Defendants did not amend their 1994 filed federal income tax return, it is assumed

they did not amend it because they got a refund that year.

The Defendants did not file federal income tax returns for the years 1996 through 2000 despite the fact that Defendant Eddy Patterson earned more than $1.78 million and Defendant Judith Patterson earned more than $68,000 in income during those years. Each year they went to Jeff Burns, a Certified Public Accountant (CPA), and had their federal income tax returns prepared. In 1997, when first notified of the Defendants' intention not to file federal income tax returns, Jeff Burns sent them a letter explaining all of the different criminal violations they could be prosecuted for if they did not file federal income tax. The Defendants continued using Mr. Burns to prepare their federal income tax returns for the years 1997, 1998, 1999 and 2000. In each year, the Defendants would receive completely prepared state and federal tax returns from Mr. Burns however, they would never sign or send the federal returns to the Internal Revenue Service. However, they did sign and send in their Oklahoma income tax returns every years.

During 1995, Defendant Judith Patterson notified the payroll department of her employer, Moore's Funeral Home, that she had nine exemptions from federal income tax withholding for her wages. The result of the nine exemptions was Defendant Judith Patterson had little or no income tax withheld from her pay. Later, Defendant Judith Patterson changed her W-4 (salary withholding) to reflect she should have no federal income tax withheld from her income.

Eddy Defendant Eddy Patterson notified the payroll department at NESCO not to

withhold federal income taxes from his personal wages for the years 1996 through 2000.

Bank Fraud: Counts 13-18

During 1999 to 2001, Defendant Eddy Patterson secured several personal loans with Tulsa banks. In 1999 Defendant Eddy Patterson secured a three million dollar personal loan from Citizen's Bank in Tulsa, now know as Gold Bank. The three million dollar loan was approved by Citizen's Bank after Defendant Eddy Patterson supplied personal financial statements and copies of his federal income tax returns to the bank. On the financial statement, under the category of "unpaid taxes", Defendant Eddy Patterson left blank. According to the tax returns provided to the bank, Eddy and his wife, Judith Patterson had paid the IRS $42,518.00 in taxes for the years 1996 and 1997. These statements were untrue because at the time of the loan, Defendant Eddy Patterson knew he and Judith Patterson had not filed or paid federal income taxes for 1996 and 1997.

In 2000, Defendant Eddy Patterson secured two personal loans from Security Bank. The first loan was for $300,059.46. Before the bank approved it, they received from Defendant Eddy Patterson his personal federal income tax returns for 1996, 1997 and 1998 and personal financial statements. These tax returns made it appear as though Defendant Eddy Patterson and his wife, Judith had paid the IRS $116, 553.00 in taxes when in truth, Defendant Eddy Patterson knew they had not filed their returns nor had they paid federal taxes for those years. The financial statements had been left blank on the area of "unpaid taxes", therefore it appeared the taxes had been paid.

In November 2000, Defendant Eddy Patterson went back to Security Bank and requested an additional loan for $900,000.00. This loan was granted based upon tax returns and a personal financial statement provided by Defendant Eddy Patterson in securing the previous loan. The personal financial statement showed no taxes were owed by Defendant Eddy Patterson and his wife, Judith Patterson when he knew federal income taxes for the years 1996, 1997, 1998 and 1999 had not been paid. According to the tax returns, it appeared Defendant Eddy Patterson had paid the federal government $169,374.00 in taxes when he had not paid any federal income taxes or filed federal income tax returns for those years.

In 2001 Defendant Eddy Patterson went to the Bank of Oklahoma to get three personal loans. The first loan in the amount of $400,000.00 was made by the Bank in reliance on the personal financial statement provided by Defendant Eddy Patterson. The financial statement showed Defendant Eddy Patterson owed $21,600 in taxes when in fact he had not paid federal income taxes or filed federal income tax returns for the years 1996, 1997, 1998 and 1999 and owed $165,562.00 in unpaid taxes. The second loan for $600,000 and the third load for $150, 000.00 were made relying on the same financial information provided by Defendant Eddy Patterson.

Securities Fraud: Counts 20-27

In 1989, Defendant Eddy Patterson and Albert "Bert" McCutcheon purchased National Environmental Services Company (NESCO). At the time of the purchase, NESCO was a private corporation. In 1995, NESCO stock began trading on the Nasdaq's Over-the-

Counter Bulletin Board. On January 24, 1996, NESCO's common stock began trading on the Nasdaq SmallCap Market under the symbol "NESC." NESCO's shares were registered with the Securities and Exchange Commission (SEC) under Section 12(g) of the Securities Exchange Act of 1934. NESCO was required to file periodic reports with the SEC pursuant to Section 13(a) of the Exchange Act.

NESCO was an Oklahoma corporation based in Tulsa, Oklahoma. NESCO performed environmental remediation services for numerous state agencies and provided construction and fueling systems for convenience stores, grocery stores and service stations. NESCO had a staff of over 300 and had offices in several states.

In 1999, Defendant Eddy Patterson bought a large portion of NESCO shares from his partner, Bert McCutcheon. The money for the buyout was provided by the three million dollar personal loan Defendant Eddy Patterson secured from Citizen's Bank.

During the late 1990s and until his resignation, in August 2001, Defendant Eddy Patterson was the CEO and Chairman of the Board at NESCO. In December 31, 2000, NESCO stock was owned by an estimated 1800 shareholders, with Defendant Eddy Patterson owning over 30% of the outstanding stock at that time. During the fall of 2000, NESCO began negotiations with a company named Saugatuck for the sale of NESCO.

In the fall of 2000, NESCO began experiencing cash flow problems. At the same time NESCO was experiencing these cash flow problems, senior management, led by Defendant Eddy Patterson, was negotiating with a group of outside investors from

Saugatuck. If completed, the private sale of NESCO to Saugatuck would infuse the company with more working capital and Defendant Eddy Patterson would have personally received several million dollars in cash and a large ownership interest in NESCO as a private company.

In late 2000, Saugatuck had begun its due diligence and was waiting on the results of NESCO's 2000 year end financial statements. In the fall of 2000, the Tulsa, Oklahoma accounting firm of Tullis Taylor was hired by NESCO to audit the corporation's year end financial statements. Defendant Eddy Patterson requested an accelerated audit of the 2000 financial books in order to facilitate NESCO's negotiations with Saugatuck. Tullis Taylor agreed to accelerate their audit and completed the majority of their work before December 1, 2000. The 2000 financial statements were not completed and submitted to Saugatuck until March, 2001.

During 2000 and continuing until May 2001, Bob Watson was the comptroller for NESCO. Catherine Randolph, a NESCO employee, was directly supervised by Bob Watson. Catherine Randolph's job duties included inputting invoices to customers into NESCO's accounting system. These invoices would make up NESCO's accounts receivable in their financial statements.

On a Saturday morning in January 2001, Catherine Randolph was working and she saw Defendant Eddy Patterson and Bob Watson in a closed-door meeting. After leaving the meeting, Bob Watson came to Catherine Randolph and instructed her to prepare false

invoices, backdating them to dates between December 19 and December 31, 2000. Bob Watson gave her detailed instructions concerning the customers to invoice, the amount to invoice and additional narrative information to include. Catherine Randolph did as she was instructed and created the false invoices and entered them into NESCO's accounting system.

The invoices reflected false accounts receivable that were not due to NESCO and were completely unrelated to services actually performed by the company or billed to its customers. The resulting phantom revenue and income, however, were included in NESCO's fiscal year 2000 financial statements, which were then provided to NESCO's auditor, Tullis Taylor. Defendant Eddy Patterson and Watson lied to the auditor to prevent discovery of the scheme during the audit, which was completed in March, 2001. On March 2, and March 26, 2001, Defendant Eddy Patterson signed NESCO's management representation letters to Tullius Taylor, stating that the financial information provided to the auditor for NESCO's fiscal year 2000 audit was accurate.

Further, Defendant Eddy Patterson provided the audited financial statements to Saugatuck and included them in NESCO's Form 10-KSB, which he signed and filed with the Commission on behalf of NESCO on April 2, 2001. Saugatuck, however, decided it would not purchase NESCO and the corporation continued with its business operations as it had in the past.

In or about April 2001, Defendant Eddy Patterson and Watson directed Randolph to create yet another invoice in the amount of $183,385 for services that had not been

performed by the company. As instructed, she back dated the invoice to March 31, 2001, and recorded it in accounts receivable in NESCO's financial accounting system for the first quarter of fiscal year 2001. Although a notation on the invoice read "construction and repair," no work had been performed and it had not been sent to a customer. This invoice was included in the first quarter 2001 financial statements and SEC filings.

In the spring of 2001 after hiring a new controller, Tom Franz, the false invoices were discovered. NESCO's audit committee investigated the false invoices and as a result, Defendant Eddy Patterson resigned as NESCO CEO in August 2001.

NESCO announced it would restate its 2000 annual report and first quarter 2001 filing with the SEC in August 2001. The announcement of the restatements caused the Nasdaq to suspend NESCO's stock from trading for approximately six months with the stock trading at $1.1 in August 2001 and dropping to .10 cents in April, 2002.

In August 2001, NESCO filed amended Forms 10-KSB and 10-QSB, restating its financial statements for fiscal year 2000 and the first quarter of fiscal year 2001. At the time of these filings, the company's internal investigation and Tullius Taylor's audit had not revealed the $183,385 false invoice from the first quarter of 2001. This misstatement was discovered in September 2001 and disclosed in NESCO's third-quarter Form 10-QSB filed in November 2001.

## LEGAL ISSUES

**I. Issue relating to tax counts**

Defendant Eddy Patterson has been charged with Conspiracy to defraud the United States (Count 1) and Tax Evasion for the years 1996-2000 (Counts 8-12). Defendant Judith Patterson has been charged with Conspiracy (Count 1) and Failure to file federal income tax returns for the years 1996, 1998, 1999 and 2000 (Counts 4-7). The Government anticipates one of the issues at trial will be whether Defendants Eddy and Judith Patterson had to file federal income tax returns.

Every individual whose taxable year's gross income equals or exceeds the exemption amount must file a tax return. 26 U.S.C. § 6012(1)(A). A married individual, entitled to file a joint return, and whose gross income, when combined with their spouse's income, is less than the sum of twice the exemption amount plus the basic standard deduction applicable to a joint return, does not have to file an income tax return. 26 U.S.C. § 6012(1)(A)(iv). The threshold amount for filing tax returns is lower if the individual is married but files under the "married, filing separately" category. Because the Pattersons did not file income tax returns, the calculations concerning gross income and deduction amounts were prepared using the categories of "married filing jointly" and "married filing separately". It was determined it would be more advantageous for Defendant Judith Patterson if the "married filing separately" category was applied to her. Under the "married filing separately" category, Defendant Judith Patterson did not make enough income in 1997 to have to file income tax returns.

Using the formula provided in 26 U.S.C. § 6012(1)(A)(iv), a married person, filing

"married filing separately", would be required to file a federal income tax return if the person's gross income was more than the amounts listed below:

| | |
|---|---|
| 1996 | $2,550 |
| 1998 | $2,700 |
| 1999 | $2,750 |
| 2000 | $2,800 |

The term "Gross Income" includes "all income from whatever source derived...". 26 U.S.C. § 61(a). Tax returns filed pursuant to 26 U.S.C. § 6012 shall be filed on or before April 15 after the close of the calendar year. 26 U.S.C. § 6072.

The proof at trial will establish Defendant Eddy Patterson had gross income which required him to file federal income tax returns for the years 1996-2000 and Defendant Judith Patterson had gross income which required her to file income tax returns for the years 1996, 1998, 1999 and 2000.

## II. Issue relating to bank fraud

The Government anticipates another issue at trial will be whether Defendant Eddy Patterson's omission to the banks that he did not file federal income tax returns or pay federal income taxes constitutes a false statement under 18 U.S.C. § 1014. In Defendant Eddy Patterson's financial statements provided to the banks, the portion of the statements where unpaid taxes would be listed was left blank. This omission lead the banks to believe there were no unpaid taxes. In addition, by providing the banks with federal income tax returns, Defendant Eddy Patterson was falsely leading the banks to believe he filed federal income tax returns and paid federal income tax.

The omission of information can be evidence upon which a jury may convict under 18 U.S.C. § 1014. The Tenth Circuit has stated, "A representation has long been held to consist of words, made orally or in writing, *or* other *conduct* manifesting to another the existence of a material present or past fact." *United States v. Copus*, 110 F.3d 1529, 1535 (10th Cir. 1997) quoting *United States v. Bonnett*, 877 F.2d 1450, 1456 (10th Cir. 1989) (emphasis in original). Although *Copus* was decided before *United States v. Wells*, 519 U.S. 482 (1997), and materiality is no longer an element of a 18 U.S.C. § 1014 charge, the definition of what defines a representation still applies.

The misrepresentation accompanied by the presentation of tax returns has been addressed in *United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000). In *Hicks*, the Defendant, upon request from the bank, provided tax returns for 1987 and 1989. The tax returns were not copies of the tax returns the Defendant had filed with the Internal Revenue Service, but were altered returns fabricated for the specific purpose of providing them to the bank. The Ninth Circuit upheld the jury's verdict, noting "By providing the Glendale returns at the time and in the manner he did, Defendant directly (albeit through assertive conduct) stated that the documents were copies of his federal income tax returns for the two relevant years. That statement was false." *Hicks*, 217 F.3d at 1043.

The evidence, at trial, will show Defendant Eddy Patterson failed to disclose his unpaid tax liability on his financial statements and gave copies of his federal income tax returns to the banks, knowing they had not nor would be filed. These actions constitute

false statements to a bank.

### III. Issue relating to securities fraud

The Government anticipates that a jury instruction on willful blindness or deliberate ignorance will be appropriate in this case relating to Defendant Eddy Patterson's knowing participation in the securities fraud alleged in the Indictment. The United States expects to introduce evidence at trial that during the periods covered by the Indictment, Defendant Eddy Patterson knowingly and willfully falsified Nesco's accounts receivable through the creation of bogus customer invoices, submitted those false receivables to the Securities and Exchange Commission ("SEC"), made false statements to the SEC and to Nesco's auditors, and falsified Nesco's books and records. Further, the United States expects that Defendant Eddy Patterson will deny having had any knowledge of or involvement in the charged fraudulent conduct. Instead, Defendant Eddy Patterson is expected to claim either complete ignorance or that any improper conduct was committed solely by Bob Watson, Nesco's now-deceased former controller, without Defendant Eddy Patterson's knowledge or complicity.

On appeal, the propriety of a willful blindness instruction is reviewed under a *de novo* standard. *United States v. Barbee,* 968 F.2d 1026, 1033 (10th Cir. 1992). Tendering a willful blindness instruction to the jury is proper in this Circuit when three circumstances are met. First, the defendant against whom the instruction is offered must deny knowledge of an operant fact. *United States v. Delreal-Ordones,* 213 F.3d 1263, 1268 (10th Cir. 2000); *United States v. de Francisco-Lopez,* 939 F.2d 1405, 1411 (10th

Cir. 1991). Second, the government must present evidence, either direct or circumstantial, showing that the defendant engaged in deliberate acts to avoid obtaining actual knowledge of the fact in question. *Id.* In this regard, the willful blindness, or "ostrich," instruction has been compared approvingly in this Circuit to "a refined circumstantial evidence instruction properly tailored to the facts of [the] case." *United States v. Manriquez Arbizo,* 833 F.2d 244, 248 (10th Cir. 1987).

Third, in addition to satisfying the above elements--denial by the defendant and presentation of sufficient supporting evidence--a proper willful blindness instruction should explicitly state that neither mistake nor negligence by the defendant is sufficient to support a conviction. Instead, a proper willful blindness instruction should include language to the effect that the defendant must have "deliberately blinded himself to the existence of a fact." *United States v. Concha,* 233 F.3d 1249, 1253 (10th Cir. 2000).

The United States is not required to produce direct evidence of conscious avoidance by Defendant Eddy Patterson of the fact in question to be entitled to such an instruction. *Delreal-Ordones,* 213 F.3d at 1268; *United States v. Hanzlicek,* 187 F.3d 1228, 1233 (10th Cir. 1999). Instead, the government may rely wholly on circumstantial evidence and the benefit of any favorable inferences that may be drawn from that evidence. *Delreal-Ordones,* 213 F.3d at 1268. Further, other circuits have held that in the securities-fraud context, evidence of a defendant's suspension of normal curiosity about a co-conspirator's actions may justify the court's instruction on willful blindness.

*United States v. Fauls*, 65 F.3d 592, 598 (7th Cir. 1995).

Indeed, this Circuit has upheld the issuance of a willful blindness instruction even when the government failed to introduce *any* evidence supporting the theory that the defendant deliberately avoided learning the relevant facts. *United States v. Sasser*, 974 F.2d 1544 (10th Cir. 1992). In *Sasser*, the government admitted that it did not present any evidence at trial concerning the defendant's knowledge that would support a willful blindness instruction. *Id.* at 1552. The district court instructed the jury on willful blindness anyway. *Id.* Setting aside this lack of evidence of willful blindness, the circuit court instead focused on evidence of the defendant's actual knowledge of the fraudulent activity in upholding the court's instruction: "In conclusion, we hold that when sufficient evidence of a defendant's guilt exists, the tendering of a 'willful blindness' instruction is harmless beyond a reasonable doubt even when the government does not introduce evidence to support such a theory." *Id.* at 1553.

In this case, Defendant Eddy Patterson has consistently denied any knowledge of wrongdoing relating to the false invoices and misstatements on which the government's securities-fraud charges are based. Accordingly, unless Defendant Eddy Patterson changes his story at trial, the Government will satisfy the first requisite for tendering a willful blindness instruction to the jury. *Delreal-Ordones*, 213 F.3d at 1268; *de Francisco-Lopez*, 939 F.2d at 1411.

Second, the United States contends that it will present evidence at trial demonstrating Defendant Eddy Patterson's active participation in the securities fraud

-14-

alleged in the Indictment. Alternatively, the United States contends that it will present evidence showing that Defendant Eddy Patterson's conduct, at a minimum, demonstrates deliberate indifference to Watson's misconduct relating to Nesco's accounts receivable and involvement in the preparation of false customer invoices. Provided that the government presents such evidence at trial, a willful blindness instruction to the jury will be proper or, at a minimum, harmless error. *Id.; Sasser*, 974 F.2d at 1553.

Finally, the requested instruction can be properly crafted to ensure that Defendant Eddy Patterson's mistake or negligence, if any, does not support a conviction, but instead to require a finding by the jury of deliberate blindness. *Concha*, 233 F.3d at 1253. Under these circumstances, the United States will be entitled to a jury instruction on willful blindness.

Respectfully submitted,

DAVID E. O'MEILIA
United States Attorney

*[signature]*
MELODY NOBLE NELSON
OBA #16467
Assistant United States Attorney
333 W. 4th Street, Suite 3460
Tulsa, Oklahoma 74103
(918) 581-7463

## CERTIFICATE OF SERVICE

This is to certify that on the 2nd day of ~~July~~ September, 2003, a true and correct copy of the foregoing was mailed to:

-15-

Jerold Barringer
Attorney At Law
P.O. Box 213
Nokomis, IL 62075

William Widell, Jr.
Attorney At Law
403 S. Cheyenne Ave.
Penthouse
Tulsa, OK 74103

Oscar Stilley
Attorney At Law
Central Mall Plaza, Suite 520
5111 Rogers Ave.
Fort Smith, AR 72903

*[signature]*
ASSISTANT UNITED STATES ATTORNEY