# Internal Revenue
# bulletin

**Bulletin No. 2007-36**
**September 4, 2007**

## HIGHLIGHTS
## OF THIS ISSUE

**These synopses are intended only as aids to the reader in identifying the subject matter covered. They may not be relied upon as authoritative interpretations.**

## INCOME TAX

**Rev. Rul. 2007–57, page 531.**
**Federal rates; adjusted federal rates; adjusted federal long-term rate and the long-term exempt rate.** For purposes of sections 382, 642, 1274, 1288, and other sections of the Code, tables set forth the rates for September 2007.

**T.D. 9340, page 487.**
Final regulations provide updated guidance on tax-shelter annuities, custodial accounts of public schools and section 501(c)(3) tax-exempt organizations, and church retirement income accounts, authorized under section 403(b) of the Code. The regulations provide the public with the guidance necessary to comply with the law and will affect sponsors of section 403(b) contracts, administrators, participants and beneficiaries. The regulations also provide guidance relating to the controlled group rules under section 414(c) for entities that are tax-exempt under section 501(a).

**T.D. 9343, page 533.**
Final regulations under section 1502 of the Code allow the Service to appoint a domestic substitute agent for a consolidated group when the group's parent is a foreign corporation that is treated as a domestic corporation under section 7872 or as the result of a section 953(d) election.

**T.D. 9344, page 535.**
**REG–148951–05, page 550.**
Final, temporary, and proposed regulations under section 7425 of the Code relate to discharge of liens and return of wrongfully levied property under section 6343. The regulations clarify that notices and claims are to be sent to the IRS office and official specified in the relevant IRS publications.

**T.D. 9345, page 523.**
Final regulations under sections 367 and 1248 of the Code set forth principles for the attribution of earnings and profits to shares of stock of current or former controlled foreign corporations that participate in certain nonrecognition transactions. The final regulations also provide that, for purposes of section 1248, when a foreign partnership sells stock of a corporation, the partners of the partnership are treated as selling their proportionate shares of such stock.

**REG–101001–05, page 548.**
Proposed regulations under section 165 of the Code provide guidance on the availability and character of a deduction for a loss sustained from abandoned stock or other securities.

**REG–128224–06, page 551.**
Proposed regulations under section 67 of the Code provide a uniform standard for identifying the types of costs incurred by estates or non-grantor trusts that are fully deductible in calculating adjusted gross income under section 67(e)(1). Costs incurred by estates or non-grantor trusts are unique to an estate or trust are not miscellaneous itemized deductions that are deductible only to the extent they exceed 2 percent of adjusted gross income. A public hearing is scheduled for November 14, 2007.

**(Continued on the next page)**

Announcements of Disbarments and Suspensions begin on page 554.
Finding Lists begin on page ii.



Department of the Treasury
Internal Revenue Service

**Notice 2007–72, page 544.**
**Transaction of interest – contribution of successor member interest.** This notice describes a transaction in which a taxpayer makes a charitable contribution of an interest in an entity that holds real property and claims a deduction for the contribution that is significantly higher than the amount the taxpayer paid to acquire the interest. This notice identifies the transaction, and substantially similar transactions, as transactions of interest for purposes of regulations section 1.6011–4(b)(6) and sections 6111 and 6112 of the Code; and alerts persons involved with these transactions to certain responsibilities that may arise from their involvement with these transactions.

**Notice 2007–73, page 545.**
This notice identifies a transaction that uses a grantor trust, and the purported termination and subsequent re-creation of the grantor trust, for the purpose of allowing the grantor to claim a tax loss greater than any actual economic loss sustained by the taxpayer or to avoid inappropriately the recognition of gain. The notice also alerts persons involved with these transactions to certain responsibilities that may arise from their involvement with these transactions.

# EMPLOYEE PLANS

### T.D. 9340, page 487.
Final regulations provide updated guidance on tax-shelter annuities, custodial accounts of public schools and section 501(c)(3) tax-exempt organizations, and church retirement income accounts, authorized under section 403(b) of the Code. The regulations provide the public with the guidance necessary to comply with the law and will affect sponsors of section 403(b) contracts, administrators, participants and beneficiaries. The regulations also provide guidance relating to the controlled group rules under section 414(c) for entities that are tax-exempt under section 501(a).

# EXEMPT ORGANIZATIONS

### T.D. 9340, page 487.
Final regulations provide updated guidance on tax-shelter annuities, custodial accounts of public schools and section 501(c)(3) tax-exempt organizations, and church retirement income accounts, authorized under section 403(b) of the Code. The regulations provide the public with the guidance necessary to comply with the law and will affect sponsors of section 403(b) contracts, administrators, participants and beneficiaries. The regulations also provide guidance relating to the controlled group rules under section 414(c) for entities that are tax-exempt under section 501(a).

**Announcement 2007–76, page 560.**
The IRS has revoked its determination that Progressive Services, Inc., of Norman, OK; Harold Binstein Humanitarian Fund of Chicago, IL; Say No to Drugs of Greenville, TX; Shamrock Boxing, Inc., of Covington, KY; National Home Foundation, Inc., of Rockville, MD; and Business & Nonprofit Center of Eastern Madera County of Fresno, CA, qualify as organizations described in sections 501(c)(3) and 170(c)(2) of the Code.

# ESTATE TAX

### T.D. 9344, page 535.
### REG–148951–05, page 550.
Final, temporary, and proposed regulations under section 7425 of the Code relate to discharge of liens and return of wrongfully levied property under section 6343. The regulations clarify that notices and claims are to be sent to the IRS office and official specified in the relevant IRS publications.

# GIFT TAX

### T.D. 9344, page 535.
### REG–148951–05, page 550.
Final, temporary, and proposed regulations under section 7425 of the Code relate to discharge of liens and return of wrongfully levied property under section 6343. The regulations clarify that notices and claims are to be sent to the IRS office and official specified in the relevant IRS publications.

# EMPLOYMENT TAX

### T.D. 9344, page 535.
### REG–148951–05, page 550.
Final, temporary, and proposed regulations under section 7425 of the Code relate to discharge of liens and return of wrongfully levied property under section 6343. The regulations clarify that notices and claims are to be sent to the IRS office and official specified in the relevant IRS publications.

# SELF-EMPLOYMENT TAX

### T.D. 9344, page 535.
### REG–148951–05, page 550.
Final, temporary, and proposed regulations under section 7425 of the Code relate to discharge of liens and return of wrongfully levied property under section 6343. The regulations clarify that notices and claims are to be sent to the IRS office and official specified in the relevant IRS publications.

**(Continued on the next page)**

# EXCISE TAX

**T.D. 9344, page 535.**
**REG–148951–05, page 550.**
Final, temporary, and proposed regulations under section 7425 of the Code relate to discharge of liens and return of wrongfully levied property under section 6343. The regulations clarify that notices and claims are to be sent to the IRS office and official specified in the relevant IRS publications.

# TAX CONVENTIONS

**Announcement 2007–75, page 540.**
This document provides a copy of the Competent Authority Agreement (CAA) entered into by the Competent Authorities of the United States and the Netherlands with respect to the qualification of certain tax-exempt trusts, companies, or other organizations for benefits under Article 35 of the U.S.–Netherlands income tax treaty. The CAA also provides guidelines for claiming treaty benefits in each country and the methods each country will use to grant treaty benefits.

# ADMINISTRATIVE

**T.D. 9344, page 535.**
**REG–148951–05, page 550.**
Final, temporary, and proposed regulations under section 7425 of the Code relate to discharge of liens and return of wrongfully levied property under section 6343. The regulations clarify that notices and claims are to be sent to the IRS office and official specified in the relevant IRS publications.

**Rev. Proc. 2007–57, page 547.**
This procedure informs taxpayers of their obligations under section 3402(q) of the Code pertaining to withholding and information reporting applicable to certain amounts paid to winners of poker tournaments. It further sets forth procedures to be used to comply with the relevant requirements of the Code and the Treasury regulations thereunder.

# The IRS Mission

Provide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and by applying the tax law with integrity and fairness to all.

# Introduction

The Internal Revenue Bulletin is the authoritative instrument of the Commissioner of Internal Revenue for announcing official rulings and procedures of the Internal Revenue Service and for publishing Treasury Decisions, Executive Orders, Tax Conventions, legislation, court decisions, and other items of general interest. It is published weekly and may be obtained from the Superintendent of Documents on a subscription basis. Bulletin contents are compiled semiannually into Cumulative Bulletins, which are sold on a single-copy basis.

It is the policy of the Service to publish in the Bulletin all substantive rulings necessary to promote a uniform application of the tax laws, including all rulings that supersede, revoke, modify, or amend any of those previously published in the Bulletin. All published rulings apply retroactively unless otherwise indicated. Procedures relating solely to matters of internal management are not published; however, statements of internal practices and procedures that affect the rights and duties of taxpayers are published.

Revenue rulings represent the conclusions of the Service on the application of the law to the pivotal facts stated in the revenue ruling. In those based on positions taken in rulings to taxpayers or technical advice to Service field offices, identifying details and information of a confidential nature are deleted to prevent unwarranted invasions of privacy and to comply with statutory requirements.

Rulings and procedures reported in the Bulletin do not have the force and effect of Treasury Department Regulations, but they may be used as precedents. Unpublished rulings will not be relied on, used, or cited as precedents by Service personnel in the disposition of other cases. In applying published rulings and procedures, the effect of subsequent legislation, regulations, court decisions, rulings, and procedures must be considered, and Service personnel and others concerned are cautioned against reaching the same conclusions in other cases unless the facts and circumstances are substantially the same.

The Bulletin is divided into four parts as follows:

**Part I.—1986 Code.**
This part includes rulings and decisions based on provisions of the Internal Revenue Code of 1986.

**Part II.—Treaties and Tax Legislation.**
This part is divided into two subparts as follows: Subpart A, Tax Conventions and Other Related Items, and Subpart B, Legislation and Related Committee Reports.

**Part III.—Administrative, Procedural, and Miscellaneous.**
To the extent practicable, pertinent cross references to these subjects are contained in the other Parts and Subparts. Also included in this part are Bank Secrecy Act Administrative Rulings. Bank Secrecy Act Administrative Rulings are issued by the Department of the Treasury's Office of the Assistant Secretary (Enforcement).

**Part IV.—Items of General Interest.**
This part includes notices of proposed rulemakings, disbarment and suspension lists, and announcements.

The last Bulletin for each month includes a cumulative index for the matters published during the preceding months. These monthly indexes are cumulated on a semiannual basis, and are published in the last Bulletin of each semiannual period.

The contents of this publication are not copyrighted and may be reprinted freely. A citation of the Internal Revenue Bulletin as the source would be appropriate.

For sale by the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402.

# Part I. Rulings and Decisions Under the Internal Revenue Code of 1986

## Section 42.—Low-Income Housing Credit

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 280G.—Golden Parachute Payments

Federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 382.—Limitation on Net Operating Loss Carryforwards and Certain Built-In Losses Following Ownership Change

The adjusted applicable federal long-term rate is set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 403.—Taxation of Employee Annuities

*26 CFR 1.403(b)–1: General overview of taxability under an annuity contract purchased by a section 501(c)(3) organization or a public school.*

## T.D. 9340

## DEPARTMENT OF THE TREASURY
**Internal Revenue Service**
**26 CFR Parts 1, 31, 54 and 602**

## Revised Regulations Concerning Section 403(b) Tax-Sheltered Annuity Contracts

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations.

SUMMARY: This document promulgates final regulations under section 403(b) of the Internal Revenue Code and under related provisions of sections 402(b), 402(g), 402A, and 414(c). The regulations provide updated guidance on section 403(b) contracts of public schools and tax-exempt organizations described in section 501(c)(3). These regulations will affect sponsors of section 403(b) contracts, administrators, participants, and beneficiaries.

DATES: *Effective Date:* July 26, 2007.

*Applicability Date:* These regulations generally apply for taxable years beginning after December 31, 2008. However, see the "Applicability date" section in this preamble for additional information regarding the applicability of these regulations.

FOR FURTHER INFORMATION CONTACT: Concerning the regulations, John Tolleris, (202) 622–6060; concerning the regulations as applied to church-related entities, Robert Architect (202) 283–9634 (not toll-free numbers).

SUPPLEMENTARY INFORMATION:

**Paperwork Reduction Act**

The collection of information in §1.403(b)–10(b)(2)(i)(C) of these final regulations has been approved by the Office of Management and Budget in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)) under control number 1545–2068. Responses to this collection of information are required in order to provide certain benefits.

The estimated burden per respondent varies among the plan administrator/payor/recordkeeper, depending upon individual respondents' circumstances, with an estimated average of 4.1 hours. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be sent to the **Internal Revenue Service**, Attn: IRS Reports Clearance Officer, SE:W:CAR:MP:T:T:SP, Washington, DC 20224, and to the **Office of Management and Budget**, Attn: Desk Officer for the Department of the Treasury, Office of Information and Regulatory Affairs, Washington, DC 20503.

The collection of information in §1.403(b)–10(b)(2)(i)(C) of these final regulations was not contained in the prior notice of proposed rulemaking. For this reason, this additional collection of information has been reviewed and, pending receipt and evaluation of public comments, approved by the Office of Management and Budget in accordance with the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)) under control number 1545–2068. Comments concerning this additional collection of information should be sent to the **Internal Revenue Service**, Attn: IRS Reports Clearance Officer, SE:W:CAR:MP:T:T:SP, Washington, DC 20224, and to the **Office of Management and Budget**, Attn: Desk Officer for the Department of the Treasury, Office of Information and Regulatory Affairs, Washington, DC 20503. Comments on the collection of information should be received by September 24, 2007. Comments are specifically requested concerning:

Whether the proposed collection of information is necessary for the proper performance of the functions of the Internal Revenue Service, including whether the information will have practical utility;

The accuracy of the estimated burden associated with the proposed collection of information (see above);

How the quality, utility, and clarity of the information to be collected may be enhanced;

How the burden of complying with the proposed collections of information may be minimized, including through the application of automated collection techniques or other forms of information technology; and

Estimates of capital or start-up costs and costs of operation, maintenance, and purchase of service to provide information.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number assigned by the Office of Management and Budget.

The estimated burden per respondent varies among the plan administrator/payor/recordkeeper, depending upon individual respondents' circumstances, with an estimated average of 4.1 hours.

Books or records relating to a collection of information must be retained as long as their contents might become material in

the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

## Background

Regulations (T.D. 6783, 1965–1 C.B. 180) under section 403(b) of the Internal Revenue Code (Code) were originally published in the **Federal Register** (29 FR 18356) on December 24, 1964. Those regulations provided guidance for complying with section 403(b), which had been enacted in 1958 in section 23(a) of the Technical Amendments Act of 1958, Public Law 85–866 (1958), relating to tax-sheltered annuity arrangements established for employees by public schools and tax-exempt organizations described in section 501(c)(3). Since 1964, additional regulations were issued under section 403(b) to reflect rules relating to certain eligible rollover distributions[1] and required minimum distributions under section 401(a)(9).[2] See §601.601(d)(2) relating to objectives and standards for publishing regulations, revenue rulings and revenue procedures in the Internal Revenue Bulletin.

On November 16, 2004, a notice of proposed rulemaking (REG–155608–02, 2004–2 C.B. 924) was published in the **Federal Register** (69 FR 67075) that proposed a comprehensive update of the regulations under section 403(b) (2004 proposed regulations), including: amending the 1964 and subsequent regulations to conform them to the numerous amendments made to section 403(b) by subsequent legislation, including section 1022(e) of the Employee Retirement Income Security Act of 1974 (ERISA) (88 Stat. 829), Public Law 93–406; section 251 of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) (96 Stat. 324, 529), Public Law 97–248; section 1120 of the Tax Reform Act of 1986 (TRA '86) (100 Stat. 2085, 2463), Public Law 99–514; section 1450(a) of the Small Business Job Protection Act of 1996 (SBJPA) (110 Stat. 1755, 1814), Public Law 104–188; and sections 632, 646, and 647 of the Economic Growth and Tax Relief Reconciliation Act of 2001

(EGTRRA) (115 Stat. 38, 113, 126, 127), Public Law 107–16. The 2004 proposed regulations also included controlled group rules under section 414(c) for entities that are tax-exempt under section 501(a).

Following publication of the 2004 proposed regulations, comments were received and a public hearing was held on February 15, 2005. After consideration of the comments received, the 2004 proposed regulations are adopted by this Treasury decision, subject to a number of changes, some of which are summarized below in this preamble.

Section 403(b) was also amended by sections 811, 821, 822, 824, 826, and 829 of the Pension Protection Act of 2006 (PPA '06) (120 Stat. 780), Public Law 109–280. These final regulations reflect these amendments.

### Sections 403(b) and 414(c) Statutory Provisions

Section 403(b) provides an exclusion from gross income for certain contributions made by specific types of employers for their employees and by certain ministers to specified types of funding arrangements. The employers are limited to public schools and section 501(c)(3) organizations. There are three categories of funding arrangements to which section 403(b) applies: (1) annuity contracts (as defined in section 401(g)) issued by an insurance company; (2) custodial accounts that are invested solely in mutual funds; and (3) retirement income accounts, which are only permitted for church employees and certain ministers. Except as otherwise indicated, an annuity contract, for purposes of these final regulations, includes a custodial account that is invested solely in mutual funds.

The exclusion applies to employer nonelective contributions (including matching contributions) and elective deferrals (other than designated Roth contributions) within the meaning of section 402(g)(3)(C) (which applies to section 403(b) contributions made pursuant to a salary reduction agreement). The exclusion applies only if certain requirements relating to availability, nondiscrimination, and distribution are satisfied. Section

403(b) arrangements may also include after-tax employee contributions.

Section 403(b)(1)(C) requires that the contract be nonforfeitable (except for the failure to pay future premiums), regardless of the type of contribution used to purchase the contract. Section 403(b)(1)(E) requires a section 403(b) contract purchased under a salary reduction agreement to satisfy the requirements of section 401(a)(30) relating to limitations on elective deferrals under section 402(g)(1). In addition, all contributions to a section 403(b) arrangement, when expressed as annual additions under section 415(c)(2), must not exceed the applicable limit of section 415.

Section 403(b)(5) provides that all section 403(b) contracts purchased for an individual by an employer are treated as purchased under a single contract for purposes of the requirements of section 403(b). Other aggregation rules apply both on an individual and aggregate basis. For example, the section 402(g) limitations on elective deferrals apply to all elective deferrals during the year with respect to an individual and the limitations of section 401(a)(30) apply to all elective deferrals made by an employer to that employer's plans with respect to an individual during the year. The contribution limitations of section 415 generally apply on an employer-by-employer basis.

Section 403(b)(12) requires a section 403(b) contract that provides for elective deferrals to make elective deferrals available to all employees (the universal availability rule) and requires other contributions to satisfy the general nondiscrimination requirements applicable to qualified plans. These rules are discussed further in this preamble under the heading "Section 403(b) Nondiscrimination and Universal Availability Rules."

A section 403(b) contract is also required to provide that it will satisfy the required minimum distribution requirements of section 401(a)(9), the incidental benefit requirements of section 401(a), and the rollover distribution rules of section 402(c).

Many section 403(b) arrangements of employers that are section 501(c)(3) organizations are subject to the Employee Retirement Income Security Act of 1974

---

[1] See T.D. 8619, 1995–2 C.B. 41, September 22, 1995 (60 FR 49199).

[2] See T.D. 8987, 2002–1 C.B. 852, April 17, 2002 (67 FR 18987).

(ERISA), which includes rules substantially identical to the rules for qualified plans, including rules parallel to the section 414(l) transfer rules, the section 401(a)(11) qualified joint and survivor annuity (QJSA) transferee plan rules, and the anti-cutback rules of section 411(d)(6) (which apply to transfers). See sections 204(g), 205, and 208 of ERISA. However, as discussed in this preamble under the heading "Interaction Between Title I of ERISA and Section 403(b) of the Code," Title I of ERISA does not apply to governmental plans, certain church plans, or a tax-exempt employer's section 403(b) program that is not considered to constitute the establishment or maintenance of an "employee pension benefit plan" under Title I of ERISA.

Section 414(c) authorizes the Secretary of the Treasury to issue regulations treating all employees of trades or businesses which are under common control as employed by a single employer.

**Explanation of Provisions**

*Overview*

Like the 2004 proposed regulations, these final regulations are a comprehensive update of the current regulations under section 403(b). These regulations replace the existing final regulations that were adopted in 1964 and reflect the numerous legal changes that have been made in section 403(b) since then and many of the positions that have been taken in interpretive guidance that has been issued under section 403(b).

As was noted in the preamble to the 2004 proposed regulations, the effect of the various amendments made to section 403(b) within the past 40 years has been to diminish the extent to which the rules governing section 403(b) plans differ from the rules governing other tax-favored employer-based retirement plans, including arrangements that include salary reduction contributions, such as section 401(k) plans and section 457(b) plans for state and local governmental entities. However, there remain significant differences between section 403(b) plans and section 401(a) and governmental section 457(b)

plans. For example, section 403(b) is limited to certain specific employers and employees (namely, employees of a public school, employees of a section 501(c)(3) organization, and certain ministers) and to certain funding arrangements (namely, an insurance annuity contract, a custodial account that is limited to mutual fund shares, or a church retirement income account). Also, section 403(b) contains the universal availability requirement for section 403(b) elective deferrals and provides consequences for failing to satisfy certain of the section 403(b) rules (described in this preamble under the heading "Effect of a Failure to Satisfy Section 403(b)")[3] that differ in significant respects from the consequences applicable to qualified plans.

The final regulations, as did the 2004 proposed regulations, require the section 403(b) contract to satisfy both in form and operation the applicable requirements for exclusion. The final regulations also require that the contract be maintained pursuant to a written plan as described in the next section.

The final regulations, like the proposed regulations, provide rules under which tax-exempt entities are aggregated and treated as a single employer under section 414(c). These rules apply to plans referenced in sections 414(b), (c), (m), (o), and (t), such as plans qualified under section 401(a) or 403(a), as well as section 403(b) plans.

Comments on the 2004 proposed regulations raised a number of questions and concerns about:

- The requirement in the 2004 proposed regulations under which a section 403(b) contract would be required to be maintained pursuant to a written plan;
- The elimination of certain non-statutory exclusions that a section 403(b) plan was permitted to have under Notice 89–23, 1989–1 C.B. 654, for purposes of the universal availability rule;
- The elimination of Rev. Rul. 90–24, 1990–1 C.B. 97, which allowed a section 403(b) contract to be exchanged for another contract; and
- The controlled group rules under section 414(c) for entities that are tax-exempt under section 501(a).

These final regulations include a number of revisions to reflect the comments received, as described further in this preamble.

*Written Plan Requirement*

These regulations retain the requirement from the 2004 proposed regulations that a section 403(b) contract be issued pursuant to a written plan which, in both form and operation, satisfies the requirements of section 403(b) and these regulations. This requirement implements the statutory requirements of section 403(b)(1)(D), which provides that the contract must be purchased "under a plan" that satisfies the nondiscrimination requirements delineated in section 403(b)(12).

The existence of a written plan facilitates the allocation of plan responsibilities among the employer, the issuer of the contract, and any other parties involved in implementing the plan. Without such a central document for a comprehensive summary of responsibilities, there is a risk that many of the important responsibilities required under the statute and final regulations may not be allocated to any party. While a section 403(b) contract issued to an employee can provide for the issuer to perform many of these functions by itself, the contract cannot satisfy the function of setting forth the eligibility criteria for other employees, nor can the issuer by itself coordinate those Code requirements that depend on other contracts, such as the loan limitations under section 72(p). The issuer must rely on information or representations provided by either the employer or the employee for employment-based information that is essential for compliance with section 403(b) provisions, such as the limitations on elective deferrals in section 402(g) and the requirements of section 72(p)(2) for a plan loan that is not a taxable deemed distribution. In addition to providing a central locus to coordinate those functions, the maintenance of a written plan also benefits participants by providing a central document setting forth their rights and enables government agencies to determine whether the arrangements satisfy applicable law and, in particular, for

---

[3] Other differences between the rules applicable to section 403(b) plans and qualified plans include the following: the definition of compensation (including the five-year rule) in section 403(b)(3); the special section 403(b) catch-up elective deferral in section 402(g)(7); and the section 415 aggregation rules. An additional difference relates to when a severance from employment occurs for purposes of section 403(b) plans maintained by State and local government employers. See §1.403(b)–6(h) of these regulations.

determining which employees are eligible to participate in the plan.

The 2004 proposed regulations would have required that the section 403(b) plan include all of the material provisions regarding eligibility, benefits, applicable limitations, the contracts available under the plan, and the time and form under which benefit distributions would be made. The proposed regulations would not have required that there be a single plan document. However, under the proposed regulations, the written plan requirement would be satisfied by complying with the plan document rules applicable to qualified plans.

Some comments raised concerns that the written plan requirement would impose additional administrative burdens. In response, the final regulations make a number of clarifications, including that the plan is permitted to allocate to the employer or another person the responsibility for performing functions to administer the plan, including functions to comply with section 403(b). Any such allocation must identify who is responsible for compliance with the requirements of the Code that apply based on the aggregated contracts issued to a participant, including loans under section 72(p) and the requirements for obtaining a hardship withdrawal under §1.403(b)–6 of these regulations.

Additional comments recommended that certain responsibilities be permitted to be allocated to employees. The IRS and Treasury Department have concluded that it is generally inappropriate to allocate these responsibilities to employees for a number of reasons. First, employees often lack the expertise to systematically meet these responsibilities and may not recognize the importance of performing these actions (including not fully appreciating the tax consequences of failing to perform the responsibility). Second, an individual employee may have a self-interest in a particular transaction. In addition, while there are various factors that will often cause an employer or issuer to have an interest in procedures that ensure that the requirements of section 403(b) are satisfied (including income tax withholding requirements), an employee generally bears the income tax exposure and other risks of failing to comply with rules set forth in the plan. The IRS and Treasury Department believe it is important to pre-

vent failures in advance so as to minimize the cases in which the adverse effects of a failure fall on the employee. See the discussion in this preamble under the heading "Contract Exchanges."

In response to comments, the final regulations clarify the requirement that the plan include all of the material provisions by permitting the plan to incorporate by reference other documents, including the insurance policy or custodial account, which as a result of such reference would become part of the plan. As a result, a plan may include a wide variety of documents, but it is important for the employer that adopts the plan to ensure that there is no conflict with other documents that are incorporated by reference. If a plan does incorporate other documents by reference, then, in the event of a conflict with another document, except in rare and unusual cases, the plan would govern. In the case of a plan that is funded through multiple issuers, it is expected that an employer would adopt a single plan document to coordinate administration among the issuers, rather than having a separate document for each issuer.

Finally, comments also indicated that, while section 403(b) contracts that are subject to ERISA are maintained pursuant to written plans, there may be a potential cost associated with satisfying the written plan requirement for those employers that do not have existing plan documents, such as public schools. To address this concern, the IRS and Treasury Department expect to publish guidance which includes model plan provisions that may be used by public school employers for this purpose. Because the requirement for a written plan will not go into effect until 2009 (see the discussion under the heading "Applicability date"), employers would be expected to adopt a written plan (including applicable amendments) no later than the applicability date of these regulations.

### Contract Exchanges, Plan-to-Plan Transfers, and Purchases of Permissive Service Credit

The final regulations, like the 2004 proposed regulations, provide for three specific kinds of non-taxable exchanges or transfers of amounts in section 403(b) contracts. Specifically, under the final regulations, a non-taxable exchange or transfer is permitted for a section 403(b) con-

tract if either: (1) it is a mere change of investment within the same plan (contract exchange); (2) it constitutes a plan-to-plan transfer, so that there is another employer plan receiving the exchange; or (3) it is a transfer to purchase permissive service credit (or a repayment to a defined benefit governmental plan). If an exchange or transfer does not constitute a change of investment within the plan, a plan-to-plan transfer, or a purchase of permissive service credit, the exchange or transfer would be treated as a taxable distribution of benefits in the form of property if the exchange occurs after a distributable event (assuming the distribution is not rolled over to an eligible retirement plan) or as a taxable conversion to a section 403(c) nonqualified annuity contract if a distributable event has not occurred. See the "Effect of a Failure to Satisfy Section 403(b)" section in this preamble for discussion of section 403(c) nonqualified annuity contracts. In any case in which a distributable event has occurred, a participant in a section 403(b) plan can always change the investment through a distribution and non-taxable rollover from a section 403(b) contract to an IRA annuity, as long as the distribution is an eligible rollover distribution. Note, however, that an IRA annuity cannot include provisions permitting participant loans. See sections 408(e)(3) and (4) and §§1.408–1(c)(5) and 1.408–3(c).

Any contract exchange, plan-to-plan transfer, or purchase of permissive service credit that is permitted under the final regulations is not treated as a distribution for purposes of the section 403(b) distribution restrictions (so that such an exchange or transfer may be made before severance from employment or another distribution event).

### Contract Exchanges

Rev. Rul. 73–124, 1973–1 C.B. 200, and Rev. Rul. 90–24, 1990–1 C.B. 97, dealt with contract exchanges. Rev. Rul. 73–124 had allowed section 403(b) contracts to be exchanged, without income inclusion, if, pursuant to an agreement with the employer, the employee cashed in the first contract and immediately transmitted the cash proceeds for contribution to the successor contract to which all subsequent employer contributions would be made. This ruling was replaced by Rev. Rul.

90–24 which does not provide for the first contract to be cashed in but allows section 403(b) contracts to be exchanged, without income inclusion, so long as the successor contract includes distribution restrictions that are the same or more stringent than the distribution restrictions in the contract that is being exchanged.

The 2004 proposed regulations would have imposed additional restrictions on contract exchanges by limiting tax-free contract exchanges to situations in which the new contract is provided under the plan. The proposal was intended to improve compliance with the Code requirements that apply on an aggregated basis because, without coordination, it is difficult, if not impossible, for a plan to comply with those tax requirements. These requirements include certain distribution restrictions, including the rule that requires the suspension of deferrals for a plan that uses the hardship withdrawal suspension safe harbor rules for elective deferrals, and the section 72(p) rules for loans. In addition, these changes make it easier for employers to respond to an IRS inquiry or audit. For example, where assets have been transferred to an insurance carrier or mutual fund that has no subsequent connection to the plan or the employer, IRS audits and related investigations have revealed that employers encounter substantial difficulty in demonstrating compliance with hardship withdrawal and loan rules. These problems are particularly acute when an individual's benefits are held by numerous carriers. Such multiple contract issuers are commonly associated with plans in which Rev. Rul. 90–24 exchanges have occurred.

Commentators generally objected to the proposal to limit exchanges allowed under Rev. Rul. 90–24. They argued that such exchanges enable participants to change funding arrangements and claimed that these exchanges have generally been responsible for improved efficiency and lower cost in the section 403(b) market. Comments often included specific suggestions, such as limiting any restrictions on exchanges to active employees and effectuating compliance with loan restrictions by alternative methods, such as having the issuer report loans on, for example, a Form 1099–R (*Distributions From Pensions, Annuities, Retirement or*

*Profit-Sharing Plans, IRAs, Insurance Contracts, etc.*), or notify the employer about loans. Other comments included a recommendation that the employer be involved to ensure that the exchange is within the plan. Comments also suggested that a grandfather may be necessary for exchanges made before the applicability date of the restrictions imposed by the final regulations.

These final regulations include a number of changes to reflect these comments. The regulations allow contract exchanges with certain characteristics associated with Rev. Rul. 90–24, but under rules that are generally similar to those applicable to qualified plans.

Unlike the 2004 proposed regulations, these regulations permit an exchange of one contract for another to constitute a mere change of investment within the same plan, but only if certain conditions are satisfied in order to facilitate compliance with tax requirements. Specifically, the other contract must include distribution restrictions that are not less stringent than those imposed on the contract being exchanged and the employer must enter into an agreement with the issuer of the other contract under which the employer and the issuer will from time to time in the future provide each other with certain information. This includes information concerning the participant's employment and information that takes into account other section 403(b) contracts or qualified employer plans, such as whether a severance from employment has occurred for purposes of the distribution restrictions and whether the hardship withdrawal rules in the regulations are satisfied. Additional information that is required is information necessary for the resulting contract or any other contract to which contributions have been made by the employer to satisfy other tax requirements, such as whether a plan loan constitutes a deemed distribution under section 72(p).

These regulations also authorize the IRS to issue guidance of general applicability allowing exchanges in other cases. This authority is limited to cases in which the resulting contract has procedures that the IRS determines are reasonably designed to ensure compliance with those requirements of section 403(b) or other tax provisions that depend on either information concerning the participant's

employment or information that takes into account other section 403(b) contracts or qualified employer plans. For example, the procedures must be reasonably designed to determine whether a severance from employment has occurred for purposes of the distribution restrictions, whether the hardship withdrawal rules are satisfied, and whether a plan loan constitutes a deemed distribution under section 72(p). By contrast, procedures that rely on an employee certification, such as whether a severance from employment has occurred or whether the participant has other outstanding loans, would generally not be adequate to meet this standard, because such a certification is not disinterested, and also because of the lack of employer oversight in the certification process to ensure accuracy.

*Plan-to-Plan Transfers*

The final regulations expand the rules in the 2004 proposed regulations under which plan-to-plan transfers would have been permitted only if the participant was an employee of the employer maintaining the receiving plan. Under the final regulations, plan-to-plan transfers are permitted if the participant whose assets are being transferred is an employee or former employee of the employer (or business of the employer) that maintains the receiving plan and certain additional requirements are met. However, the final regulations retain the rules that were in the 2004 proposed regulations prohibiting a plan-to-plan transfer to a qualified plan, an eligible plan under section 457(b), or any other type of plan that is not a section 403(b) plan, except as described in the next paragraph. Similarly, a section 403(b) plan is not permitted to accept a transfer from a qualified plan, an eligible plan under section 457(b), or any other type of plan that is not a section 403(b) plan.

*Purchases of Permissive Service Credit and Certain Repayments*

The final regulations, like the 2004 proposed regulations, include an exception permitting a section 403(b) plan to provide for the transfer of its assets to a qualified plan under section 401(a) to purchase permissive service credit under a defined benefit governmental plan or to make a re-

payment to a defined benefit governmental plan.

*Limitations on Contributions*

The final regulations, like the 2004 proposed regulations, provide that the section 403(b) exclusion applies only to the extent that all amounts contributed by the employer for the purchase of an annuity contract for the participant do not exceed the applicable limits under section 415. The final regulations retain the rule in the 2004 proposed regulations that if an excess annual addition is made to a contract that otherwise satisfies the requirements of section 403(b), then the portion of the contract that includes the excess will fail to be a section 403(b) contract (and instead will be a contract to which section 403(c), relating to nonqualified annuity contracts, applies) and the remaining portion of the contract that includes the contribution that is not in excess of the section 415 limitations is a section 403(b) contract. This rule under which only the excess annual addition is subject to section 403(c) does not apply unless, for the year of the excess and each year thereafter, the issuer of the contract maintains separate accounts for the portion that includes the excess and for the 403(b) portion (which is the portion that includes the amount that is not in excess of the section 415 limitations).

With respect to section 403(b) elective deferrals, section 403(b) applies only if the contract is purchased under a plan that includes the elective deferral limits under section 402(g), including aggregation of all plans, contracts, or arrangements of the employer that are subject to the limits of section 402(g). As in the 2004 proposed regulations, the final regulations require a section 403(b) contract to include this limit on section 403(b) elective deferrals, as imposed under sections 401(a)(30) and 402(g). For purposes of the final regulations, the term "elective deferral" includes a designated Roth contribution as well as a pre-tax elective contribution. These rules are generally the same as the rules for qualified cash or deferred arrangements (CODAs) under section 401(k).

Any contribution made for a participant to a section 403(b) contract for a taxable year that exceeds either the section 415 maximum annual contribution limits or the section 402(g) elective deferral limit constitutes an excess contribution that is included in gross income for that taxable year (or, if later, the taxable year in which the contract becomes nonforfeitable). The final regulations, like the 2004 proposed regulations, provide that the section 403(b) plan (including contracts under the plan) may provide that any excess deferral as a result of a failure to comply with the section 402(g) elective deferral limit for the taxable year with respect to any section 403(b) elective deferral made for a participant by the employer will be distributed to the participant, with allocable net income, no later than April 15 or otherwise in accordance with section 402(g).

*Catch-up Contributions*

A section 403(b) plan may provide for additional catch-up contributions for a participant who is age 50 by the end of the year, provided that those age 50 catch-up contributions do not exceed the catch-up limit under section 414(v) for the taxable year ($5,000 for 2007). In addition, a section 403(b) plan may provide that an employee of a qualified organization who has at least 15 years of service (disregarding any period during which an individual is not an employee of the eligible employer) is entitled to a special section 403(b) catch-up limit. Under the special section 403(b) catch-up limit, the section 402(g) limit is increased by the lowest of the following three amounts: (i) $3,000; (ii) the excess of $15,000 over the amount not included in gross income for prior taxable years by reason of the special section 403(b) catch-up rules, plus elective deferrals that are designated Roth contributions;[4] or (iii) the excess of (A) $5,000 multiplied by the number of years of service of the employee with the qualified organization, over (B) the total elective deferrals made for the employee by the qualified organization for prior taxable years. For this purpose, a qualified organization is an eligible employer that

is a school, hospital, health and welfare service agency (including a home health service agency), or a church-related organization.

The 2004 proposed regulations defined a health and welfare service agency as either an organization whose primary activity is to provide medical care as defined in section 213(d)(1) (such as a hospice), or a section 501(c)(3) organization whose primary activity is the prevention of cruelty to individuals or animals or which provides substantial personal services to the needy as part of its primary activity (such as a section 501(c)(3) organization that provides meals to needy individuals). In response to several commentators' requests, the final regulations expand this definition to include an adoption agency and an agency that provides either home health services or assistance to individuals with substance abuse problems or that provides help to the disabled.

Like the 2004 proposed regulations, the final regulations provide that any catch-up contribution for an employee who is eligible for both an age 50 catch-up and the special section 403(b) catch-up is treated first as a special section 403(b) catch-up to the extent a special section 403(b) catch-up is permitted, and then as an amount contributed as an age 50 catch-up (to the extent the age 50 catch-up amount exceeds the maximum special section 403(b) catch-up).

*Timing of Distributions and Benefits*

The final regulations, like the 2004 proposed regulations, contain provisions reflecting the statutory rules regarding when distributions can be made from a section 403(b) plan. Distributions of amounts attributable to section 403(b) elective deferrals may not be paid to a participant earlier than when the participant has a severance from employment, has a hardship, becomes disabled (within the meaning of section 72(m)(7)), or attains age 59½. Hardship is generally defined under regulations issued under section 401(k). In addition, amounts held in a custodial account attributable to employer contributions (that are not section 403(b)

---

[4] A technical correction was made to section 402(g)(7)(A)(ii) by section 407(a) of the Gulf Opportunity Zone Act of 2005 (119 Stat. 2577), P.L. 109–135, to clarify that the aggregate $15,000 limit on such contributions was reduced not only by pre-tax elective deferrals made pursuant to the special section 403(b) catch-up rules, but also by designated Roth contributions. Treasury has recommended that this language be further changed to reflect the intent that the reduction for designated Roth contributions at section 402(g)(7)(A)(ii)(II) be limited to designated Roth contributions that have been made pursuant to the special section 403(b) catch-up rules.

elective deferrals) may not be paid to a participant before the participant has a severance from employment, becomes disabled (within the meaning of section 72(m)(7)), or attains age 59$^1$/2. This rule also applies to amounts transferred out of a custodial account to an annuity contract or retirement income account, including earnings thereon.

The final regulations, as did the 2004 proposed regulations, include a number of exceptions to the timing restrictions. For example, the rule for elective deferrals does not apply to distributions of section 403(b) elective deferrals (not including earnings thereon) that were contributed before January 1, 1989.

The final regulations, as did the 2004 proposed regulations, reflect the direct rollover rules of section 401(a)(31) and the related requirements of section 402(f) concerning the written explanation requirement for distributions that qualify as eligible rollover distributions, including conforming the timing rule to the rule for qualified plans.

In addition to the restrictions described in this preamble, the final regulations generally retain, with certain modifications, the additional rules from the 2004 proposed regulations relating to when distributions are permitted to be made from a section 403(b) plan, including the restrictions described in this preamble imposed by sections 403(b)(7)(A)(ii) and (11) on distribution of amounts held in custodial accounts and elective deferrals, and the tax treatment of distributions from section 403(b) plans. Comments raised no objections to the various rules that were proposed in 2004, other than concerning the general rule requiring the occurrence of a stated event. The 2004 proposed regulations generally would have required the occurrence of a stated event in order to commence distributions of amounts attributable to employer contributions to section 403(b) plans other than elective deferrals or distributions from custodial accounts. The stated event rule is substantially the same as the rule applicable to qualified defined contribution plans that are not money purchase pension plans

(under §1.401–1(b)(1)(ii)), so that a plan is permitted to provide for a distribution upon completion of a fixed number of years (such as five years of participation), the attainment of a stated age, or upon the occurrence of some other identified event (such as the occurrence of a financial need,$^5$ including a need to buy a home).

However, the final regulations make a number of changes relating to distributions. First, the final regulations clarify that after-tax employee contributions are not subject to any in-service distribution restrictions. Second, the regulations address comments that were made regarding certain disability arrangements by clarifying that, if an insurance contract includes provisions under which contributions will be continued in the event a participant becomes disabled, then that benefit is treated as an incidental benefit that must satisfy the incidental benefit requirement applicable to qualified plans (at §1.401–1(b)(1)(ii)). Third, changes were made to reflect elective deferrals that are designated Roth contributions, discussed further later in this preamble under the heading, "Requirement of Certain Separate Accounts Under Section 403(b)." Fourth, §1.403(b)–7(b)(5) has been added referencing the automatic rollover rules of section 401(a)(31), in accordance with section 403(b)(10). See Notice 2005–5, 2005–1 C.B. 337, for rules interpreting this requirement. Fifth, a cross-reference to certain employment tax rules was added, discussed under the heading "Employment Taxes." Sixth, in response to comments, the final regulations provide that the general rule requiring the occurrence of a stated event in order for distributions to commence does not apply to insurance contracts issued before January 1, 2009, and a special rule has been added allowing conforming amendments to be adopted by plans that are subject to ERISA. Section 1.403(b)–10(c) has been clarified to indicate that in order to be treated as a distribution under this section, the distribution must be pursuant to a QDRO as described in section 206(d)(3) of ERISA and the Department of Labor's guidance.

### Severance From Employment

The final regulations, like the 2004 proposed regulations, define severance from employment in a manner that is generally the same as the regulations under section 401(k) (see §1.401(k)–1(d)(2)), but provide that, for purposes of distributions from a section 403(b) plan, a severance from employment occurs on any date on which the employee ceases to be employed by an eligible employer that maintains the section 403(b) plan. Thus, a severance from employment would occur when an employee ceases to be employed by an eligible employer, even though the employee may continue to be employed by an entity that is part of the same controlled group but that is not an eligible employer, or on any date on which the employee works in a capacity that is not employment with an eligible employer. Examples of the situations that constitute a severance from employment include: an employee transferring from a section 501(c)(3) organization to a for-profit subsidiary of the section 501(c)(3) organization; an employee ceasing to work for a public school, but continuing to be employed by the same State; and an individual employed as a minister for an entity that is neither a State nor a section 501(c)(3) organization ceasing to perform services as a minister, but continuing to be employed by the same entity.

### Section 401(a)(9)

The final regulations, like the 2004 proposed regulations, require section 403(b) plans to comply with rules similar to those in the existing regulations relating to the required minimum distribution requirements of section 401(a)(9), but with some minor changes (for example, omitting the special rules for 5-percent owners). Thus, section 403(b) contracts must satisfy the incidental benefit rules. Guidance concerning the application of the incidental benefit requirements to permissible non-retirement benefits such as life, accident, or health benefits is contained in revenue rulings.$^6$

---

$^5$ See, for example, Rev. Rul. 56–693, 1956–2 C.B. 282.

$^6$ See, for example, Rev. Rul. 61–121, 1961–2 C.B. 65; Rev. Rul. 68–304, 1968–1 C.B. 179; Rev. Rul. 72–240, 1972–1 C.B. 108; Rev. Rul. 72–241, 1972–1 C.B. 108; Rev. Rul. 73–239, 1973–1 C.B. 201; and Rev. Rul. 74–115, 1974–1 C.B. 100.

*Loans*

The final regulations adopt the provisions in the 2004 proposed regulations relating to loans to participants from a section 403(b) contract.

*QDROs*

The final regulations also adopt the 2004 proposed regulations' limited rules relating to QDROs under section 414(p). Section 414(p)(9) provides that the QDRO rules only apply to plans that are subject to the anti-alienation provisions of section 401(a)(13), except that section 414(p)(9) also provides that the section 414(p) QDRO rules apply to a section 403(b) contract. The final regulations, like the proposed regulations, clarify that the QDRO rules under section 414(p) apply to section 403(b) plans. The Secretary of Labor has authority to interpret the QDRO provisions, section 206(d)(3), and its parallel provision at section 414(p) of the Code, and to issue QDRO regulations in consultation with the Secretary of the Treasury. 29 U.S.C. 1056(d)(3)(N). Under section 401(n) of the Internal Revenue Code, the Secretary of the Treasury has authority to issue rules and regulations necessary to coordinate the requirements of section 414(p) (and the regulations issued by the Secretary of Labor thereunder) with the other provisions of Chapter I of Subtitle A of the Code.

*Taxation of Distributions and Benefits From a Section 403(b) Contract*

The final regulations, like the 2004 proposed regulations, reflect the statutory provisions regarding the taxation of distributions and benefits from section 403(b) contracts, including the provision that generally only amounts actually distributed from a section 403(b) contract are includible in the gross income of the recipient under section 72 for the year in which distributed. The final regulations also reflect the rule that any payment that constitutes an eligible rollover distribution is not taxed in the year distributed to the extent the payment is rolled over to an eligible retirement plan. The payor must withhold 20 percent Federal income tax, however, if an eligible rollover distribution is not rolled over in a direct rollover. Another provision requires

the payor to give proper written notice to the section 403(b) participant or beneficiary concerning the eligible rollover distribution provision.

*Section 403(b) Nondiscrimination and Universal Availability Rules*

*Nondiscrimination*

Section 403(b)(12)(A)(i) requires that employer contributions, other than elective deferrals, and after-tax employee contributions made under a section 403(b) contract satisfy a specified series of requirements (the nondiscrimination requirements) in the same manner as a qualified plan under section 401(a). These nondiscrimination requirements include rules relating to nondiscrimination in contributions, benefits, and coverage (sections 401(a)(4) and 410(b)), a limitation on the amount of compensation that can be taken into account (section 401(a)(17)), and the average contribution percentage rules of section 401(m) (relating to matching and after-tax employee contributions).

Notice 89–23 discusses these requirements and provides a good faith reasonable standard for satisfying these requirements. The 2004 proposed regulations would have eliminated the good faith reasonable standard for satisfying the nondiscrimination requirements of section 403(b)(12)(A)(i) for non-governmental plans. Comments acknowledged the need for and the IRS's authority to make this change. Accordingly, these final regulations do not include the Notice 89–23 good faith reasonable standard.

However, as discussed in this preamble under the heading "Treatment of Controlled Groups that Include Certain Entities," the Notice 89–23 good faith reasonable standard will continue to apply to State and local public schools (and certain church entities) for determining the controlled group. Although the general nondiscrimination requirements do not apply to governmental plans (within the meaning of section 414(d)), these plans are required to limit the amount of compensation to the amount permitted under section 401(a)(17) for all purposes under the plan, including, for example the amount of compensation taken into account for employer contributions, and are required to satisfy the universal availability rule (described in

this preamble under the heading "Universal Availability for Elective Deferrals"). A non-governmental section 403(b) plan that provides for nonelective employer contributions must satisfy the coverage requirements of section 410(b) and the nondiscrimination requirements of section 401(a)(4) with respect to such contributions.

These final regulations, like the 2004 proposed regulations, require a section 403(b) plan to comply with the nondiscrimination requirements for matching contributions in the same manner as a qualified plan. Thus, a non-governmental section 403(b) plan that provides for matching contribution must satisfy the nondiscrimination requirements of section 401(m). The nondiscrimination requirements are generally tested using compensation as defined in section 414(s) and are applied on an aggregated basis taking into account all plans of the employer. See the discussion under the heading "Treatment of Controlled Groups that Include Certain Entities."

The nondiscrimination requirements do not apply to section 403(b) elective deferrals. Instead, a universal availability requirement, discussed further in the next section, applies to all section 403(b) elective deferrals (including elective deferrals made under a governmental section 403(b) plan).

*Universal Availability for Elective Deferrals*

The universal availability requirement of section 403(b)(12)(A)(ii) provides that all employees of the eligible employer must be permitted to elect to have section 403(b) elective deferrals contributed on their behalf if any employee of the eligible employer may elect to have the organization make section 403(b) elective deferrals. Under the 2004 proposed regulations, the universal availability requirement would not have been satisfied unless the contributions were made pursuant to a section 403(b) plan and the plan permitted all employees of an employer an opportunity to make elective deferrals if any employee of that employer has the right to make elective deferrals.

The rules in the final regulations relating to the universal availability requirement are substantially similar to those in

the 2004 proposed regulations. The final regulations clarify that the employee's right to make elective deferrals also includes the right to designate section 403(b) elective deferrals as designated Roth contributions (if any employee of the eligible employer may elect to have the organization make section 403(b) elective deferrals as designated Roth contributions).

The preamble to the 2004 proposed regulations requested comments regarding certain exclusions that have been permitted under transitional guidance issued in 1989. Specifically, Notice 89–23 had allowed, pending issuance of regulatory guidance, the exclusion of the following classes of employees for purposes of the universal availability rule: employees who are covered by a collective bargaining agreement; employees who make a one-time election to participate in a governmental plan described in section 414(d), instead of a section 403(b) plan; professors who are providing services on a temporary basis to another public school for up to one year and for whom section 403(b) contributions are being made at a rate no greater than the rate each such professor would receive under the section 403(b) plan of the original public school; and employees who are affiliated with a religious order and who have taken a vow of poverty where the religious order provides for the support of such employees in their retirement.

The comments submitted in response to the request generally requested to have these exclusions continue to be allowed. However, after consideration of the comments received, the IRS and Treasury Department have concluded that these exclusions are inconsistent with the statute and, accordingly, they are not permitted under these regulations. Nonetheless, as described further in the following paragraphs, other rules may provide relief with respect to individuals who are under a vow of poverty and to certain university professors affected.

Rev. Rul. 68–123, 1968–1 C.B. 35, as clarified by Rev. Rul. 83–127, 1983–2 C.B. 25, generally excludes from gross income, and from wage withholding, income of an individual working under a vow of poverty for an employer controlled by a church and the individual is treated as working as an agent of the church, not as an employee. While these regulations

do not provide an exclusion from the universal availability requirement for individuals working under a vow of poverty, individuals who work for an institution that is controlled by the church organization and whose compensation from the employer is not treated as wages for purposes of income tax withholding under Rev. Rul. 68–123 may be excluded from the section 403(b) plan without violating the universal availability requirement because they are not treated as employees of the entity maintaining the section 403(b) plan.

With respect to an exclusion relating to visiting professors, if an individual is rendering services to a university as a visiting professor, but continues to receive his or her compensation from his or her home university and elective deferrals on his or her behalf are made under the home university's section 403(b) plan, the final regulations do not, for purposes of section 403(b) and in any case in which such treatment is appropriate, preclude the plan maintained by the home university from treating the visiting professor as an eligible employee of the home university.

The discussion in this preamble under the heading "Applicability date" describes transition relief for any existing plan that excludes, in accordance with Notice 89–23, collective bargaining employees, visiting professors, government employees who make a one-time election, or employees who work under a vow of poverty.

*Rules Relating to Funding Arrangements*

These regulations retain, with certain modifications, the rules in the 2004 proposed regulations relating to the permitted investments for a section 403(b) contract. In general, a section 403(b) plan must be funded either by an annuity contract issued by an insurance company qualified to issue annuities in a State or a custodial account held by a bank (or a person who satisfies the conditions in section 401(f)(2)) where all of the amounts in the account are held for the exclusive benefit of plan participants or their beneficiaries in regulated investment companies (mutual funds) and certain other conditions are satisfied (including restrictions on distributions). Additional rules apply with respect to retirement income accounts for plans of

a church or a convention or association of churches as discussed in the next section.

*Special Rules for Church Plans'
Retirement Income Accounts*

The final regulations, like the 2004 proposed regulations, include a number of special rules for church plans. Under section 403(b)(9), a retirement income account for employees of a church-related organization is treated as an annuity contract for purposes of section 403(b). Under these regulations, the rules for a retirement income account are based largely on the provisions of section 403(b)(9) and the legislative history of TEFRA. The regulations define a retirement income account as a defined contribution program established or maintained by a church-related organization under which (i) there is separate accounting for the retirement income account's interest in the underlying assets (namely, it must be possible at all times to determine the retirement income account's interest in the underlying assets and to distinguish that interest from any interest that is not part of the retirement income account), (ii) investment performance is based on gains and losses on those assets, and (iii) the assets held in the account cannot be used for, or diverted to, purposes other than for the exclusive benefit of plan participants or their beneficiaries. For this purpose, assets are treated as diverted to the employer if the employer borrows assets from the account. A retirement income account must be maintained pursuant to a program which is a plan and the plan document must state (or otherwise evidence in a similarly clear manner) the intent to constitute a retirement income account.

If any asset of a retirement income account is owned or used by a participant or beneficiary, then that ownership or use is treated as a distribution to that participant or beneficiary. The regulations also provide that a retirement income account that is treated as an annuity contract is not a custodial account (even if it is invested in stock of a regulated investment company).

A life annuity can generally only be provided from an individual account by the purchase of an insurance annuity contract. However, in light of the special rules applicable to church retirement income accounts, the final regulations, like the 2004

proposed regulations, permit a life annuity to be paid from such an account if certain conditions are satisfied. The conditions are that the distribution from the account has an actuarial present value, at the annuity starting date, that is equal to the participant's or beneficiary's accumulated benefit, based on reasonable actuarial assumptions, including assumptions regarding interest and mortality, and that the plan sponsor guarantee benefits in the event that a payment is due that exceeds the participant's or beneficiary's accumulated benefit.

### Termination of a Section 403(b) Plan

The final regulations adopt the provisions of the 2004 proposed regulations permitting an employer to amend its section 403(b) plan to eliminate future contributions for existing participants, and allowing plan provisions that permit plan termination and a resulting distribution of accumulated benefits, with the associated right to roll over eligible rollover distributions to an eligible retirement plan, such as an individual retirement account or annuity (IRA). Comments on the rules in the 2004 proposed regulations regarding plan termination were favorable. In general, the distribution of accumulated benefits is permitted under these regulations only if the employer (taking into account all entities that are treated as a single employer under section 414 on the date of the termination) does not make contributions to any section 403(b) contract that is not part of the plan during the period beginning on the date of plan termination and ending 12 months after distribution of all assets from the terminated plan. However, if at all times during the period beginning 12 months before the termination and ending 12 months after distribution of all assets from the terminated plan, fewer than 2 percent of the employees who were eligible under the section 403(b) plan as of the date of plan termination are eligible under the alternative section 403(b) contract, the other section 403(b) contract is disregarded. In order for a section 403(b) plan to be considered terminated, all accumulated benefits under the plan must be distributed to all participants and beneficiaries as soon as administratively practicable after termination of

the plan. A distribution for this purpose includes delivery of a fully paid individual insurance annuity contract.

### Effect of a Failure to Satisfy Section 403(b)

These regulations include revisions to the 2004 proposed regulations that address the effects of a failure to satisfy section 403(b). Section 403(b)(5) provides for all of the contracts purchased for an employee by an employer to be treated as a single contract for purposes of section 403(b). Thus, if a contract fails to satisfy any of the section 403(b) requirements, then not only that contract but also any other contract purchased for that individual by that employer would fail to be a contract that qualifies for tax-deferral under section 403(b).

Under these regulations, as under the 2004 proposed regulations, if a contract includes any amount that fails to satisfy the requirements of these regulations, then, except for special rules relating to vesting conditions and excess contributions (under section 415 or 402(g)), that contract and any other contract purchased for that individual by that employer does not constitute a section 403(b) contract. In addition, if a contract is not established pursuant to a written plan, then the contract does not satisfy section 403(b). Thus, if an employer fails to have a written plan, any contract purchased by that employer would not be a section 403(b) contract. Similarly, if an employer is not an eligible employer for purposes of section 403(b), none of the contracts purchased by that employer is a section 403(b) contract. If a plan fails to satisfy the nondiscrimination rules (including a failure to operate the plan in accordance with its coverage provisions or a failure to operate the plan in a manner that satisfies the nondiscrimination rules), none of the contracts issued under the plan would be section 403(b) contracts.

However, under these regulations, any operational failure, other than those described in the preceding paragraph, that is solely within a specific contract generally will not adversely affect the contracts issued to other employees that qualify in form and operation with section 403(b). Thus, for example, if an employee's elec-

tive deferrals under a contract, when aggregated with any other contract, plan, or arrangement of the employer for that employee during a calendar year, exceed the maximum deferral amount permitted under section 402(g)(1)(A) (as made applicable by section 403(b)(1)(E)), the failure would adversely affect the contracts issued to the employee by that employer, but would not adversely affect any other employee's contracts.

### Requirement of Certain Separate Accounts Under Section 403(b)

The final regulations, like the 2004 proposed regulations, include technical provisions addressing certain situations in which a separate account[7] is necessary under section 403(b). For example, a separate bookkeeping account is required for any contract in which only a portion of the employee's interest is vested because, in such a case, separate accounting for each type of contribution (and earnings thereon) that is subject to a different vesting schedule is necessary to determine which vested contributions, including earnings thereon, are treated as held under a section 403(b) contract. In addition, the final regulations also clarify that if the section 403(b) plan fails to establish a separate account for contributions in excess of the section 415(c) limitation under section 403(c) (relating to nonqualified annuity contracts whose present values are generally subject to current taxation), so that such excess contributions are commingled in a single insurance contract with contributions intended to qualify under section 403(b) without maintaining a separate account for each amount, then none of the amounts held under the insurance contract qualify for tax deferral under section 403(b). Any such separate account must be established by the time the excess contribution is made to the plan. The separate account for excess contributions under section 415(c) is necessary to effectuate differences in the tax treatment of distributions (for example, because of the need to properly allocate basis under section 72 and separately identify amounts that can be rolled over). Similarly, a separate account is required for elective deferrals to be treated

---

[7] These rules are not related to segregated asset accounts under section 817(h).

as held in a designated Roth account, as described in the following paragraph.

### Designated Roth Accounts

These regulations also include final regulations relating to elective deferrals that are designated Roth contributions under a section 403(b) plan. These regulations, however, do not address the taxation of a distribution of designated Roth contributions from a section 403(b) plan. See §1.402A–1 for those rules. The final regulations relating to elective deferrals under a section 403(b) plan that are designated Roth contributions are substantially unchanged from the proposed regulations that were issued in January of 2006 regarding designated Roth accounts under a section 403(b) plan.[8]

### Interaction Between Title I of ERISA and Section 403(b) of the Code

The Treasury Department and the IRS consulted with the Department of Labor in connection with both the 2004 proposed regulations and these final regulations concerning the interaction between Title I of ERISA and section 403(b) of the Internal Revenue Code. In particular, the consultation focused on whether the requirements imposed on employers in these regulations would exceed the scope of the Department of Labor's safe harbor regulation at 29 CFR §2510.3–2(f) and result in all section 403(b) programs sponsored by tax-exempt employers (other than governmental plans and certain church plans) falling under the purview of ERISA.

According to the Department of Labor, Title I of ERISA generally applies to "any plan, fund, or program . . . established or maintained by an employer or by an employee organization, or by both, to the extent that . . . such plan, fund, or program . . . provides retirement income to employees, or . . . results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." ERISA section 3(2)(A). However, governmental plans and church plans are generally excluded from coverage under Title I of ERISA. ERISA section 4(b)(1) and (2). Therefore, contracts purchased or provided under a program that is either a "governmental plan" under sec-

tion 3(32) of ERISA or a "church plan" under section 3(33) of ERISA are not generally covered under Title I. However, section 403(b) of the Internal Revenue Code is also available with respect to contracts purchased or provided by employers for employees of a section 501(c)(3) organization, and many programs for the purchase of section 403(b) contracts offered by such employers are covered under Title I of ERISA as part of an "employee pension benefit plan" within the meaning of section 3(2)(A) of ERISA. The Department of Labor promulgated a regulation in 1975, 29 CFR §2510.3–2(f), describing circumstances under which an employer's program for the purchase of section 403(b) contracts for its employees, which is not otherwise excluded from coverage under Title I, will not be considered to constitute the establishment or maintenance of an "employee pension benefit plan" under Title I of ERISA.

As described in the preamble to the 2004 proposed regulations, the Department of Labor advised the Treasury Department and the IRS that the proposed regulations did not appear to require, but left open the possibility that an employer may undertake, responsibilities in connection with a section 403(b) program that would exceed the limits in the safe harbor and constitute establishing and maintaining an ERISA-covered plan. Comments submitted on the proposal supported the continued availability of non-Title I section 403(b) programs to employees of tax-exempt employers and asked for additional guidance for employers who offer their employees access to such programs.

According to the Department of Labor, review of the final section 403(b) regulations has not led the Department of Labor to change its view on the principles that apply in determining whether any given section 403(b) program is covered by Title I of ERISA. Even though the differences between the tax rules for section 403(b) programs and those governing other ERISA-covered pension plans may have diminished as a result of the final section 403(b) regulations, the Department of Labor continues to be of the view that tax-exempt employers can comply with the requirements in the section 403(b) regulations and remain within the Department

of Labor's safe harbor for tax-sheltered annuity programs funded solely by salary deferrals. The Department of Labor notes, however, that the new section 403(b) regulations offer employers considerable flexibility in shaping the extent and nature of their involvement. The question of whether any particular employer, in complying with the section 403(b) regulations, has established or maintained a plan covered under Title I of ERISA must be analyzed on a case-by-case basis applying the criteria set forth in 29 CFR §2510.3–2(f) and section 3(2) of ERISA. To assist employers interested in offering their employees access to a tax sheltered annuity program that would not be an ERISA-covered plan, the Department of Labor is issuing, in conjunction with the final publication of this regulation, a Field Assistance Bulletin to provide additional guidance on the interaction of the safe harbor and the requirements in these final regulations. The Field Assistance Bulletin can be found at *www.dol.gov/ebsa*.

### Treatment of Controlled Groups that Include Tax-Exempt Entities

The final regulations retain the basic rules in the 2004 proposed regulations regarding controlled groups for entities that are tax-exempt under section 501(a), but with a number of modifications to reflect the comments that were made. As in the 2004 proposed regulations, these rules are not limited to section 403(b) plans, but apply more broadly for purposes of determining when tax-exempt entities are treated as a single employer under sections 414(b), (c), (m), and (o). Thus, for example, these rules apply for purposes of plans maintained by a tax-exempt entity that are intended to be qualified under section 401(a). These rules can apply to treat two section 501(c) organizations as a single employer, or a section 501(c) organization and a non-section 501(c) organization as a single employer, if the organizations are under common control. For a section 501(c)(3) organization that makes contributions to a section 403(b) plan, these rules would be generally relevant for purposes of the nondiscrimination requirements, as well as for the section 415 contribution limitations, the special

---

[8] REG–146459–05, 2006–1 C.B. 504, published in the **Federal Register** (71 FR 4320) on January 26, 2006.

section 403(b) catch-up contributions, and the section 401(a)(9) minimum distribution rules.

Under the rules in the 2004 proposed regulations, the employer for a plan maintained by a section 501(c) organization would include not only the organization whose employees participate in the plan, but also any other organization that is under common control with the tax-exempt organization. Under the 2004 proposed regulations, the existence of control would be determined based on the facts and circumstances. For this purpose, common control would exist between a tax-exempt organization and another organization if at least 80 percent of the directors or trustees of one organization were either representatives of, or directly or indirectly controlled by, the other organization.[9] The 2004 proposed regulations permitted tax-exempt organizations to choose to be aggregated (permissive aggregation) if they maintained a single plan covering one or more employees from each organization and the organizations regularly coordinated their day-to-day regular activities. These rules were subject to an overall anti-abuse rule. The final regulations retain the basic rules in the 2004 proposed regulations and the anti-abuse rule, and add an example to illustrate when the anti-abuse rule might apply.

Comments on the 2004 proposed regulations generally approved of the proposed controlled group rules, but some comments argued for expanding the category of entities that can use the permissive aggregation rules. These comments typically did not recommend an overall standard for when permissive aggregation should be permitted, but identified certain specific practices which would be facilitated by permissive aggregation. In response, these regulations authorize the IRS to issue published guidance permitting other types of combinations of entities that include tax-exempt entities to elect to be treated as under common control for one or more specified purposes. This authority is limited to situations in which there

are substantial business reasons for maintaining each entity in a separate trust, corporation, or other form, and under which common control treatment would be consistent with the anti-abuse standards in the regulations. It is expected that this authority would not be exercised unless the IRS determines that the organizations are so integrated in their operations as to effectively constitute a single coordinated employer for purposes of sections 414(b), (c), (m), and (o), including common employee benefit plans.

A comment was also received stating that a legally required trusteeship for a labor union that has been imposed in order to correct corruption or financial malpractice[10] should not constitute control. In response, a change was made to the regulations to reflect the intent that whether a person has the power to appoint and replace a trustee or director is based on facts and circumstances. For example, that power would generally not exist if that power was extremely limited due to the application of other laws, such as where a labor union was put under trusteeship pursuant to a court order, the trusteeship is for the sole purpose of correcting corruption, financial malpractice, or similar circumstances, and the replacement trustees were permitted to serve only for the time necessary for that purpose.

These controlled group rules for tax-exempt entities generally do not apply to certain church entities under section 3121(w)(3). These rules also do not apply to a State or local government or a federal government entity. Until further guidance is issued, church entities under section 3121(w)(3)(A) and (B) and State or local government public schools that sponsor section 403(b) plans can continue to rely on the rules in Notice 89–23 for determining the controlled group.

### Employment Taxes

These regulations include several new cross-references to certain rules concerning the application of employment taxes.

For example, the definition of an elective deferral at §1.403(b)–2(a)(7) of these regulations refers to §1.402(g)(3)–1 of these regulations, which in turn refers to section 3121(a)(5)(D). See §31.3121(a)(5)–2T of the temporary regulations for additional guidance on section 3121(a)(5)(D) (defining salary reduction agreement for purposes of the Federal Insurance Contributions Act (FICA)).

As another example, §1.403(b)–7(f) of these regulations generally references the special income tax withholding rules under section 3405 for purposes of income tax withholding on distributions from section 403(b) contracts and also references the special rules at §1.72(p)–l, Q&A–15, and §35.3405(c)–1, Q&A–11, relating to income tax withholding for loans deemed distributed from qualified employer plans, including section 403(b) contracts. However, the general income tax withholding rules apply for purposes of income tax withholding for annuity contracts or custodial accounts that are not section 403(b) contracts, as well as for cases in which an annuity contract or custodial account ceases to qualify as a section 403(b) contract. See section 3401 and §§1.83–8(a) and 35.3405–1T, Q&A–18.

### Effect of These Regulations on Other Guidance

Since the existing regulations were issued in 1964, a number of revenue rulings and other items of guidance under section 403(b) have become outdated as a result of changes in law. In addition, as a result of the inclusion in these regulations of much of the guidance that the IRS has issued regarding section 403(b), these regulations effectively supersede or substantially modify a number of revenue rulings and notices that have been issued under section 403(b). Thus, as indicated in the preamble to the 2004 proposed regulations, the IRS anticipates taking action in the future to obsolete

---

[9] Treas. Reg. §1.512(b)–1(l)(4)(i)(*b*) uses a similar test to determine control of a non-stock organization. Note that those regulations do not reflect amendments that were made in section 512(b)(13) by section 1041(a) of the Taxpayer Relief Act of 1997 (111 Stat. 788).

[10] See 29 U.S.C. 462.

many revenue rulings, notices, and other guidance under section 403(b).[11]

However, the positions taken in certain rulings and other outstanding guidance are expected to be retained. For example, it is intended that the existing rules[12] for determining when employees are performing services for a public school will continue to apply. Further, as discussed above in the preamble under the heading, "Treatment of Controlled Groups that Include Tax-Exempt Entities," church entities under section 3121(w)(3)(A) and (B) and public schools that sponsor section 403(b) plans can continue to rely on the rules in Notice 89–23 for determining the controlled group. In addition, certain positions taken in prior guidance are expected to be reevaluated in light of these regulations, such as Rev. Rul. 2004–67, 2004–2 C.B. 28, which revised the group trust rules of Rev. Rul. 81–100, 1981–1 C.B. 326. With the issuance of these regulations, a number of conforming changes will be considered for the compliance programs maintained by the IRS, as most recently published in Rev. Proc. 2006–27, 2006–1 C.B. 945 (EPCRS), including, for example, to reflect the written plan requirement and the positions described above in this preamble under the heading, "Effect of a Failure to Satisfy Section 403(b)."

The prior regulations under section 403(b) had included certain rules for determining the amount of the contributions made for an employee under a defined benefit plan, based on the employee's pension under the plan. These rules are generally no longer applicable for section 403(b) because the limitations on contributions to a section 403(b) contract under section 415(c) are no longer coordinated with accruals under a defined benefit plan.[13] However, the rules for determining the amount of contributions made for an employee under a defined benefit plan in the prior regulations under section 403(b) had also been used for purposes of sec-

tion 402(b) (relating to nonqualified plans funded through trusts). These regulations replace those rules with regulations under section 402(b) that provide for the same rules (those in the section 403(b) regulations that were in effect prior to these regulations) to continue to apply for purposes of section 402(b). However, these section 402(b) regulations also authorize the Commissioner to issue guidance for determining the amount of the contributions made for an employee under a defined benefit plan under section 402(b).

**Applicability Date**

These regulations are generally applicable for taxable years beginning after December 31, 2008. Thus, because individuals will almost uniformly be on a calendar taxable year, these regulations will generally apply on January 1, 2009. However, these regulations include a number of explicit transition rules.

For a section 403(b) plan maintained pursuant to one or more collective bargaining agreements that have been ratified and are in effect on July 26, 2007, the regulations do not apply until the earlier of: (1) the date on which the last of such collective bargaining agreements terminates (determined without regard to any extension thereof after July 26, 2007; or (2) July 26, 2010. For a section 403(b) plan maintained by a church-related organization for which the authority to amend the plan is held by a church convention (within the meaning of section 414(e)), the regulations do not apply before the beginning of the first plan year following December 31, 2009.

There are also special applicability dates for several of the specific provisions in these regulations. First, special rules apply to plans which may have included one or more of the exclusions that Notice 89–23 permitted for the universal availability rule, but which are no longer permitted under these regulations. Specif-

ically, a special rule applies if a plan has eligibility conditions for elective deferrals relating to employees who make a one-time election to participate in a governmental plan described in section 414(d) instead of a section 403(b) plan, professors who are providing services on a temporary basis to another school for up to one year and for whom section 403(b) contributions are being made at a rate no greater than the rate each such professor would receive under the section 403(b) plan of the original school, or employees who are affiliated with a religious order and who have taken a vow of poverty where the religious order provides for the support of such employees in their retirement. If, as permitted by Notice 89–23, a plan excludes any of these three classes of employees from eligibility to make elective deferrals on July 26, 2007, the plan is permitted to continue that exclusion until taxable years beginning on or after January 1, 2010. In addition, if a plan excludes employees covered by a collective bargaining agreement from eligibility to make elective deferrals on July 26, 2007, the plan is permitted to continue that exclusion until the later of (i) the first day of the first taxable year that begins after December 31, 2008, or (ii) the earlier of (I) the date that such agreement terminates (determined without regard to any extension thereof after July 26, 2007) or (II) July 26, 2010. In the case of a governmental plan (as defined in section 414(d)) for which the authority to amend the plan is held by a legislative body that meets in legislative session, the plan is permitted to continue the exclusion until the earlier of: (i) the close of the first regular legislative session of the legislative body with the authority to amend the plan that begins on or after January 1, 2009; or (ii) January 1, 2011.

These regulations (at §1.403(b)–6(b)) also provide that a section 403(b) contract is permitted to distribute retirement benefits to the participant no earlier than

---

[11] When these regulations go into effect, the following guidance will be outdated or superseded by these regulations and it is expected that guidance will be issued in the future to formally supersede these items: Rev. Rul. 64–333, 1964–2 C.B. 114; Rev. Rul. 65–200, 1965–2 C.B. 141; Rev. Rul. 66–254, 1966–2 C.B. 125; Rev. Rul. 66–312, 1966–2 C.B. 127; Rev. Rul. 67–78, 1967–1 C.B. 94; Rev. Rul. 67–69, 1967–1 C.B. 93; Rev. Rul. 67–361, 1967–2 C.B. 153; Rev. Rul. 67–387, 1967–2 C.B. 153; Rev. Rul. 67–388, 1967–2 C.B. 153; Rev. Rul. 68–179, 1968–1 C.B. 179; Rev. Rul. 68–482, 1968–2 C.B. 186; Rev. Rul. 68–487, 1968–2 C.B. 187; Rev. Rul. 68–488, 1968–2 C.B. 188; Rev. Rul. 69–629, 1969–2 C.B. 101; Rev. Rul. 70–243, 1970–1 C.B. 107; Rev. Rul. 87–114, 1987–2 C.B. 116; Rev. Rul. 90–24, 1990–1 C.B. 97; Notice 90–73, 1990–2 C.B. 353; Notice 92–36, 1992–2 C.B. 364; and Announcement 95–48, 1995–23 I.R.B. 13. In addition, Notice 89–23, 1989–1 C.B. 654, is likewise superseded as a result of these regulations, except to the extent described above under the heading "Treatment of Controlled Groups that Include Tax-Exempt Entities." It is expected that the following guidance will not be superseded when these regulations are issued in final form: Rev. Rul. 66–254, 1966–2 C.B. 125; Rev. Rul. 68–33, 1968–1 C.B. 175; Rev. Rul 68–58, 1968–1 C.B. 176; Rev. Rul. 68–116, 1968–1 C.B. 177; Rev. Rul. 68–648, 1968–2 C.B. 49; Rev. Rul. 68–488, 1968–2 C.B. 188; and Rev. Rul. 69–146, 1969–1 C.B. 132.

[12] Rev. Rul. 73–607, 1973–2 C.B. 145, and Rev. Rul. 80–139, 1980–1 C.B. 88.

[13] However, see §1.403(b)–10(f)(2) of these regulations for a special rule applicable to certain church defined benefit plans that were in effect on September 3, 1982.

the earliest of the participant's severance from employment or upon the prior occurrence of some event, subject to a number of exceptions (relating to distributions from custodial accounts, distributions attributable to section 403(b) elective deferrals, correction of excess deferrals, distributions at plan termination, and payment of after-tax employee contributions). This rule does not apply for contracts issued before January 1, 2009. In addition, in order to permit plans to comply with the rules relating to in-service distributions for contracts issued before January 1, 2009, the regulations provide that an amendment adopted before January 1, 2009, to comply with these rules does not violate the anticutback rules of section 204(g) of ERISA.

These regulations (at §1.403(b)–8(c)(2)) also do not permit a life insurance contract, an endowment contract, a health or accident insurance contract, or a property, casualty, or liability insurance contract to constitute an annuity contract for purposes of section 403(b). This rule does not apply for contracts issued before September 24, 2007.

These regulations also include specific rules relating to contract exchanges that were permitted under Rev. Rul. 90–24. These new rules do not apply to contracts received in an exchange that occurred on or before September 24, 2007, assuming that the exchange (including the contract received in the exchange) satisfies applicable pre-existing legal requirements (including Rev. Rul. 90–24).

Finally, these regulations include special applicability date rules to coordinate with recently issued regulations under sections 402A and 415.

For periods following July 26, 2007, and before the applicable date, taxpayers can rely on these regulations, except that (1) such reliance must be on a consistent and reasonable basis and (2) the special rule at §1.403(b)–10(a) of these regulations permitting accumulated benefits to be distributed on plan termination can be relied upon only if all of the contracts issued under the plan at that time satisfy all of the applicable requirements of these regulations (other than the requirement at §1.403(b)–3(b)(3)(i) of these regulations that there be a written plan).

**Special Analyses**

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations. It is hereby certified that the collection of information in these regulations will not have a significant economic impact on a substantial number of small entities. This certification is based upon the determination that respondents will need to spend minimal time (an average of 4.1 hours per year) complying with the contract exchange requirements in these regulations, and small entities are generally expected to spend much less time. Thus, the cost of complying with this statutory requirement is small, even for small entities. Therefore, a Regulatory Flexibility Analysis is not required under the Regulatory Flexibility Act (5 U.S.C. chapter 6).

Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding these regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small businesses.

**Drafting Information**

The principal authors of these regulations are R. Lisa Mojiri-Azad and John Tolleris, Office of the Division Counsel/Associate Chief Counsel (Tax Exempt and Government Entities), IRS. However, other personnel from the IRS and the Treasury Department participated in their development.

\* \* \* \* \*

**Adoption of Amendments to the Regulations**

Accordingly, 26 CFR parts 1, 31, 54 and 602 are amended as follows:

PART 1—INCOME TAXES

Paragraph 1. The authority citation for part 1 is amended by removing the entry for §1.403(b)–3 and adding entries in numerical order to read in part as follows:

Authority: 26 U.S.C. 7805 \* \* \*

§1.403(b)–6 also issued under 26 U.S.C. 403(b)(10). \* \* \*

§1.414(c)–5 also issued under 26 U.S.C. 414(b), (c), and (o). \* \* \*

Par. 2. Section 1.402(b)–1 is amended by revising paragraphs (a)(2) and (b)(2)(ii) to read as follows:

*§1.402(b)–1 Treatment of beneficiary of a trust not exempt under section 501(a).*

(a) \* \* \*

(2) *Determination of amount of employer contributions.* If, for an employee, the actual amount of employer contributions referred to in paragraph (a)(1) of this section for any taxable year of the employee is not determinable or for any other reason is not known, then, except as set forth in rules prescribed by the Commissioner in revenue rulings, notices, or other guidance published in the Internal Revenue Bulletin (see §601.601(d)(2)(ii)(*b*) of this chapter), such amount shall be either—

(i) The excess of—

(A) The amount determined as of the end of such taxable year in accordance with the formula described in §1.403(b)–1(d)(4), as it appeared in the April 1, 2006, edition of 26 CFR Part 1; over

(B) The amount determined as of the end of the prior taxable year in accordance with the formula described in paragraph (a)(2)(i)(A) of this section; or

(ii) The amount determined under any other method utilizing recognized actuarial principles that are consistent with the provisions of the plan under which such contributions are made and the method adopted by the employer for funding the benefits under the plan.

(b) \* \* \*

(2) \* \* \*

(ii) If a separate account in a trust for the benefit of two or more employees is not maintained for each employee, the value of the employee's interest in such trust is determined in accordance with rules prescribed by the Commissioner under the authority in paragraph (a)(2) of this section.

\* \* \* \* \*

Par. 3. Section 1.402(g)(3)–1 is added to read as follows:

*§1.402(g)(3)–1 Employer contributions to purchase a section 403(b) contract under a salary reduction agreement.*

(a) *General rule.* With respect to an annuity contract under section 403(b), except as provided in paragraph (b) of this section, an elective deferral means an employer contribution to purchase an annuity contract under section 403(b) under a salary reduction agreement within the meaning of section 3121(a)(5)(D).

(b) *Special rule.* Notwithstanding paragraph (a) of this section, for purposes of section 403(b), an elective deferral only includes a contribution that is made pursuant to a cash or deferred election (as defined at §1.401(k)–1(a)(3)). Thus, for purposes of section 402(g)(3)(C), an elective deferral does not include a contribution that is made pursuant to an employee's one-time irrevocable election made on or before the employee's first becoming eligible to participate under the employer's plans or a contribution made as a condition of employment that reduces the employee's compensation.

(c) *Applicable date.* This section is applicable for taxable years beginning after December 31, 2008.

Par. 4. Section 1.402A–1, A–1 is revised to read as follows:

*§1.402A–1 Designated Roth Accounts.*

* * * * *

A–1. A designated Roth account is a separate account under a qualified cash or deferred arrangement under a section 401(a) plan, or under a section 403(b) plan, to which designated Roth contributions are permitted to be made in lieu of elective contributions and that satisfies the requirements of §1.401(k)–1(f) (in the case of a section 401(a) plan) or §1.403(b)–3(c) (in the case of a section 403(b) plan).

* * * * *

Par. 5. Section 1.403(b)–0 is added to read as follows:

*§1.403(b)–0 Taxability under an annuity purchased by a section 501(c)(3) organization or a public school*

This section lists the headings that appear in §§1.403(b)–1 through 1.403(b)–11.

*§1.403(b)–1 General overview of taxability under an annuity contract*

purchased by a section 501(c)(3) organization or a public school.

*§1.403(b)–2 Definitions.*

(a) Application of definitions.
(b) Definitions.

*§1.403(b)–3 Exclusion for contributions to purchase section 403(b) contracts.*

(a) Exclusion for section 403(b) contracts.
(b) Application of requirements.
(c) Special rules for designated Roth section 403(b) contributions.
(d) Effect of failure.

*§1.403(b)–4 Contribution limitations.*

(a) Treatment of contributions in excess of limitations.
(b) Maximum annual contribution.
(c) Section 403(b) elective deferrals.
(d) Employer contributions for former employees.
(e) Special rules for determining years of service.
(f) Excess contributions of deferrals.

*§1.403(b)–5 Nondiscrimination rules.*

(a) Nondiscrimination rules for contributions other than section 403(b) elective deferrals.
(b) Universal availability required for section 403(b) elective deferrals.
(c) Plan required.
(d) Church plans exception.
(e) Other rules.

*§1.403(b)–6 Timing of distributions and benefits.*

(a) Distributions generally.
(b) Distributions from contracts other than custodial accounts or amounts attributable to section 403(b) elective deferrals.
(c) Distributions from custodial accounts that are not attributable to section 403(b) elective deferrals.
(d) Distribution of section 403(b) elective deferrals.
(e) Minimum required distributions for eligible plans.
(f) Loans.
(g) Death benefits and other incidental benefits.
(h) Special rule regarding severance from employment.

*§1.403(b)–7 Taxation of distributions and benefits.*

(a) General rules for when amounts are included in gross income.
(b) Rollovers to individual retirement arrangements and other eligible retirement plans.
(c) Special rules for certain corrective distributions.
(d) Amounts taxable under section 72(p)(1).
(e) Special rules relating to distributions from a designated Roth account.
(f) Certain rules relating to employment taxes.

*§1.403(b)–8 Funding.*

(a) Investments.
(b) Contributions to the plan.
(c) Annuity contracts.
(d) Custodial accounts.
(e) Retirement income accounts.
(f) Combining assets.

*§1.403(b)–9 Special rules for church plans.*

(a) Retirement income accounts.
(b) Retirement income account defined.
(c) Special deduction rule for self-employed ministers.

*§1.403(b)–10 Miscellaneous provisions.*

(a) Plan terminations and frozen plans.
(b) Contract exchanges and plan-to-plan transfers.
(c) Qualified domestic relations orders.
(d) Rollovers to a section 403(b) contract.
(e) Deemed IRAs.
(f) Defined benefit plans.
(g) Other rules relating to section 501(c)(3) organizations.

*§1.403(b)–11 Applicable date.*

(a) General rule.
(b) Collective bargaining agreements.
(c) Church conventions.
(d) Special rules for plans that exclude certain types of employees from elective deferrals.
(e) Special rules for plans that permit in-service distributions.
(f) Special rule for life insurance contracts.

(g) *Special rule for contracts received in an exchange.*

Par. 6. Sections 1.403(b)–1, 1.403(b)–2, and 1.403(b)–3 are revised to read as follows:

*§1.403(b)–1 General overview of taxability under an annuity contract purchased by a section 501(c)(3) organization or a public school.*

Section 403(b) and §§1.403(b)–2 through 1.403(b)–10 provide rules for the Federal income tax treatment of an annuity purchased for an employee by an employer that is either a tax-exempt entity under section 501(c)(3) (relating to certain religious, charitable, scientific, or other types of organizations) or a public school, or for a minister described in section 414(e)(5)(A). See section 403(a) (relating to qualified annuities) for rules regarding the taxation of an annuity purchased under a qualified annuity plan that meets the requirements of section 404(a)(2), and see section 403(c) (relating to nonqualified annuities) for rules regarding the taxation of other types of annuities.

*§1.403(b)–2 Definitions.*

(a) *Application of definitions.* The definitions set forth in this section are applicable for purposes of §1.403(b)–1, this section and §§1.403(b)–3 through 1.403(b)–11.

(b) *Definitions*—(1) *Accumulated benefit* means the total benefit to which a participant or beneficiary is entitled under a section 403(b) contract, including all contributions made to the contract and all earnings thereon.

(2) *Annuity contract* means a contract that is issued by an insurance company qualified to issue annuities in a State and that includes payment in the form of an annuity. See §1.401(f)–1(d)(2) and (e) for the definition of an annuity, and see §1.403(b)–8(c)(3) for a special rule for certain State plans. See also §1.403(b)–8(d) and 1.403(b)–9(a) for additional rules regarding the treatment of custodial accounts and retirement income accounts as annuity contracts.

(3) *Beneficiary* means a person who is entitled to benefits in respect of a participant following the participant's death or an alternate payee pursuant to a qualified domestic relations order, as described in §1.403(b)–10(c).

(4) *Catch-up* amount or *catch-up* limitation for a participant for a taxable year means a section 403(b) elective deferral permitted under section 414(v) (as described in §1.403(b)–4(c)(2)) or section 402(g)(7) (as described in §1.403(b)–4(c)(3)).

(5) *Church* means a church as defined in section 3121(w)(3)(A) and a qualified church-controlled organization as defined in section 3121(w)(3)(B).

(6) *Church-related organization* means a church or a convention or association of churches, including an organization described in section 414(e)(3)(A).

(7) *Elective deferral* means an elective deferral under §1.402(g)–1 (with respect to an employer contribution to a section 403(b) contract) and any other amount that constitutes an elective deferral under section 402(g)(3).

(8) (i) *Eligible employer* means—

(A) A State, but only with respect to an employee of the State performing services for a public school;

(B) A section 501(c)(3) organization with respect to any employee of the section 501(c)(3) organization;

(C) Any employer of a minister described in section 414(e)(5)(A), but only with respect to the minister; or

(D) A minister described in section 414(e)(5)(A), but only with respect to a retirement income account established for the minister.

(ii) An entity is not an eligible employer under paragraph (a)(8)(i)(A) of this section if it treats itself as not being a State for any other purpose of the Internal Revenue Code, and a subsidiary or other affiliate of an eligible employer is not an eligible employer under paragraph (a)(8)(i) of this section if the subsidiary or other affiliate is not an entity described in paragraph (a)(8)(i) of this section.

(9) *Employee* means a common-law employee performing services for the employer, and does not include a former employee or an independent contractor. Subject to any rules in §1.403(b)–1, this section, and §§1.403(b)–3 through 1.403(b)–11 that are specifically applicable to ministers, an employee also includes a minister described in section 414(e)(5)(A) when performing services in the exercise of his or her ministry.

(10) *Employee performing services for a public school* means an employee performing services as an employee for a public school of a State. This definition is not applicable unless the employee's compensation for performing services for a public school is paid by the State. Further, a person occupying an elective or appointive public office is not an employee performing services for a public school unless such office is one to which an individual is elected or appointed only if the individual has received training, or is experienced, in the field of education. The term *public office* includes any elective or appointive office of a State.

(11) *Includible compensation* means the employee's compensation received from an eligible employer that is includible in the participant's gross income for Federal income tax purposes (computed without regard to section 911) for the most recent period that is a year of service. Includible compensation for a minister who is self-employed means the minister's earned income as defined in section 401(c)(2) (computed without regard to section 911) for the most recent period that is a year of service. Includible compensation does not include any compensation received during a period when the employer is not an eligible employer. Includible compensation also includes any elective deferral or other amount contributed or deferred by the eligible employer at the election of the employee that would be includible in the gross income of the employee but for the rules of sections 125, 132(f)(4), 402(e)(2), 402(h)(1)(B), 402(k), or 457(b). The amount of includible compensation is determined without regard to any community property laws. See section 415(c)(3)(A) through (D) for additional rules, and see §1.403(b)–4(d) for a special rule regarding former employees.

(12) *Participant* means an employee for whom a section 403(b) contract is currently being purchased, or an employee or former employee for whom a section 403(b) contract has previously been purchased and who has not received a distribution of his or her entire accumulated benefit under the contract.

(13) *Plan* means a plan as described in §1.403(b)–3(b)(3).

(14) *Public school* means a State-sponsored educational organization described

in section 170(b)(1)(A)(ii) (relating to educational organizations that normally maintain a regular faculty and curriculum and normally have a regularly enrolled body of pupils or students in attendance at the place where educational activities are regularly carried on).

(15) *Retirement income account* means a defined contribution program established or maintained by a church-related organization to provide benefits under section 403(b) for its employees or their beneficiaries as described in §1.403(b)–9.

(16) *Section 403(b) contract; section 403(b) plan*—(i) *Section 403(b) contract* means a contract that satisfies the requirements of §1.403(b)–3. If for any taxable year an employer contributes to more than one section 403(b) contract for a participant or beneficiary, then, under section 403(b)(5), all such contracts are treated as one contract for purposes of section 403(b) and §1.403(b)–1, this section, and §§1.403(b)–3 through 1.403(b)–11. See also §1.403(b)–3(b)(1).

(ii) *Section 403(b) plan* means the plan of the employer under which the section 403(b) contracts for its employees are maintained.

(17) *Section 403(b) elective deferral; designated Roth contribution*—(i) *Section 403(b) elective deferral* means an elective deferral that is an employer contribution to a section 403(b) plan for an employee. See §1.403(b)–5(b) for additional rules with respect to a section 403(b) elective deferral.

(ii) *Designated Roth contribution* under a section 403(b) plan means a section 403(b) elective deferral that satisfies §1.403(b)–3(c).

(18) *Section 501(c)(3) organization* means an organization that is described in section 501(c)(3) (relating to certain religious, charitable, scientific, or other types of organizations) and exempt from tax under section 501(a).

(19) *Severance from employment* means that the employee ceases to be employed by the employer maintaining the plan. See §1.401(k)–1(d) for additional guidance concerning severance from employment. See also §1.403(b)–6(h) for a special rule under which severance from employment is determined by reference to employment with the eligible employer.

(20) *State* means a State, a political subdivision of a State, or any agency or instrumentality of a State. For this purpose, the District of Columbia is treated as a State. In addition, for purposes of determining whether an individual is an employee performing services for a public school, an Indian tribal government is treated as a State, as provided under section 7871(a)(6)(B). See also section 1450(b) of the Small Business Job Protection Act of 1996 (110 Stat. 1755, 1814) for special rules treating certain contracts purchased in a plan year beginning before January 1, 1995, that include contributions by an Indian tribal government as section 403(b) contracts, whether or not those contributions are for employees performing services for a public school.

(21) *Year of service* means each full year during which an individual is a full-time employee of an eligible employer, plus fractional credit for each part of a year during which the individual is either a full-time employee of an eligible employer for a part of the year or a part-time employee of an eligible employer. See §1.403(b)–4(e) for rules for determining years of service.

*§1.403(b)–3 Exclusion for contributions to purchase section 403(b) contracts.*

(a) *Exclusion for section 403(b) contracts.* Amounts contributed by an eligible employer for the purchase of an annuity contract for an employee are excluded from the gross income of the employee under section 403(b) only if each of the requirements in paragraphs (a)(1) through (9) of this section is satisfied. In addition, amounts contributed by an eligible employer for the purchase of an annuity contract for an employee pursuant to a cash or deferred election (as defined at §1.401(k)–1(a)(3)) are not includible in an employee's gross income at the time the cash would have been includible in the employee's gross income (but for the cash or deferred election) if each of the requirements in paragraphs (a)(1) through (9) of this section is satisfied. However, the preceding two sentences generally do not apply to designated Roth contributions; see paragraph (c) of this section and §1.403(b)–7(e) for special taxation rules that apply with respect to designated Roth contributions under a section 403(b) plan.

(1) *Not a contract issued under qualified plan or eligible governmental plan.* The annuity contract is not purchased under a qualified plan (under section 401(a) or 403(a)) or an eligible governmental plan under section 457(b).

(2) *Nonforfeitability.* The rights of the employee under the annuity contract (disregarding rights to future premiums) are nonforfeitable. An employee's rights under a contract fail to be nonforfeitable unless the employee for whom the contract is purchased has at all times a fully vested and nonforfeitable right (as defined in regulations under section 411) to all benefits provided under the contract. See paragraph (d)(2) of this section for additional rules regarding the nonforfeitability requirement of this paragraph (a)(2).

(3) *Nondiscrimination.* In the case of an annuity contract purchased by an eligible employer other than a church, the contract is purchased under a plan that satisfies section 403(b)(12) (relating to nondiscrimination requirements, including universal availability). See §1.403(b)–5.

(4) *Limitations on elective deferrals.* In the case of an elective deferral, the contract satisfies section 401(a)(30) (relating to limitations on elective deferrals). A contract does not satisfy section 401(a)(30) as required under this paragraph (a)(4) unless the contract requires that all elective deferrals for an employee not exceed the limits of section 402(g)(1), including elective deferrals for the employee under the contract and any other elective deferrals under the plan under which the contract is purchased and under all other plans, contracts, or arrangements of the employer. See §1.401(a)–30.

(5) *Nontransferability.* The contract is not transferable. This paragraph (a)(5) does not apply to a contract issued before January 1, 1963. See section 401(g).

(6) *Minimum required distributions.* The contract satisfies the requirements of section 401(a)(9) (relating to minimum required distributions). See §1.403(b)–6(e).

(7) *Rollover distributions.* The contract provides that, if the distributee of an eligible rollover distribution elects to have the distribution paid directly to an eligible retirement plan, as defined in section 402(c)(8)(B), and specifies the eligible retirement plan to which the distribution is to be paid, then the distribution will be paid to that eligible retirement plan in a direct rollover. See §1.403(b)–7(b)(2).

(8) *Limitation on incidental benefits.* The contract satisfies the incidental benefit requirements of section 401(a). See §1.403(b)–6(g).

(9) *Maximum annual additions.* The annual additions to the contract do not exceed the applicable limitations of section 415(c) (treating contributions and other additions as annual additions). See paragraph (b) of this section and §1.403(b)–4(b) and (f).

(b) *Application of requirements*—(1) *Aggregation of contracts.* In accordance with section 403(b)(5), for purposes of determining whether this section is satisfied, all section 403(b) contracts purchased for an individual by an employer are treated as purchased under a single contract. Additional aggregation rules apply under section 402(g) for purposes of satisfying paragraph (a)(4) of this section and under section 415 for purposes of satisfying paragraph (a)(9) of this section.

(2) *Disaggregation for excess annual additions.* In accordance with the last sentence of section 415(a)(2), if an excess annual addition is made to a contract that otherwise satisfies the requirements of this section, then the portion of the contract that includes such excess annual addition fails to be a section 403(b) contract (as further described in paragraph (d)(1) of this section) and the remaining portion of the contract is a section 403(b) contract. This paragraph (b)(2) is not satisfied unless, for the year of the excess and each year thereafter, the issuer of the contract maintains separate accounts for each such portion. Thus, the entire contract fails to be a section 403(b) contract if an excess annual addition is made and a separate account is not maintained with respect to the excess.

(3) *Plan in form and operation.* (i) A contract does not satisfy paragraph (a) of this section unless it is maintained pursuant to a plan. For this purpose, a plan is a written defined contribution plan, which, in both form and operation, satisfies the requirements of §1.403(b)–1, §1.403(b)–2, this section, and §§1.403(b)–4 through 1.403(b)–11. For purposes of §1.403(b)–1, §1.403(b)–2, this section, and §§1.403(b)–4 through 1.403(b)–11, the plan must contain all the material terms and conditions for eligibility, benefits, applicable limitations, the contracts available under the plan, and the time and form under which benefit dis-

tributions would be made. For purposes of §1.403(b)–1, §1.403(b)–2, this section, and §§1.403(b)–4 through 1.403(b)–11, a plan may contain certain optional features that are consistent with but not required under section 403(b), such as hardship withdrawal distributions, loans, plan-to-plan or annuity contract-to-annuity contract transfers, and acceptance of rollovers to the plan. However, if a plan contains any optional provisions, the optional provisions must meet, in both form and operation, the relevant requirements under section 403(b), this section, and §§1.403(b)–4 through 1.403(b)–11.

(ii) The plan may allocate responsibility for performing administrative functions, including functions to comply with the requirements of section 403(b) and other tax requirements. Any such allocation must identify responsibility for compliance with the requirements of the Internal Revenue Code that apply on the basis of the aggregated contracts issued to a participant under a plan, including loans under section 72(p) and the conditions for obtaining a hardship withdrawal under §1.403(b)–6. A plan is permitted to assign such responsibilities to parties other than the eligible employer, but not to participants (other than employees of the employer a substantial portion of whose duties are administration of the plan), and may incorporate by reference other documents, including the insurance policy or custodial account, which thereupon become part of the plan.

(iii) This paragraph (b)(3) applies to contributions to an annuity contract by a church only if the annuity is part of a retirement income account, as defined in §1.403(b)–9.

(4) *Exclusion limited for former employees*—(i) *General rule.* Except as provided in paragraph (b)(4)(ii) of this section and in §1.403(b)–4(d), the exclusion from gross income provided by section 403(b) does not apply to contributions made for former employees. For this purpose, a contribution is not made for a former employee if the contribution is with respect to compensation that would otherwise be paid for a payroll period that begins before severance from employment.

(ii) *Exceptions.* The exclusion from gross income provided by section 403(b) applies to contributions made for former employees with respect to compensation described in §1.415(c)–2(e)(3)(i) (relating

to certain compensation paid by the later of 2¹/₂ months after severance from employment or the end of the limitation year that includes the date of severance from employment), and compensation described in §1.415(c)–2(e)(4), §1.415(c)–2(g)(4), or §1.415(c)–2(g)(7) (relating to compensation paid to participants who are permanently and totally disabled or relating to qualified military service under section 414(u)).

(c) *Special rules for designated Roth section 403(b) contributions.* (1) The rules of §1.401(k)–1(f)(1) and (2) for designated Roth contributions under a qualified cash or deferred arrangement apply to designated Roth contributions under a section 403(b) plan. Thus, a designated Roth contribution under a section 403(b) plan is a section 403(b) elective deferral that is designated irrevocably by the employee at the time of the cash or deferred election as a designated Roth contribution that is being made in lieu of all or a portion of the section 403(b) elective deferrals the employee is otherwise eligible to make under the plan; that is treated by the employer as includible in the employee's gross income at the time the employee would have received the amount in cash if the employee had not made the cash or deferred election (such as by treating the contributions as wages subject to applicable withholding requirements); and that is maintained in a separate account (within the meaning of §1.401(k)–1(f)(2)).

(2) A designated Roth contribution under a section 403(b) plan must satisfy the requirements applicable to section 403(b) elective deferrals. Thus, for example, designated Roth contributions under a section 403(b) plan must satisfy the requirements of §1.403(b)–6(d). Similarly, a designated Roth account under a section 403(b) plan is subject to the rules of sections 401(a)(9)(A) and (B) and §1.403(b)–6(e).

(d) *Effect of failure*—(1) *General rules.* (i) If a contract includes any amount that fails to satisfy the requirements of section 403(b), §1.403(b)–1, §1.403(b)–2, this section, or §§1.403(b)–4 through 1.403(b)–11, then, except as otherwise provided in paragraph (d)(2) of this section (relating to failure to satisfy nonforfeitability requirements) or §1.403(b)–4(f) (relating to excess contributions under section 415 and excess deferrals under section 402(g)), the contract is not a sec-

tion 403(b) contract. In addition, section 403(b)(5) and paragraph (b)(1) of this section provide that, for purposes of determining whether a contract satisfies section 403(b), all section 403(b) contracts purchased for an individual by an employer are treated as purchased under a single contract. Thus, except as provided in paragraph (b)(2) of this section or as otherwise provided in this paragraph (d), a failure to satisfy section 403(b) with respect to any contract issued to an individual by an employer adversely affects all contracts issued to that individual by that employer.

(ii) In accordance with paragraph (b)(3) of this section, a failure to operate in accordance with the terms of a plan adversely affects all of the contracts issued by the employer to the employee or employees with respect to whom the operational failure occurred. Such a failure does not adversely affect any other contract if the failure is neither a failure to satisfy the nondiscrimination requirements of §1.403(b)–5 (a nondiscrimination failure) nor a failure of the employer to be an eligible employer as defined in §1.403(b)–2 (an employer eligibility failure). However, any failure that is not an operational failure adversely affects all contracts issued under the plan, including: a failure to have contracts issued pursuant to a written defined contribution plan which, in form, satisfies the requirements of §1.403(b)–1, §1.403(b)–2, this section, and §§1.403(b)–4 through 1.403(b)–11 (a written plan failure); a nondiscrimination failure; or an employer eligibility failure.

(iii) See other applicable Internal Revenue Code provisions for the treatment of a contract that is not a section 403(b) contract, such as sections 61, 83, 402(b), and 403(c). Thus, for example, section 403(c) (relating to nonqualified annuities) applies if any annuity contract issued by an insurance company fails to satisfy section 403(b), based on the value of the contract at the time of the failure. However, see paragraph (d)(2) of this section for special rules with respect to the nonforfeitability requirement of paragraph (a)(2) of this section.

(2) *Failure to satisfy nonforfeitability requirement*—(i) *Treatment before contract becomes nonforfeitable*. If an annuity contract issued by an insurance company would qualify as a section 403(b) contract but for the failure to satisfy the nonforfeitability requirement of paragraph (a)(2) of this section, then the contract is treated as a contract to which section 403(c) applies. See §1.403(b)–8(d)(4) for a rule under which a custodial account that fails to satisfy the nonforfeitability requirement of paragraph (a)(2) of this section is treated as a section 401(a) qualified plan for certain purposes.

(ii) *Treatment when contract becomes nonforfeitable*—(A) *In general*. Notwithstanding paragraph (d)(2)(i) of this section, on or after the date on which the participant's interest in a contract described in paragraph (d)(2)(i) of this section becomes nonforfeitable, the contract may be treated as a section 403(b) contract if no election has been made under section 83(b) with respect to the contract, the participant's interest in the contract has been subject to a substantial risk of forfeiture (as defined in section 83) before becoming nonforfeitable, each contribution under the contract that is subject to a different vesting schedule is maintained in a separate account, and the contract has at all times satisfied the requirements of paragraph (a) of this section other than the nonforfeitability requirement of paragraph (a)(2) of this section. Thus, for example, for the current year and each prior year, no contribution can have been made to the contract that would cause the contract to fail to be a section 403(b) contract as a result of contributions exceeding the limitations of section 415 (except to the extent permitted under paragraph (b)(2) of this section) or to fail to satisfy the nondiscrimination rules described in §1.403(b)–5. See also §1.403(b)–10(a)(1) for a special rule in connection with termination of a section 403(b) plan.

(B) *Partial vesting*. For purposes of applying this paragraph (d), if only a portion of a participant's interest in a contract becomes nonforfeitable in a year, then the portion that is nonforfeitable and the portion that fails to be nonforfeitable are each treated as separate contracts. In addition, for purposes of applying this paragraph (d), if a contribution is made to an annuity contract in excess of the limitations of section 415(c) and the excess is maintained in a separate account, then the portion of the contract that includes the excess contributions account and the remainder are each treated as separate contracts.

Thus, if an annuity contract that includes an excess contributions account changes from forfeitable to nonforfeitable during a year, then the portion that is not attributable to the excess contributions account constitutes a section 403(b) contract (assuming it otherwise satisfies the requirements to be a section 403(b) contract) and is not included in gross income, and the portion that is attributable to the excess contributions account is included in gross income in accordance with section 403(c). See §1.403(b)–4(f) for additional rules.

Par. 7. Sections 1.403(b)–4, 1.403(b)–5, 1.403(b)–6, 1.403(b)–7, 1.403(b)–8, 1.403(b)–9, 1.403(b)–10, and 1.403(b)–11 are added to read as follows:

### §1.403(b)–4 Contribution limitations.

(a) *Treatment of contributions in excess of limitations*. The exclusion provided under §1.403(b)–3(a) applies to a participant only if the amounts contributed by the employer for the purchase of an annuity contract for the participant do not exceed the applicable limit under sections 415 and 402(g), as described in this section. Under §1.403(b)–3(a)(4), a section 403(b) contract is required to include the limits on elective deferrals imposed by section 402(g), as described in paragraph (c) of this section. See paragraph (f) of this section for special rules concerning excess contributions and deferrals. Rollover contributions made to a section 403(b) contract, as described in §1.403(b)–10(d), are not taken into account for purposes of the limits imposed by section 415, §1.403(b)–3(a)(9), section 402(g), §1.403(b)–3(a)(4), and this section, but after-tax employee contributions are taken into account under section 415, §1.403(b)–3(a)(9), and paragraph (b) of this section.

(b) *Maximum annual contribution*—(1) *General rule*. In accordance with section 415(a)(2) and §1.403(b)–3(a)(9), the contributions for any participant under a section 403(b) contract (namely, employer nonelective contributions (including matching contributions), section 403(b) elective deferrals, and after-tax employee contributions) are not permitted to exceed the limitations imposed by section 415. Under section 415(c), contributions are permitted to be made for participants in a defined contribution

plan, subject to the limitations set forth therein (which are generally the lesser of a dollar limit for a year or the participant's compensation for the year). For purposes of section 415, contributions made for a participant are aggregated to the extent applicable under section 414(b), (c), (m), (n), and (o). For purposes of sections 415(a)(2), §§1.403(b)–1 through 1.403(b)–3, this section, and §§1.403(b)–5 through 1.403(b)–11, a contribution means any annual addition, as defined in section 415(c).

(2) *Special rules.* See section 415(k)(4) for a special rule under which contributions to section 403(b) contracts are generally aggregated with contributions under other arrangements in applying section 415. For purposes of applying section 415(c)(1)(B) (relating to compensation) with respect to a section 403(b) contract, except as provided in section 415(c)(3)(C), a participant's includible compensation (as defined in §1.403(b)–2) is substituted for the participant's compensation, as described in section 415(c)(3)(E). Any age 50 catch-up contributions under paragraph (c)(2) of this section are disregarded in applying section 415.

(c) *Section 403(b) elective deferrals*—(1) *Basic limit under section 402(g)(1).* In accordance with section 402(g)(1)(A), the section 403(b) elective deferrals for any individual are included in the individual's gross income to the extent the amount of such deferrals, plus all other elective deferrals for the individual, for the taxable year exceeds the applicable dollar amount under section 402(g)(1)(B). The applicable annual dollar amount under section 402(g)(1)(B) is $15,000, adjusted for cost-of-living after 2006 in the manner described in section 402(g)(4). See §1.403(b)–5(b) for a universal availability rule that applies if any employee is permitted to have any section 403(b) elective deferrals made on his or her behalf.

(2) *Age 50 catch-up*—(i) *In general.* In accordance with section 414(v) and the regulations thereunder, a section 403(b) contract may provide for catch-up contributions for a participant who is age 50 by the end of the year, provided that such age 50 catch-up contributions do not exceed the catch-up limit under section 414(v)(2) for the taxable year. The maximum amount of additional age 50 catch-up contributions for a taxable year

under section 414(v) is $5,000, adjusted for cost-of-living after 2006 in the manner described in section 414(v)(2)(C). For additional requirements, see regulations under section 414(v).

(ii) *Coordination with special section 403(b) catch-up.* In accordance with sections 414(v)(6)(A)(ii) and 402(g)(7)(A), the age 50 catch-up described in this paragraph (c)(2) may apply for any taxable year in which a participant also qualifies for the special section 403(b) catch-up under paragraph (c)(3) of this section.

(3) *Special section 403(b) catch-up for certain organizations*—(i) *Amount of the special section 403(b) catch-up.* In the case of a qualified employee of a qualified organization for whom the basic section 403(b) elective deferrals for any year are not less than the applicable dollar amount under section 402(g)(1)(B), the section 403(b) elective deferral limitation of section 402(g)(1) for the taxable year of the qualified employee is increased by the least of—

(A) $3,000;

(B) The excess of—

(*1*) $15,000, over

(*2*) The total elective deferrals described in section 402(g)(7)(A)(ii) made for the qualified employee by the qualified organization for prior years; or

(C) The excess of—

(*1*) $5,000 multiplied by the number of years of service of the employee with the qualified organization, over

(*2*) The total elective deferrals (as defined at §1.403(b)–2) made for the employee by the qualified organization for prior years.

(ii) *Qualified organization.* (A) For purposes of this paragraph (c)(3), *qualified organization* means an eligible employer that is—

(*1*) An educational organization described in section 170(b)(1)(A)(ii);

(*2*) A hospital;

(*3*) A health and welfare service agency (including a home health service agency);

(*4*) A church-related organization; or

(*5*) Any organization described in section 414(e)(3)(B)(ii).

(B) All entities that are in a church-related organization or an organization controlled by a church-related organization under section 414(e)(3)(B)(ii) are treated as a single qualified organization (so that years of service and any special section

403(b) catch-up elective deferrals previously made for a qualified employee for a church or other entity within a church-related organization or an organization controlled by the church-related organization are taken into account for purposes of applying this paragraph (c)(3) to the employee with respect to any other entity within the same church-related organization or organization controlled by a church-related organization).

(C) For purposes of this paragraph (c)(3)(ii), a *health and welfare service agency* means—

(*1*) An organization whose primary activity is to provide services that constitute medical care as defined in section 213(d)(1) (such as a hospice);

(*2*) A section 501(c)(3) organization whose primary activity is the prevention of cruelty to individuals or animals;

(*3*) An adoption agency; or

(*4*) An agency that provides substantial personal services to the needy as part of its primary activity (such as a section 501(c)(3) organization that either provides meals to needy individuals, is a home health service agency, provides services to help individuals who have substance abuse, or provides help to the disabled).

(iii) *Qualified employee.* For purposes of this paragraph (c)(3), *qualified employee* means an employee who has completed at least 15 years of service (as defined under paragraph (e) of this section) taking into account only employment with the qualified organization. Thus, an employee who has not completed at least 15 years of service (as defined under paragraph (e) of this section) taking into account only employment with the qualified organization is not a qualified employee.

(iv) *Coordination with age 50 catch-up.* In accordance with sections 402(g)(1)(C) and 402(g)(7), any catch-up amount contributed by an employee who is eligible for both an age 50 catch-up and a special section 403(b) catch-up is treated first as an amount contributed as a special section 403(b) catch-up to the extent a special section 403(b) catch-up is permitted, and then as an amount contributed as an age 50 catch-up (to the extent the catch-up amount exceeds the maximum special section 403(b) catch-up after taking into account sections 402(g) and 415(c), this paragraph (c)(3), and any limitations on

the special section 403(b) catch-up that are imposed by the terms of the plan).

(4) *Coordination with designated Roth contributions*. See regulations under section 402A for rules for determining whether an elective deferral is a pre-tax elective deferral or a designated Roth contribution.

(5) *Examples*. The provisions of this paragraph (c) are illustrated by the following examples:

*Example 1*. (i) *Facts illustrating application of the basic dollar limit*. Participant B, who is 45, is eligible to participate in a State university section 403(b) plan in 2006. B is not a qualified employee, as defined in paragraph (c)(3)(iii) of this section. The plan permits section 403(b) elective deferrals, but no other employer contributions are made under the plan. The plan provides limitations on section 403(b) elective deferrals up to the maximum permitted under paragraphs (c)(1) and (3) of this section and the additional age 50 catch-up amount described in paragraph (c)(2) of this section. For 2006, B will receive includible compensation of $42,000 from the eligible employer. B desires to elect to have the maximum section 403(b) elective deferral possible contributed in 2006. For 2006, the basic dollar limit for section 403(b) elective deferrals under paragraph (c)(1) of this section is $15,000 and the additional dollar amount permitted under the age 50 catch-up is $5,000.

(ii) *Conclusion*. B is not eligible for the age 50 catch-up in 2006 because B is 45 in 2006. B is also not eligible for the special section 403(b) catch-up under paragraph (c)(3) of this section because B is not a qualified employee. Accordingly, the maximum section 403(b) elective deferral that B may elect for 2006 is $15,000.

*Example 2*. (i) *Facts illustrating application of the includible compensation limitation*. The facts are the same as in *Example 1*, except B's includible compensation is $14,000.

(ii) *Conclusion*. Under section 415(c), contributions may not exceed 100 percent of includible compensation. Accordingly, the maximum section 403(b) elective deferral that B may elect for 2006 is $14,000.

*Example 3*. (i) *Facts illustrating application of the age 50 catch-up*. Participant C, who is 55, is eligible to participate in a State university section 403(b) plan in 2006. The plan permits section 403(b) elective deferrals, but no other employer contributions are made under the plan. The plan provides limitations on section 403(b) elective deferrals up to the maximum permitted under paragraphs (c)(1) and (c)(3) of this section and the additional age 50 catch-up amount described in paragraph (c)(2) of this section. For 2006, C will receive includible compensation of $48,000 from the eligible employer. C desires to elect to have the maximum section 403(b) elective deferral possible contributed in 2006. For 2006, the basic dollar limit for section 403(b) elective deferrals under paragraph (c)(1) of this section is $15,000 and the additional dollar amount permitted under the age 50 catch-up is $5,000. C does not have 15 years of service and thus is not a qualified employee, as defined in paragraph (c)(3)(iii) of this section.

(ii) *Conclusion*. C is eligible for the age 50 catch-up in 2006 because C is 55 in 2006. C is

not eligible for the special section 403(b) catch-up under paragraph (c)(3) of this section because C is not a qualified employee (as defined in paragraph (c)(3)(iii) of this section). Accordingly, the maximum section 403(b) elective deferral that C may elect for 2006 is $20,000 ($15,000 plus $5,000).

*Example 4*. (i) *Facts illustrating application of both the age 50 and the special section 403(b) catch-up*. The facts are the same as in *Example 3*, except that C is a qualified employee for purposes of the special section 403(b) catch-up provisions in paragraph (c)(3) of this section. For 2006, the maximum additional section 403(b) elective deferral for which C qualifies under the special section 403(b) catch-up under paragraph (c)(3) of this section is $3,000.

(ii) *Conclusion*. The maximum section 403(b) elective deferrals that C may elect for 2006 is $23,000. This is the sum of the basic limit on section 403(b) elective deferrals under paragraph (c)(1) of this section equal to $15,000, plus the $3,000 additional special section 403(b) catch-up amount for which C qualifies under paragraph (c)(3) of this section, plus the additional age 50 catch-up amount of $5,000.

*Example 5*. (i) *Facts illustrating calculation of years of service with a predecessor organization for purposes of the special section 403(b) catch-up*. Participant A is an employee of hospital H and is eligible to participate in a section 403(b) plan of H in 2006. A does not have 15 years of service with H, but A has previously made special section 403(b) catch-up deferrals to a section 403(b) plan maintained by hospital P which has since been acquired by H.

(ii) *Conclusion*. The special section 403(b) catch-up amount for which A qualifies under paragraph (c)(3) of this section must be calculated taking into account A's prior years of service and section 403(b) elective deferrals with the predecessor hospital if and only if A did not have any severance from service in connection with the acquisition.

*Example 6*. (i) *Facts illustrating application of the age 50 catch-up and the section 415(c) dollar limitation*. The facts are the same as in *Example 4*, except that the employer makes a nonelective contribution for each employee equal to 20 percent of C's compensation (which is $48,000). Thus, the employer makes a nonelective contribution for C for 2006 equal to $9,600. The plan provides that a participant is not permitted to make section 403(b) elective deferrals to the extent the section 403(b) elective deferrals would result in contributions in excess of the maximum permitted under section 415 and provides that contributions are reduced in the following order: the special section 403(b) catch-up elective deferrals under paragraph (c)(3) of this section are reduced first; the age 50 catch-up elective deferrals under paragraph (c)(2) of this section are reduced second; and then the basic section 403(b) elective deferrals under paragraph (c)(1) of this section are reduced. For 2006, the applicable dollar limit under section 415(c)(1)(A) is $44,000.

(ii) *Conclusion*. The maximum section 403(b) elective deferral that C may elect for 2006 is $23,000. This is the sum of the basic limit on section 403(b) elective deferrals under paragraph (c)(1) of this section equal to $15,000, plus the $3,000 additional special section 403(b) catch-up amount for which C qualifies under paragraph (c)(3) of this section, plus the additional age 50 catch-up amount of $5,000. The

limit in paragraph (b) of this section would not be exceeded because the sum of the $9,600 nonelective contribution and the $23,000 section 403(b) elective deferrals does not exceed the lesser of $49,000 (which is the sum of $44,000 plus the $5,000 additional age 50 catch-up amount) or $53,000 (which is the sum of C's includible compensation for 2006 ($48,000) plus the $5,000 additional age 50 catch-up amount).

*Example 7*. (i) *Facts further illustrating application of the age 50 catch-up and the section 415(c) dollar limitation*. The facts are the same as in *Example 6*, except that C's includible compensation for 2006 is $58,000 and the plan provides for a nonelective contribution equal to 50 percent of includible compensation, so that the employer nonelective contribution for C for 2006 is $29,000 (50 percent of $58,000).

(ii) *Conclusion*. The maximum section 403(b) elective deferral that C may elect for 2006 is $20,000. A section 403(b) elective deferral in excess of this amount would exceed the sum of the limit in section 415(c)(1)(A) plus the additional age 50 catch-up amount, because the sum of the employer's nonelective contribution of $29,000 plus a section 403(b) elective deferral in excess of $20,000 would exceed $49,000 (the sum of the $44,000 limit in section 415(c)(1)(A) plus the $5,000 additional age 50 catch-up amount). (Note that a section 403(b) elective deferral in excess of $20,000 would also exceed the limitations of section 402(g) unless a special section 403(b) catch-up were permitted.)

*Example 8*. (i) *Facts further illustrating application of the age 50 catch-up and the section 415(c) dollar limitation*. The facts are the same as in *Example 7*, except that the plan provides for a nonelective contribution for C equal to $44,000 (which is the limit in section 415(c)(1)(A)).

(ii) *Conclusion*. The maximum section 403(b) elective deferral that C may elect for 2006 is $5,000. A section 403(b) elective deferral in excess of this amount would exceed the sum of the limit in section 415(c)(1)(A) plus the additional age 50 catch-up amount ($5,000), because the sum of the employer's nonelective contribution of $44,000 plus a section 403(b) elective deferral in excess of $5,000 would exceed $49,000 (the sum of the $44,000 limit in section 415(c)(1)(A) plus the $5,000 additional age 50 catch-up amount).

*Example 9*. (i) *Facts illustrating application of the age 50 catch-up and the section 415(c) includible compensation limitation*. The facts are the same as in *Example 7*, except that C's includible compensation for 2006 is $28,000, so that the employer nonelective contribution for C for 2006 is $14,000 (50 percent of $28,000).

(ii) *Conclusion*. The maximum section 403(b) elective deferral that C may elect for 2006 is $19,000. A section 403(b) elective deferral in excess of this amount would exceed the sum of the limit in section 415(c)(1)(B) plus the additional age 50 catch-up amount, because C's includible compensation is $28,000 and the sum of the employer's nonelective contribution of $14,000 plus a section 403(b) elective deferral in excess of $19,000 would exceed $33,000 (which is the sum of 100 percent of C's includible compensation plus the $5,000 additional age 50 catch-up amount).

*Example 10*. (i) *Facts illustrating that section 403(b) elective deferrals cannot exceed compensation otherwise payable*. Employee D is age 60, has in-

cludible compensation of $14,000, and wishes to contribute section 403(b) elective deferrals of $20,000 for the year. No nonelective contributions are made for Employee D.

(ii) *Conclusion.* Because a contribution is a section 403(b) elective deferral only if it relates to an amount that would otherwise be included in the participant's compensation, the effective limitation on section 403(b) elective deferrals for a participant whose compensation is less than the basic dollar limit for section 403(b) elective deferrals is the participant's compensation. Thus, D cannot make section 403(b) elective deferrals in excess of D's actual compensation, which is $14,000, even though the basic dollar limit exceeds that amount.

*Example 11.* (i) *Facts illustrating calculation of the special section 403(b) catch-up.* For 2006, employee E, who is age 53, is eligible to participate in a section 403(b) plan of hospital H, which is a section 501(c)(3) organization. H's plan permits section 403(b) elective deferrals and provides for an employer contribution of 10 percent of a participant's compensation. The plan provides limitations on section 403(b) elective deferrals up to the maximum permitted under paragraphs (c)(1), (2), and (3) of this section. For 2006, E's includible compensation is $50,000. E wishes to elect to have the maximum section 403(b) elective deferral possible contributed in 2006. E has previously made $62,000 of section 403(b) elective deferrals under the plan, but has never made an election for a special section 403(b) catch-up elective deferral. For 2006, the basic dollar limit for section 403(b) elective deferrals under paragraph (c)(1) of this section is $15,000, the additional dollar amount permitted under the age 50 catch-up is $5,000, E's employer will make a nonelective contribution of $5,000 (10% of $50,000 compensation), and E is a qualified employee of a qualified employer as defined in paragraph (c)(3) of this section.

(ii) *Conclusion.* The maximum section 403(b) elective deferrals that E may elect under H's section 403(b) plan for 2006 is $23,000. This is the sum of the basic limit on section 403(b) elective deferrals for 2006 under paragraph (c)(1) of this section equal to $15,000, plus the $3,000 maximum additional special section 403(b) catch-up amount for which D qualifies in 2006 under paragraph (c)(3) of this section, plus the additional age 50 catch-up amount of $5,000. The limitation on the additional special section 403(b) catch-up amount is not less than $3,000 because the limitation at paragraph (c)(3)(i)(B) of this section is $15,000 ($15,000 minus zero) and the limitation at paragraph (c)(3)(i)(C) of this section is $13,000 ($5,000 times 15, minus $62,000 of total deferrals in prior years). These conclusions would be unaffected if H were an eligible governmental employer under section 457(b) that has a section 457(b) eligible governmental plan and E were in the past to have made annual deferrals to that plan, because contributions to a section 457(b) eligible governmental plan do not constitute elective deferrals; and these conclusions would also be the same if H had a section 401(k) plan and E were in the past to have made elective deferrals to that plan, assuming that those elective deferrals did not exceed $10,000 ($5,000 times 15, minus the sum of $62,000 plus $10,000, equals $3,000), so as to result in the limitation at paragraph (c)(3)(i)(C) of this section being less than $3,000.

*Example 12.* (i) *Facts illustrating calculation of the special section 403(b) catch-up in the next calendar year.* The facts are the same as in *Example 11*, except that, for 2007, E has includible compensation of $60,000. For 2007, E now has previously made $85,000 of section 403(b) elective deferrals ($62,000 deferred before 2006, plus the $15,000 in basic section 403(b) elective deferrals in 2006, the $3,000 maximum additional special section 403(b) catch-up amount in 2006, plus the $5,000 age 50 catch-up amount in 2006). However, the $5,000 age 50 catch-up amount deferred in 2006 is disregarded for purposes of applying the limitation at paragraph (c)(3)(i)(B) of this section to determine the special section 403(b) catch-up amount. Thus, for 2007, only $80,000 of section 403(b) elective deferrals are taken into account in applying the limitation at paragraph (c)(3)(i)(B) of this section. For 2007, the basic dollar limit for section 403(b) elective deferrals under paragraph (c)(1) of this section is assumed to be $16,000, the additional dollar amount permitted under the age 50 catch-up is assumed to be $5,000, and E's employer contributes $6,000 (10% of $60,000) as a non-elective contribution.

(ii) *Conclusion.* The maximum section 403(b) elective deferral that D may elect under H's section 403(b) plan for 2007 is $21,000. This is the sum of the basic limit on section 403(b) elective deferrals under paragraph (c)(1) of this section equal to $16,000, plus the additional age 50 catch-up amount of $5,000. E is not entitled to any additional special section 403(b) catch-up amount for 2007 under paragraph (c)(3) of this section due to the limitation at paragraph (c)(3)(i)(C) of this section (16 times $5,000 equals $80,000, minus D's total prior section 403(b) elective deferrals of $80,000 equals zero).

(d) *Employer contributions for former employees*—(1) *Includible compensation deemed to continue for nonelective contributions.* For purposes of applying paragraph (b) of this section, a former employee is deemed to have monthly includible compensation for the period through the end of the taxable year of the employee in which he or she ceases to be an employee and through the end of each of the next five taxable years. The amount of the monthly includible compensation is equal to one twelfth of the former employee's includible compensation during the former employee's most recent year of service. Accordingly, nonelective employer contributions for a former employee must not exceed the limitation of section 415(c)(1) up to the lesser of the dollar amount in section 415(c)(1)(A) or the former employee's annual includible compensation based on the former employee's average monthly compensation during his or her most recent year of service.

(2) *Examples.* The provisions of paragraph (d)(1) of this section are illustrated by the following examples:

*Example 1.* (i) *Facts.* Private college M is a section 501(c)(3) organization operated on the basis of a June 30 fiscal year that maintains a section 403(b) plan for its employees. In 2004, M amends the plan to provide for a temporary early retirement incentive under which the college will make a nonelective contribution for any participant who satisfies certain minimum age and service conditions and who retires before June 30, 2006. The contribution will equal 110 percent of the participant's rate of pay for one year and will be payable over a period ending no later than the end of the fifth fiscal year that begins after retirement. It is assumed for purposes of this *Example 1* that, in accordance with §1.401(a)(4)–10(b) and under the facts and circumstances, the post-retirement contributions made for participants who satisfy the minimum age and service conditions and retire before June 30, 2006, do not discriminate in favor of former employees who are highly compensated employees. Employee A retires under the early retirement incentive on March 12, 2006, and A's annual includible compensation for the period from March 1, 2005, through February 28, 2006 (which is A's most recent one year of service) is $30,000. The applicable dollar limit under section 415(c)(1)(A) is assumed to be $44,000 for 2006 and $45,000 for 2007. The college contributes $30,000 for A for 2006 and $3,000 for A for 2007 (totaling $33,000 or 110 percent of $30,000). No other contributions are made to a section 403(b) contract for A for those years.

(ii) *Conclusion.* The contributions made for A do not exceed A's includible compensation for 2006 or 2007.

*Example 2.* (i) *Facts.* Private college N is a section 501(c)(3) organization that maintains a section 403(b) plan for its employees. The plan provides for N to make monthly nonelective contributions equal to 20 percent of the monthly includible compensation for each eligible employee. In addition, the plan provides for contributions to continue for 5 years following the retirement of any employee after age 64 and completion of at least 20 years of service (based on the employee's average annual rate of base salary in the preceding 3 calendar years ended before the date of retirement). It is assumed for purposes of this *Example 2* that, in accordance with §1.401(a)(4)–10(b) and under the facts and circumstances, the post-retirement contributions made for participants who satisfy the minimum age and service conditions do not discriminate in favor of former employees who are highly compensated employees. Employee B retires on July 1, 2006, at age 64 after completion of 20 or more years of service. At that date, B's annual includible compensation for the most recently ended fiscal year of N is $72,000 and B's average monthly rate of base salary for 2003 through 2005 is $5,000. N contributes $1,200 per month (20 percent of 1/12th of $72,000) from January of 2006 through June of 2006 and contributes $1,000 (20 percent of $5,000) per month for B from July of 2006 through June of 2011. The applicable dollar limit under section 415(c)(1)(A) is $44,000 for 2006 through 2011. No other contributions are made to a section 403(b) contract for B for those years.

(ii) *Conclusion.* The contributions made for B do not exceed B's includible compensation for any of the years from 2006 through 2010.

*Example 3.* (i) *Facts.* A public university maintains a section 403(b) plan under which it contributes

annually 10% of compensation for participants, including for the first 5 calendar years following the date on which the participant ceases to be an employee. The plan provides that if a participant who is a former employee dies during the first 5 calendar years following the date on which the participant ceases to be an employee, a contribution is made that is equal to the lesser of —

(A) The excess of the individual's includible compensation for that year over the contributions previously made for the individual for that year; or

(B) The total contributions that would have been made on the individual's behalf thereafter if he or she had survived to the end of the 5-year period.

(ii) Individual C's annual includible compensation is $72,000 (so that C's monthly includible compensation is $6,000). A $600 contribution is made for C for January of the first taxable year following retirement (10% of individual C's monthly includible compensation of $6,000). Individual C dies during February of that year. The university makes a contribution for individual C for February equal to $11,400 (C's monthly includible compensation for January and February, reduced by $600).

(iii) *Conclusion.* The contribution does not exceed the amount of individual C's includible compensation for the taxable year for purposes of section 415(c), but any additional contributions would exceed C's includible compensation for purposes of section 415(c).

(3) *Disabled employees.* See also section 415(c)(3)(C) which sets forth a special rule under which compensation may be treated as continuing for purposes of section 415 for certain former employees who are disabled.

(e) *Special rules for determining years of service*—(1) *In general.* For purposes of determining a participant's includible compensation under paragraph (b)(2) of this section and a participant's years of service under paragraphs (c)(3) (special section 403(b) catch-up for qualified employees of certain organizations) and (d) (employer contributions for former employees) of this section, an employee must be credited with a full year of service for each year during which the individual is a full-time employee of the eligible employer for the entire work period, and a fraction of a year for each part of a work period during which the individual is a full-time or part-time employee of the eligible employer. An individual's number of years of service equals the aggregate of the annual work periods during which the individual is employed by the eligible employer.

(2) *Work period.* A year of service is based on the employer's annual work period, not the employee's taxable year. For example, in determining whether a university professor is employed full time, the annual work period is the school's academic year. However, in no case may an employee accumulate more than one year of service in a twelve-month period.

(3) *Service with more than one eligible employer*—(i) *General rule.* With respect to any section 403(b) contract of an eligible employer, except as provided in paragraph (e)(3)(ii) of this section, any period during which an individual is not an employee of that eligible employer is disregarded for purposes of this paragraph (e).

(ii) *Special rule for church employees.* With respect to any section 403(b) contract of an eligible employer that is a church-related organization, any period during which an individual is an employee of that eligible employer and any other eligible employer that is a church-related organization that has an association (as defined in section 414(e)(3)(D)) with that eligible employer is taken into account on an aggregated basis, but any period during which an individual is not an employee of a church-related organization or is an employee of a church-related organization that does not have an association with that eligible employer is disregarded for purposes of this paragraph (e).

(4) *Full-time employee for full year.* Each annual work period during which an individual is employed full time by the eligible employer constitutes one year of service. In determining whether an individual is employed full-time, the amount of work which he or she actually performs is compared with the amount of work that is normally required of individuals performing similar services from which substantially all of their annual compensation is derived.

(5) *Other employees.* (i) An individual is treated as performing a fraction of a year of service for each annual work period during which he or she is a full-time employee for part of the annual work period and for each annual work period during which he or she is a part-time employee either for the entire annual work period or for a part of the annual work period.

(ii) In determining the fraction that represents the fractional year of service for an individual employed full time for part of an annual work period, the numerator is the period of time (such as weeks or months) during which the individual is a full-time employee during that annual work period, and the denominator is the period of time that is the annual work period.

(iii) In determining the fraction that represents the fractional year of service of an individual who is employed part time for the entire annual work period, the numerator is the amount of work performed by the individual, and the denominator is the amount of work normally required of individuals who perform similar services and who are employed full time for the entire annual work period.

(iv) In determining the fraction representing the fractional year of service of an individual who is employed part time for part of an annual work period, the fractional year of service that would apply if the individual were a part-time employee for a full annual work period is multiplied by the fractional year of service that would apply if the individual were a full-time employee for the part of an annual work period.

(6) *Work performed.* For purposes of this paragraph (e), in measuring the amount of work of an individual performing particular services, the work performed is determined based on the individual's hours of service (as defined under section 410(a)(3)(C)), except that a plan may use a different measure of work if appropriate under the facts and circumstances. For example, a plan may provide for a university professor's work to be measured by the number of courses taught during an annual work period in any case in which that individual's work assignment is generally based on a specified number of courses to be taught.

(7) *Most recent one-year period of service.* For purposes of paragraph (d) of this section, in the case of a part-time employee or a full-time employee who is employed for only part of the year determined on the basis of the employer's annual work period, the employee's most recent periods of service are aggregated to determine his or her most recent one-year period of service. In such a case, there is first taken into account his or her service during the annual work period for which the last year of service's includible compensation is being determined; then there is taken into account his or her service during his or her next preceding annual work period based on whole months; and so forth, until the employee's service equals, in the aggregate, one year of service.

(8) *Less than one year of service considered as one year.* If, at the close of a

taxable year, an employee has, after application of all of the other rules in this paragraph (e), some portion of one year of service (but has accumulated less than one year of service), the employee is deemed to have one year of service. Except as provided in the previous sentence, fractional years of service are not rounded up.

(9) *Examples*. The provisions of this paragraph (e) are illustrated by the following examples:

*Example 1*. (i) *Facts*. Individual G is employed half-time in 2004 and 2005 as a clerk by H, a hospital which is a section 501(c)(3) organization. G earns $20,000 from H in each of those years, and retires on December 31, 2005.

(ii) *Conclusion*. For purposes of determining G's includible compensation during G's last year of service under paragraph (d) of this section, G's most recent periods of service are aggregated to determine G's most recent one-year period of service. In this case, since D worked half-time in 2004 and 2005, the compensation D earned in those two years are aggregated to produce D's includible compensation for D's last full year in service. Thus, in this case, the $20,000 that D earned in 2004 and 2005 for D's half-time work are aggregated, so that D has $40,000 of includible compensation for D's most recent one-year of service for purposes of applying paragraphs (b)(2), (c)(3), and (d) of this section.

*Example 2*. (i) *Facts*. Individual H is employed as a part-time professor by public University U during the first semester of its two-semester 2004-2005 academic year. While H teaches one course generally for 3 hours a week during the first semester of the academic year, U's full-time faculty members generally teach for 9 hours a week during the full academic year.

(ii) *Conclusion*. For purposes of calculating how much of a year of service H performs in the 2004-2005 academic year (before application of the special rules of paragraphs (e)(7) and (8) of this section concerning less than one year of service), paragraph (e)(5)(iv) of this section is applied as follows: since H teaches one course at U for 3 hours per week for 1 semester and other faculty members at U teach 9 hours per week for 2 semesters, H is considered to have completed 3/18 or 1/6 of a year of service during the 2004-2005 academic year, determined as follows:

(A) The fractional year of service if H were a part-time employee for a full year is 3/9 (number of hours employed divided by the usual number of hours of work required for that position).

(B) The fractional year of service if H were a full-time employee for half of a year is 1/2 (one semester, divided by the usual 2-semester annual work period).

(C) These fractions are multiplied to obtain the fractional year of service: 3/9 times 1/2, or 3/18, equals 1/6 of a year of service.

(f) *Excess contributions or deferrals*—(1) *Inclusion in gross income*. Any contribution made for a participant to a section 403(b) contract for the taxable year that exceeds either the maximum annual contribution limit set forth in paragraph (b) of this section or the maximum

annual section 403(b) elective deferral limit set forth in paragraph (c) of this section constitutes an excess contribution that is included in gross income for that taxable year. See §1.403(b)–3(d)(1)(iii) and (2)(i) for additional rules, including special rules relating to contracts that fail to be nonforfeitable. See also section 4973 for an excise tax applicable with respect to excess contributions to a custodial account and section 4979(f)(2)(B) for a special rule applicable if excess matching contributions, excess after-tax employee contributions, and excess section 403(b) elective deferrals do not exceed $100.

(2) *Separate account required for certain excess contributions; distribution of excess elective deferrals*. A contract to which a contribution is made that exceeds the maximum annual contribution limit set forth in paragraph (b) of this section is not a section 403(b) contract unless the excess contribution is held in a separate account which constitutes a separate account for purposes of section 72. See also §1.403(b)–3(a)(4) and paragraph (f)(4) of this section for additional rules with respect to the requirements of section 401(a)(30) and any excess deferral.

(3) *Ability to distribute excess contributions*. A contract does not fail to satisfy the requirements of §1.403(b)–3, the distribution rules of §1.403(b)–6 or 1.403(b)–9, or the funding rules of §1.403(b)–8 solely by reason of a distribution made from a separate account under paragraph (f)(2) of this section or made under paragraph (f)(4) of this section.

(4) *Excess section 403(b) elective deferrals*. A section 403(b) contract may provide that any excess deferral as a result of a failure to comply with the limitation under paragraph (c) of this section for a taxable year with respect to any section 403(b) elective deferral made for a participant by the employer will be distributed to the participant, with allocable net income, no later than April 15 of the following taxable year or otherwise in accordance with section 402(g). See section 402(g)(2)(A) for rules permitting the participant to allocate excess deferrals among the plans in which the participant has made elective deferrals, and see section 402(g)(2)(C) for special rules to determine the tax treatment of such a distribution.

(5) *Examples*. The provisions of this paragraph (f) are illustrated by the following examples:

*Example 1*. (i) *Facts*. Individual D's employer makes a $46,000 contribution for 2006 to an individual annuity insurance policy for Individual D that would otherwise be a section 403(b) contract. The contribution does not include any elective deferrals and the applicable limit under section 415(c) is $44,000 for 2006. The $2,000 section 415(c) excess is put into a separate account under the policy. Employer includes $2,000 in D's gross income as wages for 2006 and, to the extent of the amount held in the separate account for the section 415(c) excess contribution, does not treat the account as a contract to which section 403(b) applies.

(ii) *Conclusion*. The separate account for the section 415(c) excess contribution is a contract to which section 403(c) applies, but the excess contribution does not cause the rest of the contract to fail section 403(b).

*Example 2*. (i) *Facts*. Same facts as *Example 1*, except that the contribution is made to purchase mutual funds that are held in a custodial account, instead of an individual annuity insurance policy.

(ii) *Conclusion*. The conclusion is the same as in *Example 1*, except that the purchase constitutes a transfer described in section 83.

*Example 3*. (i) *Facts*. Same facts as *Example 1*, except that the amount held in the separate account for the section 415(c) excess contribution is subsequently distributed to D.

(ii) *Conclusion*. The distribution is included in gross income to the extent provided under section 72 relating to distributions from a section 403(c) contract.

*Example 4*. (i) *Facts*. Individual E makes section 403(b) elective deferrals totaling $15,500 for 2006, when E is age 45 and the applicable limit on section 403(b) elective deferrals is $15,000. On April 14, 2007, the plan refunds the $500 excess along with applicable earnings of $65.

(ii) *Conclusion*. The $565 payment constitutes a distribution of an excess deferral under paragraph (f)(4) of this section. Under section 402(g), the $500 excess deferral is included in E's gross income for 2006. The additional $65 is included in E's gross income for 2007 and, because the distribution is made by April 15, 2007 (as provided in section 402(g)(2)), the $65 is not subject to the additional 10 percent income tax on early distributions under section 72(t).

### §1.403(b)–5 Nondiscrimination rules.

(a) *Nondiscrimination rules for contributions other than section 403(b) elective deferrals*—(1) *General rule*. Under section 403(b)(12)(A)(i), employer contributions and after-tax employee contributions to a section 403(b) plan must satisfy all of the following requirements (the nondiscrimination requirements) in the same manner as a qualified plan under section 401(a):

(i) Section 401(a)(4) (relating to nondiscrimination in contributions and

benefits), taking section 401(a)(5) into account.

(ii) Section 401(a)(17) (limiting the amount of compensation that can be taken into account).

(iii) Section 401(m) (relating to matching and after-tax employee contributions).

(iv) Section 410(b) (relating to minimum coverage).

(2) *Nonapplication to section 403(b) elective deferrals.* The requirements of this paragraph (a) do not apply to section 403(b) elective deferrals.

(3) *Compensation for testing.* Except as may otherwise be specifically permitted under the provisions referenced in paragraph (a)(1) of this section, compliance with those provisions is tested using compensation as defined in section 414(s) (and without regard to section 415(c)(3)(E)). In addition, for purposes of paragraph (a)(1) of this section, there may be excluded employees who are permitted to be excluded under paragraph (b)(4)(ii)(D) and (E) of this section. However, as provided in paragraph (b)(4)(i) of this section, the exclusion of any employee listed in paragraph (b)(4)(ii)(D) or (E) of this section is subject to the conditions applicable under section 410(b)(4).

(4) *Employer aggregation rules.* See regulations under section 414(b), (c), (m), and (o) for rules treating entities as a single employer for purposes of the nondiscrimination requirements.

(5) *Special rules for governmental plans.* Paragraphs (a)(1)(i), (iii), and (iv) of this section do not apply to a governmental plan as defined in section 414(d) (but contributions to a governmental plan must comply with paragraphs (a)(1)(ii) and (b) of this section).

(b) *Universal availability required for section 403(b) elective deferrals*—(1) *General rule.* Under section 403(b)(12)(A)(ii), all employees of the eligible employer must be permitted to have section 403(b) elective deferrals contributed on their behalf if any employee of the eligible employer may elect to have the organization make section 403(b) elective deferrals. Further, the employee's right to make elective deferrals also includes the right to designate section 403(b) elective deferrals as designated Roth contributions.

(2) *Effective opportunity required.* For purposes of paragraph (b)(1) of this section, an employee is not treated as being permitted to have section 403(b) elective deferrals contributed on the employee's behalf unless the employee is provided an effective opportunity that satisfies the requirements of this paragraph (b)(2). Whether an employee has an effective opportunity is determined based on all the relevant facts and circumstances, including notice of the availability of the election, the period of time during which an election may be made, and any other conditions on elections. A section 403(b) plan satisfies the effective opportunity requirement of this paragraph (b)(2) only if, at least once during each plan year, the plan provides an employee with an effective opportunity to make (or change) a cash or deferred election (as defined at §1.401(k)–1(a)(3)) between cash or a contribution to the plan. Further, an effective opportunity includes the right to have section 403(b) elective deferrals made on his or her behalf up to the lesser of the applicable limits in §1.403(b)–4(c) (including any permissible catch-up elective deferrals under §1.403(b)–4(c)(2) and (3)) or the applicable limits under the contract with the largest limitation, and applies to part-time employees as well as full-time employees. An effective opportunity is not considered to exist if there are any other rights or benefits (other than rights or benefits listed in §1.401(k)–1(e)(6)(i)(A), (B), or (D)) that are conditioned (directly or indirectly) upon a participant making or failing to make a cash or deferred election with respect to a contribution to a section 403(b) contract.

(3) *Special rules.* (i) In the case of a section 403(b) plan that covers the employees of more than one section 501(c)(3) organization, the universal availability requirement of this paragraph (b) applies separately to each common law entity (that is, applies separately to each section 501(c)(3) organization). In the case of a section 403(b) plan that covers the employees of more than one State entity, this requirement applies separately to each entity that is not part of a common payroll. An eligible employer may condition the employee's right to have section 403(b) elective deferrals made on his or her behalf on the employee electing a section 403(b) elective deferral of more than $200 for a year.

(ii) For purposes of this paragraph (b)(3), an employer that historically has treated one or more of its various geographically distinct units as separate for employee benefit purposes may treat each unit as a separate organization if the unit is operated independently on a day-to-day basis. Units are not geographically distinct if such units are located within the same Standard Metropolitan Statistical Area (SMSA).

(4) *Exclusions*—(i) *Exclusions for special types of employees.* A plan does not fail to satisfy the universal availability requirement of this paragraph (b) merely because it excludes one or more of the types of employees listed in paragraph (b)(4)(ii) of this section. However, the exclusion of any employee listed in paragraph (b)(4)(ii)(D) or (E) of this section is subject to the conditions applicable under section 410(b)(4). Thus, if any employee listed in paragraph (b)(4)(ii)(D) of this section has the right to have section 403(b) elective deferrals made on his or her behalf, then no employee listed in that paragraph (b)(4)(ii)(D) of this section may be excluded under this paragraph (b)(4) and, if any employee listed in paragraph (b)(4)(ii)(E) of this section has the right to have section 403(b) elective deferrals made on his or her behalf, then no employee listed in that paragraph (b)(4)(ii)(E) of this section may be excluded under this paragraph (b)(4).

(ii) *List of special types of excludible employees.* The following types of employees are listed in this paragraph (b)(4)(ii):

(A) Employees who are eligible under another section 403(b) plan, or a section 457(b) eligible governmental plan, of the employer which permits an amount to be contributed or deferred at the election of the employee.

(B) Employees who are eligible to make a cash or deferred election (as defined at §1.401(k)–1(a)(3)) under a section 401(k) plan of the employer.

(C) Employees who are non-resident aliens described in section 410(b)(3)(C).

(D) Subject to the conditions applicable under section 410(b)(4) (including section 410(b)(4)(B) permitting separate testing for employees not meeting minimum age and service requirements), employees who are students performing services described in section 3121(b)(10).

(E) Subject to the conditions applicable under section 410(b)(4), employees who

normally work fewer than 20 hours per week (or such lower number of hours per week as may be set forth in the plan).

(iii) *Special rules.* (A) A section 403(b) plan is permitted to take into account coverage under another plan, as permitted in paragraphs (b)(4)(ii)(A) and (B) of this section, only if the rights to make elective deferrals with respect to that coverage would satisfy paragraphs (b)(2) and (4)(i) of this section if that coverage were provided under the section 403(b) plan.

(B) For purposes of paragraph (b)(4)(ii)(E) of this section, an employee normally works fewer than 20 hours per week if and only if—

(*1*) For the 12-month period beginning on the date the employee's employment commenced, the employer reasonably expects the employee to work fewer than 1,000 hours of service (as defined in section 410(a)(3)(C)) in such period; and

(*2*) For each plan year ending after the close of the 12-month period beginning on the date the employee's employment commenced (or, if the plan so provides, each subsequent 12-month period), the employee worked fewer than 1,000 hours of service in the preceding 12-month period. (See, however, section 202(a)(1) of the Employee Retirement Income Security Act of 1974 (ERISA) (88 Stat. 829) Public Law 93–406, and regulations under section 410(a) of the Internal Revenue Code applicable with respect to plans that are subject to Title I of ERISA.)

(c) *Plan required.* Contributions to an annuity contract do not satisfy the requirements of this section unless the contributions are made pursuant to a plan, as defined in §1.403(b)–3(b)(3), and the terms of the plan satisfy this section.

(d) *Church plans exception.* This section does not apply to a section 403(b) contract purchased by a church (as defined in §1.403(b)–2).

(e) *Other rules.* This section only reflects requirements of the Internal Revenue Code applicable for purposes of section 403(b) and does not include other requirements. Specifically, this section does not reflect the requirements of ERISA that may apply with respect to section 403(b) arrangements, such as the vesting requirements at 29 U.S.C. 1053.

*§1.403(b)–6 Timing of distributions and benefits.*

(a) *Distributions generally.* This section provides special rules regarding the timing of distributions from, and the benefits that may be provided under, a section 403(b) contract, including limitations on when early distributions can be made (in paragraphs (b) through (d) of this section), required minimum distributions (in paragraph (e) of this section), and special rules relating to loans (in paragraph (f) of this section) and incidental benefits (in paragraph (g) of this section).

(b) *Distributions from contracts other than custodial accounts or amounts attributable to section 403(b) elective deferrals.* Except as provided in paragraph (c) of this section relating to distributions from custodial accounts, paragraph (d) of this section relating to distributions attributable to section 403(b) elective deferrals, §1.403(b)–4(f) (relating to correction of excess deferrals), or §1.403(b)–10(a) (relating to plan termination), a section 403(b) contract is permitted to distribute retirement benefits to the participant no earlier than upon the earlier of the participant's severance from employment or upon the prior occurrence of some event, such as after a fixed number of years, the attainment of a stated age, or disability. See §1.401–1(b)(1)(ii) for additional guidance. This paragraph (b) does not apply to after-tax employee contributions or earnings thereon.

(c) *Distributions from custodial accounts that are not attributable to section 403(b) elective deferrals.* Except as provided in §1.403(b)–4(f) (relating to correction of excess deferrals) or §1.403(b)–10(a) (relating to plan termination), distributions from a custodial account, as defined in §1.403(b)–8(d)(2), may not be paid to a participant before the participant has a severance from employment, dies, becomes disabled (within the meaning of section 72(m)(7)), or attains age 59½. Any amounts transferred out of a custodial account to an annuity contract or retirement income account, including earnings thereon, continue to be subject to this paragraph (c). This paragraph (c) does not apply to distributions that are attributable to section 403(b) elective deferrals.

(d) *Distribution of section 403(b) elective deferrals*—(1) *Limitation on distributions*—(i) *General rule.* Except as provided in §1.403(b)–4(f) (relating to correction of excess deferrals) or §1.403(b)–10(a) (relating to plan termination), distributions of amounts attributable to section 403(b) elective deferrals may not be paid to a participant earlier than the earliest of the date on which the participant has a severance from employment, dies, has a hardship, becomes disabled (within the meaning of section 72(m)(7)), or attains age 59½.

(ii) *Special rule for pre-1989 section 403(b) elective deferrals.* For special rules relating to amounts held as of the close of the taxable year beginning before January 1, 1989 (which does not apply to earnings thereon), see section 1123(e)(3) of the Tax Reform Act of 1986 (100 Stat. 2085, 2475) Public Law 99–514, and section 1011A(c)(11) of the Technical and Miscellaneous Revenue Act of 1988 (102 Stat. 3342, 3476) Public Law 100–647.

(2) *Hardship rules.* A hardship distribution under this paragraph (d) has the same meaning as a distribution on account of hardship under §1.401(k)–1(d)(3) and is subject to the rules and restrictions set forth in §1.401(k)–1(d)(3) (including limiting the amount of a distribution in the case of hardship to the amount necessary to satisfy the hardship). In addition, a hardship distribution is limited to the aggregate dollar amount of the participant's section 403(b) elective deferrals under the contract (and may not include any income thereon), reduced by the aggregate dollar amount of the distributions previously made to the participant from the contract.

(3) *Failure to keep separate accounts.* If a section 403(b) contract includes both section 403(b) elective deferrals and other contributions and the section 403(b) elective deferrals are not maintained in a separate account, then distributions may not be made earlier than the later of—

(i) Any date permitted under paragraph (d)(1) of this section; and

(ii) Any date permitted under paragraph (b) or (c) of this section with respect to contributions that are not section 403(b) elective deferrals (whichever applies to the contributions that are not section 403(b) elective deferrals).

(e) *Minimum required distributions for eligible plans*—(1) *In general.* Under section 403(b)(10), a section 403(b) contract must meet the minimum distribution re-

quirements of section 401(a)(9) (in both form and operation). See section 401(a)(9) for these requirements.

(2) *Treatment as IRAs.* For purposes of applying the distribution rules of section 401(a)(9) to section 403(b) contracts, the minimum distribution rules applicable to individual retirement annuities described in section 408(b) and individual retirement accounts described in section 408(a) apply to section 403(b) contracts. Consequently, except as otherwise provided in paragraphs (e)(3) through (e)(5) of this section, the distribution rules in section 401(a)(9) are applied to section 403(b) contracts in accordance with the provisions in §1.408–8 for purposes of determining required minimum distributions.

(3) *Required beginning date.* The required beginning date for purposes of section 403(b)(10) is April 1 of the calendar year following the later of the calendar year in which the employee attains age 70¹/₂ or the calendar year in which the employee retires from employment with the employer maintaining the plan. However, for any section 403(b) contract that is not part of a governmental plan or church plan, the required beginning date for a 5-percent owner is April 1 of the calendar year following the calendar year in which the employee attains age 70¹/₂.

(4) *Surviving spouse rule does not apply.* The special rule in §1.408–8, A–5 (relating to spousal beneficiaries), does not apply to a section 403(b) contract. Thus, the surviving spouse of a participant is not permitted to treat a section 403(b) contract as the spouse's own section 403(b) contract, even if the spouse is the sole beneficiary.

(5) *Retirement income accounts.* For purposes of §1.401(a)(9)–6, A–4 (relating to annuity contracts), annuity payments provided with respect to retirement income accounts do not fail to satisfy the requirements of section 401(a)(9) merely because the payments are not made under an annuity contract purchased from an insurance company, provided that the relationship between the annuity payments and the retirement income accounts is not inconsistent with any rules prescribed by the Commissioner in revenue rulings, notices, or other guidance published in the Internal Revenue Bulletin (see §601.601(d)(2)(ii)(*b*) of this chapter).

See also §1.403(b)–9(a)(5) for additional rules relating to annuities payable from a retirement income account).

(6) *Special rules for benefits accruing before December 31, 1986.* (i) The distribution rules provided in section 401(a)(9) do not apply to the undistributed portion of the account balance under the section 403(b) contract valued as of December 31, 1986, exclusive of subsequent earnings (pre-'87 account balance). The distribution rules provided in section 401(a)(9) apply to all benefits under section 403(b) contracts accruing after December 31, 1986 (post-'86 account balance), including earnings after December 31, 1986. Consequently, the post-'86 account balance includes earnings after December 31, 1986, on contributions made before January 1, 1987, in addition to the contributions made after December 31, 1986, and earnings thereon.

(ii) The issuer or custodian of the section 403(b) contract must keep records that enable it to identify the pre-'87 account balance and subsequent changes as set forth in paragraph (d)(6)(iii) of this section and provide such information upon request to the relevant employee or beneficiaries with respect to the contract. If the issuer or custodian does not keep such records, the entire account balance is treated as subject to section 401(a)(9).

(iii) In applying the distribution rules in section 401(a)(9), only the post-'86 account balance is used to calculate the required minimum distribution for a calendar year. The amount of any distribution from a contract is treated as being paid from the post-'86 account balance to the extent the distribution is required to satisfy the minimum distribution requirement with respect to that contract for a calendar year. Any amount distributed in a calendar year from a contract in excess of the required minimum distribution for a calendar year with respect to that contract is treated as paid from the pre-'87 account balance, if any, of that contract.

(iv) If an amount is distributed from the pre-'87 account balance and rolled over to another section 403(b) contract, the amount is treated as part of the post-'86 account balance in that second contract. However, if the pre-'87 account balance under a section 403(b) contract is directly transferred to another section 403(b) contract (as permitted under

§1.403(b)–10(b)), the amount transferred retains its character as a pre-'87 account balance, provided the issuer of the transferee contract satisfies the recordkeeping requirements of paragraph (e)(6)(ii) of this section.

(v) The distinction between the pre-'87 account balance and the post-'86 account balance provided for under this paragraph (e)(6) of this section has no relevance for purposes of determining the portion of a distribution that is includible in income under section 72.

(vi) The pre-'87 account balance must be distributed in accordance with the incidental benefit requirement of §1.401–1(b)(1)(i). Distributions attributable to the pre-'87 account balance are treated as satisfying this requirement if all distributions from the section 403(b) contract (including distributions attributable to the post-'86 account balance) satisfy the requirements of §1.401–1(b)(1)(i) without regard to this section, and distributions attributable to the post-'86 account balance satisfy the rules of this paragraph (e) (without regard to this paragraph (e)(6)). Distributions attributable to the pre-'87 account balance are treated as satisfying the incidental benefit requirement if all distributions from the section 403(b) contract (including distributions attributable to both the pre-'87 account balance and the post-'86 account balance) satisfy the rules of this paragraph (e) (without regard to this paragraph (e)(6)).

(7) *Application to multiple contracts for an employee.* The required minimum distribution must be separately determined for each section 403(b) contract of an employee. However, because, as provided in paragraph (e)(2) of this section, the distribution rules in section 401(a)(9) apply to section 403(b) contracts in accordance with the provisions in §1.408–8, the required minimum distribution from one section 403(b) contract of an employee is permitted to be distributed from another section 403(b) contract in order to satisfy section 401(a)(9). Thus, as provided in §1.408–8, A–9, with respect to IRAs, the required minimum distribution amount from each contract is then totaled and the total minimum distribution taken from any one or more of the individual section 403(b) contracts. However, consistent with the rules in §1.408–8, A–9, only amounts in section 403(b) contracts

that an individual holds as an employee may be aggregated. Amounts in section 403(b) contracts that an individual holds as a beneficiary of the same decedent may be aggregated, but such amounts may not be aggregated with amounts held in section 403(b) contracts that the individual holds as the employee or as the beneficiary of another decedent. Distributions from section 403(b) contracts do not satisfy the minimum distribution requirements for IRAs, nor do distributions from IRAs satisfy the minimum distribution requirements for section 403(b) contracts.

(f) *Loans.* The determination of whether the availability of a loan, the making of a loan, or a failure to repay a loan made from an issuer of a section 403(b) contract to a participant or beneficiary is treated as a distribution (directly or indirectly) for purposes of this section, and the determination of whether the availability of the loan, the making of the loan, or a failure to repay the loan is in any other respect a violation of the requirements of section 403(b) and §§1.403(b)–1 through 1.403(b)–5, this section and §§1.403(b)–7 through 1.403(b)–11 depends on the facts and circumstances. Among the facts and circumstances are whether the loan has a fixed repayment schedule and bears a reasonable rate of interest, and whether there are repayment safeguards to which a prudent lender would adhere. Thus, for example, a loan must bear a reasonable rate of interest in order to be treated as not being a distribution. However, a plan loan offset is a distribution for purposes of this section. See §1.72(p)–1, Q&A–13. See also §1.403(b)–7(d) relating to the application of section 72(p) with respect to the taxation of a loan made under a section 403(b) contract. (Further, see section 408(b)(1) of Title I of ERISA and 29 CFR 2550.408b–1 of the Department of Labor regulations concerning additional requirements applicable with respect to plans that are subject to Title I of ERISA.)

(g) *Death benefits and other incidental benefits.* An annuity is not a section 403(b) contract if it fails to satisfy the incidental benefit requirement of §1.401–1(b)(1)(ii) (in form or in operation). For purposes of this paragraph (g), to the extent the incidental benefit requirement of §1.401–1(b)(1)(ii) requires a distribution of the participant's or beneficiary's accumulated benefit, that require-

ment is deemed to be satisfied if distributions satisfy the minimum distribution requirements of section 401(a)(9). In addition, if a contract issued by an insurance company qualified to issue annuities in a State includes provisions under which, in the event a participant becomes disabled, benefits will be provided by the insurance carrier as if employer contributions were continued until benefit distribution commences, then that benefit is treated as an incidental benefit (as insurance for a deferred annuity benefit in the event of disability) that must satisfy the incidental benefit requirement of §1.401–1(b)(1)(ii) (taking into account any other incidental benefits provided under the plan).

(h) *Special rule regarding severance from employment.* For purposes of this section, severance from employment occurs on any date on which an employee ceases to be an employee of an eligible employer, even though the employee may continue to be employed either by another entity that is treated as the same employer where either that other entity is not an entity that can be an eligible employer (such as transferring from a section 501(c)(3) organization to a for-profit subsidiary of the section 501(c)(3) organization) or in a capacity that is not employment with an eligible employer (for example, ceasing to be an employee performing services for a public school but continuing to work for the same State employer). Thus, this paragraph (h) does not apply if an employee transfers from one section 501(c)(3) organization to another section 501(c)(3) organization that is treated as the same employer or if an employee transfers from one public school to another public school of the same State employer.

(i) *Certain limitations do not apply to rollover contributions.* The limitations on distributions in paragraphs (b) through (d) of this section do not apply to amounts held in a separate account for eligible rollover distributions as described in §1.403(b)–10(d).

### §1.403(b)–7 Taxation of distributions and benefits.

(a) *General rules for when amounts are included in gross income.* Except as provided in this section (or in §1.403(b)–10(c) relating to payments pursuant to a qualified domestic relations order), amounts

actually distributed from a section 403(b) contract are includible in the gross income of the recipient participant or beneficiary (in the year in which so distributed) under section 72 (relating to annuities). For an additional income tax that may apply to certain early distributions that are includible in gross income, see section 72(t).

(b) *Rollovers to individual retirement arrangements and other eligible retirement plans*—(1) *Timing of taxation of rollovers.* In accordance with sections 402(c), 403(b)(8), and 403(b)(10), a direct rollover in accordance with section 401(a)(31) is not includible in the gross income of a participant or beneficiary in the year rolled over. In addition, any payment made in the form of an eligible rollover distribution (as defined in section 402(c)(4)) is not includible in gross income in the year paid to the extent the payment is contributed to an eligible retirement plan (as defined in section 402(c)(8)(B)) within 60 days, including the contribution to the eligible retirement plan of any property distributed. For this purpose, the rules of section 402(c)(2) through (7) and (c)(9) apply. Thus, to the extent that a portion of a distribution (including a distribution from a designated Roth account) would be excluded from gross income if it were not rolled over, if that portion of the distribution is to be rolled over into an eligible retirement plan that is not an IRA, the rollover must be accomplished through a direct rollover of the entire distribution to a plan qualified under section 401(a) or section 403(b) plan and that plan must agree to separately account for the amount not includible in income (so that a 60-day rollover to a plan qualified under section 401(a) or another section 403(b) plan is not available for this portion of the distribution). Any direct rollover under this paragraph (b)(1) is a distribution that is subject to the distribution requirements of §1.403(b)–6.

(2) *Requirement that contract provide rollover options for eligible rollover distributions.* As required in §1.403(b)–3(a)(7), an annuity contract is not a section 403(b) contract unless the contract provides that if the distributee of an eligible rollover distribution elects to have the distribution paid directly to an eligible retirement plan (as defined in section 402(c)(8)(B)) and specifies the eligible retirement plan to which the distribution is to be paid, then the dis-

tribution will be paid to that eligible retirement plan in a direct rollover. For purposes of determining whether a contract satisfies this requirement, the provisions of section 401(a)(31) apply to the annuity as though it were a plan qualified under section 401(a) unless otherwise provided in section 401(a)(31). Thus, the special rule in §1.401(k)–1(f)(3)(ii) with respect to distributions from a designated Roth account that are expected to total less than $200 during a year applies to designated Roth accounts under a section 403(b) plan. In applying the provisions of this paragraph (b)(2), the payor of the eligible rollover distribution from the contract is treated as the plan administrator.

(3) *Requirement that contract payor provide notice of rollover option to distributees.* To ensure that the distributee of an eligible rollover distribution from a section 403(b) contract has a meaningful right to elect a direct rollover, section 402(f) requires that the distributee be informed of the option. Thus, within a reasonable time period before making the initial eligible rollover distribution, the payor must provide an explanation to the distributee of his or her right to elect a direct rollover and the income tax withholding consequences of not electing a direct rollover. For purposes of satisfying the reasonable time period requirement, the plan timing rule provided in section 402(f)(1) and §1.402(f)–1 applies to section 403(b) contracts.

(4) *Mandatory withholding upon certain eligible rollover distributions from contracts.* If a distributee of an eligible rollover distribution from a section 403(b) contract does not elect to have the eligible rollover distribution paid directly to an eligible retirement plan in a direct rollover, the eligible rollover distribution is subject to 20-percent income tax withholding imposed under section 3405(c). See section 3405(c) and §31.3405(c)–1 of this chapter for provisions regarding the withholding requirements relating to eligible rollover distributions.

(5) *Automatic rollover for certain mandatory distributions under section 401(a)(31).* In accordance with section 403(b)(10), a section 403(b) plan is required to comply with section 401(a)(31) (including automatic rollover for certain mandatory distributions) in the same manner as a qualified plan.

(c) *Special rules.* See section 402(g)(2)(C) for special rules to determine the tax treatment of a distribution of excess deferrals, and see §1.401(m)–1(e)(3)(v) for the tax treatment of corrective distributions of after-tax employee contributions and matching contributions to comply with section 401(m). See sections 402(l) and 403(b)(2) for a special rule regarding distributions for certain retired public safety officers made from a governmental plan for the direct payment of certain premiums.

(d) *Amounts taxable under section 72(p)(1).* In accordance with section 72(p), the amount of any loan from a section 403(b) contract to a participant or beneficiary (including any pledge or assignment treated as a loan under section 72(p)(1)(B)) is treated as having been received as a distribution from the contract under section 72(p)(1), except to the extent set forth in section 72(p)(2) (relating to loans that do not exceed a maximum amount and that are repayable in accordance with certain terms) and §1.72(p)–1. See generally §1.72(p)–1. Thus, except to the extent a loan satisfies section 72(p)(2), any amount loaned from a section 403(b) contract to a participant or beneficiary (including any pledge or assignment treated as a loan under section 72(p)(1)(B)) is includible in the gross income of the participant or beneficiary for the taxable year in which the loan is made. A deemed distribution is not an actual distribution for purposes of §1.403(b)–6, as provided at §1.72(p)–1, Q&A–12 and Q&A–13. (Further, see section 408(b)(1) of Title I of ERISA concerning the effect of noncompliance with Title I loan requirements for plans that are subject to Title I of ERISA.)

(e) *Special rules relating to distributions from a designated Roth account.* If an amount is distributed from a designated Roth account under a section 403(b) plan, the amount, if any, that is includible in gross income and the amount, if any, that may be rolled over to another section 403(b) plan is determined under §1.402A–1. Thus, the designated Roth account is treated as a separate contract for purposes of section 72. For example, the rules of section 72(b) must be applied separately to annuity payments with respect to a designated Roth account under a section 403(b) plan and separately to annuity payments with respect to amounts

attributable to any other contributions to the section 403(b) plan.

(f) *Aggregation of contracts.* In accordance with section 403(b)(5), the rules of this section are applied as if all annuity contracts for the employee by the employer are treated as a single contract.

(g) *Certain rules relating to employment taxes.* With respect to contributions under the Federal Insurance Contributions Act (FICA) under Chapter 21, see section 3121(a)(5)(D) for a special rule relating to section 403(b) contracts. With respect to income tax withholding on distributions from section 403(b) contracts, see section 3405 generally. However, see section 3401 for income tax withholding applicable to annuity contracts or custodial accounts that are not section 403(b) contracts or for cases in which an annuity contract or custodial account ceases to be a section 403(b) contract. See also §1.72(p)–1, Q&A–15, and §35.3405(c)–1, Q&A–11 of this chapter, for special rules relating to income tax withholding for loans made from certain employer plans, including section 403(b) contracts.

### *§1.403(b)–8 Funding.*

(a) *Investments.* Section 403(b) and §1.403(b)–3(a) only apply to amounts held in an annuity contract (as defined in §1.403(b)–2), including a custodial account that is treated as an annuity contract under paragraph (d) of this section, or a retirement income account that is treated as an annuity contract under §1.403(b)–9.

(b) *Contributions to the plan.* Contributions to a section 403(b) plan must be transferred to the insurance company issuing the annuity contract (or the entity holding assets of any custodial or retirement income account that is treated as an annuity contract) within a period that is not longer than is reasonable for the proper administration of the plan. For purposes of this requirement, the plan may provide for section 403(b) elective deferrals for a participant under the plan to be transferred to the annuity contract within a specified period after the date the amounts would otherwise have been paid to the participant. For example, the plan could provide for section 403(b) elective deferrals under the plan to be contributed within 15 business days following the month in which these amounts

would otherwise have been paid to the participant.

(c) *Annuity contracts*—(1) *Generally*. As defined in §1.403(b)–2, and except as otherwise permitted under this section, an annuity contract means a contract that is issued by an insurance company qualified to issue annuities in a State and that includes payment in the form of an annuity. This paragraph (c) sets forth additional rules regarding annuity contracts.

(2) *Certain insurance contracts*. Neither a life insurance contract, as defined in section 7702, an endowment contract, a health or accident insurance contract, nor a property, casualty, or liability insurance contract meets the definition of an annuity contract. See §1.401(f)–4(e). If a contract issued by an insurance company qualified to issue annuities in a State provides death benefits as part of the contract, then that coverage is permitted, assuming that those death benefits do not cause the contract to fail to satisfy any requirement applicable to section 403(b) contracts, for example, assuming that those benefits satisfy the incidental benefit requirement of §1.401–1(b)(1)(i), as required by §1.403(b)–6(g).

(3) *Special rule for certain contracts*. This paragraph (c)(3) applies in the case of a contract issued under a State section 403(b) plan established on or before May 17, 1982, or for an employee who becomes covered for the first time under the plan after May 17, 1982, unless the Commissioner had before that date issued any written communication (either to the employer or financial institution) to the effect that the arrangement under which the contract was issued did not meet the requirements of section 403(b). The requirement that the contract be issued by an insurance company qualified to issue annuities in a State does not apply to a contract described in the preceding sentence if one of the following two conditions is satisfied and that condition has been satisfied continuously since May 17, 1982—

(i) Benefits under the contract are provided from a separately funded retirement reserve that is subject to supervision of the State insurance department; or

(ii) Benefits under the contract are provided from a fund that is separate from the fund used to provide statutory benefits payable under a state retirement system and that is part of a State teachers retirement system (including a state university retirement system) to purchase benefits that are unrelated to the basic benefits provided under the retirement system, and the death benefit provided under the contract does not at any time exceed the larger of the reserve or the contribution made for the employee.

(d) *Custodial accounts*—(1) *Treatment as a section 403(b) contract*. Under section 403(b)(7), a custodial account is treated as an annuity contract for purposes of §§1.403(b)–1 through 1.403(b)–7, this section and §§1.403(b)–9 through 1.403(b)–11. See section 403(b)(7)(B) for special rules regarding the tax treatment of custodial accounts and section 4973(c) for an excise tax that applies to excess contributions to a custodial account.

(2) *Custodial account defined*. A custodial account means a plan, or a separate account under a plan, in which an amount attributable to section 403(b) contributions (or amounts rolled over to a section 403(b) contract, as described in §1.403(b)–10(d)) is held by a bank or a person who satisfies the conditions in section 401(f)(2), if—

(i) All of the amounts held in the account are invested in stock of a regulated investment company (as defined in section 851(a) relating to mutual funds);

(ii) The requirements of §1.403(b)–6(c) (imposing restrictions on distributions with respect to a custodial account) are satisfied with respect to the amounts held in the account;

(iii) The assets held in the account cannot be used for, or diverted to, purposes other than for the exclusive benefit of plan participants or their beneficiaries (for which purpose, assets are treated as diverted to the employer if the employer borrows assets from the account); and

(iv) The account is not part of a retirement income account.

(3) *Effect of definition*. The requirement in paragraph (d)(2)(i) of this section is not satisfied if the account includes any assets other than stock of a regulated investment company.

(4) *Treatment of custodial account*. A custodial account is treated as a section 401 qualified plan solely for purposes of subchapter F of subtitle A and subtitle F of the Internal Revenue Code with respect to amounts received by it (and income from investment thereof). This treatment only applies to a custodial account that constitutes a section 403(b) contract under §§1.403(b)–1 through 1.403(b)–7, this section and §§1.403(b)–9 through 1.403(b)–11 or that would constitute a section 403(b) contract under §§1.403(b)–1 through 1.403(b)–7, this section and §§1.403(b)–9 through 1.403(b)–11 if the amounts held in the account were to satisfy the nonforfeitability requirement of §1.403(b)–3(a)(2).

(e) *Retirement income accounts*. See §1.403(b)–9 for special rules under which a retirement income account for employees of a church-related organization is treated as a section 403(b) contract for purposes of §§1.403(b)–1 through 1.403(b)–7, this section and §§1.403(b)–9 through 1.403(b)–11.

(f) *Combining assets*. To the extent permitted by the Commissioner in revenue rulings, notices, or other guidance published in the Internal Revenue Bulletin (see §601.601(d)(2)(ii)(*b*) of this chapter), trust assets held under a custodial account and trust assets held under a retirement income account, as described in §1.403(b)–9(a)(6), may be invested in a group trust with trust assets held under a qualified plan or individual retirement plan. For this purpose, a trust includes a custodial account that is treated as a trust under section 401(f).

### §1.403(b)–9 Special rules for church plans.

(a) *Retirement income accounts*—(1) *Treatment as a section 403(b) contract*. Under section 403(b)(9), a retirement income account for employees of a church-related organization (as defined in §1.403(b)–2) is treated as an annuity contract for purposes of §§1.403(b)–1 through 1.403(b)–8, this section, §1.403(b)–10 and §1.403(b)–11.

(2) *Retirement income account defined*—(i) *In general*. A retirement income account means a defined contribution program established or maintained by a church-related organization under which—

(A) There is separate accounting for the retirement income account's interest in the underlying assets (namely, there must be sufficient separate accounting in order for it to be possible at all times to determine the retirement income account's interest in the underlying assets and to distinguish

that interest from any interest that is not part of the retirement income account);

(B) Investment performance is based on gains and losses on those assets; and

(C) The assets held in the account cannot be used for, or diverted to, purposes other than for the exclusive benefit of plan participants or their beneficiaries (and for this purpose, assets are treated as diverted to the employer if there is a loan or other extension of credit from assets in the account to the employer).

(ii) *Plan required*. A retirement income account must be maintained pursuant to a program which is a plan (as defined in §1.403(b)–3(b)(3)) and the plan document must state (or otherwise evidence in a similarly clear manner) the intent to constitute a retirement income account.

(3) *Ownership or use constitutes distribution*. Any asset of a retirement income account that is owned or used by a participant or beneficiary is treated as having been distributed to that participant or beneficiary. See §§1.403(b)–6 and 1.403(b)–7 for rules relating to distributions.

(4) *Coordination of retirement income account with custodial account rules*. A retirement income account that is treated as an annuity contract is not a custodial account (as defined in §1.403(b)–8(d)(2)), even if it is invested solely in stock of a regulated investment company.

(5) *Life annuities*. A retirement income account may distribute benefits in a form that includes a life annuity only if—

(i) The amount of the distribution form has an actuarial present value, at the annuity starting date, equal to the participant's or beneficiary's accumulated benefit, based on reasonable actuarial assumptions, including regarding interest and mortality; and

(ii) The plan sponsor guarantees benefits in the event that a payment is due that exceeds the participant's or beneficiary's accumulated benefit.

(6) *Combining retirement income account assets with other assets*. For purposes of §1.403(b)–8(f) relating to combining assets, retirement income account assets held in trust (including a custodial account that is treated as a trust under section 401(f)) are subject to the same rules regarding combining of assets as custodial account assets. In addition, retirement income account assets are permitted to be commingled in a common fund with amounts devoted exclusively to church purposes (such as a fund from which unfunded pension payments are made to former employees of the church). However, unless otherwise permitted by the Commissioner, no assets of the plan sponsor, other than retirement income account assets, may be combined with custodial account assets or any other assets permitted to be combined under §1.403(b)–8(f). This paragraph (a)(6) is subject to any additional rules issued by the Commissioner in revenue rulings, notices, or other guidance published in the Internal Revenue Bulletin (see §601.601(d)(2)(ii)(*b*) of this chapter).

(7) *Trust treated as tax exempt*. A trust (including a custodial account that is treated as a trust under section 401(f)) that includes no assets other than assets of a retirement income account is treated as an organization that is exempt from taxation under section 501(a).

(b) *No compensation limitation up to $10,000*. See section 415(c)(7) for special rules regarding certain annual additions not exceeding $10,000.

(c) *Special deduction rule for self-employed ministers*. See section 404(a)(10) for a special rule regarding the deductibility of a contribution made by a self-employed minister.

### §1.403(b)–10  Miscellaneous provisions.

(a) *Plan terminations and frozen plans*—(1) *In general*. An employer is permitted to amend its section 403(b) plan to eliminate future contributions for existing participants or to limit participation to existing participants and employees (to the extent consistent with §1.403(b)–5). A section 403(b) plan is permitted to contain provisions that provide for plan termination and that allow accumulated benefits to be distributed on termination. However, in the case of a section 403(b) contract that is subject to the distribution restrictions in §1.403(b)–6(c) or (d) (relating to custodial accounts and section 403(b) elective deferrals), termination of the plan and the distribution of accumulated benefits is permitted only if the employer (taking into account all entities that are treated as the same employer under section 414(b), (c), (m), or (o) on the date of the termination) does not make contributions to any section 403(b) contract that is not part of the plan during the period beginning on the date of plan termination and ending 12 months after distribution of all assets from the terminated plan. However, if at all times during the period beginning 12 months before the termination and ending 12 months after distribution of all assets from the terminated plan, fewer than 2 percent of the employees who were eligible under the section 403(b) plan as of the date of plan termination are eligible under the alternative section 403(b) contract, the alternative section 403(b) contract is disregarded. To the extent a contract fails to satisfy the nonforfeitability requirement of §1.403(b)–3(a)(2) at the date of plan termination, the contact is not, and cannot later become, a section 403(b) contract. In order for a section 403(b) plan to be considered terminated, all accumulated benefits under the plan must be distributed to all participants and beneficiaries as soon as administratively practicable after termination of the plan. For this purpose, delivery of a fully paid individual insurance annuity contract is treated as a distribution. The mere provision for, and making of, distributions to participants or beneficiaries upon plan termination does not cause a contract to cease to be a section 403(b) contract. See §1.403(b)–7 for rules regarding the tax treatment of distributions, including §1.403(b)–7(b)(1) under which an eligible rollover distribution is not included in gross income if paid in a direct rollover to an eligible retirement plan or if transferred to an eligible retirement plan within 60 days.

(2) *Employers that cease to be eligible employers*. An employer that ceases to be an eligible employer may no longer contribute to a section 403(b) contract for any subsequent period, and the contract will fail to satisfy §1.403(b)–3(a) if any further contributions are made with respect to a period after the employer ceases to be an eligible employer.

(b) *Contract exchanges and plan-to-plan transfers*—(1) *Contract exchanges and transfers*—(i) *General rule*. If the conditions in paragraph (b)(2) of this section are met, a section 403(b) contract held under a section 403(b) plan is permitted to be exchanged for another section 403(b) contract held under that section 403(b) plan. Further, if the conditions in paragraph (b)(3) of this section are met, a section 403(b) plan is permitted

to provide for the transfer of its assets (including any assets held in a custodial account or retirement income account that are treated as section 403(b) contracts) to another section 403(b) plan. In addition, if the conditions in paragraph (b)(4) of this section (relating to permissive service credit and repayments under section 415) are met, a section 403(b) plan is permitted to provide for the transfer of its assets to a qualified plan under section 401(a). However, neither a qualified plan nor an eligible governmental plan under section 457(b) may transfer assets to a section 403(b) plan, and a section 403(b) plan may not accept such a transfer. In addition, a section 403(b) contract may not be exchanged for an annuity contract that is not a section 403(b) contract. Neither a plan-to-plan transfer nor a contract exchange permitted under this paragraph (b) is treated as a distribution for purposes of the distribution restrictions at §1.403(b)–6. Therefore, such a transfer or exchange may be made before severance from employment or another distribution event. Further, no amount is includible in gross income by reason of such a transfer or exchange.

(ii) *ERISA rules*. See §1.414(l)–1 for other rules that are applicable to section 403(b) plans that are subject to section 208 of the Employee Retirement Income Security Act of 1974 (88 Stat. 829, 865).

(2) *Requirements for contract exchange within the same plan*—(i) *General rule*. A section 403(b) contract of a participant or beneficiary may be exchanged under paragraph (b)(1) of this section for another section 403(b) contract of that participant or beneficiary under the same section 403(b) plan if each of the following conditions are met:

(A) The plan under which the contract is issued provides for the exchange.

(B) The participant or beneficiary has an accumulated benefit immediately after the exchange that is at least equal to the accumulated benefit of that participant or beneficiary immediately before the exchange (taking into account the accumulated benefit of that participant or beneficiary under both section 403(b) contracts immediately before the exchange).

(C) The other contract is subject to distribution restrictions with respect to the participant that are not less stringent than those imposed on the contract being ex-

changed, and the employer enters into an agreement with the issuer of the other contract under which the employer and the issuer will from time to time in the future provide each other with the following information:

(*1*) Information necessary for the resulting contract, or any other contract to which contributions have been made by the employer, to satisfy section 403(b), including information concerning the participant's employment and information that takes into account other section 403(b) contracts or qualified employer plans (such as whether a severance from employment has occurred for purposes of the distribution restrictions in §1.403(b)–6 and whether the hardship withdrawal rules of §1.403(b)–6(d)(2) are satisfied).

(*2*) Information necessary for the resulting contract, or any other contract to which contributions have been made by the employer, to satisfy other tax requirements (such as whether a plan loan satisfies the conditions in section 72(p)(2) so that the loan is not a deemed distribution under section 72(p)(1)).

(ii) *Accumulated benefit*. The condition in paragraph (b)(2)(i)(B) of this section is satisfied if the exchange would satisfy section 414(l)(1) if the exchange were a transfer of assets.

(iii) *Authority for future guidance*. Subject to such conditions as the Commissioner determines to be appropriate, the Commissioner may issue rules of general applicability, in revenue rulings, notices, or other guidance published in the Internal Revenue Bulletin (see §601.601(d)(2)(ii)(*b*) of this chapter), permitting an exchange of one section 403(b) contract for another section 403(b) contract for an exchange that does not satisfy paragraph (b)(2)(i)(C) of this section. Any such rules must require the resulting contract to set forth procedures that the Commissioner determines are reasonably designed to ensure compliance with those requirements of section 403(b) or other tax provisions that depend on either information concerning the participant's employment or information that takes into account other section 403(b) contracts or other employer plans (such as whether a severance from employment has occurred for purposes of the distribution restrictions in §1.403(b)–6, whether the hardship withdrawal rules of §1.403(b)–6(d)(2) are

satisfied, and whether a plan loan constitutes a deemed distribution under section 72(p)).

(3) *Requirements for plan-to-plan transfers*. (i) A plan-to-plan transfer under paragraph (b)(1) of this section from a section 403(b) plan to another section 403(b) plan is permitted if each of the following conditions are met—

(A) In the case of a transfer for a participant, the participant is an employee or former employee of the employer (or the business of the employer) for the receiving plan.

(B) In the case of a transfer for a beneficiary of a deceased participant, the participant was an employee or former employee of the employer (or business of the employer) for the receiving plan.

(C) The transferor plan provides for transfers.

(D) The receiving plan provides for the receipt of transfers.

(E) The participant or beneficiary whose assets are being transferred has an accumulated benefit immediately after the transfer that is at least equal to the accumulated benefit of that participant or beneficiary immediately before the transfer.

(F) The receiving plan provides that, to the extent any amount transferred is subject to any distribution restrictions under §1.403(b)–6, the receiving plan imposes restrictions on distributions to the participant or beneficiary whose assets are being transferred that are not less stringent than those imposed on the transferor plan.

(G) If a plan-to-plan transfer does not constitute a complete transfer of the participant's or beneficiary's interest in the section 403(b) plan, the transferee plan treats the amount transferred as a continuation of a *pro rata* portion of the participant's or beneficiary's interest in the section 403(b) plan (for example, a *pro rata* portion of the participant's or beneficiary's interest in any after-tax employee contributions).

(ii) *Accumulated benefit*. The condition in paragraph (b)(3)(i)(D) of this section is satisfied if the transfer would satisfy section 414(l)(1).

(4) *Purchases of permissive service credit by contract-to-plan transfers from a section 403(b) contract to a qualified plan*—(i) *General rule*. If the conditions in paragraph (b)(4)(ii) of this section are met, a section 403(b) plan may provide

for the transfer of assets held in the plan to a qualified defined benefit plan that is a governmental plan (as defined in section 414(d)).

(ii) *Conditions for plan-to-plan transfers.* A transfer may be made under this paragraph (b)(4) only if the transfer is either—

(A) For the purchase of permissive service credit (as defined in section 415(n)(3)(A)) under the receiving defined benefit plan; or

(B) A repayment to which section 415 does not apply by reason of section 415(k)(3).

(c) *Qualified domestic relations orders.* In accordance with the second sentence of section 414(p)(9), any distribution from an annuity contract under section 403(b) (including a distribution from a custodial account or retirement income account that is treated as a section 403(b) contract) pursuant to a qualified domestic relations order is treated in the same manner as a distribution from a plan to which section 401(a)(13) applies. Thus, for example, a section 403(b) plan does not fail to satisfy the distribution restrictions set forth in §1.403(b)–6(b), (c), or (d) merely as a result of distribution made pursuant to a qualified domestic relations order under section 414(p), so that such a distribution is permitted without regard to whether the employee from whose contract the distribution is made has had a severance from employment or another event permitting a distribution to be made under section 403(b). In the case of a plan that is subject to Title I of ERISA, see also section 206(d)(3) of ERISA under which the prohibition against assignment or alienation of plan benefits under section 206(d)(1) of ERISA does not apply to an order that is determined to be a qualified domestic relations order.

(d) *Rollovers to a section 403(b) contract*—(1) *General rule.* A section 403(b) contract may accept a contribution that is an eligible rollover distribution (as defined in section 402(c)(4)) made from another eligible retirement plan (as defined in section 402(c)(8)(B)). Any amount contributed to a section 403(b) contract as an eligible rollover distribution is not taken into account for purposes of the limits in §1.403(b)–4, but, except as otherwise specifically provided (for example, at §1.403(b)–6(i)), is otherwise treated in the

same manner as an amount held under a section 403(b) contract for purposes of §§1.403(b)–3 through 1.403(b)–9 and this section.

(2) *Special rules relating to after-tax employee contributions and designated Roth contributions.* A section 403(b) plan that receives an eligible rollover distribution that includes after-tax employee contributions or designated Roth contributions is required to obtain information regarding the employee's section 72 basis in the amount rolled over. A section 403(b) plan is permitted to receive an eligible rollover distribution that includes designated Roth contributions only if the plan permits employees to make elective deferrals that are designated Roth contributions.

(e) *Deemed IRAs.* See regulations under section 408(q) for special rules relating to deemed IRAs.

(f) *Defined benefit plans*—(1) *Defined benefit plans generally.* Except for a TEFRA church defined benefit plan as defined in paragraph (f)(2) of this section, section 403(b) does not apply to any contributions or accrual under a defined benefit plan.

(2) *TEFRA church defined benefit plans.* See section 251(e)(5) of the Tax Equity and Fiscal Responsibility Act of 1982, Public Law 97–248, for a provision permitting certain arrangements established by a church-related organization and in effect on September 3, 1982 (a TEFRA church defined benefit plan) to be treated as a section 403(b) contract even though it is a defined benefit arrangement. In accordance with section 403(b)(1), for purposes of applying section 415 to a TEFRA church defined benefit plan, the accruals under the plan are limited to the maximum amount permitted under section 415(c) when expressed as an annual addition, and, for this purpose, the rules at §1.402(b)–1a(2) for determining the present value of an accrual under a nonqualified defined benefit plan also apply for purposes of converting the accrual under a TEFRA church defined benefit plan to an annual addition. See section 415(b) for additional limits applicable to TEFRA church defined benefit plans.

(g) *Other rules relating to section 501(c)(3) organizations.* See section 501(c)(3) and regulations thereunder for the substantive standards for tax-exemp-

tion under that section, including the requirement that no part of the organization's net earnings inure to the benefit of any private shareholder or individual. See also sections 4941 (self dealing), 4945 (taxable expenditures), and 4958 (excess benefit transactions), and the regulations thereunder, for rules relating to excise taxes imposed on certain transactions involving organizations described in section 501(c)(3).

### §1.403(b)–11  Applicable dates.

(a) *General rule.* Except as otherwise provided in this section, §§1.403(b)–1 through 1.403(b)–10 apply for taxable years beginning after December 31, 2008.

(b) *Collective bargaining agreements.* In the case of a section 403(b) plan maintained pursuant to one or more collective bargaining agreements that have been ratified and in effect on July 26, 2007, §§1.403(b)–1 through 1.403(b)–10 do not apply before the earlier of—

(1) The date on which the last of the collective bargaining agreements terminates (determined without regard to any extension thereof after July 26, 2007); or

(2) July 26, 2010.

(c) *Church conventions; retirement income account.* (1) In the case of a section 403(b) plan maintained by a church-related organization for which the authority to amend the plan is held by a church convention (within the meaning of section 414(e)), §§1.403(b)–1 through 1.403(b)–10 do not apply before the first day of the first plan year that begins after December 31, 2009.

(2) In the case of a loan or other extension of credit to the employer that was entered into under a retirement income account before July 26, 2007, the plan does not fail to satisfy §1.403(b)–9(a)(2)(i)(C) on account of the loan or other extension of credit if the plan takes reasonable steps to eliminate the loan or other extension of credit to the employer before the applicable date for §1.403(b)–9(a)(2) or as promptly as practical thereafter (including taking steps after July 26, 2007 and before the applicable date).

(d) *Special rules for plans that exclude certain types of employees from elective deferrals.* (1) If, on July 26, 2007, a plan excludes any of the following categories of employees, then the plan does not fail

to satisfy §1.403(b)–5(b) as a result of that exclusion before the first day of the first taxable year that begins after December 31, 2009:

(i) Employees who make a one-time election to participate in a governmental plan described in section 414(d) that is not a section 403(b) plan.

(ii) Professors who are providing services on a temporary basis to another educational organization (as defined under section 170(b)(1)(A)(ii)) for up to one year and for whom section 403(b) contributions are being made at a rate no greater than the rate each such professor would receive under the section 403(b) plan of the original educational organization.

(iii) Employees who are affiliated with a religious order and who have taken a vow of poverty where the religious order provides for the support of such employees in their retirement from eligibility to make elective deferrals.

(2) If, on July 26, 2007, a plan excludes employees who are covered by a collective bargaining agreement from eligibility to make elective deferrals, the plan does not fail to satisfy §1.403(b)–5(b) (relating to universal availability) as a result of that exclusion before the later of—

(i) The first day of the first taxable year that begins after December 31, 2008; or

(ii) The earlier of—

(A) The date on which the related collective bargaining agreement terminates (determined without regard to any extension thereof after July 26, 2007); or

(B) July 26, 2010.

(3) In the case of a governmental plan (as defined in section 414(d)) for which the authority to amend the plan is held by a legislative body that meets in legislative session, the plan does not fail to satisfy §1.403(b)–5(b) as a result of any exclusion in paragraph (d)(1)(i), (d)(1)(ii), (d)(1)(iii), or (d)(2) of this section before the earlier of —

(i) The close of the first regular legislative session of the legislative body with the authority to amend the plan that begins on or after January 1, 2009; or

(ii) January 1, 2011.

(e) *Special rules for plans that permit in-service distributions.* (1) Section 1.403(b)–6(b) does not apply to a contract issued by an insurance company before January 1, 2009.

(2) Any amendment to comply with the requirements of §1.403(b)–6 (disregarding paragraph (e)(1) of this section) that is adopted before January 1, 2009, or such later date as may be permitted under guidance issued by the Commissioner in revenue rulings, notices, or other guidance published in the Internal Revenue Bulletin (see §601.601(d)(2)(ii)(*b*) of this chapter), does not violate section 204(g) of the Employee Retirement Income Security Act of 1974 to the extent the amendment eliminates or reduces a right to receive benefit distributions during employment.

(f) *Special rule for life insurance contracts.* Section 1.403(b)–8(c)(2) does not apply to a contract issued before September 24, 2007.

(g) *Special rule for contracts received in an exchange.* Section 1.403(b)–10(b)(2) does not apply to a contract received in an exchange that occurred on or before September 24, 2007 if the exchange (including the contract received in the exchange) satisfies such rules as the Commissioner has prescribed in guidance of general applicability at the time of the exchange.

(h) *Special rule for coordination with regulations under section 415.* Section 1.403(b)–3(b)(4)(ii) is applicable for taxable years beginning on or after July 1, 2007.

(i) *Special rule for coordination with regulations under section 402A.* Sections 1.403(b)–3(c), 1.403(b)–7(e), and 1.403(b)–10(d)(2) are applicable with respect to taxable years beginning on or after January 1, 2007.

### §1.403(d)–1 [Removed]

Par. 8.  Section 1.403(d)–1 is removed.
Par. 9.  Section 1.414(c)–5 is redesignated as §1.414(c)–6 and new §1.414(c)–5 is added to read as follows:

### *§1.414(c)–5 Certain tax-exempt organizations.*

(a) *Application.* This section applies to an organization that is exempt from tax under section 501(a). The rules of this section only apply for purposes of determining when entities are treated as the same employer for purposes of section 414(b), (c), (m), and (o) (including the sections referred to in section 414(b), (c), (m), (o),

and (t)), and are in addition to the rules otherwise applicable under section 414(b), (c), (m), and (o) for determining when entities are treated as the same employer. Except to the extent set forth in paragraphs (d), (e), and (f) of this section, this section does not apply to any church, as defined in section 3121(w)(3)(A), or any qualified church-controlled organization, as defined in section 3121(w)(3)(B).

(b) *General rule.* In the case of an organization that is exempt from tax under section 501(a) (an exempt organization) whose employees participate in a plan, the employer with respect to that plan includes the exempt organization whose employees participate in the plan and any other organization that is under common control with that exempt organization.  For this purpose, common control exists between an exempt organization and another organization if at least 80 percent of the directors or trustees of one organization are either representatives of, or directly or indirectly controlled by, the other organization.  A trustee or director is treated as a representative of another exempt organization if he or she also is a trustee, director, agent, or employee of the other exempt organization.  A trustee or director is controlled by another organization if the other organization has the general power to remove such trustee or director and designate a new trustee or director.  Whether a person has the power to remove or designate a trustee or director is based on facts and circumstances.  To illustrate the rules of this paragraph (b), if exempt organization A has the power to appoint at least 80 percent of the trustees of exempt organization B (which is the owner of the outstanding shares of corporation C, which is not an exempt organization) and to control at least 80 percent of the directors of exempt organization D, then, under this paragraph (b) and §1.414(b)–1, entities A, B, C, and D are treated as the same employer with respect to any plan maintained by A, B, C, or D for purposes of the sections referenced in section 414(b), (c), (m), (o), and (t).

(c) *Permissive aggregation with entities having a common exempt purpose*—(1) *General rule.*  For purposes of this section, exempt organizations that maintain a plan to which section 414(c) applies that covers one or more employees from each organization may treat themselves as under common control for purposes of

section 414(c) (and, thus, as a single employer for all purposes for which section 414(c) applies) if each of the organizations regularly coordinates their day-to-day exempt activities. For example, an entity that provides a type of emergency relief within one geographic region and another exempt organization that provides that type of emergency relief within another geographic region may treat themselves as under common control if they have a single plan covering employees of both entities and regularly coordinate their day-to-day exempt activities. Similarly, a hospital that is an exempt organization and another exempt organization with which it coordinates the delivery of medical services or medical research may treat themselves as under common control if there is a single plan covering employees of the hospital and employees of the other exempt organization and the coordination is a regular part of their day-to-day exempt activities.

(2) *Authority to permit aggregation.* (i) For determining when entities are treated as the same employer under section 414(b), (c), (m), and (o), the Commissioner may issue rules of general applicability, in revenue rulings, notices, or other guidance published in the Internal Revenue Bulletin (see §601.601(d)(2)(ii)(*b*) of this chapter), permitting other types of combinations of entities that include exempt organizations to elect to be treated as under common control for one or more specified purposes if—

(A) There are substantial business reasons for maintaining each entity in a separate trust, corporation, or other form; and

(B) Such treatment would be consistent with the anti-abuse standards in paragraph (f) of this section.

(ii) For example, this authority might be exercised in any situation in which the organizations are so integrated in their operations as to effectively constitute a single coordinated employer for purposes of section 414(b), (c), (m), and (o), including common employee benefit plans.

(d) *Permissive disaggregation between qualified church controlled organizations and other entities.* In the case of a church plan (as defined in section 414(e)) to which contributions are made by more than one common law entity, any employer may apply paragraphs (b) and (c) of this section to those entities that are not a church (as defined in section 403(b)(12)(B) and §1.403(b)–2) separately from those entities that are churches. For example, in the case of a group of entities consisting of a church (as defined in section 3121(w)(3)(A)), a secondary school (that is treated as a church under §1.403(b)–2), and several nursing homes each of which receives more than 25 percent of its support from fees paid by residents (so that none of them is a qualified church-controlled organization under §1.403(b)–2 and section 3121(w)(3)(B)), the nursing homes may treat themselves as being under common control with each other, but not as being under common control with the church and the school, even though the nursing homes would be under common control with the school and the church under paragraph (b) of this section.

(e) *Application to certain church entities under section 3121(w)(3).* [Reserved].

(f) *Anti-abuse rule.* In any case in which the Commissioner determines that the structure of one or more exempt organizations (which may include an exempt organization and an entity that is not exempt from income tax) or the positions taken by those organizations has the effect of avoiding or evading any requirements imposed under section 401(a), 403(b), or 457(b), or any applicable section (as defined in section 414(t)), or any other provision for which section 414(c) applies, the Commissioner may treat an entity as under common control with the exempt organization.

(g) *Examples.* The provisions of this section are illustrated by the following examples:

*Example 1.* (i) *Facts.* Organization A is a tax-exempt organization under section 501(c)(3) which owns 80% or more of the total value of all classes of stock of corporation B, which is a for profit organization.

(ii) *Conclusion.* Under paragraph (a) of this section, this section does not alter the rules of section 414(b) and (c), so that organization A and corporation B are under common control under §1.414(c)–2(b).

*Example 2.* (i) *Facts.* Organization M is a hospital which is a tax-exempt organization under section 501(c)(3) and organization N is a medical clinic which is also a tax-exempt organization under section 501(c)(3). N is located in a city and M is located in a nearby suburb. There is a history of regular coordination of day-to-day activities between M and N, including periodic transfers of staff, coordination of staff training, common sources of income, and coordination of budget and operational goals. A single section 403(b) plan covers professional and staff employees of both the hospital and the medical clinic. While a number of members of the board of directors of M are also on the board of directors of N, there is less than 80% overlap in board membership. Both organizations have approximately the same percentage of employees who are highly compensated and have appropriate business reasons for being maintained in separate entities.

(ii) *Conclusion.* M and N are not under common control under this section, but, under paragraph (c) of this section, may choose to treat themselves as under common control, assuming both of them act in a manner that is consistent with that choice for purposes of §1.403(b)–5(a), sections 401(a), 403(b), and 457(b), and any other applicable section (as defined in section 414(t)), or any other provision for which section 414(c) applies.

*Example 3.* (i) *Facts.* Organizations O and P are each tax-exempt organizations under section 501(c)(3). Each organization maintains a qualified plan for its employees, but one of the plans would not satisfy section 410(b) (or section 401(a)(4)) if the organizations were under common control. The two organizations are closely related and, while the organizations have several trustees in common, the common trustees constitute fewer than 80 percent of the trustees of either organization. Organization O has the power to remove any of the trustees of P and to select the slate of replacement nominees.

(ii) *Conclusion.* Under these facts, pursuant to paragraphs (b) and (f) of this section, the Commissioner treats the entities as under common control.

(h) *Applicable date.* This section applies for plan years beginning after December 31, 2008.

Par. 10. For each entry listed in the "Location" column, remove the language in the "Remove" column and add the language in the "Add" column in its place.

| Location | Remove | Add |
|---|---|---|
| §1.101–1(a)(2)(ii) | paragraph (a) or (b) of §1.403(b)–1 | §1.403(b)–3 |
| §1.101–1(a)(2)(ii) | paragraph (c)(3) of §1.403(b)–1 | §1.403(b)–7 |
| §1.401(a)(9)–1, A–1 | §1.403(b)–3 | §1.403(b)–6(e) |

| Location | Remove | Add |
|---|---|---|
| §1.401(a)(31)–1, introductory text | 1.403(b)–2 | 1.403(b)–7(b) |
| §1.401(a)(31)–1, A–1(b)(3) | §1.403(b)–2 | §1.403(b)–7(b) |
| §1.402(c)–2, introductory text | 1.403(b)–2 | 1.403(b)–7(b) |
| §1.402(c)–2, A–1(b)(4) | §1.403(b)–2 | §1.403(b)–7(b) |
| §1.402(f)–1, introductory text | 1.403(b)–2 | 1.403(b)–7(b) |
| §1.403(a)–1(a) | §1.403(b)–1 | §§1.403(b)–1 through 1.403(b)–10 |
| §1.403(c)–1, all locations | §1.403(b)–1(b) | §1.403(b)–3 |
| §1.403(c)–1, all locations | §1.403(b)–1(b)(2) | §1.403(b)–3(c) |

**PART 31—EMPLOYMENT TAXES, INCOME TAXES, PENALTIES, PENSIONS, RAILROAD RETIREMENT, REPORTING AND RECORDKEEPING REQUIREMENTS, SOCIAL SECURITY, UNEMPLOYMENT COMPENSATION**

Par. 11. The authority citation for part 31 continues to read in part as follows:
Authority: 26 U.S.C. 7805 * * *

Par. 12. For each entry listed in the "Location" column, remove the language in the "Remove" column and add the language in the "Add" column in its place.

| Location | Remove | Add |
|---|---|---|
| §31.3405(c)–1, all locations | §1.403(b)–2, Q&A–1 | §1.403(b)–7(b) |
| §31.3405(c)–1, A–1(b) | §1.403(b)–2, Q&A–3 | §1.403(b)–7(b) |
| §31.3405(c)–1, A–1(b) | §1.403(b)–2, Q&A–1 and Q&A–2 | §1.403(b)–7(b) |
| §31.3405(c)–1, A–2 | §1.403(b)–2, Q&A–2 | §1.403(b)–7(b) |

**PART 54—EXCISE TAXES, PENSIONS, REPORTING AND RECORDKEEPING REQUIREMENTS**

Par. 13. The authority citation for part 54 continues to read in part as follows:

Authority: 26 U.S.C. 7805 * * *
Par. 14. For the entry listed in the "Location" column, remove the language in the "Remove" column and add the language in the "Add" column in its place.

| Location | Remove | Add |
|---|---|---|
| §54.4974–2, A–3(a)(2) | §1.403(b)–3 | §1.403(b)–6(e) |

**PART 602—OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT**

Par. 15. The authority citation for part 602 continues to read in part as follows:

Authority: 26 U.S.C. 7805.
Par. 16. In §602.101, paragraph (b) is amended by removing the entry for §1.403(b)–2 and adding entries to the table for §§1.403(b)–7 and 1.402(b)–10 to read as follows:

*§602.101 OMB Control numbers.*

* * * * *
(b) * * *

| CFR part or section where identified and described | | Current OMB control No. |
|---|---|---|
| * * * * * | | |
| 1.403(b)–7 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1545–1341 |
| 1.403(b)–10 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1545–2068 |
| * * * * * | | |

Kevin M. Brown,
*Deputy Commissioner for
Services and Enforcement.*

Approved July 2, 2007.

Eric Solomon,
*Assistant Secretary of
Treasury (Tax Policy).*

(Filed by the Office of the Federal Register on July 23, 2007,
8:45 a.m., and published in the issue of the Federal Register
for July 26, 2007, 72 F.R. 41127)

## Section 412.—Minimum Funding Standards

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 467.—Certain Payments for the Use of Property or Services

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 468.—Special Rules for Mining and Solid Waste Reclamation and Closing Costs

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 482.—Allocation of Income and Deductions Among Taxpayers

Federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 483.—Interest on Certain Deferred Payments

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 642.—Special Rules for Credits and Deductions

Federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 807.—Rules for Certain Reserves

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 846.—Discounted Unpaid Losses Defined

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 953.—Insurance Income

Final regulations under section 1502 of the Code allow the Internal Revenue Service to appoint a domestic substitute agent for a consolidated group when the group's parent is a foreign corporation that is treated as a domestic corporation as the result of a section 953(d) election. See T.D. 9343, page 533.

## Section 1248.—Gain From Certain Sales or Exchanges of Stock in Certain Foreign Corporations

*26 CFR 1.1248–1: Treatment of gain from certain sales or exchanges of stock in certain foreign corporations.*

## T.D. 9345

## DEPARTMENT OF THE TREASURY Internal Revenue Service 26 CFR Part 1

## Section 1248 Attribution Principles

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations.

SUMMARY: This document contains final regulations under section 1248 of the Internal Revenue Code (Code) that provide guidance for determining the earnings and profits attributable to stock of controlled foreign corporations (or former controlled foreign corporations) that are (were) involved in certain nonrecognition transactions. The final regulations are necessary in order to supplement and clarify existing guidance in the regulations under section 1248. The final regulations affect persons subject to the regulations under section 1248, as well as persons to which regulations under other Code provisions, such as section 367(b), apply to the extent that those regulations incorporate the principles of the section 1248 regulations. In addition, the final regulations provide that with respect to the sale by a foreign partnership of the stock of a corporation, the partners in such foreign partnership shall be treated as selling or exchanging their proportionate share of the stock of such corporation for purposes of section 1248.

DATES: *Effective Date:* These regulations are effective on July 30, 2007.

*Applicability Dates:* For dates of applicability, see §§1.1248–1(g) and 1.1248–8(d).

FOR FURTHER INFORMATION CONTACT: Michael Gilman at (202) 622–3850 (not a toll-free number).

SUPPLEMENTARY INFORMATION:

**Background**

On June 2, 2006, proposed revisions to the regulations under section 1248(a) of the Code (REG–135866–02, 2006–27 I.R.B. 34) were published in the **Federal Register** (71 FR 31985–01). On August 14, 2006, two corrections to those proposed regulations were published in the **Federal Register** (published in the I.R.B. as Announcement 2006–64, 2006–37 I.R.B. 447 [71 FR 46415], and Announcement 2006–65, 2006–37 I.R.B. 447 [71 FR 46416]). Two written comments were received. A public hearing was not requested and none was held. After consideration of the written comments and other comments, the June 2, 2006, proposed regulations are adopted as amended by this Treasury decision.

## Summary of Comments and Explanation of Revisions

With respect to attribution of earnings and profits to stock of an acquiring corporation held by a non-exchanging shareholder, §1.1248–8(b)(4) of the proposed regulations provides a rule by cross-reference to §1.1248–2 or §1.1248–3 (whichever is applicable) and §1.1248–8(b)(6) (as applicable). A commentator asserted that the proposed regulations did not adequately explain which earnings and profits were attributed to the stock of the non-exchanging shareholder. This commentator thought that the rule was better explained in the preamble to the proposed regulations, which states that generally the earnings and profits attributable to stock of an acquiring corporation held by a non-exchanging shareholder immediately prior to a restructuring transaction continue to be attributed to such stock, and the earnings and profits of the acquired corporation accumulated prior to the restructuring transaction attributable to the stock of an acquired corporation are not attributed to the non-exchanging shareholder's stock in the acquiring corporation. In order to clarify the regulations, this language from the preamble to the proposed regulations is included in §1.1248–8(b)(4) of the final regulations.

Under §1.1248–1(a)(4) of the proposed regulations, the partners in a foreign partnership shall be treated as selling or exchanging their proportionate share of stock of a corporation sold or exchanged by the foreign partnership. The proposed regulations also apply section 1248(a) in cases where the stock in a corporation that is sold or exchanged is held through tiers of foreign partnerships. This treatment is necessary to reflect properly each partner's share of the corporation's earnings and profits as a dividend.

A commentator noted that §1.1248–1(a)(4) of the proposed regulations could be read to apply to the sale by a partner of its interest in a partnership holding the stock of a corporation. The Treasury Department and the IRS did not intend that interpretation because it would be contrary to section 1248(g)(2)(B). An amount that is received by a partner in exchange for all or part of its partnership interest is treated as ordinary income under section 751(a) and (c) to the extent

attributable to stock in a foreign corporation as described in section 1248. Section 1248(g)(2)(B) provides that section 1248 will not apply if any other provision of the Code imposes an amount as ordinary income. Accordingly, §1.1248–1(a)(4) in the final regulations is revised to clarify that a foreign partnership is treated as an aggregate for this purpose only when a foreign partnership sells or exchanges stock of a corporation. Finally, a commentator requested that the final regulations allow a taxpayer to elect to apply the rule in §1.1248–1(a)(4) to taxable years ending before the effective date of the final regulations. The Treasury Department and the IRS regard this rule as a clarification of existing law, but recognize that some practitioners have expressed the view that prior law was not entirely clear. Accordingly, the final regulations allow taxpayers to apply the rule in §1.1248–1(a)(4) to open years provided that the taxpayer consistently applies the rule in all such years. A partner makes this election by treating its distributive share of gain attributable to a sale of shares in a controlled foreign corporation as gain recognized on a sale or exchange of stock in a foreign corporation within the meaning of section 1248(a).

In order to clarify the application of §1.1248–8, the definition of controlled foreign corporation at §1.1248–8(b)(1)(iii) has been revised to provide that a controlled foreign corporation includes corporations described in either section 953(c)(1)(B) or section 957.

A commentator requested the addition of an example to §1.367(b)–4(d) to clarify that earnings and profits attributable to certain lower-tier subsidiaries are not taken into account in determining the all earnings and profits amount attributable to transactions described in §1.367(b)–3. In response to this comment, such an example is included in §1.367(b)–4(d) of the final regulations.

## Special Analyses

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of 5 U.S.C. chapter 5 does not apply to these regulations, and,

because the regulations do not impose a collection of information on small entities, the Regulatory Flexibility Act, 5 U.S.C. chapter 6, does not apply. Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding this regulation was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on their impact on small businesses.

## Drafting Information

The principal author of the final regulations is Michael I. Gilman of the Office of Associate Chief Counsel (International). However, other personnel from the Treasury Department and the IRS participated in their development.

\* \* \* \* \*

## Adoption of Amendments to the Regulations

Accordingly, 26 CFR part 1 is amended as follows:

PART 1—INCOME TAXES

Paragraph 1. The authority citation for part 1 is amended by adding entries in numerical order to read in part as follows:

Authority: 26 U.S.C. 7805 \* \* \*

Sections 1.367(b)–2(c)(1) and (2) also issued under 26 U.S.C. 367(b)(1) and (2).

Section 1.367(b)–2(d)(3) also issued under 26 U.S.C. 367(b)(1) and (2).\* \* \*

Section 1.367(b)–4(d) also issued under 26 U.S.C. 367(b)(1) and (2). \* \* \*

Sections 1.1248–1(a)(1), (4), and (5) also issued under 26 U.S.C. 1248(a) and (c)(1) and (2).\* \* \*

Section 1.1248–8 also issued under 26 U.S.C. 1248(a) and (c)(1) and (2). \* \* \*

### §1.367(b)–2 [Amended]

Par. 2. Section 1.367(b)–2 is amended by:

1. Removing the language ", as modified by §1.367(b)–4(d) (as applicable)." from the last sentence of paragraph (c)(1)(ii) and adding the language ". See §1.1248–8." in its place.

2. Removing paragraphs (c)(2) *Example 4* and (d)(3)(ii).

3. Removing the language ", as modified by paragraph (d)(3)(ii) of this

section and §1.367(b)–4(d) (as applicable)." from the last sentence of paragraph (d)(3)(i)(B)(2) and adding the language ". See §1.1248–8." in its place.

4. Redesignating paragraph (d)(3)(iii) as paragraph (d)(3)(ii).

Par. 3. Section 1.367(b)–4(d) is revised to read as follows:

*§1.367(b)–4 Acquisition of foreign corporate stock or assets by a foreign corporation in certain nonrecognition transactions.*

* * * * *

(d) *Rules for subsequent sales or exchanges*—(1) *Rule.* If an exchanging shareholder (as defined in §1.1248–8(b)(1)(iv)) is not required to include in income as a deemed dividend the section 1248 amount under paragraph (b) of this section in a section 367(b) exchange described in paragraph (a) of this section (non-inclusion exchange), then, for purposes of applying section 367(b) or section 1248 to subsequent sales or exchanges, and subject to the limitation of §1.367(b)–2(d)(3)(ii) (in the case of a transaction described in §1.367(b)–3), the determination of the earnings and profits attributable to the stock an exchanging shareholder receives in the non-inclusion exchange shall be determined pursuant to the rules of section 1248 and the regulations under that section.

(2) *Example.* The following example illustrates the rules of this section. For purposes of the example, assume that—

(i) There is no immediate gain recognition pursuant to section 367(a)(1) and the regulations under that section (either through operation of the rules or because the appropriate parties have entered into a gain recognition agreement under §§1.367(a)–3(b) and 1.367(a)–8);

(ii) References to earnings and profits are to earnings and profits that would be includible in income as a dividend under section 1248 and the regulations under that section if stock to which the earnings and profits are attributable were sold or exchanged by its shareholder;

(iii) Each corporation has only a single class of stock outstanding and uses the calendar year as its taxable year; and

(iv) Each transaction is unrelated to all other transactions.

*Example. Acquisition of the stock of a foreign corporation that controls a foreign acquiring corporation in a reorganization described in section 368(a)(1)(C).* (i) *Facts.* DC1, a domestic corporation, has owned all the stock of CFC1, a controlled foreign corporation, since its formation on January 1, year 1. CFC1 has owned all the stock of CFC2, a controlled foreign corporation, since its formation on January 1, year 1. FC, a foreign corporation that is not a controlled foreign corporation, has owned all of the stock of FC2, a foreign corporation, since its formation on January 1, year 2. On December 31, year 3, pursuant to a restructuring transaction that was a triangular reorganization described in section 368(a)(1)(C), CFC1 transfers all of its assets, including the CFC2 stock, to FC2 in exchange for 80% of the voting stock of FC. CFC1 transfers the voting stock of FC to DC1 and the CFC1 stock is cancelled. Pursuant to section 1223(1), DC1 is considered to have held the stock of FC since January 1, year 1. Under section 1223(2), FC2 is considered to have held the stock of CFC2 since January 1, year 1. On December 31, year 3, CFC1 has $100 of earnings and profits. From January 1, year 4, until December 31, year 5, FC (a controlled foreign corporation after the restructuring transaction) accumulates an additional $50 of earnings and profits. FC2, a controlled foreign corporation after the restructuring transaction, accumulates $100 of earnings and profits from January 1, year 4, until December 31, year 5. On December 31, year 5, FC is liquidated into DC1 in a transaction described in section 332.

(ii) *Result.* Generally, this paragraph (d) requires that DC1 include in income the earnings and profits attributable to its stock in FC as determined under §1.1248–8. However, since the liquidation of FC into DC1 is a transaction described in §1.367(b)–3, the earnings and profits attributable to the stock of FC are limited by §1.367(b)–2(d)(3)(ii) to that portion of the earnings and profits accumulated by FC itself before or after the restructuring transaction, and do not include the earnings and profits of FC's subsidiaries accumulated before or after the restructuring transaction. Thus, DC1 will include $40 of earnings and profits in income (80% of the $50 of earnings and profits accumulated by FC after the restructuring transaction).

Par. 4. Section 1.1248–1 is amended by:

1. Removing the language "(or was considered as held by reason of the application of section 1223)" from the first sentence of paragraph (a)(1) and adding the language "(or was considered as held by reason of the application of section 1223, taking into account §1.1248–8)" in its place and adding a new third sentence.

2. Redesignating paragraph (a)(4) as paragraph (a)(5).

3. Adding new paragraphs (a)(4) and (g).

4. Adding *Example 4* in newly-designated paragraph (a)(5).

The additions read as follows:

*§1.1248–1 Treatment of gain from certain sales or exchanges of stock in certain foreign corporations.*

(a) *In general.* (1) * * * See §1.1248–8 for additional rules regarding the attribution of earnings and profits to the stock of a foreign corporation following certain nonrecognition transactions. * * *

* * * * *

(4) For purposes of paragraph (a)(1) of this section, if a foreign partnership sells or exchanges stock of a corporation, the partners in such foreign partnership shall be treated as selling or exchanging their proportionate share of the stock of such corporation. Stock which is considered to have been sold or exchanged by a partner by reason of the application of this paragraph (a)(4) shall for purposes of applying such sentence be treated as actually sold or exchanged by such partner.

(5) * * *

*Example 4.* (i) *Facts.* X, a domestic corporation, and Y, a foreign corporation that is not a controlled foreign corporation, are partners in foreign partnership Z. X has a 60% interest in Z, and Y has a 40% interest in Z. All parties are calendar year taxpayers. On January 1, year 1, Z forms foreign corporation H, a controlled foreign corporation that conducts a business in Country C. Z and H's functional currency is the United States dollar. In years 1 and 2, H did not earn subpart F income as defined in section 952(a). On December 31, year 2, Z sells all of the H stock for $600 when Z's adjusted basis in the stock is $100. Therefore, Z recognizes a gain of $500 on the sale, of which $300 is allocable to X as a 60% partner. At the time of the sale, H had $300 of earnings and profits, $180 of which (that is, 60% of $300) is attributable to X's 60% share of the H stock.

(ii) *Result.* Pursuant to section 1248(a) and paragraphs (a)(1) and (4) of this section, X and Y are treated as selling 60% and 40%, respectively, of the H stock. X includes in its gross income as a dividend $180 of the gain recognized on the sale. Because Y is a foreign corporation that is not a CFC, neither section 1248 nor section 964 applies to the sale of Y's 40% share of the H stock.

(iii) *Alternative facts.* If, instead, X owned its 60% interest in Z through another foreign partnership, the result would be the same.

* * * * *

(g) *Effective/applicability date.* The third sentence in paragraph (a)(1), paragraph (a)(4), and paragraph (a)(5) *Example 4* of this section apply to income inclusions that occur on or after July 30, 2007. A taxpayer may elect to apply paragraph (a)(4) of this section to income inclusions in open taxable years provided that it consistently applies paragraph (a)(4) for income inclusions in the first year for

which the election is applicable and in all subsequent years.

**§§1.1248–2, 1.1248–3, 1.1248–7 [Amended]**

Par. 5. In §§1.1248–2, 1.1248–3, and 1.1248–7, for each entry in the "Section" column, remove the language in the "Remove" column and add the language in the "Add" column in its place.

| Section | Remove | Add |
|---|---|---|
| §1.1248–2(a)(1) | (or was considered to be held by reason of the application of section 1223) | (or was considered to be held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–2(a)(2)(ii) | (or is considered to have held by reason of the application of section 1223) | (or is considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–2(a)(3) | (or is considered to have held by reason of the application of section 1223) | (or is considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–2(c)(4) | (or is considered to have held by reason of the application of section 1223) | (or is considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–2(e)(1), introductory text | (or is considered to have held by reason of the application of section 1223) | (or is considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–2(e)(2) | (or is considered as held by reason of the application of section 1223) | (or is considered as held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–2(e)(3)(i) | (or is considered to have held by reason of the application of section 1223) | (or is considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–3(a)(1) | (or was considered to be held by reason of the application of section 1223) | (or was considered to be held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–3(c)(1)(ii) | (or was considered to have held by reason of the application of section 1223) | (or was considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–3(e)(2)(i) | (during the period such share, or block, was considered to be held by such person by reason of the application of section 1223) | (during the period such share, or block, was considered to be held by such person by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–3(e)(3) | (during the period such share, or block, was considered to be held by such person by reason of the application of section 1223) | (during the period such share, or block, was considered to be held by such person by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–3(e)(5) | (or another person who actually owned the stock during such taxable year and whose holding of the stock is attributed by reason of the application of section 1223 to the person who sold or exchanged the stock) | (or another person who actually owned the stock during such taxable year and whose holding of the stock is attributed by reason of the application of section 1223, taking into account §1.1248–8, to the person who sold or exchanged the stock) |

| Section | Remove | Add |
|---|---|---|
| §1.1248–3(e)(6), two places | by reason of the application of section 1223 to such person | by reason of the application of section 1223 to such person, taking into account §1.1248–8 |
| §1.1248–3(f)(2)(ii) | (or was considered to have held by reason of the application of section 1223) | (or was considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–3(f)(5)(ii) | (during the period such stock was considered to be held by such person by reason of the application of section 1223) | (during the period such stock was considered to be held by such person by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–3(f)(5)(iv) | (during the period such share (or block) was considered to be held by such person by reason of the application of section 1223) | (during the period such share (or block) was considered to be held by such person by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–7(b)(3)(i) | (or was considered to have held by reason of the application of section 1223) | (or was considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–7(b)(3)(iii) | (or is considered to have held by reason of the application of section 1223) | (or is considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |
| §1.1248–7(b)(4), introductory text | (or was considered to have held by reason of the application of section 1223) | (or was considered to have held by reason of the application of section 1223, taking into account §1.1248–8) |

Par. 6. Section 1.1248–8 is added to read as follows:

*§1.1248–8 Earnings and profits attributable to stock following certain non-recognition transactions.*

(a) *Scope.* This section sets forth rules for the attribution of earnings and profits for purposes of section 1248 and §1.1248–1(a)(1) and to supplement the rules in §§1.1248–2 and 1.1248–3 with respect to—

(1) *Stock that an exchanging shareholder receives, or an acquiring corporation receives, in restructuring transactions.* Except as otherwise provided in this paragraph (a), stock of a foreign corporation that an exchanging shareholder receives, or an acquiring corporation receives, pursuant to a restructuring transaction (as defined in paragraph (b)(1)(vii) of this section) in which the holding period of such stock is determined by application of section 1223(1) or 1223(2), whichever is appropriate. This section shall not apply to an exchange otherwise described in this paragraph (a)(1) if, as a result of the exchange, the exchanging shareholder is required to include in income as a deemed

dividend the section 1248 amount pursuant to §1.367(b)–4(b). See paragraphs (b)(2) and (3) of this section;

(2) *Nonexchanging shareholders.* Stock of a foreign corporation that participates in a restructuring transaction that is held by a non-exchanging shareholder (as defined in paragraph (b)(1)(vi) of this section) in the restructuring transaction. See paragraph (b)(4) of this section;

(3) *Application of section 381.* Stock of a foreign corporation that receives assets in a transfer to which section 361(a) applies in connection with a reorganization described in section 368(a)(1)(A), (C), (D), (F), or (G), or in a distribution to which section 332 applies, and to which section 381(c)(2)(A) and 1.381(c)(2)–1(a) apply. See paragraph (b)(6) of this section; or

(4) *Section 332 liquidations.* Stock of a foreign corporation that receives the assets and liabilities of a foreign corporation in a complete liquidation described in section 332 if the foreign distributee is a foreign corporate shareholder (as defined in paragraph (b)(1)(v) of this section) of the liquidating corporation. See paragraph (c) of this section.

(b) *Earnings and profits attributable to stock following a restructuring transaction—*(1) *Definitions.* The following definitions apply for purposes of this section:

(i) *Acquired corporation* is a corporation whose stock or assets are acquired in exchange for stock in (or stock in and other property of) either the acquiring corporation or a foreign corporation that controls, within the meaning of section 368(c), the acquiring corporation in a restructuring transaction.

(ii) *Acquiring corporation* is a corporation that acquires the stock or assets of an acquired corporation in a restructuring transaction.

(iii) *Controlled foreign corporation* is a corporation described in either section 953(c)(1)(B) or section 957.

(iv) *Exchanging shareholder* is a person that exchanges—

(A) In a restructuring transaction qualifying as a nonrecognition transaction within the meaning of section 7701(a)(45) and described in section 354, 356, or 361(a), stock in an acquired corporation for stock in either a foreign acquiring corporation or a foreign corporation that is in control, within the meaning of sec-

tion 368(c), of an acquiring corporation (whether domestic or foreign); or

(B) In a restructuring transaction qualifying as a nonrecognition transaction within the meaning of section 7701(a)(45) and described in section 351, property (including stock) for stock in a foreign acquiring corporation.

(v) *Foreign corporate shareholder* is a foreign corporation that—

(A) Owns stock of another foreign corporation; and

(B) Has a section 1248 shareholder that is also a section 1248 shareholder of the other foreign corporation.

(vi) *Non-exchanging shareholder* is, at the time the acquiring corporation participates in a restructuring transaction, either a section 1248 shareholder or a foreign corporate shareholder of the acquiring corporation that is not an exchanging shareholder with respect to that corporation.

(vii) *Restructuring transaction* is a transaction qualifying as a nonrecognition transaction within the meaning of section 7701(a)(45) and described in section 351, 354, 356, or 361.

(viii) *Section 1248 shareholder* is any United States person that satisfies the ownership requirements of section 1248(a)(2) and §1.1248–1(a)(2) with respect to a foreign corporation.

(2) *Earnings and profits attributable to stock that an exchanging shareholder receives in a restructuring transaction.* Where, in a restructuring transaction, an exchanging shareholder receives stock in a foreign corporation, the holding period of which is determined under section 1223(1), and the exchanging shareholder is either a section 1248 shareholder or a foreign corporate shareholder with respect to that foreign corporation immediately after the restructuring transaction, the earnings and profits attributable to the stock the exchanging shareholder receives shall be determined pursuant to the rules in paragraphs (b)(2)(i), (ii), and (iii) of this section.

(i) *Exchanging shareholder exchanges property that is not stock of a foreign acquired corporation with respect to which the exchanging shareholder is a section 1248 shareholder or a foreign corporate shareholder.* Where the exchanging shareholder exchanges in a restructuring transaction property that is not stock of a foreign acquired corporation with respect to

which the exchanging shareholder is a section 1248 shareholder or a foreign corporate shareholder immediately before such transaction, the earnings and profits attributable to the stock that the exchanging shareholder receives in the restructuring transaction shall be determined in accordance with §1.1248–2 or §1.1248–3, whichever is applicable, without regard to any portion of the section 1223(1) holding period in that stock that is prior to the restructuring transaction. See paragraph (b)(7) *Example 1* of this section.

(ii) *Exchanging shareholder exchanges stock of a foreign corporation with respect to which the exchanging shareholder is either a section 1248 shareholder or a foreign corporate shareholder.* Except as provided in paragraph (b)(2)(iii) of this section, where the exchanging shareholder exchanges in a restructuring transaction stock of a foreign acquired corporation with respect to which the exchanging shareholder is either a section 1248 shareholder or a foreign corporate shareholder immediately before such restructuring transaction, the earnings and profits attributable to the stock that the exchanging shareholder receives in the restructuring transaction shall be the sum of the earnings and profits attributable to—

(A) The stock of the foreign acquired corporation exchanged (determined in accordance with §1.1248–2 or §1.1248–3, whichever is applicable, and this section, if applicable) that was accumulated before the restructuring transaction; and

(B) The stock of the foreign corporation that the exchanging shareholder receives in the restructuring transaction (determined in accordance with §1.1248–2 or §1.1248–3, whichever is applicable, and this section, if applicable), without regard to any portion of the section 1223(1) holding period in that stock that is prior to the restructuring transaction. See paragraph (b)(7) *Example 2, Example 4,* and *Example 6* of this section.

(iii) *Exchanging shareholder receives stock in a foreign corporation that controls a domestic acquiring corporation.* Where the acquiring corporation is a domestic corporation and the exchanging shareholder receives in a restructuring transaction stock in a foreign corporation that controls (within the meaning of section 368(c)) the domestic acquiring corporation, the earnings and profits at-

tributable to the stock that the exchanging shareholder receives in the restructuring transaction shall consist solely of the amount of earnings and profits attributable to such stock (determined in accordance with §1.1248–2 or §1.1248–3, whichever is applicable, and this section, if applicable) without regard to any portion of the section 1223(1) holding period in that stock that is prior to the restructuring transaction. See paragraph (b)(7) *Example 5* of this section.

(3) *Earnings and profits attributable to stock in a foreign corporation certain acquiring corporations receive in a restructuring transaction.* Where an acquiring corporation receives, in a restructuring transaction, stock in a foreign acquired corporation, the holding period of which is determined under section 1223(2), and the acquiring corporation is either a section 1248 shareholder or a foreign corporate shareholder with respect to that foreign acquired corporation immediately after the restructuring transaction, the earnings and profits attributable to the foreign acquired corporation stock that the acquiring corporation receives shall be determined pursuant to the rules in paragraphs (b)(3)(i) and (ii) of this section.

(i) *Stock of a foreign corporation with respect to which the exchanging shareholder is neither a section 1248 shareholder nor a foreign corporate shareholder.* The earnings and profits attributable to the stock of the foreign acquired corporation that the acquiring corporation receives in a restructuring transaction where the exchanging shareholder is neither a section 1248 shareholder nor a foreign corporate shareholder with respect to that foreign acquired corporation immediately before the restructuring transaction shall be determined in accordance with §1.1248–2 or §1.1248–3, whichever is applicable, without regard to any portion of the section 1223(2) holding period in that stock that is prior to the restructuring transaction.

(ii) *Stock of a foreign corporation with respect to which the exchanging shareholder is either a section 1248 shareholder or a foreign corporate shareholder.* The earnings and profits attributable to the stock of a foreign acquired corporation that the acquiring corporation receives in the restructuring transaction where the exchanging shareholder is either a

section 1248 shareholder or a foreign corporate shareholder with respect to that foreign corporation immediately before the restructuring transaction shall be determined in accordance with §1.1248–2 or §1.1248–3, whichever is applicable, with regard to the portion of the section 1223(2) holding period of the stock that the exchanging shareholder took into account for purposes of attributing earnings and profits to that stock (determined in accordance with this section). See paragraph (b)(7) *Example 3*, *Example 5*, and *Example 7* of this section.

(4) *Earnings and profits attributable to stock held by a non-exchanging shareholder in a foreign acquiring corporation.* (i) Except to the extent paragraph (b)(4)(ii) of this section applies, the earnings and profits attributable to stock of a foreign acquiring corporation held by a non-exchanging shareholder immediately prior to a restructuring transaction continue to be attributed to such stock, and the earnings and profits of the acquired corporation accumulated prior to the restructuring transaction attributable to the stock of an acquired corporation are not attributed to the non-exchanging shareholder's stock in the foreign acquiring corporation. See §1.1248–2 or §1.1248–3 (whichever is applicable) and, as applicable, paragraph (b)(6) of this section; see also paragraph (b)(7) *Example 2* and *Example 4* of this section.

(ii) Where a non-exchanging shareholder holds stock in a foreign corporation that is also an exchanging shareholder and a foreign acquiring corporation in the same restructuring transaction—

(A) The earnings and profits attributable to such stock shall be the sum of the earnings and profits attributable to the stock of such foreign corporation immediately before the restructuring transaction (including amounts attributed under section 1248(c)(2)) and the earnings and profits attributable to the stock of the foreign acquiring corporation accumulated after the restructuring transaction (including amounts attributed under section 1248(c)(2)); and

(B) Paragraph (b)(6) of this section applies. See paragraph (b)(7) *Example 8* of this section.

(iii) Where the acquiring corporation is a foreign corporate shareholder with respect to stock of a foreign acquired cor-

poration, paragraph (b)(3) of this section shall not apply for purposes of determining the earnings and profits attributable to stock in the foreign acquiring corporation owned by a non-exchanging shareholder thereof (see section 1248(c)(2)). See paragraph (b)(7) *Example 6* of this section.

(5) *Reduction in earnings and profits attributable to stock to prevent multiple inclusions with respect to the same earnings and profits.* To the extent consistent with the principles of section 1248, adjustments to earnings and profits attributable to stock shall be made such that section 1223(1) and (2) and this section are applied in a manner that results in earnings and profits being taken into account only once. Thus, for example, when a controlled foreign corporation sells or exchanges all or part of the stock of another foreign corporation to which earnings and profits are attributable pursuant to this paragraph (b) or paragraph (c) of this section, proportionate reductions shall be made to the earnings and profits attributed to the stock of the selling foreign corporate shareholder owned by a section 1248 shareholder. See paragraph (b)(7) *Example 7* of this section.

(6) *Special rule regarding section 381.* Solely for purposes of determining the earnings and profits (or deficit in earnings and profits) attributable to stock pursuant to this paragraph (b), the earnings and profits of a corporation shall not include earnings and profits that are treated as received or incurred under section 381(c)(2)(A) and §1.381(c)(2)–1(a). See paragraph (b)(7) *Example 4* of this section.

(7) *Examples.* The application of this paragraph (b) is illustrated by the following examples. Unless otherwise indicated, in the following examples assume that—

(i) There is no immediate gain recognition pursuant to section 367(a)(1) and the regulations under that section (either through operation of the rules or because the appropriate parties have entered into a gain recognition agreement under §§1.367(a)–3(b) and 1.367(a)–8);

(ii) There is no income inclusion required pursuant to section 367(b) and the regulations under that section, and all reporting requirements in those regulations are complied with;

(iii) References to earnings and profits are to earnings and profits that would be includible in income as a dividend un-

der section 1248 and the regulations under that section if stock to which the earnings and profits are attributable were sold or exchanged by its shareholder;

(iv) Each corporation has only a single class of stock outstanding and uses the calendar year as its taxable year; and

(v) Each transaction is unrelated to all other transactions.

*Example 1. A section 351 exchange of property other than stock in a foreign corporation with respect to which the exchanging shareholder is either a section 1248 shareholder or a foreign corporate shareholder.* (i) *Facts.* DC1, a domestic corporation, has owned all the stock of CFC, a foreign corporation, since CFC's formation on January 1, year 3. On December 31, year 5, DC2, a domestic corporation unrelated to DC1, contributes property it has held since January 1, year 1, to CFC in exchange for voting stock of CFC in a restructuring transaction that is an exchange under section 351. The property that DC2 contributes is not stock in a foreign corporation with respect to which DC2 was either a section 1248 shareholder or a foreign corporate shareholder. DC2 receives 80% of the voting stock of CFC in the restructuring transaction and its holding period in that CFC stock, determined pursuant to section 1223(1), began on January 1, year 1. CFC has $100 of accumulated earnings and profits on December 31, year 5. On December 31, year 7, when the accumulated earnings and profits of CFC are $200, DC2, a section 1248 shareholder with respect to CFC, sells its CFC stock.

(ii) *Result.* Under paragraph (b)(2)(i) of this section, the earnings and profits attributable to the CFC stock sold by DC2 are $80. This amount consists of none of the $100 of earnings and profits accumulated by CFC before the restructuring transaction, and 80% of the $100 of earnings and profits of CFC accumulated after the restructuring transaction.

*Example 2. A section 351 exchange of controlled foreign corporation stock by a United States person for stock in a controlled foreign corporation in a restructuring transaction.* (i) *Facts.* The facts are the same as in *Example 1* except as follows. The property that DC2 contributes is 100% of the stock in CFC2, a foreign corporation. DC2 has owned all the stock of CFC2 since CFC2's formation on January 1, year 2, and CFC2 has $200 of earnings and profits as of December 31, year 5. CFC2 does not accumulate any additional earnings and profits from December 31, year 5, to December 31, year 7. On December 31, year 7, when the accumulated earnings and profits of CFC are $200, DC2, a section 1248 shareholder with respect to CFC, sells its CFC stock. Also on that date, DC1 sells its CFC stock.

(ii) *Result.* (A) *DC2 sale.* Pursuant to paragraph (b)(2)(ii) of this section, the earnings and profits attributable to the CFC stock sold by DC2 are $280. This amount consists of all of the $200 of earnings and profits of CFC2 accumulated before the restructuring transaction (see also section 1248(c)(2)), none of the $100 of earnings and profits accumulated by CFC before the restructuring transaction, and 80% of the $100 of earnings and profits of CFC accumulated after the restructuring transaction.

(B) *DC1 sale.* Pursuant to paragraph (b)(4) of this section, the earnings and profits attributable to

the CFC stock sold by DC1, a non-exchanging shareholder in the restructuring transaction, are $120. This amount consists of all of the $100 of earnings and profits of CFC accumulated before the restructuring transaction, none of the $200 of earnings and profits of CFC2 accumulated before the restructuring transaction, and 20% of the $100 of earnings and profits of CFC accumulated after the restructuring transaction.

*Example 3. A section 351 exchange of controlled foreign corporation stock by a United States person for stock in a domestic corporation in a restructuring transaction.* (i) *Facts.* DC1, a domestic corporation, has owned all of the stock of CFC, a foreign corporation, since CFC's formation on January 1, year 1. DC1 has also owned all the stock of DC2, a domestic corporation, since DC2's formation on January 1, year 1. On December 31, year 2, DC1 contributes the stock of CFC to DC2 in exchange for stock in DC2 in a restructuring transaction that is an exchange described in section 351. On December 31, year 2, CFC has $100 of accumulated earnings and profits. DC2 has a basis in the CFC stock determined under section 362, and is considered to have held the CFC stock since January 1, year 1, pursuant to section 1223(2). On December 31, year 4, when the accumulated earnings and profits of CFC are still $100, DC2 sells its CFC stock.

(ii) *Result.* Under paragraph (b)(3)(ii) of this section, $100 of accumulated earnings and profits of CFC is attributable to the stock of CFC sold by DC2, even though DC2 did not hold the stock of CFC during the time CFC accumulated the earnings and profits.

*Example 4. Acquisition of a controlled foreign corporation by a controlled foreign corporation in a reorganization described in section 368(a)(1)(C) (or section 368(a)(1)(B)).* (i) *Facts.* DC1, a domestic corporation, has owned all the stock of CFC1, a foreign corporation, since its formation on January 1, year 1. DC2, a domestic corporation unrelated to DC1, has owned all of the stock of CFC2, a foreign corporation, since its formation on January 1, year 2. On December 31, year 3, pursuant to a restructuring transaction that is a reorganization described in section 368(a)(1)(C), CFC1 transfers all of its assets to CFC2 in exchange for 25% of the voting stock of CFC2. CFC1 distributes the CFC2 stock to DC1 and the CFC1 stock is cancelled. DC1's holding period in the CFC2 stock, determined under section 1223(1), begins on January 1, year 1. On December 31, year 3, CFC1 has $100 of accumulated earnings and profits and CFC2 has $200 of accumulated earnings and profits. CFC2 succeeds to the $100 of CFC1 accumulated earnings and profits in the reorganization under section 381. From January 1, year 4 to December 31, year 5, CFC2 incurred a deficit in earnings and profits in the amount of ($200). On December 31, year 5, both DC1 and DC2 sell their stock in CFC2.

(ii) *Result.* (A) *DC1.* Pursuant to paragraph (b)(2)(ii) of this section, $50 of earnings and profits is attributable to the CFC2 stock sold by DC1. This amount consists of $100 of CFC1's earnings and profits accumulated before the restructuring transaction, reduced by 25% of CFC2's ($200) post-restructuring transaction deficit in earnings and profits. None of the $200 of CFC2's earnings and profits accumulated by CFC2 prior to the reorganization is attributed to the CFC2 stock sold by DC1. Also, none of the earnings and profits CFC2 suc-

ceeded to under section 381 is attributed to the CFC2 stock sold by DC1, pursuant to paragraph (b)(6) of this section.

(B) *DC2.* Pursuant to paragraph (b)(4) of this section, there is $50 of accumulated earnings and profits attributable to the CFC2 stock sold by DC2. This amount consists of all of the $200 of CFC2's earnings and profits accumulated by CFC2 prior to the reorganization, reduced by 75% of CFC2's deficit in earnings and profits in the amount of ($200) incurred after the restructuring transaction. None of the $100 of CFC1 accumulated earnings and profits succeeded to under section 381 is attributable to the CFC2 stock sold by DC2, pursuant to paragraph (b)(6) of this section.

(C) *Section 368(a)(1)(B) reorganization.* If, instead of DC1 acquiring its 25% interest in CFC2 pursuant to a reorganization described in section 368(a)(1)(C), DC1 had transferred the stock of CFC1 to CFC2 in exchange for 25% of the voting stock of CFC2 in a reorganization described in section 368(a)(1)(B), the results would be the same as described in paragraphs (ii)(A) and (B) of this *Example 4.*

*Example 5. Acquisition of the stock of a foreign corporation that controls a domestic acquiring corporation in a triangular reorganization described in section 368(a)(1)(C).* (i) *Facts.* DC1, a domestic corporation, has owned all the stock of CFC1, a foreign corporation, since its formation on January 1, year 1. CFC1 has owned all the stock of CFC2, a foreign corporation, since its formation on January 1, year 1. FC, a foreign corporation that is not a controlled foreign corporation, has owned all of the stock of DC2, a domestic corporation, since its formation on January 1, year 2. On December 31, year 3, pursuant to a restructuring transaction that was a triangular reorganization described in section 368(a)(1)(C), CFC1 transfers all of its assets, including the CFC2 stock, to DC2 in exchange for 60% of the voting stock of FC. CFC1 transfers the voting stock of FC to DC1 and the CFC1 stock is cancelled. Pursuant to section 1223(1), DC1 is considered to have held the stock of FC since January 1, year 1. Under section 1223(2), DC2 is considered to have held the stock of CFC2 since January 1, year 1. On December 31, year 3, CFC1 has $100 of earnings and profits, CFC2 has $300 of earnings and profits, and FC has $200 of earnings and profits. DC1 includes the $100 all earnings and profits amount attributable to its CFC1 stock in income as a deemed dividend under §1.367(b)–3 upon the exchange of CFC1 stock for FC stock. Pursuant to the lower-tier earnings exclusion of §1.367(b)–2(d)(3)(ii), that amount does not include the $300 of earnings and profits of CFC2. From January 1, year 4, until December 31, year 5, FC (now a controlled foreign corporation) accumulates an additional $50 of earnings and profits. From January 1, year 4 until December 31, year 5, CFC2 accumulates an additional $100 of earnings and profits. On December 31, year 5, DC1 sells its stock in FC and DC2 sells its stock in CFC2.

(ii) *Result.* (A) *DC1.* Pursuant to paragraph (b)(2)(iii) of this section, there is $30 of earnings and profits attributable to the stock of FC sold by DC1. This amount consists of 60% of the $50 of earnings and profits accumulated by FC after the restructuring transaction, and none of the earnings

and profits accumulated by CFC1, CFC2, or FC before the restructuring transaction.

(B) *DC2.* Pursuant to paragraph (b)(3)(ii) of this section, there is $400 of earnings and profits attributable to the stock of CFC2 sold by DC2. This amount consists of all of the earnings and profits accumulated by CFC2 during DC2's section 1223(2) holding period.

*Example 6. Acquisition of the stock of a foreign corporation that controls a foreign acquiring corporation in a reorganization described in section 368(a)(1)(C).* (i) *Facts.* DC1, a domestic corporation, has owned all the stock of CFC1, a foreign corporation, since its formation on January 1, year 1. CFC1 has owned all the stock of CFC2, a foreign corporation, since its formation on January 1, year 1. FC, a foreign corporation that is not a controlled foreign corporation, has owned all of the stock of FC2, a foreign corporation, since its formation on January 1, year 2. On December 31, year 3, pursuant to a restructuring transaction that was a triangular reorganization described in section 368(a)(1)(C), CFC1 transfers all of its assets, including the CFC2 stock, to FC2 in exchange for 60% of the voting stock of FC. CFC1 transfers the voting stock of FC to DC1 and the CFC1 stock is cancelled. Pursuant to section 1223(1), DC1 is considered to have held the stock of FC since January 1, year 1. Under section 1223(2), FC2 is considered to have held the stock of CFC2 since January 1, year 1. On December 31, year 3, CFC1 has $100 of earnings and profits, CFC2 has $300 of earnings and profits, FC has $200 of earnings and profits, and FC2 has no earnings and profits. From January 1, year 4, until December 31, year 5, FC (now a controlled foreign corporation) accumulates an additional $50 of earnings and profits. From January 1, year 4 until December 31, year 5, CFC2 accumulates an additional $100 of earnings and profits. FC2, a controlled foreign corporation after the restructuring transaction, accumulates $100 of earnings and profits from January 1, year 4, until December 31, year 5. On December 31, year 5, DC1 sells its stock in FC.

(ii) *Result.* Pursuant to paragraphs (b)(2)(ii) and (b)(4)(iii) of this section, there is $550 of earnings and profits attributable to the stock of FC sold by DC1. This amount consists of all $400 of the CFC1 and CFC2 earnings and profits accumulated before the restructuring transaction (see also section 1248(c)(2)), and 60% of the $250 of the earnings and profits accumulated by FC, FC2, and CFC2 after the restructuring transaction.

*Example 7. Acquisition of controlled foreign corporation stock by a controlled foreign corporation in a reorganization described in section 368(a)(1)(B), followed by a sale of the acquired stock by the acquiring controlled foreign corporation.* (i) *Facts.* DC1, a domestic corporation, has owned all of the outstanding stock of CFC1, a foreign corporation, since its formation on January 1, year 1. CFC1 has owned all of the outstanding stock of CFC3, a foreign corporation, since its formation on January 1, year 1. DC2, a domestic corporation unrelated to DC1, has owned all of the outstanding stock of CFC2, a foreign corporation, since its formation on January 1, year 2. On December 31, year 3, pursuant to a restructuring transaction that is a reorganization described in section 368(a)(1)(B), CFC1 transfers all of the stock of CFC3 to CFC2 in exchange for 40% of CFC2's stock. On December 31, year 3, CFC2 and CFC3 have, re-

spectively, $40 and $20 of earnings and profits. On December 31, year 5, when the accumulated earnings and profits of CFC3 are $50 ($20 of earnings and profits as of December 31, year 3, plus $30 of earnings and profits generated from January 1, year 4, through December 31, year 5), CFC2 sells the stock of CFC3 in a transaction to which section 964(e) applies.

(ii) *Result.* (A) *CFC2.* Pursuant to paragraph (b)(3)(ii) of this section, there is $50 of earnings and profits attributable to the CFC3 stock sold by CFC2. This amount consists of the accumulated earnings and profits attributable to CFC2's entire section 1223(2) holding period in the CFC3 stock.

(B) *CFC1, DC2, and DC1.* Under paragraph (b)(5) of this section, the earnings and profits attributable to the CFC2 stock held by CFC1 and DC2, and the earnings and profits attributable to the CFC1 stock held by DC1, will be reduced (regardless of whether CFC2 recognizes gain on its sale of CFC3 stock).

(*1*) *CFC1.* The earnings and profits attributable to the CFC2 stock held by CFC1 will be reduced by $32, or the amount of earnings and profits as of December 31, year 5, that would have been attributable to the CFC2 stock held by CFC1 pursuant to paragraph (b)(2)(ii) of this section. This amount consists of all of the $20 of earnings and profits accumulated by CFC3 before the restructuring transaction and 40% of the $30 of earnings and profits accumulated by CFC3 after the restructuring transaction (.40 X $30 = $12).

(*2*) *DC1.* The earnings and profits attributable to the CFC1 stock held by DC1 will also be reduced by $32, or the amount of earnings and profits that would have been attributable to the CFC1 stock held by DC1 as of December 31, year 5.

(*3*) *DC2.* The earnings and profits attributable to the CFC2 stock held by DC2 will be reduced by $18, or the amount of earnings and profits that would have been attributable to the CFC2 stock held by DC2 as of December 31, year 5, under paragraph (b)(4) of this section. This amount consists of 60% of the $30 (.60 X $30 = $18) of earnings and profits accumulated by CFC3 after the restructuring transaction.

(C) *Partial sale by CFC2.* If, instead of selling 100% of the CFC3 stock, on December 31, year 5, CFC2 sells only 50% of its CFC3 stock, paragraph (b)(5) of this section requires CFC1 to reduce the earnings and profits of CFC3 attributable to its CFC2 stock to $16. Similarly, DC1 would be required to reduce the earnings and profits of CFC3 attributable to its CFC1 stock by $16. Paragraph (b)(5) of this section also requires DC2 to reduce the CFC3 earnings and profits attributable to its CFC2 stock by $9. These reductions occur without regard to whether CFC2 recognizes gain on its sale of CFC3 stock.

*Example 8.  Acquisition of the assets of a lower-tier controlled foreign corporation by an upper-tier controlled foreign corporation in a restructuring transaction described in section 368(a)(1)(C).* (i) *Facts.* DC, a domestic corporation, has owned all the stock of CFC1, a controlled foreign corporation, since its formation on January 1, year 1. CFC1 is a holding company that has owned 79% of the stock of CFC2, a controlled foreign corporation, since its formation on January 1, year 1. The other 21% of CFC2 stock is owned by X, an unrelated party. On December 31, year 1, CFC2 has $200 of earnings and profits. On December 31, year 1, CFC1 has

no accumulated earnings and profits. On December 31, year 1, pursuant to a restructuring transaction described in section 368(a)(1)(C), CFC2 transfers all its properties to CFC1. In exchange, CFC1 assumes the liabilities of CFC2 and transfers to CFC2 voting stock representing 21% of the stock of CFC1. CFC2 distributes the voting stock to X and liquidates. The liabilities assumed do not exceed 20% of the value of the properties of CFC2. From January 1, year 2, to December 31, year 3, CFC1 accumulates $100 of earnings and profits. On December 31, year 3, DC sells its CFC1 stock.

(ii) *Result.* Pursuant to paragraph (b)(4)(ii) of this section, there is $237 of earnings and profits attributable to DC's CFC1 stock. This amount consists of 79% of CFC2's $200 of earnings and profits accumulated before the restructuring transaction (see section 1248(c)(2)), and 79% of CFC1's $100 of earnings and profits accumulated after the restructuring transaction. Pursuant to paragraph (b)(6) of this section, none of CFC2's $200 of earnings and profits to which CFC1 succeeded under section 381 would be attributable to DC's CFC1 stock.

(c) *Earnings and profits attributable to stock of a foreign distributee corporation that is a foreign corporate shareholder with respect to a foreign liquidating corporation*—(1) *General rule.* If a foreign corporation (liquidating corporation) makes a distribution of property in complete liquidation under section 332 to a foreign corporation (distributee), and immediately before the liquidation the distributee was a foreign corporate shareholder with respect to the liquidating foreign corporation, the amount of earnings and profits attributable to the distributee stock upon its subsequent sale or exchange will be determined under this paragraph (c)(1). The earnings and profits attributable will be the sum of the earnings and profits attributable to the stock of the distributee immediately before the liquidation (including amounts attributed under section 1248(c)(2)) and the earnings and profits attributable to the stock of the distributee accumulated after the liquidation (including amounts attributed under section 1248(c)(2)).

(2) *Special rule regarding section 381.* Solely for purposes of determining the earnings and profits (or deficit in earnings and profits) attributable to stock under this paragraph (c), the attributed earnings and profits of a corporation shall not include earnings and profits that are treated as received or incurred pursuant to section 381(c)(2)(A) and §1.381(c)(2)–1(a).

(3) *Example.* (i) *Facts.* DC, a domestic corporation, has owned all of the stock of CFC1, a foreign corporation, since its formation on January 1, year 1. CFC1 is an operating company that has owned all of the stock of CFC2, a foreign corporation, since its for-

mation on January 1, year 1. On December 31, year 2, CFC1 has $200 of accumulated earnings and profits and CFC2 has a ($200) deficit in earnings and profits. On December 31, year 2, CFC2 distributes all of its assets and liabilities to CFC1 in a liquidation to which section 332 applies. From January 1, year 3, until December 31, year 4, CFC1 accumulates no additional earnings and profits. On December 31, year 4, DC sells its stock in CFC1.

(ii) *Result.* Pursuant to paragraph (c)(1) of this section, there are no earnings and profits attributable to DC's CFC1 stock. This amount consists of the sum of the earnings and profits attributable to the CFC1 stock immediately before the liquidation (100% of the $200 accumulated earnings and profits of CFC1 and 100% of CFC2's ($200) deficit in earnings and profits) and the amount of earnings and profits accumulated after the section 332 liquidation (see also section 1248(c)(2)).

(d) *Effective/applicability date.* This section applies to income inclusions that occur on or after July 30, 2007.

Kevin M. Brown,
*Deputy Commissioner for
Services and Enforcement.*

Approved July 16, 2007.

Eric Solomon,
*Assistant Secretary of
the Treasury (Tax Policy).*

(Filed by the Office of the Federal Register on July 27, 2007, 8:45 a.m., and published in the issue of the Federal Register for July 30, 2007, 72 F.R. 41442)

---

# Section 1274.—Determination of Issue Price in the Case of Certain Debt Instruments Issued for Property

*(Also Sections 42, 280G, 382, 412, 467, 468, 482, 483, 642, 807, 846, 1288, 7520, 7872.)*

**Federal rates; adjusted federal rates; adjusted federal long-term rate and the long-term exempt rate.** For purposes of sections 382, 642, 1274, 1288, and other sections of the Code, tables set forth the rates for September 2007.

## Rev. Rul. 2007–57

This revenue ruling provides various prescribed rates for federal income tax purposes for September 2007 (the current month). Table 1 contains the short-term, mid-term, and long-term applicable federal rates (AFR) for the current month for purposes of section 1274(d) of the Internal Revenue Code. Table 2 contains the short-term, mid-term, and long-term

adjusted applicable federal rates (adjusted AFR) for the current month for purposes of section 1288(b). Table 3 sets forth the adjusted federal long-term rate and the long-term tax-exempt rate described in section 382(f). Table 4 contains the appropriate percentages for determining the low-income housing credit described in section 42(b)(2) for buildings placed in service during the current month. Finally, Table 5 contains the federal rate for determining the present value of an annuity, an interest for life or for a term of years, or a remainder or a reversionary interest for purposes of section 7520.

| REV. RUL. 2007–57 TABLE 1 | | | |
|---|---|---|---|
| Applicable Federal Rates (AFR) for September 2007 | | | |
| *Period for Compounding* | | | |
| *Annual* | *Semiannual* | *Quarterly* | *Monthly* |
| *Short-term* | | | |
| AFR        4.82% | 4.76% | 4.73% | 4.71% |
| 110% AFR   5.31% | 5.24% | 5.21% | 5.18% |
| 120% AFR   5.79% | 5.71% | 5.67% | 5.64% |
| 130% AFR   6.29% | 6.19% | 6.14% | 6.11% |
| *Mid-term* | | | |
| AFR        4.79% | 4.73% | 4.70% | 4.68% |
| 110% AFR   5.27% | 5.20% | 5.17% | 5.14% |
| 120% AFR   5.76% | 5.68% | 5.64% | 5.61% |
| 130% AFR   6.24% | 6.15% | 6.10% | 6.07% |
| 150% AFR   7.23% | 7.10% | 7.04% | 7.00% |
| 175% AFR   8.45% | 8.28% | 8.20% | 8.14% |
| *Long-term* | | | |
| AFR        5.09% | 5.03% | 5.00% | 4.98% |
| 110% AFR   5.61% | 5.53% | 5.49% | 5.47% |
| 120% AFR   6.13% | 6.04% | 6.00% | 5.97% |
| 130% AFR   6.65% | 6.54% | 6.49% | 6.45% |

| REV. RUL. 2007–57 TABLE 2 | | | |
|---|---|---|---|
| Adjusted AFR for September 2007 | | | |
| *Period for Compounding* | | | |
| *Annual* | *Semiannual* | *Quarterly* | *Monthly* |
| Short-term adjusted AFR | 3.65% | 3.62% | 3.60% | 3.59% |
| Mid-term adjusted AFR | 3.92% | 3.88% | 3.86% | 3.85% |
| Long-term adjusted AFR | 4.44% | 4.39% | 4.37% | 4.35% |

| REV. RUL. 2007–57 TABLE 3 | |
|---|---|
| Rates Under Section 382 for September 2007 | |
| Adjusted federal long-term rate for the current month | 4.44% |
| Long-term tax-exempt rate for ownership changes during the current month (the highest of the adjusted federal long-term rates for the current month and the prior two months.) | 4.50% |

| REV. RUL. 2007–57 TABLE 4 | |
|---|---|
| Appropriate Percentages Under Section 42(b)(2) for September 2007 | |
| Appropriate percentage for the 70% present value low-income housing credit | 8.15% |
| Appropriate percentage for the 30% present value low-income housing credit | 3.49% |

| REV. RUL. 2007–57 TABLE 5 | |
|---|---|
| Rate Under Section 7520 for September 2007 | |
| Applicable federal rate for determining the present value of an annuity, an interest for life or a term of years, or a remainder or reversionary interest | 5.8% |

## Section 1288.—Treatment of Original Issue Discount on Tax-Exempt Obligations

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

## Section 1502.—Regulations

*26 CFR 1.1502–77: Agent for the group.*

## T.D. 9343

## DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## 26 CFR Part 1

## Agent for a Consolidated Group With Foreign Common Parent

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final regulations and removal of temporary regulations.

SUMMARY: This document contains final regulations under section 1502 that provide the Internal Revenue Service with the authority to designate a domestic member of the consolidated group as a substitute agent to act as the sole agent for the group where a foreign entity is the group's common parent. The final regulations are necessary to clarify and explain the rules governing the designation of an agent for the members of a consolidated group. The regulations affect corporations that join in the filing of a consolidated Federal income tax return where the common parent of the consolidated group is a foreign entity that is treated as a domestic corporation pursuant to section 7874(b) of the Internal Revenue Code (Code) or as the result of a section 953(d) election.

DATES: *Effective Date:* These regulations are effective July 23, 2007.

*Applicability Date:* For dates of applicability, see §1.1502–77(h)(3).

FOR FURTHER INFORMATION CONTACT: Stephen R. Cleary, (202) 622–7750, (not a toll-free number).

SUPPLEMENTARY INFORMATION:

### Background

On March 14, 2006, the IRS and Treasury Department published temporary regulations (T.D. 9255, 2006–1 C.B. 741) in the **Federal Register** (71 FR 13001) providing the IRS the authority to designate a domestic member of a consolidated group to be the sole agent for the group where the common parent of the group is a foreign entity. A notice of proposed rulemaking (REG–164247–05, 2006–1 C.B. 758) cross-referencing the temporary regulations was published in the **Federal Register** for the same day (71 FR 13062). The temporary regulations provide procedures for the IRS's designation of a "domestic substitute agent" and define the term of that substitute agent's agency.

### Explanation of Provisions and Summary of Comments

No comments were received responding to the notice of proposed rulemaking, and no public hearing was requested or held. The proposed regulations are adopted as amended by this Treasury decision and the corresponding temporary regulations are removed. The temporary regulations, as contained in the 26 CFR part 1 edition revised as of April 1, 2007, remain in effect for certain taxable years as provided by §1.1502–77(h)(3)(ii) of these final regulations.

These final regulations clarify the term of the domestic substitute agent's agency by specifying that once appointed for one or more taxable years of the group, unless the designation is expressly limited to such term, the domestic substitute agent will continue to be the agent for subsequent taxable years of the group until certain specified events occur. These final regulations also specify that, if the domestic substitute agent is the group's agent for a taxable year, it will generally continue to serve as the agent for that year until the domestic substitute agent's existence terminates. Finally, these final regulations clarify that if a group with a domestic substitute agent continues in existence with a new common parent that is a domestic corporation (without regard to section 7874 or a section 953(d) election) during a consolidated return year, the domestic substitute agent is the agent of the group for the year through the date of the transaction in which the new common parent becomes the common parent, and thereafter the new common parent becomes the agent of the group for the entire taxable year.

Additionally, these regulations indicate that §1.1502–77(e)(1) is also applicable for purposes of determining whether a domestic substitute agent's existence has terminated.

**Special Analyses**

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. Pursuant to 5 U.S.C. 553(d)(3) it has been determined that a delayed effective date is unnecessary because this rule finalizes currently effective temporary rules regarding the designation of a domestic substitute agent without substantive change. It is hereby certified that these regulations will not have a significant economic impact on a substantial number of small entities. This certification is based on the fact that these regulations will primarily affect affiliated groups of corporations that have elected to file consolidated returns, which tend to be larger businesses. Therefore, a regulatory flexibility analysis is not required. Pursuant to section 7805(f) of the Internal Revenue Code, the notice of proposed rulemaking preceding these final regulations was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

**Drafting Information**

The principal author of these regulations is Stephen R. Cleary of the Office of Associate Chief Counsel (Corporate). Other personnel from the Treasury Department and the IRS participated in their development.

* * * * *

**Adoption of Amendments to the Regulations**

Accordingly, 26 CFR part 1 is amended as follows:

PART 1—INCOME TAXES

Paragraph 1. The authority citation for part 1 is amended by removing the entry for §1.1502–77T to read as follows:

Authority: 26 U.S.C. 7805 * * *

Par. 2. Section 1.1502–77 is amended by:

1. Revising paragraph (e)(1).

2. Adding paragraph (h)(3).

3. Revising paragraph (j).

The additions and revisions read as follows:

§1.1502–77 Agent for the group.

* * * * *

(e) *Termination of a corporation's existence*—(1) *In general.* For purposes of paragraphs (a)(1)(v), (a)(4)(i), (d), and (j) of this section, the existence of a corporation is deemed to terminate if—

(i) Its existence terminates under applicable law; or

(ii) Except as provided in paragraph (e)(3) of this section, it becomes, for Federal tax purposes, either—

(A) an entity that is disregarded as an entity separate from its owner; or

(B) an entity that is reclassified as a partnership. * * *

* * * * *

(h) * * *

(3) *Designation of a domestic substitute agent*—(i) *In general.* The provisions of paragraphs (e)(1) and (j) of this section apply to taxable years for which the consolidated Federal income tax return is due (without extensions) after July 23, 2007.

(ii) *Prior law.* For taxable years for which the consolidated Federal income tax return is due (without extensions) on or before July 23, 2007, see §1.1502–77(e)(1) as contained in the 26 CFR part 1 edition revised as of April 1, 2007. For taxable years for which the consolidated Federal income tax return is due (without extensions) after March 14, 2006, and on or before July 23, 2007, see §1.1502–77T as contained in the 26 CFR part 1 edition revised as of April 1, 2007.

* * * * *

(j) *Designation by Commissioner if common parent is treated as a domestic corporation under section 7874 or section 953(d)*—(1) *In general.* If the common parent is an entity created or organized under the law of a foreign country and is treated as a domestic corporation by reason of section 7874 (or regulations under that section) or a section 953(d) election (a foreign common parent), the Commissioner may at any time, with or without a request from any member of the group to act as the agent for the group (a domestic substitute agent) for any taxable year for which the consolidated Federal income tax return is due (without extensions) after July 23, 2007, and the foreign common parent would otherwise be the agent for the group. For each such year, the domestic substitute agent will be the sole agent for the group even though the foreign common parent remains in existence. The foreign common parent ceases to be the agent for the group when the Commissioner's designation of a domestic substitute agent becomes effective. The Commissioner may designate a domestic substitute agent for the term of a single taxable year, multiple years, or on a continuing basis.

(2) *Domestic substitute agent.* The domestic substitute agent, by designation or by succession, shall be a domestic corporation described in paragraph (d)(1)(i)(A) of this section (determined without regard to section 7874, a section 953(d) election or section 1504(d)).

(3) *Designation by the Commissioner.* The Commissioner will notify the domestic substitute agent in writing by mail or faxed transmission of the designation. The domestic substitute agent's designation is effective on the earliest of the 14th day following the date of a mailing, the 4th day following a faxed transmission, or the date the Commissioner receives written confirmation of the designation by a duly authorized officer of the domestic substitute agent (within the meaning of section 6062). The domestic substitute agent must give notice of its designation to the foreign common parent and each corporation that was a member of the group during any part of any consolidated return year for which the domestic substitute agent will be the agent. A failure of the domestic substitute agent to notify the foreign common parent or any member of the group does not invalidate the designation. The Commissioner will send a copy of the notification to the foreign common parent, and if applicable, to any domestic substitute agent the designation replaces; a failure to send a copy of the notification does not invalidate the designation.

(4) *Term of agency*—(i) *Taxable years for which domestic substitute agent is the agent.* If the Commissioner designates a domestic substitute agent for one or more taxable years, unless the designation is expressly limited to such term, such domestic substitute agent will continue as the group's sole agent for subsequent taxable years until the domestic substitute agent ceases to be a member of the continuing group, is replaced by a new domes-

tic common parent (as provided in paragraph (j)(4)(iv)(A) of this section), is replaced by the Commissioner, or is replaced by a default substitute agent (as provided in paragraph (j)(5)(ii) of this section). If during the course of a consolidated return year the domestic substitute agent ceases to be a member of the continuing group or is replaced, it shall no longer act as agent for such taxable year or subsequent taxable years in any matter.

(ii) *Continuing agency for prior taxable years.* Unless replaced by a default substitute agent (as provided in paragraph (j)(5)(ii) of this section) or by the Commissioner, the domestic substitute agent at the end of a taxable year of the group will remain the agent for such year until its existence terminates, even if the group subsequently ceases to exist or the domestic substitute agent subsequently ceases to be a member of the group.

(iii) *Replacement of a §1.1502– 77(d)(1) agent.* If, pursuant to paragraph (d)(1) of this section, the common parent of the group designates a foreign common parent as the agent for the group for any taxable year, the Commissioner may, at any time, designate a domestic substitute agent to replace the foreign common parent, even if the Commissioner approved the terminating common parent's designation.

(iv) *Group continues with a new common parent*—(A) *Year the new common parent becomes the common parent.* If the group has a domestic substitute agent and the group continues in existence with a new common parent during a consolidated return year, and such new common parent is a domestic corporation (determined without regard to section 7874 or a section 953(d) election), the domestic substitute agent at the beginning of the year is the agent for the group through the date of the transaction in which the new common parent becomes the common parent, and the new common parent becomes the agent for the group beginning the day after the transaction, at which time it becomes the agent for the group with respect to the entire consolidated return year (including the period through the date of the transaction) and the former domestic substitute agent will no longer be the agent for the group for that year.

(B) *Years preceding the year the new common parent becomes the common*

*parent.* If after the Commissioner's designation of a domestic substitute agent the group remains in existence with a new common parent, and such new common parent is a domestic corporation (determined without regard to section 7874 or a section 953(d) election), the Commissioner may designate the new common parent as the sole agent for the group for any of the group's prior taxable years (for which the consolidated Federal income tax return is due (without extensions) after July 23, 2007) in which the new common parent was a member of the group. For this purpose, the new common parent is treated as having been a member of the group for any taxable year it is primarily liable for the group's income tax liability.

(v) *Replacement of domestic substitute agent by the Commissioner.* The Commissioner may at any time, with or without a request from any member of the group, designate a replacement for a domestic substitute agent (or a successor to such agent).

(5) *Deemed §1.1502–77(d) designation*—(i) *In general.* If the Commissioner designates a domestic substitute agent under this paragraph (j), it will be treated as a designation of a substitute agent under paragraph (d) of this section.

(ii) *Default substitute agent.* If the domestic substitute agent's existence terminates and it has a single successor that is a domestic corporation (without regard to section 269B) that is eligible to be a domestic substitute agent, such successor becomes the domestic substitute agent and is treated as a default substitute agent under paragraph (d)(2) of this section. See paragraph (d)(4) of this section regarding the consequences of the successor's failure to notify the Commissioner of its status as a default substitute agent. The default substitute agent shall use procedures in section 9 of Rev. Proc. 2002–43, 2002–2 C.B. 99, or a corresponding provision of a successor revenue procedure for notification. (See §601.601(d)(2)(ii)(*b*) of this chapter.)

(6) *Request that IRS designate a domestic substitute agent*—(i) *Original designation.* If the common parent of the group is a foreign common parent, and the IRS has not designated a domestic substitute agent, one or more members of the group may request the IRS to make a designation for taxable years for which the consolidated Federal income tax return is due (without

extensions) after July 23, 2007. Such request is deemed to be a request under paragraph (d)(3)(i) of this section. Members of the group shall use the procedures in section 10 of Rev. Proc. 2002–43, 2002–2 C.B. 99, or a corresponding provision of a successor revenue procedure for this purpose. (See §601.601(d)(2)(ii)(*b*) of this chapter.)

(ii) *Request that IRS replace a previously designated substitute agent.* If the IRS designates a domestic substitute agent pursuant to this paragraph (j), one or more members of the group may request that the IRS replace the designated domestic substitute agent with another member (or successor to another member). Such a request is deemed to be a request pursuant to paragraph (d)(3)(ii) of this section. Members of the group shall use the procedures in section 11 of Rev. Proc. 2002–43, 2002–2 C.B. 99, or a corresponding provision of a successor revenue procedure for this purpose. (See §601.601(d)(2)(ii)(*b*) of this chapter.)

**§1.1502–77T [Removed]**

Par. 3. Section 1.1502–77T is removed.

Kevin M. Brown,
*Deputy Commissioner for Services and Enforcement.*

Approved July 16, 2007.

Eric Solomon,
*Assistant Secretary of the Treasury (Tax Policy).*

(Filed by the Office of the Federal Register on July 20, 2007, 8:45 a.m., and published in the issue of the Federal Register for July 23, 2007, 72 F.R. 40066)

# Section 7425.—Discharge of Liens

*26 CFR 301.7425–3: Discharge of liens; special rules.*

# T.D. 9344

# DEPARTMENT OF THE TREASURY
Internal Revenue Service
26 CFR Part 301

# Change to Office to Which Notices of Nonjudicial Sale

## and Requests for Return of Wrongfully Levied Property Must Be Sent

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Final and temporary regulations.

SUMMARY: This document contains final and temporary regulations relating to the discharge of liens under section 7425 and return of wrongfully levied upon property under section 6343 of the Internal Revenue Code (Code) of 1986. These temporary regulations clarify that such notices and claims should be sent to the IRS official and office specified in the relevant IRS publications. The temporary regulations will affect parties seeking to provide the IRS with notice of a nonjudicial foreclosure sale and parties making administrative requests for return of wrongfully levied property. The text of the temporary regulations also serves as the text of the proposed regulation (REG–148951–05) set forth in the notice of proposed rulemaking on this subject in this issue of the Bulletin.

DATES: *Effective/applicability Date:* These regulations are effective **August 20, 2007**.

FOR FURTHER INFORMATION CONTACT: Robin M. Ferguson, (202) 622–3630 (not a toll-free call).

SUPPLEMENTARY INFORMATION:

### Background

This document contains amendments to the Procedure and Administration Regulations (26 CFR part 301) relating to the giving of notice of nonjudicial sales under section 7425(b) of the Code. Final regulations (T.D. 7430, 1976–2 C.B. 314) were published on August 20, 1976, in the **Federal Register** (41 FR 35174). This document also contains amendments to the Procedure and Administration Regulations relating to requests for return of wrongfully levied property under section 6343(b) of the Code. Final regulations (T.D. 8587, 1995–1 C.B. 207) were published on January 3, 1995, in the **Federal Register** (60 FR 33).

For notices of nonjudicial foreclosure sale under Section 7425(b) and requests for return of property wrongfully levied upon under Section 6343(b), the existing regulations direct the notices and requests to be sent to the "district director (marked for the attention of the Chief, Special Procedures Staff)." The offices of the district director and Special Procedures were eliminated by the IRS reorganization implemented pursuant to the IRS Restructuring and Reform Act of 1998, Public Law 105–206 (RRA 1998), creating uncertainty as to the timeliness of notices and requests under these provisions.

### Explanation of Provisions

Section 7425(b) provides for the discharge of a junior federal tax lien by a nonjudicial sale, if proper notice is provided to the IRS. Treas. Reg. §301.7425–2(a). Notice of a nonjudicial sale is required if notice of the federal tax lien has been properly filed more than 30 days before the nonjudicial sale. Section 7425(b)(1). A party holding a nonjudicial sale must provide written notification to the IRS at least 25 days prior to the scheduled sale of the property or the federal tax lien remains on the property after the sale. Section 7425(c)(1). When the notice is properly sent, and the federal tax lien discharged, the IRS may redeem the property within 120 days from the date of sale or any longer period allowed under state law. Section 7425(d). If the notice is not properly sent, the nonjudicial sale is made subject to and without disturbing the federal tax lien. Section 7425(b); Treas. Reg. §301.7425–2(a); *Tompkins v. United States*, 946 F.2d 817, 820 (11th Cir. 1991); *Simon v. United States*, 756 F.2d 696, 697–98 (9th Cir. 1985).

Treas. Reg. §301.7425–3(a)(1) specifies that notice "shall be given, in writing by registered or certified mail or by personal service … to the district director (marked for the attention of the chief, special procedures staff) for the Internal Revenue district in which the sale is to be conducted." The regulation further provides that such notice of sale is not effective if given to a district director other than the district director for the Internal Revenue district in which the sale is to be conducted.

In light of the IRS reorganization subsequent to RRA 1998, the district and special procedures offices referenced in the regulations no longer exist. Notices of sale, if addressed to an office other than that stated in the regulation, may be misdirected. As a result, the IRS office responsible for evaluating notices of nonjudicial sale may not receive notice of the sale and the IRS may not have the opportunity to timely redeem. In *Glasgow Realty, LLC v. Withington*, 345 F.Supp. 2d 1025 (E.D. Mo. 2004), the court held that the federal tax lien was discharged by a nonjudicial sale under section 7425(b) where the notice of sale was addressed to a local IRS taxpayer assistance center rather than the district director's office. *Glasgow Realty* demonstrates the confusion that resulted from attempts to comply with the current regulation in light of the IRS reorganization. An amendment is necessary to both assist the public so as to prevent further confusion on where to send notices of nonjudicial foreclosure sales, and to prevent the possible loss of proceeds that the IRS could acquire from redemptions if the proper office has timely notice of the sale.

Similar problems arise with respect to requests for return of wrongfully levied property under section 6343(b). Requests for the return of the amount of money levied upon or received from the sale of property must be filed within nine months from the date of the levy. Treas. Reg. §301.6343–2(a)(2). The nine month period for filing a wrongful levy suit is extended by the filing of a timely administrative claim. Section 6532(c).

As is the case with notices of nonjudicial sale, the regulations specify that the request for return of wrongfully levied property be addressed to the district director (marked for the attention of the Chief, Special Procedures Staff) for the Internal Revenue district in which the levy is made. Treas. Reg. §301.6343–2(b). The elimination of these offices by the IRS reorganization can similarly result in misdirected requests. An amendment is necessary to assist the public in filing timely requests with the proper office.

In order to account for the IRS's current organizational structure and to allow for future reorganizations of the IRS, the temporary regulations remove the title "district director" throughout Treas. Reg. §§301.7425–3 and 301.6343–2. The title is not replaced with any specific official or office. Instead, the public is directed

to refer to the current relevant IRS publications or their successor publications for where to send notices or claims. The temporary regulations provide the web address for the IRS Internet site which may be used to obtain copies of IRS publications. The current publications for nonjudicial foreclosure sales are IRS Publication 786, "*Instructions for Preparing a Notice of Nonjudicial Sale of Property and Application for Consent to Sale,*" and IRS Publication 4235, "*Technical Services (Advisory) Group Addresses*." According to Publication 786, the application or notice should be addressed to the Technical Services Group Manager for the area in which the notice of federal tax lien was filed. Publication 786 then instructs the reader to use Publication 4235 to determine where to mail the request. Publication 4235 lists the addresses for the Technical Services offices. The current publication for requests for return of wrongfully levied property is IRS Publication 4528, "*Making an Administrative Wrongful Levy Claim Under Internal Revenue Code (IRC) Section 6343(b).*" According to Publication 4528, the claim should be marked for the attention of the Advisory Territory Manager for the area where the taxpayer whose tax liability was the basis for the levy or seizure resides. Publication 4528 then instructs the reader to use Publication 4235 to locate the mailing address for the appropriate Advisory Territory Manager.

**Effective Date**

These temporary regulations apply to any notice of sale filed or request for return of property made after **August 20, 2007**.

**Special Analyses**

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. For applicability of the Regulatory Flexibility Act, please refer to the cross-reference notice of proposed rulemaking published elsewhere in this Bulletin. Pursuant to section 7805(f) of the Internal Revenue Code, these regulations have been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

**Drafting Information**

The principal author of these regulations is Robin M. Ferguson, Office of Associate Chief Counsel, Procedure and Administration Division.

\* \* \* \* \*

**Amendments to the Regulations**

Accordingly, 26 CFR part 301 is amended as follows:

PART 301—PROCEDURE AND ADMINISTRATION

Paragraph 1. The authority citation for part 301 continues to read in part as follows:

Authority: 26 U.S.C. 7805 * * *

Par. 2. Section 301.6343–2 is amended as follows:

1. Paragraphs (a)(1) introductory text and (b) introductory text are revised.

2. Paragraphs (a)(4), (c), (d)(1), and (d)(2) are amended by removing the language "director" and adding the language "IRS" in its place wherever it appears.

3. Paragraph (b)(4), is amended by removing the language "Internal Revenue district" and adding the language "IRS office" in its place.

4. Paragraph (e) is revised.

The revisions and addition read as follows:

*§301.6343–2 Return of wrongfully levied upon property.*

(a) * * * (1) [Reserved]. For further guidance, see §301.6343–2T(a) introductory text.

\* \* \* \* \*

(b) [Reserved]. For further guidance, see §301.6343–2T(b) introductory text.

\* \* \* \* \*

(e) [Reserved]. For further guidance, see §301.6343–2T(e).

Par. 3. Section 301.6343–2T is added to read as follows:

*§301.6343–2T Return of wrongfully levied upon property.*

(a) *Return of property*— (1) *General rule.* If the Internal Revenue Service (IRS) determines that property has been wrongfully levied upon, the IRS may return—

(a)(1)(i) through (a)(4) [Reserved]. For further guidance, see §301.6343–2(a)(1)(i) through (a)(4).

(b) *Request for return of property.* A written request for the return of property wrongfully levied upon must be given to the IRS official, office and address specified in IRS Publication 4528, "*Making an Administrative Wrongful Levy Claim Under Internal Revenue Code (IRC) Section 6343(b),*" or its successor publication. The relevant IRS publications may be downloaded from the IRS internet site at *www.irs.gov*. Under this section, a request for the return of property wrongfully levied upon is not effective if it is given to an office other than the office listed in the relevant publication. The written request must contain the following information—

(b)(1) through (d)(2) [Reserved]. For further guidance, see §301.6343–2(b)(1) through (d)(2).

(e) *Effective/applicability date.* This section applies to any request for return of wrongfully levied property that is filed after **August 20, 2007**.

Par. 4. Section 301.7425–3 is amended as follows:

1. Paragraphs (a)(1), (b)(1), (b)(2), (c)(1), (d)(2), (d)(3), and (d)(4) are revised.

2. Paragraphs (a)(2)(i), (a)(2)(ii)(C), and (a)(2)(iii) *Examples 1, 2,* and *3* are amended by removing the language "district director" and adding the language "IRS" in its place wherever it appears.

3. Paragraph (d)(1)(ii)(A) is amended by removing the language "internal revenue district" and adding the language "IRS office" in its place.

4. Paragraph (e) is added.

The revisions and addition read as follows:

*§301.7425–3 Discharge of liens; special rules.*

(a) * * * (1) [Reserved]. For further guidance, see §301.7425–3T(a)(1).

\* \* \* \* \*

(b) * * * (1) [Reserved]. For further guidance, see §301.7425–3T(b)(1).

\* \* \* \* \*

(2) [Reserved]. For further guidance, see §301.7425–3T(b)(2).

(c) * * * (1) [Reserved]. For further guidance, see §301.7425–3T(c)(1).

* * * * *

(d) * * *

(2) [Reserved]. For further guidance, see §301.7425–3T(d)(2).

(3) [Reserved]. For further guidance, see §301.7425–3T(d)(3).

(4) [Reserved]. For further guidance, see §301.7425–3T(d)(4).

(e) [Reserved]. For further guidance, see §301.7425–3T(e).

Par. 5. Section 301.7425–3T is added to read as follows:

§301.7425–3T Discharge of liens; special rules.

(a) Notice of sale requirements—(1) In general. Except in the case of the sale of perishable goods described in paragraph (c) of this section, a notice (as described in paragraph (d) of this section) of a nonjudicial sale shall be given, in writing by registered or certified mail or by personal service, not less than 25 days prior to the date of sale (determined under the provisions of §301.7425–2(b)), to the Internal Revenue Service (IRS) official, office and address specified in IRS Publication 786, "Instructions for Preparing a Notice of Nonjudicial Sale of Property and Application for Consent to Sale," or its successor publication. The relevant IRS publications may be downloaded from the IRS internet site at www.irs.gov. Under this section, a notice of sale is not effective if it is given to an office other than the office listed in the relevant publication. The provisions of sections 7502 (relating to timely mailing treated as timely filing) and 7503 (relating to time for performance of acts where the last day falls on Saturday, Sunday, or a legal holiday) apply in the case of notices required to be made under this paragraph.

(a)(2) [Reserved]. For further guidance, see §301.7425–3(a)(2).

(b) Consent to sale—(1) In general. Notwithstanding the notice of sale provisions of paragraph (a) of this section, a nonjudicial sale of property shall discharge or divest the property of the lien and title of the United States if the IRS consents to the sale of the property free of the lien or title. Pursuant to section 7425(c)(2), where adequate protection is afforded the lien or title of the United States, the IRS may, in its discretion, consent with respect to the sale of property in appropriate cases. Such consent shall be effective only

if given in writing and shall be subject to such limitations and conditions as the IRS may require. However, the IRS may not consent to a sale of property under this section after the date of sale, as determined under §301.7425–2(b). For provisions relating to the authority of the IRS to release a lien or discharge property subject to a tax lien, see section 6325 and the section 6325 regulations.

(2) Application for consent. Any person desiring the IRS's consent to sell property free of a tax lien or a title derived from the enforcement of a tax lien of the United States in the property shall submit to the IRS, at the office and address specified in the relevant IRS publications, a written application, in triplicate, declaring that it is made under penalties of perjury, and requesting that such consent be given. The application shall contain the information required in the case of a notice of sale, as set forth in paragraph (d)(1) of this section, and, in addition, shall contain a statement of the reasons why the consent is desired.

(c) Sale of perishable good–(1) In general. A notice (as described in paragraph (d) of this section) of a nonjudicial sale of perishable goods (as defined in paragraph (c)(2) of this section) shall be given in writing, by registered or certified mail or delivered by personal service, at any time before the sale, to the IRS official and office specified in the relevant IRS publications, at the address specified in such publications. Under this section, a notice of sale is not effective if it is given to an office other than the office listed in the relevant publication. If a notice of a nonjudicial sale is timely given in the manner described in this paragraph, the nonjudicial sale shall discharge or divest the tax lien, or a title derived from the enforcement of a tax lien, of the United States in the property. The provisions of sections 7502 (relating to timely mailing treated as timely filing) and 7503 (relating to time for performance of acts where the last day falls on Saturday, Sunday, or a legal holiday) apply in the case of notices required to be made under this paragraph. The seller of the perishable goods shall hold the proceeds (exclusive of costs) of the sale as a fund, for not less than 30 days after the date of sale, subject to the liens and claims of the United States, in the same manner and with the same priority as the liens and claims of the United States had with respect to the

property sold. If the seller fails to hold the proceeds of the sale in accordance with the provisions of this paragraph and if the IRS asserts a claim to the proceeds within 30 days after the date of sale, the seller shall be personally liable to the United States for an amount equal to the value of the interest of the United States in the fund. However, even if the proceeds of the sale are not so held by the seller, but all the other provisions of this paragraph are satisfied, the buyer of the property at the sale takes the property free of the liens and claims of the United States. In the event of a postponement of the scheduled sale of perishable goods, the seller is not required to notify the IRS of the postponement. For provisions relating to the authority of the IRS to release a lien or discharge property subject to a tax lien, see section 6325 and the regulations.

(c)(2) through (d)(1) [Reserved]. For further guidance, see §301.7425–3(c)(2) through (d)(1).

(d)(2) Inadequate notice. Except as otherwise provided in this paragraph, a notice of sale described in paragraph (a) of this section which does not contain the information described in paragraph (d)(1) of this section shall be considered inadequate by the IRS. If the IRS determines that the notice is inadequate, the IRS will give written notification of the items of information which are inadequate to the person who submitted the notice. A notice of sale which does not contain the name and address of the person submitting such notice shall be considered to be inadequate for all purposes without notification of any specific inadequacy. In any case where a notice of sale does not contain the information required under paragraph (d)(1)(ii) of this section with respect to a Notice of Federal Tax Lien, the IRS may give written notification of such omission without specification of any other inadequacy and such notice of sale shall be considered inadequate for all purposes. In the event the IRS gives notification that the notice of sale is inadequate, a notice complying with the provisions of this section (including the requirement that the notice be given not less than 25 days prior to the sale in the case of a notice described in paragraph (a) of this section) must be given. However, in accordance with the provisions of paragraph (b)(1) of this section, in such a case the IRS may, in its discretion, consent to the

sale of the property free of the lien or title of the United States even though notice of the sale is given less than 25 days prior to the sale. In any case where the person who submitted a timely notice which indicates his name and address does not receive, more than 5 days prior to the date of sale, written notification from the IRS that the notice is inadequate, the notice shall be considered adequate for purposes of this section.

(3) *Acknowledgment of notice.* If a notice of sale described in paragraph (a) or (c) of this section is submitted in duplicate to the IRS with a written request that receipt of the notice be acknowledged and returned to the person giving the notice, this request will be honored by the IRS. The acknowledgment by the IRS will indicate the date and time of the receipt of the notice.

(4) *Disclosure of adequacy of notice.* The IRS is authorized to disclose, to any person who has a proper interest, whether an adequate notice of sale was given under paragraph (d)(1) of this section. Any person desiring this information should submit to the IRS a written request which clearly describes the property sold or to be sold, identifies the applicable notice of lien, gives the reasons for requesting the information, and states the name and address of the person making the request. The request should be submitted to the IRS official, office and address specified in IRS Publication 4235, "*Technical Services (Advisory) Group Addresses,*" or its successor publication. The relevant IRS publications may be downloaded from the IRS internet site at *www.irs.gov*.

(e) *Effective/applicability date.* This section applies to any notice of sale that is filed after **August 20, 2007**.

Kevin M. Brown,
*Deputy Commissioner for Services and Enforcement.*

Approved July 11, 2007.

Eric Solomon,
*Assistant Secretary of the Treasury (Tax Policy).*

(Filed by the Office of the Federal Register on July 19, 2007, 8:45 a.m., and published in the issue of the Federal Register for July 20, 2007, 72 F.R. 39737)

# Section 7520.—Valuation Tables

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

# Section 7872.—Treatment of Loans With Below-Market Interest Rates

The adjusted applicable federal short-term, mid-term, and long-term rates are set forth for the month of September 2007. See Rev. Rul. 2007-57, page 531.

# Section 7874.—Rules Relating to Expatriated Entities and Their Foreign Parents

Final regulations under section 1502 of the Code allow the Internal Revenue Service to appoint a domestic substitute agent for a consolidated group when the group's parent is a foreign corporation that is treated as a domestic corporation under section 7874 of the Code. See T.D. 9343, page 533.

# Part II. Treaties and Tax Legislation
## Subpart A.—Tax Conventions and Other Related Items

### U.S.-Netherlands: Qualification of Certain Pension and Other Employee Benefit Arrangements

### Announcement 2007–75

The following is a copy of the Competent Authority Agreement ("CAA") entered into by the Competent Authorities of the United States and the Netherlands with respect to the qualification of certain tax-exempt trusts, companies, or other organizations for benefits under Article 35 of the U.S.-Netherlands income tax treaty. The CAA also provides guidelines for claiming treaty benefits in each country and the methods each country will use to grant treaty benefits.

The text of the CAA is as follows:

### COMPETENT AUTHORITY AGREEMENT

The Competent Authorities of the Netherlands and the United States hereby amend and restate the agreement that they entered into on March 23, 2000[1], with respect to the qualification of certain tax-exempt trusts, companies, or other organizations for benefits under Article 35 of the Convention between the Kingdom of the Netherlands and the United States of America for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, signed on December 18, 1992, and amended by Protocols signed on October 13, 1993 and March 8, 2004 (the "Treaty"). The agreement specifies the procedures for claiming treaty benefits in each country and the methods each country will use to grant treaty benefits.

This agreement constitutes a Mutual Agreement in accordance with Article 29 of the Treaty.

### Chapter I

*Qualification for treaty benefits under Article 35 of the 1992 Netherlands-US income tax treaty*

Paragraph 1 of Article 35 of the Treaty provides that dividends or interest derived by a trust, company, or other organization constituted and operated exclusively to administer or provide benefits under one or more funds or plans established to provide pension, retirement, or other employee benefits shall be exempt from tax in one Contracting State if it is a resident of the other Contracting State according to the laws of that other State and its income is generally exempt from tax in that other State. Paragraph 2 provides that the provisions of paragraph 1 do not apply with respect to the income of a trust, company, or other organization from carrying on a trade or business or from a related person other than a person referred to in paragraph 1.

Questions have been raised regarding the types of trusts, companies, or other organizations that qualify for benefits under Article 35 of the Treaty. In practice, there are many different types of funds or plans established to provide pension, retirement, or other employee benefits and it is not always clear which of these funds or plans fulfill the requirements of Article 35. In view of this uncertainty, the competent authorities of the Netherlands and the United States agree that the types of trusts, companies, or other organizations mentioned in chapters II and IV of this agreement are considered to fall within the scope of Article 35.

It is understood that for the purpose of this agreement the term "Code section" refers to a section of the U.S. Internal Revenue Code of 1986, as amended, and that the term "trust" includes a custodial account treated as a trust for U.S. federal income tax purposes.

### Chapter II

*U.S. resident tax-exempt trusts, companies, or other organizations*

Subject to the conditions of Article 26, paragraph 2 of Article 35, and paragraph 4 of Article 34 of the Treaty, the following types of U.S. resident trusts, companies, or other organizations are treated as the bene-

ficial owners of dividends and interest derived from the Netherlands and are considered to qualify for benefits under Article 35 of the Treaty:

1. a U.S. resident tax-exempt trust providing pension or retirement benefits under a Code section 401(a) qualified pension plan, profit sharing plan or stock bonus plan (including Code section 401(k) arrangements);

2. a U.S. resident tax-exempt trust described in Code section 457(g) providing pension or retirement benefits under a Code section 457(b) plan;

3. a U.S. resident tax-exempt trust providing pension or retirement benefits under a Code section 403(b) plan;

4. a U.S. resident tax-exempt trust that is an individual retirement account (Code section 408), a Roth individual retirement account (Code section 408A), or a simple retirement account, or a U.S. resident tax-exempt trust that is providing pension or retirement benefits under a simplified employee pension plan;

5. a group trust described in IRS Revenue Ruling 81–100 and meeting the conditions of IRS Revenue Ruling 2004–67;

6. a U.S. resident common trust fund (Code section 584) to the extent that the participants are trusts mentioned under points 1) through 5) above;

7. the Thrift Savings Fund (Code section 7701(j)); and

8. a voluntary employees' beneficiary association (Code section 501(c)(9)).

However, a U.S. resident tax-exempt trust mentioned under points 2), 3), or 4) above will not be considered to qualify for treaty benefits under Article 35 of the Treaty in any taxable year if less than 70% of the total amount of the withdrawals

---

[1] Dutch Form IB 96 USA uses the date March 27, 2000, which was the date the original agreement was published in the Staatscourant, but the competent authorities here refer to the same original mutual agreement as is referred to in Form IB–96-USA.

from such U.S. trust during that year is used to provide pension, retirement or other employee benefits as meant in Article 35 of the Treaty.

Any type of U.S. resident tax-exempt trust, company, or other organization not mentioned above, that considers itself to qualify for benefits under Article 35 of the Treaty, may present its case to the Netherlands tax unit Belastingdienst Limburg / kantoor Buitenland (address: P.O. Box 2865, 6401 DJ HEERLEN, The Netherlands), or to the U.S. competent authority (see Rev. Proc. 2006–54, 2006–49 I.R.B. 1035) requesting competent authority consideration under Article 29 of the Treaty.

## Chapter III

*Appropriate procedures for filing a request for an application of treaty benefits in the Netherlands*

A trust, company, or other organization that qualifies for benefits under Article 35 of the Treaty may claim benefits with respect to income derived from the Netherlands referred to in Article 10 (Dividends). The Netherlands does not apply a withholding tax on outgoing interest payments as meant in Article 12 of the Treaty.

The Netherlands has two methods for granting benefits for Dutch source dividend income: the so-called exemption method (in which case the treaty rate is applied at source) and the so-called refund method.

As a general rule, the Netherlands applies the exemption method when granting treaty benefits in the case of Dutch source dividend income received by a resident of the United States, which means that treaty benefits will be granted by means of an exemption from Netherlands withholding tax at source. In view of the Netherlands competent authority's preference for a closer monitoring of all requests filed for an application of benefits under Article 35 of the Treaty, a U.S. resident tax-exempt trust (including a U.S. common trust fund or group trust) mentioned in point 1) through 8) of Chapter II of this agreement shall — as a general rule — be required to use the refund method when filing its request for an application of benefits under Article 35 of the Treaty. Only if the conditions listed below are fulfilled, may such a U.S. res-

ident tax-exempt trust use the exemption method when filing its request for an application of benefits under Article 35 of the Treaty.

The Netherlands 2007 regulations for the implementation of the Treaty give a detailed description of the procedures to be applied in the case of both the exemption method and the refund method.

The exemption method may be used if the U.S. resident tax-exempt trust, company, or other organization requesting benefits under Article 35 of the Treaty:

* provides to the appropriate Dutch withholding agent or payor, Form 6166, a U.S. residency certification letter issued by the U.S. Internal Revenue Service for the applicable taxable year(s) (Form 6166 may be obtained by filing Form 8802 (Application for United States Residency Certification) in accordance with the instructions for Form 8802) stating that the entity in question is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under Code section 401(a) of the Internal Revenue Code (an example of Form 6166 is attached); or

* provides to the appropriate Dutch withholding agent or payor, a so-called "qualification" certification issued by the competent Netherlands tax authorities, stating that the entity in question is a U.S. resident tax-exempt trust, company, or other organization described in paragraph 1 of Article 35 of the Treaty.

Requests for a "qualification" certification may be filed with the tax unit Belastingdienst Limburg / kantoor Buitenland (address: P.O. Box 2865, 6401 DJ HEERLEN, The Netherlands).

A "qualification" certification, issued by the competent Netherlands tax authorities, is in principle valid indefinitely. However, a "qualification" certification will no longer be valid in the event:

*there is a material change in facts or circumstances; or

*It is determined that the "qualification" certification was issued erroneously; or

*the U.S. resident tax-exempt entity in question has not claimed an application of benefits under Article 35 of the Treaty for five consecutive calendar years. Since Form 6166 issued by the U.S. Internal Revenue Service is not valid indefinitely, a U.S. resident tax-exempt entity that has been issued a Form 6166 by the U.S. In-

ternal Revenue Service may also file a request for a "qualification" certification with the competent Netherlands tax authorities.

Irrespective of the above, use of the refund method is mandatory in any taxable year for a U.S. resident tax-exempt entity mentioned under point 2) or 4) of chapter II, if less than 70% of the total amount of the withdrawals from such U.S. trust during that year is used to provide pension or retirement benefits.

Where assets of the pension fund(s) or pension plan(s) are held in custodial accounts, the Dutch Form IB 96 USA requires a certification that the claim for a refund of Dutch dividend tax is filed for the benefit of the custodial accounts in question.

The status of all U.S. resident tax-exempt trusts, companies, or other organizations claiming benefits under Article 35 of the Treaty may at any time be subject to verification by the competent Netherlands tax authority. If considered necessary, use will be made of the exchange of information procedure (Article 30 of the Treaty).

## Chapter IV

*Netherlands resident tax-exempt trusts, companies, or other organizations*

Subject to the conditions of Article 26, paragraph 2 of Article 35, and paragraph 4 of Article 34 of the Treaty, the following types of Netherlands resident trusts, companies, or other organizations are treated as beneficial owners of dividends and interest derived from the United States and are considered to qualify for benefits under Article 35 of the Treaty:

1. a Netherlands resident tax-exempt company constituted and operated exclusively to administer or provide benefits as meant in article 5, paragraph 1, under b), of the Netherlands corporation tax act (including a Netherlands resident tax-exempt company constituted and operated exclusively to administer or provide benefits under a pension plan as meant in article 3.13, paragraph 1, under b), of the Netherlands income tax act);

2. a Netherlands fund that is exempt under the Netherlands corporation tax

act and constituted by a Netherlands labor union and operated exclusively to administer or provide benefits to its members in case they are on strike (stakingskassen) and of which the payments are exempt under article 3.13, paragraph 1, under f), of the Netherlands income tax act; and

3. Netherlands limited fund for mutual account (besloten fondsen voor gemene rekening) in which each participant is a Netherlands resident tax-exempt company mentioned under points 1) or 2) above.

Any type of Netherlands resident tax-exempt trust, company, or other organization not mentioned above, that considers itself to qualify for benefits under Article 35 of the Treaty, may present its case to the U.S. competent authority, or to the Netherlands competent authority requesting competent authority consideration under Article 29 of the Treaty.

## Chapter V

*Appropriate procedures for filing a request for an application of treaty benefits in the United States*

Under U.S. tax law, a Netherlands resident taxpayer (including a Netherlands resident tax-exempt entity referred to in Article 35 of the Treaty) may file for an application of treaty benefits at source, or may claim a refund of U.S. income tax withheld according to regulations set forth under the Internal Revenue Code. The following procedures apply to a Netherlands resident tax-exempt trust, company, or other organization.

A Netherlands resident tax-exempt trust, company, or other organization described in this agreement should claim exemption from U.S. income tax withholding under Article 35 of the Treaty on dividends or interest income referred to in Articles 10 and 12, respectively, of the Treaty by providing a properly completed IRS Form W–8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding) to the appropriate withholding agent or payer of such income before the income is paid or credited to the company. An entity filing Form W–8BEN should cite Article 35 of the Treaty on line 10 thereof, and state that it is a Netherlands resident tax-exempt trust, company, or other organization described in chapter IV of this agreement.

Alternatively, the trust, company, or other organization may seek a refund of taxes withheld on such dividend or interest income by timely filing a U.S. income tax return and claiming a refund of such taxes.

The status of all Netherlands resident tax-exempt trusts, companies, or other organizations providing pension, retirement, or other employee benefits and claiming benefits under Article 35 of the Treaty may be subject to verification by the Internal Revenue Service. If considered necessary, use will be made of the exchange of information procedure (Article 30 of the Treaty).

As amended by Article 6 of the Protocol signed on October 13, 1993, paragraph 2 of Article 35 of the Treaty provides that dividends paid by a person resident in the United States that is a Real Estate Investment Trust ("REIT") from gains realized on the disposition of real property situated in the United States are not eligible for benefits under Article 35. Such distributions are subject to U.S. tax under paragraph 1 of Article 14 of the Treaty. In addition, distributions paid by a person resident in the United States that is a Regulated Investment Company ("RIC") from gains realized on the disposition of real property situated in the United States are not eligible for benefits under Article 35 and are subject to U.S. tax under paragraph 1 of Article 14.

Pursuant to section 897(h)(1) of the Internal Revenue Code, as amended, certain amounts distributed by qualified investment entities (REITs and certain RICs) that would have otherwise been treated as distributions from gains realized on the disposition of real property situated in the United States are treated and taxed as dividends. Such amounts will be treated as dividends that are eligible for exclusion under paragraph 1 of Article 35.

Paragraph 2 of Article 35 also provides that income of a trust, company, or other organization is not exempt under Article 35 if it is derived from carrying on a trade or business or from a related person that is not itself eligible for benefits under Article 35. Paragraph XXXVII of the Understanding accompanying the Protocol signed on March 8, 2004 provides that for purposes of paragraph 2 of Article 35, a person will be considered to be a "related person" if more than 80 percent of the vote or value of any class of shares is owned by the person deriving the income.

Agreed to by the undersigned competent authorities:

_____
Frank Y. Ng
U.S. Competent Authority

_____
Maarten Brabers
Netherlands Competent Authority



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
PHILADELPHIA, PA 19255

CERTIFICATION
PROGRAM

Date: 7/12/2007

Taxpayer: ABC PENSION PLAN
    TIN: XX-XXXXXXX
Tax Year: 2007

I certify that, to the best of our knowledge, the above-named entity is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation.

Andrew E. Zuckerman
Field Director, Philadelphia Accounts Management Center

Form **6166** (Rev. 3-2006)        Catalog Number 43134V        Department of the Treasury-**Internal Revenue Service**

# Part III. Administrative, Procedural, and Miscellaneous

## Transaction of Interest — Contribution of Successor Member Interest

### Notice 2007–72

The Internal Revenue Service and the Treasury Department are aware of a type of transaction, described below, in which a taxpayer directly or indirectly acquires certain rights in real property or in an entity that directly or indirectly holds real property, transfers the rights more than one year after the acquisition to an organization described in § 170(c) of the Internal Revenue Code, and claims a charitable contribution deduction under § 170 that is significantly higher than the amount that the taxpayer paid to acquire the rights. The IRS and the Treasury Department believe this transaction has the potential for tax avoidance or evasion, but lack sufficient information to determine whether the transaction should be identified specifically as a tax avoidance transaction. This notice identifies this transaction, and substantially similar transactions, as transactions of interest for purposes of § 1.6011–4(b)(6) of the Income Tax Regulations and §§ 6111 and 6112. This notice also alerts persons involved with these transactions to certain responsibilities that may arise from their involvement with these transactions.

FACTS

In a typical transaction, Advisor owns all of the membership interests in a limited liability company (LLC) that directly or indirectly owns real property (other than a personal residence as defined in § 1.170A–7(b)(3)) that may be subject to a long-term lease. Advisor and Taxpayer enter into an agreement under the terms of which Advisor continues to own the membership interests in LLC for a term of years (the Initial Member Interest), and Taxpayer purchases the successor member interest in LLC (the Successor Member Interest), which entitles Taxpayer to own all of the membership interests in LLC upon the expiration of the term of years. In some variations of this transaction, Taxpayer may hold the Successor Member Interest through another entity, such as a single member limited liability company. Further, the agreement may refer to the Successor Member Interest as a remainder interest.

After holding the Successor Member Interest for more than one year (in order to treat the interest as long-term capital gain property), Taxpayer transfers the Successor Member Interest to an organization described in § 170(c) (Charity).

Taxpayer claims the value of the Successor Member Interest to be an amount that is significantly higher than Taxpayer's purchase price (for example, an amount that is a multiple of Taxpayer's purchase price and exceeds normal appreciation). Taxpayer claims a charitable contribution deduction under § 170 based on this higher amount. Taxpayer reaches this value by taking into account an appraisal obtained by or on behalf of Advisor or Taxpayer of the fee interest in the underlying real property and the § 7520 valuation tables.

The Internal Revenue Service and the Treasury Department are concerned about apparent irregularities in this transaction. Specifically, the IRS and the Treasury Department are concerned with the large discrepancy between (1) the amount Taxpayer paid for the Successor Member Interest, and (2) the amount claimed by Taxpayer as a charitable contribution. The IRS and the Treasury Department also have the following additional concerns, which may be present in some variations of this transaction: (1) any mischaracterization of the ownership interests in LLC; (2) a Charity's agreement not to transfer the Successor Member Interest for a period of time (which may coincide with the expiration of the applicable period in § 6050L(a)(1)); and (3) any sale by Charity of the Successor Member Interest to a party selected by or related to Advisor or Taxpayer.

TRANSACTION OF INTEREST

*Effective Date*

Transactions that are the same as, or substantially similar to, the transactions described in this notice are identified as transactions of interest for purposes of § 1.6011–4(b)(6) and §§ 6111 and 6112 effective August 14, 2007, the date this notice was released to the public. Persons entering into these transactions on or after November 2, 2006, must disclose the transaction as described in § 1.6011–4. Material advisors who make a tax statement on or after November 2, 2006, with respect to transactions entered into on or after November 2, 2006, have disclosure and list maintenance obligations under §§ 6111 and 6112. See § 1.6011–4(h) and §§ 301.6111–3(i) and 301.6112–1(g) of the Procedure and Administration Regulations.

Independent of their classification as transactions of interest, transactions that are the same as, or substantially similar to, the transaction described in this notice already may be subject to the requirements of § 6011, 6111, or 6112, or the regulations thereunder. When the IRS and the Treasury Department have gathered enough information to make an informed decision as to whether this transaction is a tax avoidance type of transaction, the IRS and the Treasury Department may take one or more actions, including removing the transaction from the transactions of interest category in published guidance, designating the transaction as a listed transaction, or providing a new category of reportable transaction.

*Participation*

Under § 1.6011–4(c)(3)(i)(E), Advisor, LLC or any entity used in place of LLC, Taxpayer, and any members of Taxpayer if Taxpayer is a flow-through entity, are participants in this transaction for each year in which their respective tax returns reflect tax consequences or the tax strategy described in this notice.

Charity is not a participant if it received the Successor Member Interest described in this notice on or prior to August 14, 2007. For Successor Member Interests received after August 14, 2007, under § 1.6011–4(c)(3)(i)(E) Charity is a participant in this transaction for the first year for which Charity's tax return reflects the Successor Member Interest described in this notice. In general, Charity is required to report the receipt of the Successor Member Interest described in this notice on its return for the year in which it is received. See § 6033. Therefore, in general, Charity will be a participant

for the year in which Charity received the Successor Member Interest.

*Time for Disclosure*

See § 1.6011–4(e) and § 301.6111–3(e).

*Material Advisor Threshold Amount*

The threshold amounts are the same as those for listed transactions. See § 301.6111–3(b)(3)(i)(B).

*Penalties*

Persons required to disclose these transactions under § 1.6011–4 who fail to do so may be subject to the penalty under § 6707A. Persons required to disclose these transactions under § 6111 who fail to do so may be subject to the penalty under § 6707(a). Persons required to maintain lists of advisees under § 6112 who fail to do so (or who fail to provide such lists when requested by the Service) may be subject to the penalty under § 6708(a). In addition, the Service may impose other penalties on persons involved in these transactions or substantially similar transactions, including the accuracy-related penalty under § 6662 or 6662A.

DRAFTING INFORMATION

The principal authors of this notice are Patricia M. Zweibel of the Office of Associate Chief Counsel (Income Tax and Accounting) and Leslie H. Finlow of the Office of Associate Chief Counsel (Passthroughs and Special Industries). For further information concerning this notice generally, contact Ms. Zweibel at (202) 622–7900 (not a toll-free call). For further information concerning the sections of this notice under the heading TRANSACTIONS OF INTEREST, contact Ms. Finlow at (202) 622–3070 (not a toll-free call).

---

# Transaction of Interest — Toggling Grantor Trust

## Notice 2007–73

The Internal Revenue Service and the Treasury Department are aware of a type of transaction, described below, that uses a grantor trust, and the purported termination and subsequent re-creation of the trust's grantor trust status, for the purpose of allowing the grantor to claim a tax loss greater than any actual economic loss sustained by the taxpayer or to avoid inappropriately the recognition of gain. The IRS and Treasury Department believe this transaction has the potential for tax avoidance or evasion, but lack sufficient information to determine whether the transaction should be identified specifically as a tax avoidance transaction. This notice identifies this transaction, and substantially similar transactions, as transactions of interest for purposes of § 1.6011–4(b)(6) of the Income Tax Regulations and §§ 6111 and 6112 of the Internal Revenue Code. This notice also alerts persons involved with these transactions to certain responsibilities that may arise from their involvement with these transactions.

FACTS

In one variation of the transaction, Grantor purchases four options. The value of each one of the options is expected to move inversely in relation to at least one of the other options over a relevant range of values so that, before expiration of any one of the options, there will be a gain in two options (gain options) and a substantially offsetting loss in the other two options (loss options). Grantor creates Trust and funds Trust with the options and a small amount of cash. Grantor gives a short-term unitrust interest in Trust to Beneficiary and retains a noncontingent remainder interest in Trust. The remainder interest is structured to have a value as determined under § 7520 that equals the fair market value of the options. Grantor takes the position that Grantor's remainder interest is a qualified interest under § 2702. Because of the retained remainder interest, Grantor treats Trust as a trust owned by Grantor under subpart E (§ 671 and following), part I, subchapter J, chapter 1 of the Code (a grantor trust). The trust agreement also provides that Grantor will have the power, exercisable in a nonfiduciary capacity, to reacquire Trust corpus by substituting other property of an equivalent value (the substitution power) and that this substitution power will become effective on a specified date in the future. See § 675(4).

After establishing and funding Trust, Grantor sells the remainder interest in Trust to an unrelated person (Buyer) for an amount equal to the fair market value of the remainder interest (which is equal to the fair market value of the options). Grantor claims that the basis in the remainder interest is determined by allocating to the remainder interest a portion of the basis in all of the Trust assets (based on the respective fair market values of the remainder and unitrust interests at the time of the sale). Therefore, Grantor claims there is no gain recognized on the sale of the remainder interest because Grantor's basis in the remainder interest is the same as the amount realized (prearranged to be equivalent to the fair market value of the options). Buyer gives Grantor an installment obligation (Note), cash, or other consideration for the remainder interest. Grantor claims that the sale of the remainder interest has terminated (toggled off) the grantor trust status of Trust so that, during the period after the sale and before the effective date of the substitution power, Trust is no longer a grantor trust under § 671.

Grantor claims that, once the substitution power becomes effective, Trust's grantor trust status is restarted (toggled on). The loss options are then closed out. The amount Grantor paid for those options (the original basis of those options) is greater than the amount Trust receives when the loss options are closed out. Grantor claims that Trust's status as a grantor trust causes Grantor to recognize the loss on the two loss options. Grantor calculates the loss based on the difference between the amount realized and the original basis in the loss options, even though Grantor previously used a portion of the basis in the Trust assets (equivalent to the basis in all of the options) to eliminate Grantor's gain on the sale of the remainder interest. Trust's remaining assets then consist of the two gain options, the contributed cash, and amounts received, if any, upon the termination of the loss options.

Buyer then purchases the unitrust interest in Trust from Beneficiary for an amount equal to the actuarial value of that interest (which equals or approximates the amount

of cash Grantor contributed to Trust), making Buyer the owner of both the remainder interest and the unitrust interest. Trust then terminates (by operation of law or Buyer's action), and Trust's assets are distributed to Buyer. Buyer claims a basis in the assets (the gain options and the cash) from Trust equal to the amount paid by Buyer for the two separate interests in Trust. Grantor does not treat the termination of Trust as a taxable disposition by Grantor of the assets of Trust.

The gain options are exercised or sold, or otherwise terminate, and Buyer claims to recognize gain on the gain options only to the extent that the amount realized exceeds the basis Buyer allocates to the gain options. The transaction has been structured so that any gain recognized would be minimal. If Buyer purchased the remainder interest from Grantor with a Note, Buyer uses the proceeds from the options to pay the Note. If Grantor borrowed to purchase the options, Grantor repays the loan from the Note proceeds.

In another variation of the transaction, the facts are the same as described above except for the following. Grantor contributes to Trust liquid assets such as cash or marketable securities, rather than options. Grantor's basis in the contributed assets equals or is approximately equal to the fair market value of the assets at the time of contribution. Before the specified date on which Grantor's substitution power becomes effective, Grantor sells the remainder interest in Trust to Buyer for an amount equal to the fair market value of the remainder interest and claims to recognize no gain or a minimal gain or loss for the same reason as described above. As in the prior variation, Grantor claims that the sale terminates (toggles off) Trust's grantor trust status. After the substitution power becomes effective, Grantor substitutes appreciated property for Trust's liquid assets. The fair market value of the substituted property is equivalent to the fair market value of the liquid assets. Grantor claims that, once the substitution power becomes effective (prior to the exchange), Trust's grantor trust status is restarted (toggled on), and, therefore, the substitution will not cause Grantor to recognize gain.

As described above, Buyer purchases the unitrust interest in Trust from Beneficiary, terminates Trust, and receives Trust's assets on distribution. For tax purposes, Grantor does not treat the termination of Trust as a disposition by Grantor of the appreciated assets in Trust. Buyer claims a basis in the assets of Trust (the appreciated property and cash) equal to the amount paid by Buyer for the interests in Trust.

One of the purported tax consequences of the first variation of the transaction is that Grantor sells the remainder interest and receives an amount substantially equal to the fair market value of the (non-cash) assets contributed to Trust but nevertheless claims a tax loss attributable to those assets even though Grantor has not suffered an equivalent economic loss. One of the purported tax consequences of the second variation of the transaction is that Grantor avoids the recognition of gain on the disposition of the appreciated assets substituted for the original assets contributed to Trust.

These transactions usually occur within a short period of time during the taxable year (typically within 30 days), and, in each case, Grantor claims that the termination and subsequent reestablishment of grantor trust status, combined with the series of events regarding Trust's assets, result in tax consequences that could not be achieved without both the toggling off and on of grantor trust status. The transactions in this notice, as described above, do not include the situation where a trust's grantor trust status is terminated, unless there is also a subsequent toggling back to the trust's original status for income tax purposes.

## TRANSACTION OF INTEREST

### Effective Date

Transactions that are the same as, or substantially similar to, the transactions described in this notice are identified as transactions of interest for purposes of § 1.6011–4(b)(6) and §§ 6111 and 6112 effective August 14, 2007, the date this notice was released to the public. Persons entering into these transactions on or after November 2, 2006, must disclose the transaction as described in § 1.6011–4. Material advisors who make a tax statement on or after November 2, 2006, with respect to transactions entered into on or after November 2, 2006, have disclosure and list maintenance obligations under §§ 6111 and 6112. See § 1.6011–4(h) and §§ 301.6111–3(i) and 301.6112–1(g) of the Procedure and Administration Regulations.

Independent of their classification as transactions of interest, transactions that are the same as, or substantially similar to, the transaction described in this notice may already be subject to the requirements of §§ 6011, 6111, or 6112, or the regulations thereunder. When the IRS and Treasury Department have gathered enough information to make an informed decision as to whether this transaction is a tax avoidance type of transaction, the IRS and Treasury Department may take one or more actions, including removing the transaction from the transactions of interest category in published guidance, designating the transaction as a listed transaction, or providing a new category of reportable transaction.

### Participation

Under § 1.6011–4(c)(3)(i)(E), Grantor, Buyer, and Beneficiary are participants in this transaction for each year in which their respective tax returns reflect tax consequences or a tax strategy described in this notice.

### Time for Disclosure

See § 1.6011–4(e) and § 301.6111–3(e).

### Material Advisor Threshold Amount

The threshold amounts are the same as those for listed transactions. See § 301.6111–3(b)(3)(i)(B).

### Penalties

Persons required to disclose these transactions under § 1.6011–4 who fail to do so may be subject to the penalty under § 6707A. Persons required to disclose these transactions under § 6111 who fail to do so may be subject to the penalty under § 6707(a). Persons required to maintain lists of advisees under § 6112 who fail to do so (or who fail to provide such lists when requested by the Service) may be subject to the penalty under § 6708(a). In addition, the Service may impose other penalties on parties involved in these transactions or substantially similar transactions, including the accuracy-related penalty under § 6662 or § 6662A.

DRAFTING INFORMATION

The principal author of this notice is Tolsun N. Waddle of the Office of Associate Chief Counsel (Passthroughs and Special Industries). For further information regarding this notice, contact Mr. Waddle at (202) 622–3070 (not a toll-free call).

———

*26 CFR 31.3402(q): Return of information on proceeds from poker tournaments.*
*(Also: § 3406.)*

# Rev. Proc. 2007–57

## SECTION 1. PURPOSE

This revenue procedure informs taxpayers of their obligations under section 3402(q) pertaining to withholding and information reporting applicable to certain amounts paid to winners of poker tournaments. It further sets forth procedures to be used to comply with the relevant requirements of the Internal Revenue Code and Treasury Regulations thereunder.

## SECTION 2. FACTUAL BACKGROUND

A business taxpayer ("poker tournament sponsor") may sponsor a poker tournament, charging an entry fee and a "buy-in" fee for each participant. In exchange for the fees, each participant receives a set of poker chips with a nominal face value for use in the specific poker tournament. The poker tournament sponsor pays amounts, which exceed a participant's fees by $5,000, to a certain number of tournament winner(s), out of a pool comprised of all the participants' fees.

## SECTION 3. LEGAL BACKGROUND

.01. *Withholding under section 3402*. Section 3402(q)(1) provides that every person who makes any payment of winnings which are subject to withholding shall deduct and withhold from the payment an amount equal to the product of the third lowest rate of tax applicable under section 1(c) and such payment. Section 3402(q)(3) provides that the term "winnings which are subject to withholding" means, in part, proceeds from a wagering transaction, if the proceeds are more than $5,000 from a wager placed in any sweepstakes, wagering pool, or lottery. The term "wagering pool" includes "all pari-mutuel betting pools, including on- and off-track racing pools, and similar types of betting pools." H.R. Conf. Rep. No. 94–1515, at 488 (1976) (relating to the enactment of § 3402(q)). "In common usage the term 'pool' connotes a particular gambling practice, an arrangement whereby all bets constitute a common fund to be taken by the winner or winners." *United States v. Berent*, 523 F.2d 1360, 1361 (9th Cir. 1975). Section 3402(q)(4)(A) provides that proceeds from a wager shall be determined by reducing the amount received by the amount of the wager.

.02. *Information reporting under section 31.3402(q)–1(e)*. Section 31.3402(q)–1(e) of the Employment Tax Regulations provides that each person who is to receive a payment of winnings subject to withholding shall furnish to the payer a statement on Form W–2G or Form 5754 (whichever is applicable) made under the penalties of perjury containing certain required information, including the name, address, and Taxpayer Identification Number of the winning payee. Section 31.3402(q)–1(f)(1) provides that every person making a payment of winnings for which withholding is required shall file a Form W–2G with the IRS on or before February 28 (March 31 if filed electronically) of the calendar year following the calendar year in which the payment of winnings is made and shall furnish a copy of the Form to the payee.

## SECTION 4. APPLICATION

A poker tournament sponsor is required to withhold and report on payments of more than $5,000 made to a winning payee in a taxable year by filing an information return with the IRS as prescribed by section 3402(q). The poker tournament sponsor must furnish a copy of the information return to the IRS on or before February 28 (March 31 if filed electronically) of the calendar year following the calendar year in which the payment is made, as prescribed by section 31.3402(q) of the regulations.

## SECTION 5. SCOPE

This revenue procedure applies to poker tournament sponsors, including casinos, which pay amounts to winners in a manner substantially similar to that described in section 2 of this revenue procedure.

## SECTION 6. WAIVER OF LIABILITY UNDER SECTION 3402 AND WAIVER OF OTHER PENALTIES OR ADDITIONS TO TAX

The IRS will not assert any liability for additional tax or additions to tax for violations of any withholding obligation with respect to amounts paid to winners of poker tournaments under section 3402, provided that the poker tournament sponsor meets all of the requirements for information reporting under section 3402(q) and the regulations thereunder.

## SECTION 7. EFFECTIVE DATE

This revenue procedure is effective for payments made on or after March 4, 2008.

## SECTION 8. DRAFTING INFORMATION

The principal author of this revenue procedure is Blaise G. Dusenberry of the Office of Associate Chief Counsel (Procedure and Administration). For further information regarding this revenue procedure, contact Cynthia McGreevy at (202) 622–4910 (not a toll-free call).

# Part IV. Items of General Interest

## Notice of Proposed Rulemaking

## Abandonment of Stock and Other Securities

## REG–101001–05

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Notice of proposed rulemaking.

SUMMARY: These proposed regulations provide guidance concerning the availability and character of a loss deduction under section 165 of the Internal Revenue Code for losses sustained from abandoned securities. These proposed regulations are necessary to clarify the tax treatment of losses from abandoned securities, and will affect any taxpayer claiming a deduction for a loss from abandoned securities after the date these regulations are published as final regulations in the **Federal Register**.

DATES: Written or electronic comments and requests for a public hearing must be received by October 29, 2007.

ADDRESSES: Send submissions to: CC:PA:LPD:PR (REG–101001–05), room 5205, Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to CC:PA:LPD:PR (REG–101001–05), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW, Washington, DC 20224, or sent electronically, via the IRS internet site at *www.irs.gov/regs* or via the Federal eRulemaking Portal at *www.regulations.gov* (indicate IRS REG–101001–05).

FOR FURTHER INFORMATION CONTACT: Concerning the proposed regulations, Lisa S. Dobson at (202) 622–7790, or Sean M. Dwyer at (202) 622–5020; concerning submissions of comments and requests for a hearing, Kelly Banks at (202) 622–7180 (not toll-free numbers).

SUPPLEMENTARY INFORMATION:

### Background and Explanation of Provisions

This document proposes to amend §1.165–5 of the Income Tax Regulations (26 CFR part 1) to provide guidance concerning the Federal income tax treatment of abandoned securities.

*Abandonment of Securities*

Section 165(a) of the Code allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 1.165–1(d)(1) of the Income Tax Regulations provides that a loss is treated as sustained during the taxable year in which the loss occurs, as evidenced by a closed and completed transaction, and as fixed by an identifiable event occurring in such taxable year.

Section 165(g)(1) provides that if any security that is a capital asset becomes worthless during the taxable year, the resulting loss is treated as a loss from the sale or exchange of a capital asset (that is, as a capital loss) on the last day of the taxable year. Section 165(g)(2) defines *security* as a share of stock in a corporation; a right to subscribe for or to receive a share of stock in a corporation; or a bond, debenture, note or certificate or other evidence of indebtedness issued by a corporation or government with interest coupons or in registered form. Section 165(g)(3) provides an exception from capital loss treatment for certain worthless securities in a domestic corporation affiliated with the taxpayer.

The legislative history of the predecessor of section 165(g) indicates that the provision was enacted to remove the "peculiar and anomalous results" that followed from treating losses from the worthlessness of securities as ordinary losses or deductions, and losses from the sale or exchange of securities as capital losses, because both losses represent a loss of capital in a transaction entered into for profit. See H. Rep. No. 1860, 75th Cong., 3d Sess., at 18–19 (1938).

The Treasury Department and the IRS understand that some taxpayers have taken the position that a loss under section 165(a) resulting from the abandonment of a security is not subject to the loss characterization rules provided in section 165(g).

Property that has become worthless to the taxpayer may give rise to a loss deduction under section 165(a). In general, worthlessness is determined by a combination of subjective and objective *indicia* including a subjective determination of worthlessness to the taxpayer and objective evidence of a closed and completed transaction. See *Echols v. Commissioner*, 950 F.2d 209 (5th Cir. 1991); *Boehm v. Commissioner*, 326 U.S. 287 (1945). For purposes of section 165(a), the act of abandonment is an event that establishes both of these elements. Rev. Rul. 2004–58, 2004–1 C.B. 1043, see §601.601(d)(2)(ii)(*b*). Although an act of abandonment may be "one of several factors in the analysis of whether the taxpayer's subjective determination of an asset's worthlessness is sustainable, abandonment is not an indispensable requirement for a worthlessness deduction under Code section 165." *Echols*, 950 F.2d at 212. Identifiable events may include "other acts or events which reflect the fact that the property is worthless." *Proesel v. Commissioner*, 77 T.C. 992, 1005 (1981).

The proposed regulations provide that, for purposes of applying the loss characterization rules of section 165(g), the abandonment of a security establishes the worthlessness of the security to the taxpayer. Under the proposed regulations a loss established by the abandonment of a security that is a capital asset is treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset, unless the exception in section 165(g)(3) applies. In characterizing losses established by the abandonment of a security in a manner consistent with other worthless security losses, the proposed regulations further the legislative intent to eliminate "peculiar and anomalous results." See H. Rep. No. 1860, 75th Cong., 3d Sess., at 18–19 (1938). See also §1.332–2(b) and Rev. Rul. 2003–125, 2003–2 C.B. 1243, see §601.601(d)(2)(ii)(*b*), (wherein the character of a loss established in a transaction in which a shareholder disposes

of stock and receives no consideration (specifically, a liquidation that fails to qualify under section 332) is prescribed by section 165(g)).

Although a taxpayer need not relinquish legal title to property in all cases to establish abandonment, in view of the nature of a taxpayer's rights in stock and other securities these proposed regulations require that to abandon a security, a taxpayer must permanently surrender and relinquish all rights in the security and receive no consideration in exchange for the security.

*Abandonment or Cancellation of Other Debt Instruments*

Section 166(a)(1) allows as a deduction any debt which becomes worthless within the taxable year. Under section 166(b), the basis for determining the amount of the deduction is the adjusted basis of the debt. Section 166(a)(2) permits a deduction for partially worthless debts. It provides that the Secretary, when satisfied that a debt is recoverable only in part, may allow a deduction for the debt in an amount not in excess of the part charged off within the taxable year. The courts have noted that the tests for worthlessness under section 165 and under section 166 are fundamentally the same. See *United States v. S.S. White Dental Mfg. Co.*, 274 U.S. 398, 401 (1927).

A creditor may not voluntarily cancel a debt that has value and claim a deduction under section 166 because the debt is now valueless. See *Jostens, Inc. v. Commissioner*, 956 F.2d 175, 176–77 (8th Cir. 1992).

Two categories of worthless debts are excepted from section 166: nonbusiness debts under section 166(d) and debt securities under section 166(e). Under section 166(e), section 166 does not apply to a debt that is evidenced by a security as defined in section 165(g)(2)(C). Accordingly, the tax treatment of debt securities is discussed in the *Abandonment of Securities* section of this preamble.

Section 166(d)(1)(A) provides that in the case of a taxpayer other than a corporation, section 166(a) does not apply to a nonbusiness debt. Instead, under section 166(d)(1)(B), a nonbusiness debt that becomes worthless is considered a loss from the sale or exchange of a capital asset held for not more than one year. A *nonbusiness debt* is defined in section 166(d)(2) as a debt that is not created or acquired in connection with, or the worthlessness of which is not incurred in, the taxpayer's trade or business. The legislative intent behind section 166(d) is in part to provide for parity of tax treatment with worthless securities under section 165(g) and other investments. See *Putnam v. Commissioner*, 352 U.S. 82, 91–92 (1956).

The Treasury Department and the IRS request comments concerning the Federal tax treatment of "abandoned debt" other than debt securities, including nonbusiness debts which, under section 166(d), are deductible when worthless as short-term capital losses, and other debt instruments, the worthlessness of which gives rise to a bad debt deduction under section 166(a).

**Proposed Effective Date**

These proposed regulations are proposed to apply to an abandonment of securities occurring after the date these regulations are published as final regulations in the **Federal Register**. No inference is intended regarding the treatment for Federal income tax purposes of an abandonment of securities occurring before these regulations are effective.

**Special Analyses**

It has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations, and, because the regulation does not impose a collection of information on small entities, the Regulatory Flexibility Act (5 U.S.C. chapter 6) does not apply. Pursuant to section 7805(f) of the Internal Revenue Code, this notice of proposed rulemaking has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small businesses.

**Comments and Requests for a Public Hearing**

Before these proposed regulations are adopted as final regulations, consideration will be given to any written comments (a signed original and eight (8) copies) or electronic comments that are submitted timely to the IRS. The Treasury Department and the IRS specifically request comments on the clarity of the proposed rule and how they can be made easier to understand. All comments will be available for public inspection and copying. A public hearing will be scheduled if requested in writing by any person that timely submits written comments. If a public hearing is scheduled, notice of the date, time, and place for the public hearing will be published in the **Federal Register**.

Although the proposed regulations provide that for purposes of section 165(g) the term *worthless* includes abandoned securities for which no consideration is received, there may be other contexts under the Code or regulations in which the tax treatment of abandoned securities is unclear or in which abandonment and worthlessness should be treated differently. In addition to comments concerning the tax treatment of non-security debt instruments, comments are requested concerning the existence and appropriate tax treatment of abandoned securities in other contexts.

**Drafting Information**

The principal authors of these regulations are Lisa S. Dobson of the Office of Associate Chief Counsel (Corporate) and Sean M. Dwyer of the Office of Associate Chief Counsel (Income Tax and Accounting). Other personnel from Treasury Department and the IRS participated in their development.

\* \* \* \* \*

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 1 is proposed to be amended as follows:

PART 1—INCOME TAXES

Paragraph 1. The authority citation for part 1 continues to read, in part, as follows:
Authority: 26 U.S.C. 7805 \* \* \*
Par. 2. Section 1.165–5 is amended as follows:
1. Paragraph (i) is redesignated as paragraph (j).
2. A new paragraph (i) is added.
The addition reads as follows:

*§1.165–5 Worthless securities.*

\* \* \* \* \*

(i) *Abandonment of securities.* For purposes of section 165 and this section, a security that becomes wholly worthless includes a security described in paragraph (a) of this section that is abandoned and otherwise satisfies the requirements for a deductible loss under section 165. If the abandoned security is a capital asset and is not described in section 165(g)(3) and paragraph (d) of this section (concerning worthless securities of certain affiliated corporations), the resulting loss is treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. See section 165(g)(1) and paragraph (c) of this section. To abandon a security, a taxpayer must permanently surrender and relinquish all rights in the security and receive no consideration in exchange for the security. For purposes of this section, all the facts and circumstances determine whether the transaction is properly characterized as an abandonment or other type of transaction, such as an actual sale or exchange, contribution to capital, dividend, or gift.

\* \* \* \* \*

Linda E. Stiff,
*Acting Deputy Commissioner for Services and Enforcement.*

(Filed by the Office of the Federal Register on July 27, 2007, 8:45 a.m., and published in the issue of the Federal Register for July 30, 2007, 72 F.R. 41468)

# Notice of Proposed Rulemaking by Cross-Reference to Temporary Regulations

## Change to Office to Which Notices of Nonjudicial Sale and Requests for Return of Wrongfully Levied Property Must Be Sent

## REG–148951–05

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Notice of proposed rulemaking by cross-reference to temporary regulations.

SUMMARY: In this issue of the Bulletin, the IRS is issuing temporary regulations (T.D. 9344) relating to the discharge of liens under section 7425 and return of wrongfully levied upon property under section 6343 of the Internal Revenue Code (Code) of 1986. Those regulations clarify that such notices and claims should be sent to the IRS official and office specified in the relevant IRS publications. The regulations will affect parties seeking to provide the IRS with notice of a nonjudicial foreclosure sale and parties making administrative requests for return of wrongfully levied property. The text of those regulations also serves as the text of these proposed regulations.

DATES: Written or electronic comments and requests for a public hearing must be received by **October 18, 2007**.

ADDRESSES: Send submissions to: CC:PA:LPD:PR (REG–148951–05), Room 5203, Internal Revenue Service, PO Box 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand-delivered to CC:PA:LPD:PR (REG–148951–05), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, NW, Washington, DC 20224. Alternatively, taxpayers may submit comments electronically to the IRS Internet site via the Federal eRulemaking Portal at *www.regulations.gov* (IRS REG–148951–05).

FOR FURTHER INFORMATION CONTACT: Concerning the proposed regulations, Robin M. Ferguson, (202) 622–3630; concerning submissions of comments, the hearing, call Kelly Banks, (202) 622–7180 (not toll-free numbers).

SUPPLEMENTARY INFORMATION:

### Background

Temporary regulations in this issue of the Bulletin contain amendments to the Procedure and Administration Regulations (26 CFR part 301) relating to the giving of notice of nonjudicial sales under section 7425(b) of the Code and requests for return of wrongfully levied property under section 6343(b) of the Code. The text of those regulations also serves as the text of these proposed regulations. The preamble to the temporary regulations explains the temporary regulations and these proposed regulations.

### Proposed Effective Date

These regulations are proposed to apply to any notice of sale filed or request for return of property made after the date that these regulations are published as final regulations in the **Federal Register**.

### Special Analyses

It has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It also has been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations, and because the regulations do not impose a collection of information on small entities, the Regulatory Flexibility Act (5 U.S.C. chapter 6) does not apply. Pursuant to section 7805(f) of the Internal Revenue Code, this regulation has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

### Comments and Requests for Public Hearing

Before these proposed regulations are adopted as final regulations, consideration will be given to any electronic and written comments (a signed original and eight (8) copies) or electronic comments that are submitted timely to the IRS. The IRS and Treasury Department specifically request comments on the clarity of the proposed rules and how they may be made easier to understand. All comments will be available for public inspection and copying. A public hearing will be scheduled if requested in writing by any person that timely submits written comments. If a public hearing is scheduled, notice of the date, time, and place for the public hearing will be published in the **Federal Register**.

**Drafting Information**

The principal author of these regulations is Robin M. Ferguson, Office of Associate Chief Counsel, Procedure and Administration Division.

* * * * *

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 301 is proposed to be amended as follows:

PART 301—PROCEDURE AND ADMINISTRATION

Paragraph 1. The authority citation for part 301 continues to read in part as follows:

Authority: 26 U.S.C. 7805 * * *

Par. 2. Section 301.6343–2 is amended by revising paragraphs (a)(1) introductory text, (b) introductory text, and (e) to read as follows:

*§301.6343–2 Return of wrongfully levied upon property.*

(a)(1) [The text of the proposed amendment for §301.6343–2(a)(1) introductory text is the same as the text of §301.6343–2T(a)(1) introductory text published elsewhere in this issue of the Bulletin].

* * * * *

(b) [The text of the proposed amendment for §301.6343–2(b) introductory text is the same as the text of §301.6343–2T(b) introductory text published elsewhere in this issue of the Bulletin].

* * * * *

(e) [The text of the proposed amendment for §301.6343–2(e) is the same as the text of §301.6343–2T(e) published elsewhere in this issue of the Bulletin].

Par. 3. Section 301.7425–3 is amended by revising paragraphs (a)(1), (b)(1), (b)(2), (c)(1), (d)(2), (d)(3), and (d)(4), and adding paragraph (e) to read as follows:

*§301.7425–3 Discharge of Liens; special rules.*

(a) * * * (1) [The text of the proposed amendment for §301.7425–3(a)(1) is the same as the text of §301.7425–3T(a)(1)

published elsewhere in this issue of the Bulletin].

* * * * *

(b) * * * (1) [The text of the proposed amendment for §301.7425–3(b)(1) is the same as the text of §301.7425–3T(b)(1) published elsewhere in this issue of the Bulletin].

(2) [The text of the proposed amendment for §301.7425–3(b)(2) is the same as the text of §301.7425–3T(b)(2) published elsewhere in this issue of the Bulletin].

* * * * *

(c) * * * (1) [The text of the proposed amendment for §301.7425–3(c)(1) is the same as the text of §301.7425–3T(c)(1) published elsewhere in this issue of the Bulletin].

* * * * *

(d) * * *

(2) [The text of the proposed amendment for §301.7425–3(d)(2) is the same as the text of §301.7425–3T(d)(2) published elsewhere in this issue of the Bulletin].

(3) [The text of the proposed amendment for §301.7425–3(d)(3) is the same as the text of §301.7425–3T(d)(3) published elsewhere in this issue of the Bulletin].

(4) [The text of the proposed amendment for §301.7425–3(d)(4) is the same as the text of §301.7425–3T(d)(4) published elsewhere in this issue of the Bulletin].

(e) [The text of the proposed amendment for §301.7425–3(e) is the same as the text of §301.7425–3T(e) published elsewhere in this issue of the Bulletin].

Kevin M. Brown,
*Deputy Commissioner for Services and Enforcement.*

(Filed by the Office of the Federal Register on July 19, 2007, 8:45 a.m., and published in the issue of the Federal Register for July 20, 2007, 72 F.R. 39771)

---

**Notice of Proposed Rulemaking and Notice of Public Hearing**

## Section 67 Limitations on Estates or Trusts

### REG–128224–06

AGENCY: Internal Revenue Service (IRS), Treasury.

ACTION: Notice of proposed rulemaking and notice of public hearing.

SUMMARY: This document contains proposed regulations that provide guidance on which costs incurred by estates or non-grantor trusts are subject to the 2-percent floor for miscellaneous itemized deductions under section 67(a). The regulations will affect estates and non-grantor trusts. This document also provides notice of a public hearing on these proposed regulations.

DATES: Written and electronic comments must be received by October 25, 2007. Outlines of topics to be discussed at the public hearing scheduled for November 14, 2007 must be received by October 24, 2007.

ADDRESSES: Send submissions to CC:PA:LPD:PR (REG–128224–06), room 5203, Internal Revenue Service, PO Box 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand-delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to CC:PA:LPD:PR (REG–128224–06), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue, N.W., Washington, DC, or sent electronically via the Federal eRulemaking Portal at *http://www.regulations.gov/* (indicate IRS and REG–128224–06). The public hearing will be held in the IRS Auditorium, Internal Revenue Building, 1111 Constitution Avenue, N.W., Washington, DC.

FOR FURTHER INFORMATION CONTACT: Concerning the proposed regulations, Jennifer N. Keeney, (202) 622–3060; concerning submissions of comments, the hearing, or to be placed on the building access list to attend the hearing, Richard A. Hurst, (202) 622–7180 (not toll-free numbers).

SUPPLEMENTARY INFORMATION:

**Background**

This document contains proposed amendments to 26 CFR part 1. Section 67(a) of the Internal Revenue Code (Code) provides that, for an individual taxpayer, miscellaneous itemized deductions are allowed only to the extent that the aggregate of those deductions exceeds 2 percent of

adjusted gross income. Section 67(b) excludes certain itemized deductions from the definition of "miscellaneous itemized deductions". Section 67(e) provides that, for purposes of section 67, the adjusted gross income of an estate or trust shall be computed in the same manner as in the case of an individual. However, section 67(e)(1) provides that the deductions for costs paid or incurred in connection with the administration of the estate or trust and which would not have been incurred if the property were not held in such estate or trust shall be treated as allowable in arriving at adjusted gross income. Therefore, deductions described in section 67(e)(1) are not subject to the 2-percent floor for miscellaneous itemized deductions under section 67(a).

United States courts of appeals have interpreted the language of section 67(e)(1) differently in determining whether costs incurred by trustees are subject to the 2-percent floor. The issue in each case has been whether the trust's costs (specifically, investment advisory fees) "would not have been incurred if the property were not held in such trust or estate." *O'Neill v. Commissioner*, 994 F.2d 302 (6th Cir. 1993), the Court of Appeals for the Sixth Circuit held that investment advisory fees paid for professional investment services were fully deductible under section 67(e)(1) where the trustees lacked experience in managing large sums of money. The court found that, under state law, the trustee was required to engage an investment advisor to meet its fiduciary obligations and to incur fees that the trust would not have incurred if the property were not held in trust. The court held that estate or trust expenditures that are necessary to meet specific fiduciary obligations under state law are not subject to the 2-percent floor. In contrast, in *Mellon Bank, N.A. v. United States*, 265 F.3d 1275 (Fed. Cir. 2001), *Scott v. United States*, 328 F.3d 132 (4th Cir. 2003), and *Rudkin v. Commissioner*, 467 F.3d 149 (2d Cir. 2006), the courts held that investment advisory fees are subject to the 2-percent floor. These courts read the language of section 67(e)(1) differently than the Sixth Circuit. Specifically, the courts in *Scott* and *Mellon Bank* concluded that a trust expense is subject to the 2-percent floor if it is an expense "commonly" or "customarily" incurred by individuals; and the

court in *Rudkin* looked to whether such an expense was "peculiar to trusts" and "could not" be incurred by an individual.

The result of this lack of consistency in the case law is that the deductions of similarly situated taxpayers may or may not be subject to the 2-percent floor, depending upon the jurisdiction in which the executor or the trustee is located. The IRS and the Treasury Department believe that similarly situated taxpayers should be treated consistently by having section 67(e)(1) construed and applied in the same way in all jurisdictions. The proposed regulations are intended to provide a uniform standard for identifying the types of costs that are not subject to the 2-percent floor under section 67(e)(1).

**Explanation of Provisions**

These proposed regulations provide that costs incurred by estates or non-grantor trusts that are unique to an estate or trust are not subject to the 2-percent floor. For this purpose, a cost is unique to an estate or trust if an individual could not have incurred that cost in connection with property not held in an estate or trust. To the extent that expenses paid or incurred by an estate or non-grantor trust do not meet this standard, they are subject to the 2-percent floor of section 67(a). (Neither section 67 nor this rule applies to expenses that are excluded under section 67(b) from the definition of miscellaneous itemized deductions, or to expenses related to a trade or business.)

Under the proposed regulations, whether costs are subject to the 2-percent floor on miscellaneous itemized deductions depends on the type of services provided, rather than on taxpayer characterizations or labels for such services. Thus, taxpayers may not circumvent the 2-percent floor by "bundling" investment advisory fees and trustees' fees into a single fee. The regulations provide that, if an estate or non-grantor trust pays a single fee that includes both costs that are unique to estates and trusts and costs that are not, then the estate or non-grantor trust must use a reasonable method to allocate the single fee between the two types of costs. The regulations also provide a non-exclusive list of services for which the cost is either exempt from or subject to the 2-percent floor. The IRS and the Treasury

Department invite comments on whether any safe harbors or other guidance, concerning allocation methods or otherwise, would be helpful.

**Proposed Effective Date**

The regulations, as proposed, apply to payments made after the date final regulations are published in **Federal Register**.

**Special Analyses**

It has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations, and because these regulations do not impose a collection of information on small entities, the Regulatory Flexibility Act (5 U.S.C. chapter 6) does not apply. Therefore, a Regulatory Flexibility Analysis is not required. Pursuant to section 7805(f) of the Code, this notice of proposed rulemaking has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

**Comments and Public Hearing**

Before these proposed regulations are adopted as final regulations, consideration will be given to any written (a signed original and eight (8) copies) or electronic comments that are submitted timely to the IRS. The IRS and Treasury Department request comments on the proposed rules, as well as their clarity and how they can be made easier to understand. All comments will be available for public inspection and copying.

A public hearing has been scheduled for November 14, 2007, beginning at 10 a.m. in the IRS Auditorium, Internal Revenue Building, 1111 Constitution Avenue, N.W., Washington, DC. Due to building security procedures, visitors must enter at the Constitution Avenue entrance. In addition, all visitors must present photo identification to enter the building. Because of access restrictions, visitors will not be admitted beyond the immediate entrance area more than 15 minutes before the hearing starts. For information about

having your name placed on the building access list to attend the hearing, see the FOR FURTHER INFORMATION CONTACT section of this preamble.

The rules of 26 CFR 601.601(a)(3) apply to the hearing. Persons who wish to present oral comments at the hearing must submit written or electronic comments and an outline of the topics to be discussed and the time to be devoted to each topic (signed original and eight (8) copies) by October 24, 2007. A period of 10 minutes will be allotted to each person for making comments. An agenda showing the schedule of speakers will be prepared after the deadline for receiving outlines has passed. Copies of the agenda will be available free of charge at the hearing.

**Drafting Information**

The principal author of these regulations is Jennifer N. Keeney, Office of the Office of Associate Chief Counsel (Passthroughs and Special Industries).

* * * * *

**Proposed Amendments to the Regulations**

Accordingly, 26 CFR part 1 is proposed to be amended as follows:

PART 1—INCOME TAXES

Paragraph 1. The authority citation for part 1 continues to read in part as follows:

Authority: 26 U.S.C. 7805 * * *

Par. 2. Section 1.67–4 is added to read as follows:

*§1.67–4 Costs paid or incurred by estates or non-grantor trusts.*

(a) *In general.* Section 67(e) provides an exception to the 2-percent floor on miscellaneous itemized deductions for costs that are paid or incurred in connection with the administration of an estate or a trust not described in §1.67–2T(g)(1)(i) (a non-grantor trust) and which would not have been incurred if the property were not held in such estate or trust. To the extent that a cost incurred by an estate or non-grantor trust is unique to such an entity, that cost is not subject to the 2-percent floor on miscellaneous itemized deductions. To the extent that a cost included in the definition of miscellaneous itemized deductions and incurred by an estate or non-grantor trust is not unique to such an entity, that cost is subject to the 2-percent floor.

(b) *Unique.* For purposes of this section, a cost is unique to an estate or a non-grantor trust if an individual could not have incurred that cost in connection with property not held in an estate or trust. In making this determination, it is the type of product or service rendered to the estate or trust, rather than the characterization of the cost of that product or service, that is relevant. A non-exclusive list of products or services that are unique to an estate or trust includes those rendered in connection with: fiduciary accountings; judicial or quasi-judicial filings required as part of the administration of the estate or trust; fiduciary income tax and estate tax returns; the division or distribution of income or corpus to or among beneficiaries; trust or will contest or construction; fiduciary bond premiums; and communications with beneficiaries regarding estate or trust matters. A non-exclusive list of products or services that are not unique to an estate or trust, and therefore are subject to the 2-percent floor, includes those rendered in connection with: custody or management of property; advice on investing for total return; gift tax returns; the defense of claims by creditors of the decedent or grantor; and the purchase, sale, maintenance, repair, insurance or management of non-trade or business property.

(c) *"Bundled fees".* If an estate or a non-grantor trust pays a single fee, commission or other expense for both costs that are unique to estates and trusts and costs that are not, then the estate or non-grantor trust must identify the portion (if any) of the legal, accounting, investment advisory, appraisal or other fee, commission or expense that is unique to estates and trusts and is thus not subject to the 2-percent floor. The taxpayer must use any reasonable method to allocate the single fee, commission or expense between the costs unique to estates and trusts and other costs.

(d) *Effective/applicability date.* These regulations are proposed to be effective for payments made after the date final regulations are published in **Federal Register**.

Kevin M. Brown,
*Deputy Commissioner for Services and Enforcement.*

(Filed by the Office of the Federal Register on July 26, 2007, 8:45 a.m., and published in the issue of the Federal Register for July 27, 2007, 72 F.R. 41243)

# Announcement of Disciplinary Actions Involving Attorneys, Certified Public Accountants, Enrolled Agents, and Enrolled Actuaries — Reinstatements, Suspensions, Censures, Disbarments, and Resignations

## Announcement 2007-72

Under Title 31, Code of Federal Regulations, Part 10, attorneys, certified public accountants, enrolled agents, and enrolled actuaries may not accept assistance from, or assist, any person who is under disbarment or suspension from practice before the Internal Revenue Service if the assistance relates to a matter constituting practice before the Internal Revenue Service and may not knowingly aid or abet another person to practice before the Internal Revenue Service during a period of suspension, disbarment, or ineligibility of such other person.

To enable attorneys, certified public accountants, enrolled agents, and enrolled actuaries to identify persons to whom these restrictions apply, the Director, Office of Professional Responsibility, will announce in the Internal Revenue Bulletin their names, their city and state, their professional designation, the effective date of disciplinary action, and the period of suspension. This announcement will appear in the weekly Bulletin at the earliest practicable date after such action and will continue to appear in the weekly Bulletins for five successive weeks.

# Reinstatement To Practice Before the Internal Revenue Service

Under Title 31, Code of Federal Regulations, Part 10, The Director, Office of Professional Responsibility, may entertain a petition for reinstatement for any attorney, certified public accountant, enrolled agent, or enrolled actuary censured, suspended, or disbarred, from practice before the Internal Revenue Service.

The following individuals' eligibility to practice before the Internal Revenue Service has been restored:

| Name | Address | Designation | Date of Reinstatement |
|------|---------|-------------|----------------------|
| Mollo, Charles W. | Anaheim, CA | EA | December 1, 2004 |
| Price, Richard A. | Novato, CA | CPA | April 29, 2005 |
| Reyes, Ruperto D. | Placentia, CA | CPA | December 8, 2005 |
| Schwartz, Kenneth J. | West Hills, CA | Attorney | February 28, 2006 |
| McCarthy III, William P. | Sacramento, CA | EA | March 10, 2006 |
| Deen, Mae T. | Salinas, CA | EA | April 16, 2006 |
| Banks, Jean R. | Van Nuys, CA | EA | December 6, 2006 |
| Eckstein, Matthew | Woodbury, NY | CPA | March 14, 2007 |
| Cunningham, William | Philadelphia, PA | CPA | March 31, 2007 |
| Ganz, Sheldon M. | Great Neck, NY | CPA | April 19, 2007 |
| Smith, Sean M. | Kensington, MD | Enrolled Agent | April 27, 2007 |
| Frascella, Russell B. | Pound Ridge, NY | CPA | April 27, 2007 |
| Lamont, Alice | Atlanta, GA | CPA | May 4, 2007 |
| Carroccio, Ronald P. | Staten Island, NY | CPA | May 15, 2007 |
| Cohen, Ronald J. | Cornwall, NY | Attorney | June 21, 2007 |
| Troese, Jr., Henry A. | Clarion, PA | Enrolled Agent | June 25, 2007 |

| Name | Address | Designation | Date of Reinstatement |
|------|---------|-------------|----------------------|
| Jacob, Robert T. | Tucson, AZ | Enrolled Agent | June 27, 2007 |
| Simontacchi, Joseph F. | Rockaway, NJ | CPA | July 3, 2007 |
| Kimes, Larry W. | Irving, TX | CPA | July 6, 2007 |

# Consent Suspensions From Practice Before the Internal Revenue Service

Under Title 31, Code of Federal Regulations, Part 10, an attorney, certified public accountant, enrolled agent, or enrolled actuary, in order to avoid the institution or conclusion of a proceeding for his or her disbarment or suspension from practice before the Internal Revenue Service, may offer his or her consent to suspension from such practice. The Director, Office of Professional Responsibility, in his discretion, may suspend an attorney, certified public accountant, enrolled agent, or enrolled actuary in accordance with the consent offered.

The following individuals have been placed under consent suspension from practice before the Internal Revenue Service:

| Name | Address | Designation | Date of Suspension |
|------|---------|-------------|-------------------|
| Caplan, Howard A. | Ocean, NJ | CPA | Indefinite from April 1, 2007 |
| Tow, Marc R. | Newport Beach, CA | Attorney | Indefinite from April 1, 2007 |
| Pyburn, Richard E. | Downers Grove, IL | CPA | Indefinite from April 9, 2007 |
| Cook, Jack D. | South Haven, MI | CPA | Indefinite from April 17, 2007 |
| Serban, Daniel E. | Roanoke, IN | Attorney | Indefinite from April 19, 2007 |
| Wentz, Debora B. | Newton, NC | CPA | Indefinite from April 19, 2007 |
| Ferguson, Duane F. | Upland, CA | CPA | Indefinite from May 1, 2007 |
| Mulrey, Robert M. | Milton, MA | CPA | Indefinite from May 1, 2007 |
| Colasuonno, Philip V. | New Rochelle, NY | CPA | Indefinite from May 23, 2007 |
| Bankston, David A. | Land O Lakes, FL | CPA | Indefinite from June 1, 2007 |

| Name | Address | Designation | Date of Suspension |
|---|---|---|---|
| Nagy, Robert J. | Charleston, SC | CPA | Indefinite from June 1, 2007 |
| Wallen, David G. | Beckley, WV | CPA | Indefinite from June 15, 2007 |
| Rudick, Josephine M. | Bear Creek, PA | Enrolled Agent | Indefinite from June 25, 2007 |
| Iglesias, Jorge E. | Roswell, GA | CPA | Indefinite from July 1, 2007 |
| Raimer, Russell B. | Brecksville, OH | CPA | Indefinite from July 1, 2007 |
| Stancukas, Stanley J. | Forth Worth, TX | CPA | Indefinite from July 1, 2007 |

# Expedited Suspensions From Practice Before the Internal Revenue Service

Under Title 31, Code of Federal Regulations, Part 10, the Director, Office of Professional Responsibility, is authorized to immediately suspend from practice before the Internal Revenue Service any practitioner who, within five years from the date the expedited proceeding is instituted (1) has had a license to practice as an attorney, certified public accountant, or actuary suspended or revoked for cause or (2) has been convicted of certain crimes.

The following individuals have been placed under suspension from practice before the Internal Revenue Service by virtue of the expedited proceeding provisions:

| Name | Address | Designation | Date of Suspension |
|---|---|---|---|
| Barach, Malcolm J. | Brookline, MA | Attorney | Indefinite from March 9, 2007 |
| Cox, Marlisa R. | Oklahoma City, OK | CPA | Indefinite from April 2, 2007 |
| Artis, Paris A. | Newberry, FL | Attorney | Indefinite from April 13, 2007 |
| Blackadar, Christine M. | Center Harbor, NH | Attorney | Indefinite from April 13, 2007 |
| Brelje, Brian J. | Laguna Beach, CA | CPA | Indefinite from April 13, 2007 |

| Name | Address | Designation | Date of Suspension |
|------|---------|-------------|--------------------|
| Decker, Craig A. | Mesa, AZ | Attorney | Indefinite from April 13, 2007 |
| House, Stephen M. | Nevada City, CA | CPA | Indefinite from April 13, 2007 |
| Laird, James J. | San Ramon, CA | CPA | Indefinite from April 13, 2007 |
| Milner, Dennis V. | Dublin, CA | Attorney | Indefinite from April 13, 2007 |
| Nutt, Jeremy C. | Forth Worth, TX | Attorney | Indefinite from April 13, 2007 |
| Picl, Frank M. | Peoria, IL | Attorney | Indefinite from April 13, 2007 |
| Britt, Jerry U. | Mount Olive, NC | CPA | Indefinite from April 19, 2007 |
| Lee, Janell M. | Oakland, CA | CPA | Indefinite from April 19, 2007 |
| Baker, Sean W. | Elkridge, MD | Attorney | Indefinite from April 30, 2007 |
| Brett, Stephen M. | York Beach, ME | Attorney | Indefinite from April 30, 2007 |
| Donahue, Richard K. | Lowell, MA | CPA | Indefinite from April 30, 2007 |
| Frank, Mack I. | Eunice, LA | Attorney | Indefinite from April 30, 2007 |
| Leung, Elsie Y. | Pasadena, CA | CPA | Indefinite from April 30, 2007 |
| Pearlman, Stephen E. | Dix Hills, NY | Attorney | Indefinite from April 30, 2007 |
| Peer, Jameelah | Waimanalo, HI | Attorney | Indefinite from April 30, 2007 |

| Name | Address | Designation | Date of Suspension |
|------|---------|-------------|--------------------|
| Riskowski, Patrick T. | Omaha, NE | Attorney | Indefinite from April 30, 2007 |
| Schumacher, Mary M. | Dubuque, IA | Attorney | Indefinite from April 30, 2007 |
| DeVaughn, Donald L. | Plainview, MN | Attorney | Indefinite from May 1, 2007 |
| Waggle, Stephen L. | Los Banos, CA | CPA | Indefinite from May 24, 2007 |
| Nefsky, Melvyn I. | Los Angeles, CA | CPA | Indefinite from June 11, 2007 |
| Neuendorf, Louis E. | Sandwich, IL | Attorney | Indefinite from June 11, 2007 |
| Thomas, Scott C. | Parker, CO | Attorney | Indefinite from June 11, 2007 |
| Todd, Donald J. | South Holland, IL | CPA | Indefinite from June 11, 2007 |
| Winrow, Wayne | Emeryville, CA | Attorney | Indefinite from June 11, 2007 |
| Cannon, Todd R. | Florence, CO | Attorney | Indefinite from June 12, 2007 |
| Hester, Karen H. | Overland Park, KS | Attorney | Indefinite from June 25, 2007 |
| Denman, Dwight E. | Dallas, TX | Attorney | Indefinite from June 25, 2007 |
| Korcan, Barry | Loretto, PA | CPA | Indefinite from June 25, 2007 |
| Lloyd, Max C. | South Jordan, UT | CPA | Indefinite from June 25, 2007 |
| White, Lanny R. | Lindon, UT | CPA | Indefinite from June 25, 2007 |
| Bjorklund, Dennis A. | Coralville, IA | Attorney | Indefinite from June 28, 2007 |

| Name | Address | Designation | Date of Suspension |
|------|---------|-------------|--------------------|
| Noel, Robert | Fairfield, CA | Attorney | Indefinite from June 28, 2007 |
| Sanger, Susan L. | Greenwood Village, CO | Attorney | Indefinite from June 28, 2007 |
| Shatzen, Robert S. | Beaverton, OR | Attorney | Indefinite from June 28, 2007 |
| Stevenson, Albert D. | Olive Branch, MS | CPA | Indefinite from June 28, 2007 |
| Van Beek, Andrea | Orange City, IA | Attorney | Indefinite from June 28, 2007 |
| Sojcher, Stuart H. | Winchester, MA | Attorney | Indefinite from July 3, 2007 |
| Estrada, Severo C. | San Jose, CA | CPA | Indefinite from July 3, 2007 |
| Ferguson, Robert E. | Salt Point, NY | Attorney | Indefinite from July 3, 2007 |
| Wickenkamp, Mary C. | Denison, TX | Attorney | Indefinite from July 3, 2007 |

# Suspensions From Practice Before the Internal Revenue Service After Notice and an Opportunity for a Proceeding

Under Title 31, Code of Federal Regulations, Part 10, after notice and an opportunity for a proceeding before an administrative law judge, the following individuals have been placed under suspension from practice before the Internal Revenue Service:

| Name | Address | Designation | Effective Date |
|------|---------|-------------|----------------|
| Cettomai, Joseph W. | Rootstown, OH | CPA | Indefinite from April 19, 2007 |

# Disbarments From Practice Before the Internal Revenue Service After Notice and an Opportunity for a Proceeding

Under Title 31, Code of Federal Regulations, Part 10, after notice and an opportunity for a proceeding before an administrative law judge, the following individuals have been disbarred from practice before the Internal Revenue Service:

| Name | Address | Designation | Effective Date |
|------|---------|-------------|----------------|
| Haynes, Scott Y. | Valdosta, GA | CPA | March 19, 2007 |

# Censure Issued by Consent

Under Title 31, Code of Federal Regulations, Part 10, in lieu of a proceeding being instituted or continued, an attorney, certified public accountant, enrolled agent, or enrolled actuary, may offer his or her consent to the issuance of a censure. Censure is a public reprimand.

The following individuals have consented to the issuance of a Censure:

| Name | Address | Designation | Date of Censure |
|------|---------|-------------|-----------------|
| Lyons, John K. | Dingmans Ferry, PA | Attorney | April 4, 2007 |
| Bowman, T. Hardie | Corpus Christi, TX | CPA | May 23, 2007 |
| Kofford, Brian T. | Provo, UT | CPA | June 12, 2007 |

# Resignations of Enrolled Agents

Under Title 31, Code of Federal Regulations, Part 10, an enrolled agent, in order to avoid the institution or conclusion of a proceeding for his or her disbarment or suspension from practice before the Internal Revenue Service, may offer his or her resignation as an enrolled agent. The Director, Office of Professional Responsibility, in his discretion, may accept the offered resignation.

The Director, Office of Professional Responsibility, has accepted offers of resignation as an enrolled agent from the following individuals:

| Name | Address | Date of Resignation |
|------|---------|---------------------|
| Hancock, William H. | Plant City, FL | April 10, 2007 |

---

## Deletions From Cumulative List of Organizations Contributions to Which are Deductible Under Section 170 of the Code

### Announcement 2007–76

The names of organizations that no longer qualify as organizations described in section 170(c)(2) of the Internal Revenue Code of 1986 are listed below.

Generally, the Service will not disallow deductions for contributions made to a listed organization on or before the date of announcement in the Internal Revenue Bulletin that an organization no longer qualifies. However, the Service is not precluded from disallowing a deduction for any contributions made after an organization ceases to qualify under section 170(c)(2) if the organization has not timely filed a suit for declaratory judgment under section 7428 and if the contributor (1) had knowledge of the revocation of the ruling or determination letter, (2) was aware that such revocation was imminent, or (3) was in part responsible for or was aware of the activities or omissions of the organization that brought about this revocation.

If on the other hand a suit for declaratory judgment has been timely filed, contributions from individuals and organizations described in section 170(c)(2) that are otherwise allowable will continue to be deductible. Protection under section 7428(c) would begin on September 4, 2007, and would end on the date the court first determines that the organization is not described in section 170(c)(2) as more particularly set forth in section 7428(c)(1). For individual contributors, the maximum deduction protected is $1,000, with a husband and wife treated as one contributor. This benefit is not extended to any individual, in whole or in part, for the acts or

omissions of the organization that were the basis for revocation.

Progressive Services, Inc.
  Norman, OK
Harold Binstein Humanitarian Fund
  Chicago, IL

Say No to Drugs
  Greenville, TX
Shamrock Boxing, Inc.
  Covington, KY
National Home Foundation, Inc.
  Rockville, MD

Business & Nonprofit Center
  of Eastern Madera County
  Fresno, CA

# Definition of Terms

*Revenue rulings and revenue procedures (hereinafter referred to as "rulings") that have an effect on previous rulings use the following defined terms to describe the effect:*

*Amplified* describes a situation where no change is being made in a prior published position, but the prior position is being extended to apply to a variation of the fact situation set forth therein. Thus, if an earlier ruling held that a principle applied to A, and the new ruling holds that the same principle also applies to B, the earlier ruling is amplified. (Compare with *modified*, below).

*Clarified* is used in those instances where the language in a prior ruling is being made clear because the language has caused, or may cause, some confusion. It is not used where a position in a prior ruling is being changed.

*Distinguished* describes a situation where a ruling mentions a previously published ruling and points out an essential difference between them.

*Modified* is used where the substance of a previously published position is being changed. Thus, if a prior ruling held that a principle applied to A but not to B, and the new ruling holds that it applies to both A and B, the prior ruling is modified because it corrects a published position. (Compare with *amplified* and *clarified*, above).

*Obsoleted* describes a previously published ruling that is not considered determinative with respect to future transactions. This term is most commonly used in a ruling that lists previously published rulings that are obsoleted because of changes in laws or regulations. A ruling may also be obsoleted because the substance has been included in regulations subsequently adopted.

*Revoked* describes situations where the position in the previously published ruling is not correct and the correct position is being stated in a new ruling.

*Superseded* describes a situation where the new ruling does nothing more than restate the substance and situation of a previously published ruling (or rulings). Thus, the term is used to republish under the 1986 Code and regulations the same position published under the 1939 Code and regulations. The term is also used when it is desired to republish in a single ruling a series of situations, names, etc., that were previously published over a period of time in separate rulings. If the new ruling does more than restate the substance of a prior ruling, a combination of terms is used. For example, *modified* and *superseded* describes a situation where the substance of a previously published ruling is being changed in part and is continued without change in part and it is desired to restate the valid portion of the previously published ruling in a new ruling that is self contained. In this case, the previously published ruling is first modified and then, as modified, is superseded.

*Supplemented* is used in situations in which a list, such as a list of the names of countries, is published in a ruling and that list is expanded by adding further names in subsequent rulings. After the original ruling has been supplemented several times, a new ruling may be published that includes the list in the original ruling and the additions, and supersedes all prior rulings in the series.

*Suspended* is used in rare situations to show that the previous published rulings will not be applied pending some future action such as the issuance of new or amended regulations, the outcome of cases in litigation, or the outcome of a Service study.

# Abbreviations

*The following abbreviations in current use and formerly used will appear in material published in the Bulletin.*

*A*—Individual.
*Acq.*—Acquiescence.
*B*—Individual.
*BE*—Beneficiary.
*BK*—Bank.
*B.T.A.*—Board of Tax Appeals.
*C*—Individual.
*C.B.*—Cumulative Bulletin.
*CFR*—Code of Federal Regulations.
*CI*—City.
*COOP*—Cooperative.
*Ct.D.*—Court Decision.
*CY*—County.
*D*—Decedent.
*DC*—Dummy Corporation.
*DE*—Donee.
*Del. Order*—Delegation Order.
*DISC*—Domestic International Sales Corporation.
*DR*—Donor.
*E*—Estate.
*EE*—Employee.
*E.O.*—Executive Order.
*ER*—Employer.
*ERISA*—Employee Retirement Income Security Act.
*EX*—Executor.
*F*—Fiduciary.
*FC*—Foreign Country.
*FICA*—Federal Insurance Contributions Act.
*FISC*—Foreign International Sales Company.
*FPH*—Foreign Personal Holding Company.
*F.R.*—Federal Register.
*FUTA*—Federal Unemployment Tax Act.
*FX*—Foreign corporation.
*G.C.M.*—Chief Counsel's Memorandum.
*GE*—Grantee.
*GP*—General Partner.
*GR*—Grantor.
*IC*—Insurance Company.
*I.R.B.*—Internal Revenue Bulletin.
*LE*—Lessee.
*LP*—Limited Partner.
*LR*—Lessor.
*M*—Minor.
*Nonacq.*—Nonacquiescence.
*O*—Organization.
*P*—Parent Corporation.
*PHC*—Personal Holding Company.
*PO*—Possession of the U.S.
*PR*—Partner.
*PRS*—Partnership.
*PTE*—Prohibited Transaction Exemption.
*Pub. L.*—Public Law.
*REIT*—Real Estate Investment Trust.
*Rev. Proc.*—Revenue Procedure.
*Rev. Rul.*—Revenue Ruling.
*S*—Subsidiary.
*S.P.R.*—Statement of Procedural Rules.
*Stat.*—Statutes at Large.
*T*—Target Corporation.
*T.C.*—Tax Court.
*T.D.* —Treasury Decision.
*TFE*—Transferee.
*TFR*—Transferor.
*T.I.R.*—Technical Information Release.
*TP*—Taxpayer.
*TR*—Trust.
*TT*—Trustee.
*U.S.C.*—United States Code.
*X*—Corporation.
*Y*—Corporation.
*Z* —Corporation.

## Numerical Finding List[1]

Bulletins 2007–27 through 2007–36

**Announcements:**

2007-61, 2007-28 I.R.B. *84*
2007-62, 2007-29 I.R.B. *115*
2007-63, 2007-30 I.R.B. *236*
2007-64, 2007-29 I.R.B. *125*
2007-65, 2007-30 I.R.B. *236*
2007-66, 2007-31 I.R.B. *296*
2007-67, 2007-32 I.R.B. *345*
2007-68, 2007-32 I.R.B. *348*
2007-69, 2007-33 I.R.B. *371*
2007-70, 2007-33 I.R.B. *371*
2007-71, 2007-33 I.R.B. *372*
2007-72, 2007-33 I.R.B. *373*
2007-73, 2007-34 I.R.B. *435*
2007-74, 2007-35 I.R.B. *483*
2007-75, 2007-36 I.R.B. *540*
2007-76, 2007-36 I.R.B. *560*

**Notices:**

2007-54, 2007-27 I.R.B. *12*
2007-55, 2007-27 I.R.B. *13*
2007-56, 2007-27 I.R.B. *15*
2007-57, 2007-29 I.R.B. *87*
2007-58, 2007-29 I.R.B. *88*
2007-59, 2007-30 I.R.B. *135*
2007-60, 2007-35 I.R.B. *466*
2007-61, 2007-30 I.R.B. *140*
2007-62, 2007-32 I.R.B. *331*
2007-63, 2007-33 I.R.B. *353*
2007-64, 2007-34 I.R.B. *385*
2007-65, 2007-34 I.R.B. *386*
2007-66, 2007-34 I.R.B. *387*
2007-67, 2007-35 I.R.B. *467*
2007-68, 2007-35 I.R.B. *468*
2007-69, 2007-35 I.R.B. *468*
2007-71, 2007-35 I.R.B. *472*
2007-72, 2007-36 I.R.B. *544*
2007-73, 2007-36 I.R.B. *545*

**Proposed Regulations:**

REG-121475-03, 2007-35 I.R.B. *474*
REG-128274-03, 2007-33 I.R.B. *356*
REG-114084-04, 2007-33 I.R.B. *359*
REG-149036-04, 2007-33 I.R.B. *365*
REG-149036-04, 2007-34 I.R.B. *411*
REG-101001-05, 2007-36 I.R.B. *548*
REG-119097-05, 2007-28 I.R.B. *74*
REG-147171-05, 2007-32 I.R.B. *334*
REG-148951-05, 2007-36 I.R.B. *550*
REG-163195-05, 2007-33 I.R.B. *366*
REG-128224-06, 2007-36 I.R.B. *551*
REG-138707-06, 2007-32 I.R.B. *342*

**Proposed Regulations— Continued:**

REG-139268-06, 2007-34 I.R.B. *415*
REG-142039-06, 2007-34 I.R.B. *415*
REG-144540-06, 2007-31 I.R.B. *296*
REG-103842-07, 2007-28 I.R.B. *79*

**Revenue Procedures:**

2007-42, 2007-27 I.R.B. *15*
2007-43, 2007-27 I.R.B. *26*
2007-44, 2007-28 I.R.B. *54*
2007-45, 2007-29 I.R.B. *89*
2007-46, 2007-29 I.R.B. *102*
2007-47, 2007-29 I.R.B. *108*
2007-48, 2007-29 I.R.B. *110*
2007-49, 2007-30 I.R.B. *141*
2007-50, 2007-31 I.R.B. *244*
2007-51, 2007-30 I.R.B. *143*
2007-52, 2007-30 I.R.B. *222*
2007-53, 2007-30 I.R.B. *233*
2007-54, 2007-31 I.R.B. *293*
2007-55, 2007-33 I.R.B. *354*
2007-56, 2007-34 I.R.B. *388*
2007-57, 2007-36 I.R.B. *547*

**Revenue Rulings:**

2007-42, 2007-28 I.R.B. *44*
2007-43, 2007-28 I.R.B. *45*
2007-44, 2007-28 I.R.B. *47*
2007-45, 2007-28 I.R.B. *49*
2007-46, 2007-30 I.R.B. *126*
2007-47, 2007-30 I.R.B. *127*
2007-48, 2007-30 I.R.B. *129*
2007-49, 2007-31 I.R.B. *237*
2007-50, 2007-32 I.R.B. *311*
2007-57, 2007-36 I.R.B. *531*

**Tax Conventions:**

2007-75, 2007-36 I.R.B. *540*

**Treasury Decisions:**

9326, 2007-31 I.R.B. *242*
9327, 2007-28 I.R.B. *50*
9328, 2007-27 I.R.B. *1*
9329, 2007-32 I.R.B. *312*
9330, 2007-31 I.R.B. *239*
9331, 2007-32 I.R.B. *298*
9332, 2007-32 I.R.B. *300*
9333, 2007-33 I.R.B. *350*
9334, 2007-34 I.R.B. *382*
9335, 2007-34 I.R.B. *380*
9336, 2007-35 I.R.B. *461*
9337, 2007-35 I.R.B. *455*
9338, 2007-35 I.R.B. *463*
9339, 2007-35 I.R.B. *437*
9340, 2007-36 I.R.B. *487*
9341, 2007-35 I.R.B. *449*

**Treasury Decisions— Continued:**

9342, 2007-35 I.R.B. *451*
9343, 2007-36 I.R.B. *533*
9344, 2007-36 I.R.B. *535*
9345, 2007-36 I.R.B. *523*

---

[1] A cumulative list of all revenue rulings, revenue procedures, Treasury decisions, etc., published in Internal Revenue Bulletins 2007–1 through 2007–26 is in Internal Revenue Bulletin 2007–26, dated June 25, 2007.

## Finding List of Current Actions on Previously Published Items[1]

Bulletins 2007–27 through 2007–36

### Announcements:

**84-26**
Obsoleted by
T.D. 9336, 2007-35 I.R.B. *461*

**84-37**
Obsoleted by
T.D. 9336, 2007-35 I.R.B. *461*

### Notices:

**2003-81**
Modified and supplemented by
Notice 2007-71, 2007-35 I.R.B. *472*

**2006-43**
Modified by
T.D. 9332, 2007-32 I.R.B. *300*

**2006-89**
Modified by
Notice 2007-67, 2007-35 I.R.B. *467*

**2007-3**
Modified by
Notice 2007-69, 2007-35 I.R.B. *468*

**2007-26**
Modified by
Notice 2007-56, 2007-27 I.R.B. *15*

### Proposed Regulations:

**REG-157711-02**
Corrected by
Ann. 2007-74, 2007-35 I.R.B. *483*

**REG-109367-06**
Hearing scheduled by
Ann. 2007-66, 2007-31 I.R.B. *296*

**REG-143601-06**
Corrected by
Ann. 2007-71, 2007-33 I.R.B. *372*

### Revenue Procedures:

**90-27**
Superseded by
Rev. Proc. 2007-52, 2007-30 I.R.B. *222*

**95-28**
Superseded by
Rev. Proc. 2007-54, 2007-31 I.R.B. *293*

**97-14**
Modified and superseded by
Rev. Proc. 2007-47, 2007-29 I.R.B. *108*

### Revenue Procedures— Continued:

**2002-9**
Modified and amplified by
Rev. Proc. 2007-48, 2007-29 I.R.B. *110*
Rev. Proc. 2007-53, 2007-30 I.R.B. *233*

**2004-42**
Superseded by
Notice 2007-59, 2007-30 I.R.B. *135*

**2005-16**
Modified by
Rev. Proc. 2007-44, 2007-28 I.R.B. *54*

**2005-27**
Superseded by
Rev. Proc. 2007-56, 2007-34 I.R.B. *388*

**2005-66**
Clarified, modified, and superseded by
Rev. Proc. 2007-44, 2007-28 I.R.B. *54*

**2006-25**
Superseded by
Rev. Proc. 2007-42, 2007-27 I.R.B. *15*

**2006-27**
Modified by
Rev. Proc. 2007-49, 2007-30 I.R.B. *141*

**2006-33**
Superseded by
Rev. Proc. 2007-51, 2007-30 I.R.B. *143*

**2006-55**
Superseded by
Rev. Proc. 2007-43, 2007-27 I.R.B. *26*

**2007-4**
Modified by
Notice 2007-69, 2007-35 I.R.B. *468*

**2007-15**
Superseded by
Rev. Proc. 2007-50, 2007-31 I.R.B. *244*

### Revenue Rulings:

**74-299**
Amplified by
Rev. Rul. 2007-48, 2007-30 I.R.B. *129*

**89-96**
Amplified by
Rev. Rul. 2007-47, 2007-30 I.R.B. *127*

**92-17**
Modified by
Rev. Rul. 2007-42, 2007-28 I.R.B. *44*

**2001-48**
Modified by
T.D. 9332, 2007-32 I.R.B. *300*

### Treasury Decisions:

**9321**
Corrected by
Ann. 2007-68, 2007-32 I.R.B. *348*

---

[1] A cumulative list of current actions on previously published items in Internal Revenue Bulletins 2007–1 through 2007–26 is in Internal Revenue Bulletin 2007–26, dated June 25, 2007.



**U.S. GOVERNMENT PRINTING OFFICE**
KEEPING AMERICA INFORMED

Order Processing Code:
3465

Easy Secure Internet:
bookstore.gpo.gov

## Internal Revenue Cumulative Bulletins Publications and Subscription Order Form

Toll Free: 866 512-1800
DC Area:  202 512-2800
Fax:      202 512-2250

Mail: Superintendent of Documents
P.O. Box 371954
Pittsburgh, PA 15250-7954

### Publications

| Qty. | Stock Number | Title | Price Each | Total Price |
|---|---|---|---|---|
| | 048-004-02467-5 | Cum. Bulletin 1999-3 | 20.40 | |
| | 048-004-02462-4 | Cum. Bulletin 2001-2 (Jul-Dec) | 24.00 | |
| | 048-004-02480-2 | Cum. Bulletin 2001-3 | 71.00 | |
| | 048-004-02470-5 | Cum. Bulletin 2002-2 (Jul-Dec) | 28.80 | |
| | 048-004-02486-1 | Cum. Bulletin 2002-3 | 54.00 | |
| | 048-004-02483-7 | Cum. Bulletin 2004-2 (July-Dec) | 54.00 | |
| | 048-004-02488-8 | Cum. Bulletin 2005-2 | 56.00 | |
| | | **Total for Publications** | | |

### Subscriptions

| Qty. | List ID | Title | Price Each | Total Price |
|---|---|---|---|---|
| | IRS | Internal Revenue Bulletin | $247 | |
| | | Optional – Add $50 to open Deposit Account | | |
| | | **Total for Subscriptions** | | |
| | | **Total for Publications and Subscriptions** | | |

**NOTE:** Price includes regular shipping and handling and is subject to change. International customers please add 40 percent.

  

### Check method of payment:

☐ Check payable to Superintendent of Documents

☐ SOD Deposit Account [ ][ ][ ][ ][ ][ ][ ]—[ ]

☐ VISA   ☐ MasterCard   ☐ Discover/Novus   ☐ American Express

[ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ][ ]

[ ][ ][ ][ ] (expiration date)     *Thank you for your Order!*

_____
Authorizing signature                        06/06

_____
Company or personal name        (Please type or print)

_____
Additional address/attention line

_____
Street address

_____
City, State, Zip Code

_____
E-mail address

_____
Daytime phone including area code

_____
Purchase order number (optional)

### Standing Order Service*

To automatically receive future editions of *Internal Revenue Cumulative Bulletins* without having to initiate a new purchase order, sign below for Standing Order Service.

| Qty. | Standing Order | Title |
|---|---|---|
| | ZIRSC | Internal Revenue Cumulative Bulletins |

#### Authorization

I hereby authorize the Superintendent of Documents to charge my account for Standing Order Service:

(enter account information at right)

☐ VISA ☐ MasterCard ☐ Discover/NOVUS ☐ American Express

☐ Superintendent of Documents (SOD) Deposit Account

Authorizing signature (Standing orders not valid unless signed.)

_____

Please print or type your name.

Daytime phone number (_____) _____

#### SuDocs Deposit Account

A Deposit Account will enable you to use Standing Order Service to receive subsequent volumes quickly and automatically. For an initial deposit of $50 you can establish your Superintendent of Documents Deposit Account.

☐ **YES!** Open a SOD Deposit Account for me so I can order future publications quickly and easily.
I am enclosing the $50 initial deposit.

---

*Standing Order Service
Just sign the authorization above to charge selected items to your existing Deposit Account, VISA or MasterCard, Discover/NOVUS, or American Express account. Or open a Deposit Account with an initial deposit of $50 or more. Your account will be charged only as each volume is issued and mailed. Sufficient money must be kept in your account to insure that items are shipped. Service begins with the next issue released of each item you select.

You will receive written acknowledgement for each item you choose to receive by Standing Order Service.
If you wish to cancel your Standing Order Service, please notify the Superintendent of Documents in writing (telephone cancellations are accepted, but must be followed up with a written cancellation within 10 days).

**Important:** Please include this completed order form with your payment.

# INTERNAL REVENUE BULLETIN

The Introduction at the beginning of this issue describes the purpose and content of this publication. The weekly Internal Revenue Bulletin is sold on a yearly subscription basis by the Superintendent of Documents. Current subscribers are notified by the Superintendent of Documents when their subscriptions must be renewed.

# CUMULATIVE BULLETINS

The contents of this weekly Bulletin are consolidated semiannually into a permanent, indexed, Cumulative Bulletin. These are sold on a single copy basis and *are not* included as part of the subscription to the Internal Revenue Bulletin. Subscribers to the weekly Bulletin are notified when copies of the Cumulative Bulletin are available. Certain issues of Cumulative Bulletins are out of print and are not available. Persons desiring available Cumulative Bulletins, which are listed on the reverse, may purchase them from the Superintendent of Documents.

# ACCESS THE INTERNAL REVENUE BULLETIN ON THE INTERNET

You may view the Internal Revenue Bulletin on the Internet at www.irs.gov. Under information for: select Businesses. Under related topics, select More Topics. Then select Internal Revenue Bulletins.

# INTERNAL REVENUE BULLETINS ON CD-ROM

Internal Revenue Bulletins are available annually as part of Publication 1796 (Tax Products CD-ROM). The CD-ROM can be purchased from National Technical Information Service (NTIS) on the Internet at www.irs.gov/cdorders (discount for online orders) or by calling 1-877-233-6767. The first release is available in mid-December and the final release is available in late January.

# HOW TO ORDER

Check the publications and/or subscription(s) desired on the reverse, complete the order blank, enclose the proper remittance, detach entire page, and mail to the Superintendent of Documents, P.O. Box 371954, Pittsburgh PA, 15250–7954. Please allow two to six weeks, plus mailing time, for delivery.

# WE WELCOME COMMENTS ABOUT THE INTERNAL REVENUE BULLETIN

If you have comments concerning the format or production of the Internal Revenue Bulletin or suggestions for improving it, we would be pleased to hear from you. You can e-mail us your suggestions or comments through the IRS Internet Home Page (www.irs.gov) or write to the IRS Bulletin Unit, SE:W:CAR:MP:T:T:SP, Washington, DC 20224

## Internal Revenue Service
## Washington, DC 20224

Official Business
Penalty for Private Use, $300